# EXHIBIT

3

**U.S. District Court**
**Northern District of Georgia (Atlanta)**
**CIVIL DOCKET FOR CASE #: 1:23-cv-05392-SEG**

1925 Hooper LLC et al v. The National Association of Realtors et al
Assigned to: Judge Sarah E. Geraghty
Cause: 15:1 Antitrust Litigation

Date Filed: 11/22/2023
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

**Plaintiff**

**Janet Phillips**
*TERMINATED: 12/06/2023*

represented by **Bryan M. Knight**
Knight Palmer, LLC
1360 Peachtree St NE
Suite 1201
Atlanta, GA 30309
404-228-4822
Email: bknight@knightpalmerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan Palmer**
Knight Palmer, LLC
1360 Peachtree St NE
Ste 1201
Atlanta, GA 30309
404-228-4822
Fax: 404-228-4821
Email: jpalmer@knightpalmerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Yehuda Joel**
Kabat Chapman Ozmer LLP
171 17th Street NW
Ste 1550
Atlanta, GA 30363
404-400-7300
Email: jjoel@kcozlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan David Chapman**
Kabat Chapman & Ozmer LLP
171 17th Street NW
Suite 1550
Atlanta, GA 30363
404-400-7300
Fax: 404-400-7333
Email: nchapman@kcozlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Tivy Sears**
Knight Palmer, LLC
1360 Peachtree Street NE
Suite 1201
Atlanta, GA 30309
404-228-4822
Email: nsears@knightpalmerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Lawton Jordan**
Knight Palmer
One Midtown Plaza
1360 Peachtree Street, NE
Ste 1201
Atlanta, GA 30309
678-732-0300
Email: ljordan@knightpalmerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joseph Hunt**
*TERMINATED: 12/06/2023*

represented by   **Bryan M. Knight**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan Palmer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Yehuda Joel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan David Chapman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Tivy Sears**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Lawton Jordan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Edith Anne Hunt**
*TERMINATED: 12/06/2023*

represented by   **Bryan M. Knight**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan Palmer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Yehuda Joel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan David Chapman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Tivy Sears**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Lawton Jordan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Penny Scheetz**
*TERMINATED: 12/06/2023*

represented by    **Bryan M. Knight**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan Palmer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Yehuda Joel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan David Chapman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Tivy Sears**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Lawton Jordan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Benjamin Aune**
*TERMINATED: 12/06/2023*

represented by    **Bryan M. Knight**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan Palmer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Yehuda Joel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan David Chapman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Tivy Sears**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Lawton Jordan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Parkwood Living, LLC**                                    represented by    **Bryan M. Knight**
*on behalf of themselves and all others similarly situated*                   (See above for address)
*TERMINATED: 12/06/2023*                                                      *LEAD ATTORNEY*
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **Jonathan Palmer**
                                                                             (See above for address)
                                                                             *LEAD ATTORNEY*
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **Joshua Yehuda Joel**
                                                                             (See above for address)
                                                                             *LEAD ATTORNEY*
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **Nathan David Chapman**
                                                                             (See above for address)
                                                                             *LEAD ATTORNEY*
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **Nicholas Tivy Sears**
                                                                             (See above for address)
                                                                             *LEAD ATTORNEY*
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **William Lawton Jordan**
                                                                             (See above for address)
                                                                             *LEAD ATTORNEY*
                                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**1925 Hooper LLC**                                        represented by    **Bryan M. Knight**
                                                                             (See above for address)
                                                                             *LEAD ATTORNEY*
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **Joshua Yehuda Joel**
                                                                             (See above for address)
                                                                             *LEAD ATTORNEY*
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **Nathan David Chapman**
                                                                             (See above for address)
                                                                             *LEAD ATTORNEY*
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **Nicholas Tivy Sears**
                                                                             (See above for address)
                                                                             *LEAD ATTORNEY*
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **William Lawton Jordan**
                                                                             (See above for address)
                                                                             *LEAD ATTORNEY*
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **Jonathan Palmer**
                                                                             (See above for address)
                                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robert J. Arko**                                                      represented by    **Bryan M. Knight**
                                                                                          (See above for address)
                                                                                          *LEAD ATTORNEY*
                                                                                          *ATTORNEY TO BE NOTICED*

                                                                                          **Joshua Yehuda Joel**
                                                                                          (See above for address)
                                                                                          *LEAD ATTORNEY*
                                                                                          *ATTORNEY TO BE NOTICED*

                                                                                          **Nathan David Chapman**
                                                                                          (See above for address)
                                                                                          *LEAD ATTORNEY*
                                                                                          *ATTORNEY TO BE NOTICED*

                                                                                          **Nicholas Tivy Sears**
                                                                                          (See above for address)
                                                                                          *LEAD ATTORNEY*
                                                                                          *ATTORNEY TO BE NOTICED*

                                                                                          **William Lawton Jordan**
                                                                                          (See above for address)
                                                                                          *LEAD ATTORNEY*
                                                                                          *ATTORNEY TO BE NOTICED*

                                                                                          **Jonathan Palmer**
                                                                                          (See above for address)
                                                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Andrew M. Moore**                                                    represented by    **Bryan M. Knight**
*on behalf of themselves and all others similarly situated*                               (See above for address)
                                                                                          *LEAD ATTORNEY*
                                                                                          *ATTORNEY TO BE NOTICED*

                                                                                          **Joshua Yehuda Joel**
                                                                                          (See above for address)
                                                                                          *LEAD ATTORNEY*
                                                                                          *ATTORNEY TO BE NOTICED*

                                                                                          **Nathan David Chapman**
                                                                                          (See above for address)
                                                                                          *LEAD ATTORNEY*
                                                                                          *ATTORNEY TO BE NOTICED*

                                                                                          **Nicholas Tivy Sears**
                                                                                          (See above for address)
                                                                                          *LEAD ATTORNEY*
                                                                                          *ATTORNEY TO BE NOTICED*

                                                                                          **William Lawton Jordan**
                                                                                          (See above for address)
                                                                                          *LEAD ATTORNEY*
                                                                                          *ATTORNEY TO BE NOTICED*

                                                                                          **Jonathan Palmer**
                                                                                          (See above for address)
                                                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The National Association of Realtors**

**Defendant**

**HomeServices of America, Inc.**
*TERMINATED: 12/06/2023*

<u>Defendant</u>

**HSF Affiliates, LLC**
*TERMINATED: 12/06/2023*

<u>Defendant</u>

**BHH Affiliates, LLC**
*TERMINATED: 12/06/2023*

<u>Defendant</u>

**HomeServices Georgia Properties**
*TERMINATED: 12/06/2023*

<u>Defendant</u>

**Harry Norman Realtors**
*TERMINATED: 12/06/2023*

<u>Defendant</u>

**Keller Williams, LLC**
*TERMINATED: 12/06/2023*

<u>Defendant</u>

**Re/Max Holdings, Inc.**
*TERMINATED: 12/06/2023*

<u>Defendant</u>

**Re/Max, LLC**
*TERMINATED: 12/06/2023*

<u>Defendant</u>

**Re/Max Metro Atlanta, Inc.**
*TERMINATED: 12/06/2023*

<u>Defendant</u>

**Compass, Inc.**
*TERMINATED: 12/06/2023*

<u>Defendant</u>

**Ansley Atlanta Real Estate, LLC**

<u>Defendant</u>

**Christies International Real Estate Group, LLC**
*TERMINATED: 12/06/2023*

<u>Defendant</u>

**Sothebys International Realty, Inc.**
*TERMINATED: 12/06/2023*

<u>Defendant</u>

**Atlanta Fine Homes, LLC**
*TERMINATED: 12/06/2023*

Defendant

**Homesmart Holdings, Inc.**

Defendant

**Solid Source Realty**

Defendant

**Palmerhouse Properties, LLC**

Defendant

**Higher Tech Realty, LLC**
*doing business as*
Mark Spain Real Estate

Defendant

**Engle and Volkers**
*TERMINATED: 12/06/2023*

Defendant

**Anywhere Real Estate, Inc.**
*TERMINATED: 12/06/2023*

Defendant

**Coldwell Banker Real Estate, LLC**
*TERMINATED: 12/06/2023*

Defendant

**Century 21 Real Estate, LLC**
*TERMINATED: 12/06/2023*

Defendant

**Hamilton Dorsey Alston Company, Inc.**

Defendant

**Christie's International Real Estate, LLC**

Defendant

**Engel & Volkers Americas, Inc.**

Defendant

**Engel & Volkers Atlanta**

Defendant

**Weichert of North America, Inc.**

Defendant

**ERA Franchise Systems, LLC**

Defendant

**EXP World Holdings, Inc.**

Defendant

**Redfin Corporation**

Defendant

**Beacham & Company, LLC**

Defendant

**Tracey Cousineau Real Estate, LLC**

Defendant

**Sanders Realty Holdings, LLC**

Defendant

**Bolst, Inc.**
*doing business as*
The Justin Landis Group

Defendant

**Chapman Hall Realtors, Inc.**

Defendant

**Signature Properties Group, Inc.**

Defendant

**Method Real Estate Group, LLC**
*doing business as*
Method Real Estate Advisors

Defendant

**Path & Post, LLC**
*doing business as*
Path & Post Real Estate

Defendant

**Duckworth Properties, LLC**

Defendant

**AF Realty Group, LLC**

Defendant

**Greater Atlanta Real Estate Group, LLC**
*doing business as*
Maximum One Realty

Defendant

**Greater Atlanta Realty Holdings Corporation**
*doing business as*
Maximum One Realty

Defendant

**Atlanta Communities Real Estate Brokerage, LLC**

| # | Docket Text | Date Filed |
|---|---|---|
| 1 | CLASS ACTION COMPLAINT filed by Janet Phillips, Penny Scheetz, Benjamin Aune, Parkwood Living, LLC, Edith Anne Hunt, Joseph Hunt. (Filing fee $402, receipt number AGANDC-13050678) (Attachments: # 1 Civil Cover Sheet)(ane) Please visit our website at http://www.gand.uscourts.gov/commonly-used-forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 11/27/2023) | 11/22/2023 |
| 2 | PROPOSED SUMMONS filed by Janet Phillips Higher Tech (Knight, Bryan) (Entered: 11/27/2023) | 11/27/2023 |
| 4 | Electronic Summons Issued as to Ansley Atlanta Real Estate, LLC, Anywhere Real Estate, Inc., Atlanta Fine Homes, LLC, Century 21 Real Estate, LLC, Christies International Real Estate Group, LLC, Coldwell Banker Real Estate, LLC, Compass, Inc., Engle and Volkers, Hamilton Dorsey Alston Company, Inc., Homesmart Holdings, Inc., Keller Williams, LLC, Palmerhouse Properties, LLC, Re/Max Holdings, Inc., Re/Max Metro Atlanta, Inc., Re/Max, LLC, Solid Source Realty, The National Association of Realtors, HomeServices of America, Inc., BHH Affiliates, LLC, Sotheby's International Realty, Inc. (rlh) (Additional attachment(s) added on 11/29/2023: # 1 Summons) (rlh). (Entered: 11/28/2023) | 11/24/2023 |
| 2 | PROPOSED SUMMONS filed by Janet Phillips Higher Tech (Knight, Bryan) (Entered: 11/27/2023) | 11/27/2023 |
| 3 | Certificate of Interested Persons and Corporate Disclosure Statement by Benjamin Aune, Edith Anne Hunt, Joseph Hunt, Parkwood Living, LLC, Janet Phillips, Penny Scheetz. (Knight, Bryan) (Entered: 11/27/2023) | 11/27/2023 |
| 3 | Certificate of Interested Persons and Corporate Disclosure Statement by Benjamin Aune, Edith Anne Hunt, Joseph Hunt, Parkwood Living, LLC, Janet Phillips, Penny Scheetz. (Knight, Bryan) (Entered: 11/27/2023) | 11/27/2023 |
| 5 | Electronic Summons Issued as to Higher Tech Realty, LLC. (ane) (Entered: 11/29/2023) | 11/29/2023 |
| 6 | AMENDED COMPLAINT against Ansley Atlanta Real Estate, LLC, Hamilton Dorsey Alston Company, Inc., Homesmart Holdings, Inc., Palmerhouse Properties, LLC, Solid Source Realty, The National Association of Realtors, Higher Tech Realty LLC d/b/a Mark Spain Real Estate, Christies International Real Estate, LLC, Engel & Volkers Americas, Inc, Engel & Volkers Atlanta, Weichert of North America Inc, ERA Franchise Systems, LLC, EXP World Holdings, Inc., Redfin Corporation Inc, Beacham & Company, LLC, Tracey Cousineau Real Estate, LLC, Sanders Realty Holdings, LLC, Bolst, Inc. d/b/a The Justin Landis Group, Chapman Hall Realtors, Inc., Signature Properties Group, Inc., Method Real Estate Group, LLC d/b/a Method Real Estate Advisors, Path & Post, LLC d/b/a Path & Post Real Estate, Duckworth Properties, LLC, AF Realty Group, LLC, Greater Atlanta Real Estate Group, LLC d/b/a Maximum One Realty, Greater Atlanta Realty Holdings Corporation d/b/a Maximum One Realty, Atlanta Communities Real Estate Brokerage, LLC with Jury Demand filed by 1925 HOOPER LLC, Robert J Arko, Andrew M Moore.(Palmer, Jonathan) Please visit our website at http://www.gand.uscourts.gov/commonly-used-forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 12/06/2023) | 12/06/2023 |
| 7 | PROPOSED SUMMONS filed by 1925 Hooper LLC, Robert J. Arko, Andrew M. Moore (Attachments: # 1 Summons Proposed Summons, # 2 Summons Proposed Summons, # 3 Summons Proposed Summons, # 4 Summons Proposed Summons, # 5 Summons Proposed Summons, # 6 Summons Proposed Summons, # 7 Summons Proposed Summons, # 8 Summons Proposed Summons, # 9 Summons Proposed Summons, # 10 Summons Proposed Summons, # 11 Summons Proposed Summons, # 12 Summons Proposed Summons, # 13 Summons Proposed Summons, # 14 Summons Proposed Summons, # 15 Summons Proposed Summons, # 16 Summons Proposed Summons, # 17 Summons Proposed Summons, # 18 Summons Proposed Summons, # 19 Summons Proposed Summons, # 20 Summons Proposed Summons)(Knight, Bryan) (Entered: 12/13/2023) | 12/13/2023 |
| 8 | Electronic Summons Issued as to AF Realty Group, LLC, Ansley Atlanta Real Estate, LLC, Atlanta Communities Real Estate Brokerage, LLC, Bolst, Inc., Chapman Hall Realtors, Inc., Duckworth Properties, LLC, ERA Franchise Systems, LLC, EXP World Holdings, Inc., Engel & Volkers Americas, Inc., Engel & Volkers Atlanta, Greater Atlanta Real Estate Group, LLC, Greater Atlanta Realty Holdings Corporation, Higher Tech Realty, LLC, Method Real Estate Group, LLC, Path & Post, LLC, Redfin Corporation, Sanders Realty Holdings, LLC, Signature Properties Group, Inc., The National Association of Realtors, Tracey Cousineau Real Estate, LLC, Weichert of North America, Inc. (ane) (Entered: 12/14/2023) | 12/14/2023 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JANET PHILLIPS; JOSEPH HUNT; EDITH
ANNE HUNT; PENNY SCHEETZ; BENJAMIN
AUNE and PARKWOOD LIVING, LLC, on
behalf of themselves and all others similarly
situated,

     Plaintiffs,

v.

THE NATIONAL ASSOCIATION OF
REALTORS; HOMESERVICES OF AMERICA,
INC.; HSF AFFILIATES, LLC; BHH
AFFILIATES, LLC; HOMESERVICES
GEORGIA PROPERTIES; HARRY NORMAN
REALTORS; KELLER WILLIAMS, LLC.;
RE/MAX HOLDINGS, INC.; RE/MAX, LLC;
RE/MAX METRO ATLANTA, INC.; COMPASS,
INC.; ANSLEY ATLANTA REAL ESTATE,
LLC; CHRISTIE'S INTERNATIONAL REAL
ESTATE GROUP, LLC; SOTHEBY'S
INTERNATIONAL REALTY, INC.; ATLANTA
FINE HOMES, LLC; HOMESMART
HOLDINGS, INC.;  SOLID SOURCE REALTY;
PALMERHOUSE PROPERTIES, LLC; HIGHER
TECH REALTY, LLC; ENGLE AND
VOLKERS; ANYWHERE REAL ESTATE, INC.;
COLDWELL BANKER REAL ESTATE, LLC;
CENTURY 21 REAL ESTATE, LLC;
HAMILTON DORSEY ALSTON COMPANY,
INC.

     Defendants.

CASE
NO.:_____

# CLASS ACTION COMPLAINT

COME NOW, Plaintiffs JANET PHILLIPS; JOSEPH HUNT, EDITH ANN HUNT, PENNY SCHEETZ; BENJAMIN AUNE and PARKWOOD LIVING, LLC ("Plaintiffs"), by and through their undersigned counsel, and hereby submit this Complaint on behalf of themselves and on behalf of the plaintiff classes (the "Classes") consisting of all persons who listed properties on one of Georgia's Multiple Listing Services (the "Subject MLSs") and incurred a buyer-broker commission in connection with the sale transaction during the period from at least November 22, 2019 through and including the present date (the "Class Period"). This action is brought against Defendants named herein, including the National Association of Realtors and other national real estate broker franchisors with a substantial presence in the state of Georgia (the "Defendants").

## NATURE OF THE CASE

1.     This case involves a nationwide conspiracy by and between the National Association of Realtors ("**NAR**") and residential real estate brokerages orchestrated to increase broker compensation at the expense of home sellers, including Georgia home sellers—the Plaintiffs in this action—by requiring home sellers to shoulder both the commission of their listing agents and the commission of the buyer's agent when properties are listed on the ubiquitous Multiple Listings Service (the "**MLS**").

2

2.     An MLS, such as the Subject MLSs listed below, functions as a repository of real estate offerings within a designated geographic area and requires all member brokers to list their properties in this centralized ledger. This ensures that MLSs are at the center of real estate transactions in the United States.

3.     To list a property in an MLS, seller brokers must agree to comply with the NAR rules.  The NAR rules, including the "Mandatory Offer of Compensation Rule" (the "Compensation Rule"), dictate the conduct of local NAR associations, local brokers, and agents in Georgia.

4.     The NAR's Compensation Rule compels home sellers to set the commission of the buyer's agent. By enforcing this mandate, the NAR establishes an anticompetitive market where sellers are coerced into subsidizing the buyer's costs.

5.     The Defendants advance the conspiracy by annually ratifying the NAR rules, including the Compensation Rule, and by participating in councils and committees that ensure compliance with the NAR rules.

6.     As a result of this scheme, the purportedly non-negotiable commissions of buyer agents are rolled into the sale price of homes.  This system, with its veiled surcharges, illegally warps the real estate market.

7.     By comparison, in foreign markets—such as the United Kingdom, Germany, Israel, Australia, and New Zealand, which are unencumbered by any analogue to the Compensation Rule—the buyer-brokerage fees fall upon the buyer, not the seller. This

results in total commission rates that hover between 1% and 4%. This stands in sharp contrast with the United States, where the average total commission rates are in the range of 5% to 6%.[1]

8.   Defendants' scheme has artificially and anticompetitively maintained commissions of buyer brokers ranging from 2.5% to 3.0% over many years.

9.   The commission overcharges levied upon home sellers have no correlation to the volume or caliber of services provided, much less any purported value conferred by the buyer brokers who receive the commissions.

10.   Furthermore, a practice known as "steering," which stems from Defendants' anticompetitive conspiracy, arises from the seller brokers' obligation to extend blanket, non-negotiable commission offer to buyer brokers, a detail visible within the MLS system to realtors yet obscured from consumer view. Steering incentivizes buyer brokers to guide their clients towards properties where they will receive higher commissions, curtailing competition.[2]

11.   Moreover, given the reluctance of buyer brokers to showcase properties where the commission offered by the seller broker is less lucrative, seller brokers are coerced

---

[1] FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf

[2] See FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf

into proposing high commissions to attract buyer brokers, commissions that will be paid by the seller brokers' clients.

12. In essence, the conspiracy (a) obliges sellers to bear excessive costs for services rendered by buyer brokers to the seller's opponent; (b) artificially inflates buyer brokers' compensation; and (c) promotes and abets "steering" and similar practices that thwart innovation and stifle competition.

13. As a direct result of this conspiracy, Plaintiffs and their fellow Class members have suffered millions of dollars in overcharges and damages.

14. Upon information and belief, the Justice Department lodged a complaint in 2020 against the NAR accusing it of anticompetitive practices.

15. In one recent Missouri class action, a federal jury reached a verdict holding the NAR along with some of the nation's biggest real estate brokerages liable for almost $1.8 billion in damages for artificially inflating commissions.

16. Plaintiffs now bring this lawsuit not only for themselves but also on behalf of all Georgia sellers who have been harmed by the NAR's anticompetitive collusion and the brokerages that dutifully toe the line.

17. Plaintiffs further bring this lawsuit as a class action representing the collective interests of home sellers who, over the past four years, have been saddled with broker commissions while selling residential real estate. This suit specifically pertains to properties listed on one of the designated MLSs in Georgia ("**Subject MLS**" or

"**Subject MLSs**"): Georgia MLS ("**GMLS**"); First MLS ("**FMLS**"); Central Georgia MLS ("**CGMLS**"); Mid Georgia MLS ("**MGMLS**"); South Georgia MLS ("**SGMLS**"); Northeast Georgia Board of Realtors MLS ("**NEGMLS**"); Athens Area Association of Realtors or Classic MLS ("**Classic MLS**"); Columbus Board of Realtors MLS ("**Columbus MLS**"); Lake Country Board of Realtors MLS ("**Lake MLS**"); Golden Isles Association of Realtors ("**Golden Isles MLS**"); Greater Augusta Association of Realtors ("**Augusta MLS**"); and Savannah Board of Realtors MLS ("**Savannah MLS**").

## JURISDICTION, VENUE AND PARTIES

18.  This court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. § 4 because the suit raises a federal question and "aris[es] under [an] Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

19.  This Court further has subject matter jurisdiction under 28 U.S.C. § 1367 over any state law claims made because those claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

20.  Further, the state law claims do not raise novel or complex issues of Georgia law, substantially predominate over the claim over which the district court has original jurisdiction, nor is there any compelling reason for the Court to decline jurisdiction.

21.  This Court has independent subject matter jurisdiction under 28 U.S.C. §1332 (d) (2) over state law claims, because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from one of the Defendants.

22.  This Court has personal jurisdiction over Defendants because they each have: (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

23.  Each Defendant, as set forth in this Complaint, engages in significant business activities within this District. For example, for each Corporate Defendant, such substantial business presence is evidenced by the extensive operations of their real estate brokerage subsidiaries, franchisees, and affiliates. Collectively, these entities play a dominant role in a major portion of residential real estate listings and sales within the Subject MLSs, including those in this District. Each Corporate Defendant has accrued millions of dollars in revenue originating from business activities in Georgia and this District, attributable to the brokerage operations of their respective subsidiaries, franchisees, and affiliates operating in Georgia and this District.

7

24.   For its part, the NAR garners substantial revenues and fees from its extensive nationwide membership, which includes a significant number of members who are actively conducting business within the Subject MLSs' coverage areas, including the Northern District of Georgia. Therefore, it follows that during the period relevant to the Subject Class, NAR has amassed millions, possibly even tens of millions, of dollars in membership dues and revenue from real estate brokerages, brokers, and/or Realtors operating within Georgia and this District.

25.   Moreover, the NAR engages in substantial business within this District through its active role in crafting, revising, and disseminating updated versions of the "Interpretations of the Code of Ethics," with its 31st Edition being published in 2019. This document evidences NAR's involvement, particularly through its Professional Standards Committee, in interacting with and conducting business alongside arbitration Hearing Panels and Boards of Directors of local real estate associations (inclusive of those operating in regions covered by the Subject MLSs). These interactions are focused on reviewing and delineating policies and principles that have been implemented in specific realtor disputes and are not merely advisory in nature. Rather, they serve as official policy statements of NAR, thereby directing the arbitration of disputes among realtors within this District.

26. The NAR mandates that each of the Defendants, along with other co-conspirators active in this District, adhere to its established policies, including those

8

outlined in the Handbook on Multiple Listing Policy and the Code of Ethics. Among these stipulated policies is the Compensation Rule, which NAR requires the Defendants and other co-conspirators in this District to follow. It is believed, based on available information, that NAR vigilantly oversees the compliance of the Defendants and other co-conspirators with its Rules and Policies, including the Compensation Rule. Non-compliance with this rule can lead to severe consequences, including the entity or individual's removal from the NAR membership and subsequent expulsion from the Subject MLSs.

27.   The NAR is also significantly involved in lobbying efforts targeted at various governmental entities and political candidates across local, state, and federal levels. It is understood, based on available information, that the NAR has undertaken such lobbying activities specifically directed towards Georgia and this District.

28.   The Compensation Rule, along with other anticompetitive rules set forth by the NAR, are applied and have been enforced by the Defendants and their co-conspirators within the scope of interstate commerce, including within this District. These regulations dictate the practices of local NAR associations, brokers, and sales agents across various states, encompassing, but not limited to, Georgia and its MLSs.

29.   The conduct of the Defendants, as set forth in this Complaint, has led to the nationwide inflation of buyer broker commissions, impacting not only this District but also home sellers across the country. Defendant NAR, via its members and other co-

conspirators, and the other Defendants, through their network of franchisees, subsidiaries, and/or affiliates, along with other co-conspirators, are actively involved in interstate commerce. Their collective actions have a significant impact on interstate commercial activities within the United States.

30. Venue is proper in the Northern District of Georgia under 15 U.S.C. § 22 and under 28 U.S.C. §1391(b), (c), and (d). Each Defendant transacted business, was found, had agents and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

**A. The Plaintiffs**

31. Plaintiff Janet Phillips is a Georgia resident. In 2022, Ms. Phillips sold a house located at 109 Dovetail Crossing, Savannah, Georgia 31419. Keller Williams acted as Ms. Phillips' real estate broker for this sale. In this transaction, Ms. Phillips was obligated to pay her seller broker's commission plus the buyer broker's commission of three percent (3%) of the sales price.

32. Plaintiffs Joseph Hunt and Edith Ann Hunt are Georgia residents. In 2021, the Hunts sold a home located at 4666 E. Conway Drive NE, Atlanta, Georgia 30327. Atlanta Fine Homes Sotheby's International Realty acted as the Hunt's real estate broker for these sales. In this transaction, the Hunts were obligated to pay for their

seller broker's commission plus the buyer broker's commission of three percent (3%) of the sales price.

33.   Plaintiffs Penny Scheetz and Benjamin Aune are Georgia residents. In 2022, they sold their home located at 1279 Sylvan Circle NE, Brookhaven, Georgia 30319. Compass acted as their real estate broker for this sale.  In this transaction, the Scheetz and Aune's were obligated to pay for their seller broker's commission plus the buyer broker's commission of three percent (3%) of the sales price.

34.   Plaintiff Parkwood Living, LLC **("Parkwood")** is a Georgia limited liability company. Parkwood sold properties located at: (a) 111 Whitefoord Avenue, Atlanta, Georgia and 133 Lynford Drive, Atlanta, Georgia. Re/Max acted as Parkwood's real estate broker for these sales.  In these transactions, Parkwood was obligated to pay for its seller broker's commission plus the buyer broker's commission of three percent (3%) of the sales price.

35.   As set forth in this Complaint, the Defendants' unlawful conduct and conspiratorial collusion have unfairly financially burdened home sellers, including the Plaintiffs, with the requirement that they pay a buyer broker's commission. Moreover, this conduct has not merely imposed an additional cost but has inflated the buyer broker's commission to levels exceeding those that would be dictated by the forces of a competitive market, absent the Compensation Rule and the Defendants' collusion.

### B. The Defendants

36. Defendant National Association of Realtors ("**NAR**"), headquartered in Chicago, Illinois, is the largest real estate brokerage association in the country. It has over 1.2 million members. According to its 2020 IRS Form 990 NAR reported receiving $268,602,796 in member dues across the nation. The NAR's dominion extends over fifty-four state and territorial associations and over more than 1,200 local chapters. NAR operates in Georgia. NAR may be served with process by service upon its registered agent, Katherine R. Johnson, at 430 North Michigan Avenue, Chicago, Illinois 60611.

37. Defendant HomeServices of America, Inc. ("**HomeServices**") is a Minnesota corporation registered to do business in Georgia. HomeServices may be served with process by service upon its registered agent, CT Corporation System, Inc., at 289 S. Culver Street, Lawrenceville, Georgia 30046. HomeServices is an affiliate of Berkshire Hathaway and is wholly owned and operated by Defendant HSF Affiliates, LLC ("**HSF Affiliates**"). HSF Affiliates is a California limited liability company that is registered to do business in Georgia. HSF Affiliates may be served with process by service upon its registered agent, CT Corporation System, Inc., at 289 S. Culver Street, Lawrenceville, Georgia 30046. HSF Affiliates is the progenitor of several real estate franchise networks and brokerage trade names, among them HomeServices Georgia Properties ("**HSF Georgia**") and Harry Norman Realtors ("**Harry Norman**"). HomeServices, HSF Affiliates, HSF Georgia and Harry Norman conduct business in

12

Georgia. BHH Affiliates, LLC **("BHH")** is an affiliate of HomeServices and HSF Affiliates and offers a network of real estate brokerage member franchisees throughout the country and Georgia.  BHH is a Delaware limited liability company that may be served upon its registered agent The Corporation Trust Company, at 129 Orange Street, Wilmington, Delaware 19801.

38. Defendant Sotheby's International Realty, Inc. **("Sotheby's)** is a foreign corporation registered to do business in Georgia. Sotheby's may be served with process by service upon its registered agent, Corporate Creations Network, Inc., at 2985 Gordy Parkway, 1st Floor, Marietta, GA 30066.  The company has established a national presence through a strategic array of affiliated, franchised and corporate-owned brokerages. Among these is Defendant Atlanta Fine Homes, LLC ("**Atlanta Fine Homes**"). Atlanta Fine Homes brokers residential homes throughout the state of Georgia.   Atlanta Fine Homes may be served with process by service upon its registered agent, Thad Gould, at 980 Hammond Drive, Suite 740, Atlanta, GA 30328.

39. Defendant Keller Williams, LLC ("**Keller Williams**") is a Texas limited liability company registered to do business in the State of Georgia. Keller Williams oversees a network of affiliates and franchises around the country, including several transacting business in Georgia and in this District.  Keller Williams may be served with process by service upon its registered agent, Cogency Global, Inc., located at 900 Old Roswell Lakes Pkwy, Suite 310, Roswell, Georgia 30076.

40. Defendant Re/Max Holdings, Inc. **("Re/Max Holdings")** is a Colorado corporation. Re/Max Holdings is the parent company of Re/Max, LLC and Re/Max Atlanta. Re/Max Holdings is a national real estate brokerage company that does business in Georgia. Re/Max Holdings may be served with process by service upon its registered agent, Susie Winders, at 5075 S. Syracuse Street, Denver, Colorado 80237. Defendant Re/Max, LLC ("**Re/Max LLC**") is the national franchise subsidiary of Re/Max Holdings. Re/Max LLC has numerous Georgia franchises operating as real estate brokerages. Re/Max LLC may be served with process by service upon its registered agent, Susie Winders, at 5075 S. Syracuse Street, Denver, Colorado 80237. Defendant Re/Max Metro Atlanta, Inc. **("Re/Max Atlanta")** is a Georgia corporation. Re/Max Atlanta has 60 real estate brokers working throughout Atlanta and Georgia. Re/Max Atlanta may be served with process by service upon its registered agent, Donna Armstrong, 2749 Lavista Road, Decatur, Georgia 30033.

41. Defendant Compass, Inc. **("Compass")** is a Delaware corporation. Compass may be served with process by service upon its registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. The company has established a national presence through a strategic array of affiliated, franchised and corporate-owned brokerages. Compass has 302 real estate brokers conducting business in the state of Georgia.

14

42.   Defendant Ansley Atlanta Real Estate, LLC ("**Ansley**"), established in 2015 as a subsidiary of Ansley Real Estate Christie's International, maintains an expansive international network and has ascended as one of the leading residential real estate firms in the metro Atlanta area.  Ansley may be served with process by service upon its registered agent, Lane McCormack, at 3035 Peachtree Road, Suite 202, Atlanta, Georgia 30305.   Defendant Christie's International Real Estate Group, LLC (**"Christie's"**) is a New York limited liability company. Christie's is an international real estate brokerage company with affiliates, franchisees and corporate owned brokerages across the country. Ansley is an affiliate of Christie's. Christie's may be served with process by service upon its registered agent, CT Corporation System, at 28 Liberty Street, New York, New York 10005.

43.   Defendant Solid Source Realty, Inc. (**"Solid Source"**) is a Georgia corporation.  Solid Source may be served with process by service upon its registered agent, CT Corporation System, located at 289 S. Culver Street, Lawrenceville, Georgia 30046.   Solid Source has brokers throughout Georgia. Solid Source is affiliated with Homesmart Holdings, Inc. (**"Homesmart"**), which is a national real estate company.   Defendant Homesmart has 61 agents working in Georgia. Homesmart is an Arizona corporation that may be served with process by service upon its registered agent, CT Corporation System, 3800 N. Central Ave. Ste 460, Phoenix, Arizona   85012.   Homesmart   acquired   Palmerhouse   Properties,   LLC

(**"Palmerhouse"**).  Palmerhouse is a Georgia limited liability company that may be served with process by service upon its registered agent, CT Corporation System, located at 289 S. Culver Street, Lawrenceville, Georgia 30046.  Solid Source, Homesmart and Palmerhouse have brokerages and realtors operating throughout Georgia.

44.  Defendant Engel & Völkers is one of the world's leading brokers of premium residential property. The company has established an international presence through a strategic array of franchisees and corporate-owned affiliates. Among these is Defendant Engel & Völkers ("**EV Atlanta**"). Currently, EV Atlanta boasts a management profile whose value cumulatively exceeds the half-billion-dollar mark in managed home listings, the majority of which are located in this District.

45.  Defendant Higher Tech Realty, LLC, which conducts its dealings under the banner of Mark Spain Real Estate ("**Mark Spain**"), is a prominent fixture in the real estate domain. With a roster of 307 active licensed agents, Mark Spain operates from its headquarters located in Alpharetta, Georgia, and its operations radiate throughout the Southeast, with a significant footprint in Georgia and, particularly, within this District. Mark Spain may be served with process by service upon its registered agent, Elaine M. Russell, at 1875 Old Alabama Road, Suite 1210, Roswell, Georgia 30076.

46. Defendant Anywhere Real Estate, Inc. (**"Anywhere"**) is a New Jersey corporation that may be served with process at 3411 Silverside Road, Tatnall Building

# 104, Wilmington, Delaware 19810. Anywhere owns Coldwell Banker Real Estate, LLC **("Coldwell Banker")**. Coldwell Banker is a New Jersey limited liability company registered to business in Georgia. Coldwell Banker may be served with process by service upon its registered agent, Corporate Creations Network, Inc., 2985 Gordy Parkway, 1st Floor, Marietta, Georgia, 30066. Anywhere also owns Century 21 Real Estate, LLC **("Century 21")**. Century 21 is a New Jersey limited liability company registered to business in Georgia. Century 21 may be served with process by service upon its registered agent, Corporate Creations Network, Inc., 2985 Gordy Parkway, 1st Floor, Marietta, Georgia, 30066. Anywhere, Coldwell, and Century 21 have numerous real estate brokerages and realtors conducting business in the State of Georgia.

47. Defendant Hamilton Dorsey Alston Company, Inc. **("Dorsey Alston")** is a Georgia corporation that may be served with process by service upon its registered agent, John C. Hamilton, 2845 Arden Road, Atlanta, Georgia 30327. Dorsey Alston is a real estate brokage company with over 200 realtors operating in Georgia.

48. Defendant Beacham & Company, LLC **("Beacham")** is a Georgia limited liability company that may be served with process by service upon its registered agent, Glennis C. Beacham, at 3060 Peachtree Road, Suite 100, Atlanta, Georgia 30305. Beacham is a real estate brokage company with over 60 realtors operating in Georgia.

49.  Each Defendant maintains a considerable presence within the markets of Georgia, particularly in this District. They hold membership within the MLSs that constitute the Georgia real estate market and engage in substantial business transactions within this District.

### C. The Co-Conspirators and Agents

50.  Beyond the Defendants specifically named, there exist several other large, national brokerages with extensive business operations in Georgia. This includes their brokerage subsidiaries, franchisees, and/or affiliates, which together play a significant role in a considerable portion of residential real estate listings within the MLSs that make up Georgia's real estate market. These entities also contribute to a substantial number of home sales listed in this District through Georgia's MLSs.

51.  These brokerages also hold memberships in the NAR, as well as its state and/or local affiliates. They contribute to and execute the conspiracy by taking active roles on various boards and committees. In these capacities, they enforce adherence to NAR's rules, employing a range of incentives and penalties – metaphorically, "carrots and sticks" – to ensure compliance.

52.  The co-conspirators have accrued millions of dollars in revenue from their business transactions within Georgia, and particularly within this District. Their income is directly attributable to the brokerage operations conducted by their

respective subsidiaries, franchisees, and/or affiliates that are actively engaged in business within Georgia.

53. The Compensation Rule along with a cadre of other anticompetitive NAR rules have been implemented by Defendants and their co-conspirators in interstate commerce, including in this District.

54. Moreover, the franchisees and brokers affiliated with the Defendants have assented to, adhered to, and enacted the Compensation Rule within the geographic areas governed by the Subject MLSs. Through these actions, they have engaged as co-conspirators in the antitrust violations and unfair practices as set forth herein, performing acts and making statements that further these allegations.

55. The Defendants are jointly and severally accountable for the actions of their co-conspirators, regardless of whether these co-conspirators are explicitly named as defendants in this Complaint.

## FACTUAL BACKGROUND

### THE BUSINESS OF REALTORS

56. In Georgia, state licensing laws govern the representation of sellers and buyers in the real estate market. Central to each brokerage is a real estate broker-in-charge, who bears the responsibility for overseeing the brokerage's brokers and salespersons. These professionals are termed "associated licensees." Upon the departure of any broker or salesperson from their broker-in-charge, the brokerage must immediately

notify the real estate commission. Legally, these brokers-in-charge are responsible for the actions and conduct of their associated licensee.

57.  Brokers-in-charge and their associated licensees perform dual roles within the real estate domain. In some transactions, they function as selling brokers for home sales, while in others, they assume the role of buyer brokers.

58.  According to NAR's own data, in 2017, a significant 92% of sellers completed their home sale with the aid of a real estate broker, and similarly, 87% of buyers procured their homes with the assistance of a real estate broker within that same year.

59. In conventional residential real estate dealings, brokers-in-charge and associated licensees are remunerated through commissions. These commissions are calculated as a percentage of the home's sale price and are disbursed upon closing.

60.  The financial terms for a seller broker's services are detailed in a listing agreement, a contract drawn between the seller and the seller broker. This agreement not only specifies the financial terms of the listing but often ensures the seller broker exclusive marketing rights over the property. As mandated by the Compensation Rule, this agreement sets the total commission due to the seller broker from the home seller and additionally prescribes the portion to be allocated to the buyer broker, should another broker be involved in the transaction.

61.  When a buyer elects to engage the services of a broker, a contract is similarly drawn up, which designates the broker as the buyer's agent. Commonly, this contract

provides that the buyer's broker will obtain compensation in the form of a commission, which is typically derived from the proceeds paid to the seller's broker.

62.   If the buyer is represented by a broker, as is usually the case, the seller broker disburses a portion of the commission received from the seller to the buyer broker upon the completion of the sale of a property.

63.   As a consequence of these contracts and the NAR's mandatory imposition of the Compensation Rule, buyer brokers are compensated from the aggregate commission paid by the seller at closing, rather than directly from the buyer whom they represent.

64.   Indeed, prior to a January 2022 amendment, a stipulated norm within the NAR's Code of Ethics permitted, even encouraged, buyer brokers to inform their clients that their services are offered at no cost – a claim which was untrue and misleading at best. The NAR's 2022 amendment amounted to a tacit admission that its prior practices were untrue and misleading. Upon information and belief, many buyer brokers still inform their clients that their services are provided at no cost, consistent with NAR's original guidance.

65.   This is untrue or misleading because, although the buyer does not directly pay a fee, the cost of the broker's services is inherently included in the overall transaction price and borne by the seller. This means that the broker's compensation is often indirectly paid from the sales price paid by the buyer rather than being an out-of-

pocket expense for the buyer. Either way, though, the buyer almost always pays a commission that he or she did not agree to pay and could not negotiate.

66. In the absence of the Compensation Rule, within a truly competitive marketplace – a context wherein a seller has no inherent motive to fund a buyer broker who is negotiating in opposition to the seller's interests – the financial responsibilities would likely be restructured. Under such conditions, a buyer would be expected to compensate their own broker directly. Concurrently, a seller would agree to a commission exclusively for the benefit of their own broker. Consequently, the total commission a seller would be obligated to pay would be significantly reduced, potentially to half (or even less) of the current sums that cover the remuneration of both the seller's and the buyer's brokers.

## MLS LISTING AND THE COMPENSATION RULE

67. MLSs are curated repositories of properties available for sale within a specific locale, accessible exclusively to real estate brokers and their agents who are in good standing with the MLS and in compliance with its regulations. The Subject MLSs in question are under the ownership and operation of local realtor associations, which are not only members of but are also regulated by the NAR.

68. As mandated by the NAR rules, seller brokers are obligated to list their clients' properties on an MLS. Should a seller broker neglect to list a property on an MLS, most buyer brokers will refrain from showing that property to potential purchasers.

22

Moreover, MLSs serve as the primary fountainhead of property listings for online platforms such as Zillow and Realtor.com, which have become a pivotal resource for many prospective home buyers in their search for homes.

69. The Compensation Rule mandates that a seller broker, acting on behalf of the seller, extend a comprehensive, unilateral, and in practice, non-negotiable offer of remuneration to buyer brokers in the act of listing a home on an MLS that is under the purview of a local NAR association. Should the home be purchased by a buyer under the representation of a broker, it is then that the buyer broker earns the compensation as offered.

## NAR's Anticompetitive Rules

70. The Compensation Rule, established by the NAR in 1996 within its Handbook on Multiple Listing Policy ("**Handbook**"), has been continuously operative to this day.

71. Prior to the inception of the Compensation Rule in 1996, the National NAR was instrumental in the creation, execution, and enforcement of a comparable, yet equally misleading and defective, market framework via the MLS system. Within this structure, brokers involved in residential home sales predominantly represented the seller's interests, functioning either directly as the seller's broker or indirectly as a "sub-agent" of the seller's broker.

72.   Within the then-dominant framework of sub-agency, brokers, even those chiefly assisting buyers, were legally bound to uphold the interests of sellers. Consequently, upon the completion of a transaction, the seller would remit a total commission to their broker, who would then allocate a portion to the "sub-agent" broker. This sub-agent, despite their involvement with the buyer, was under a legal and fiduciary duty to the seller.

73.   This convoluted and deceptive market practice led to widespread misconceptions among homebuyers, many of whom erroneously presumed that the sub-agent broker was advocating for them. The revelation of this system, where brokers engaged with buyers were legally compelled to relay information to sellers that could be detrimental to their clients, precipitated its rapid disintegration.

74.   When brokers assisting buyers ceased to act as "sub-agents" for the seller's broker, the customary practice of sellers compensating both the seller's and buyer's brokers should have become obsolete, lacking any further rationale for its continuation.

75.   Nonetheless, it was at this juncture that the NAR and its co-conspirators intervened, instituting and upholding a restrictive and misleading strategy – a strategy aimed at preserving artificially high commission rates and obstructing more cost-effective and innovative competition.

24

76. This objective was realized by imposing a directive through the Compensation Rule, which compels seller brokers to extend standardized, non-negotiable compensation offers to buyer brokers at the point of listing a property on an MLS.

77. The NAR's Board of Directors, along with its subordinate committees, retains the discretionary power to periodically assess and determine the necessity of modifications to the policies delineated in the NAR Handbook. In accordance with this prerogative, the Board has, in recent years, sanctioned specific amendments pertinent to the MLSs operation within the jurisdiction of the Georgia real estate market.

78. Each policy, be it existing, revised, or novel, is included in the Handbook's annual editions, reflecting a consistent, yearly tradition of update and renewal.

79. Notwithstanding criticisms from economists and industry specialists about the Compensation Rule's anticompetitive nature and its tendency to elevate commission rates above market levels, the NAR Board of Directors has persistently chosen to uphold this rule in the Handbook.

80. In the process of updating and reissuing the Handbook, the NAR has consistently extended an invitation to each of the Defendants and other co-conspirators to partake in the agreement, amalgamation, and conspiracy as set forth in this Complaint.

81. Every conspirator, Defendants included, may only participate in the MLSs across the United States' real estate markets, notably in Georgia, and particularly this District, if they agree to comply with and enforce the anticompetitive constraints outlined in the Handbook, including the Compensation Rule.

82. Each conspirator, Defendants among them, has invariably and willfully participated in the respective MLSs.

83. Thus, regardless of their claims of non-authorship of the Handbook, the Compensation Rule, or other anticompetitive rules therein, the Defendants have nonetheless consented to (and do) adhere to, execute, and enforce these policies, including the Compensation Rule.

84. NAR characterizes an MLS as a "means by which authorized participants make blanket, unilateral compensation offers to other participants."

85. This declaration implicitly acknowledges the Compensation Rule as a nonnegotiable cornerstone of the MLS system.

86. The Handbook, on page 65, articulates the Compensation Rule as follows:

> In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants.

87. Further, page 40 of the Handbook continues with the following:

> Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling

price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships.

88. Effectively, the Compensation Rule reallocates a cost to the seller, a burden typically borne by the buyer in a competitive market. In fact, the *Wall Street Journal* recently opined that this practice requires home sellers to engage a buyer broker for MLS listing — a service mandating a seller broker. This system is a "potentially illegal tying arrangement under the Sherman Anti-Trust Act that keeps buying agents paid though they offer almost no useful services."[3]

89. These rules also not only mandate the seller's payment of the buyer-broker's compensation, but they also obscure the compensation structure from buyers and sellers, concealing the true source of the buyer broker's payment.

90. Furthermore, the rules explicitly forbid negotiations over the buyer broker's compensation by either the buyer or the paying seller. Moreover, they preclude a buyer broker from presenting offers to sellers that are predicated on lowering this commission.

91. In response to the conceivable scenario where a buyer aims to lower their broker's commission as a condition of their purchase offer, the NAR has implemented a rule to preclude such arrangements. Particularly, the NAR's Code of Ethics, under Standard Practice 16-16, explicitly states:

---

[3] Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J. (Mar. 3, 2019), https://www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734

REALTORS, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[4]

92. The Compensation Rule reallocates a cost to the seller, a cost that, in a competitive market, would typically be borne directly by the buyer. When combined with Standard Practice 16-16, this rule lacks economic rationality.

93. Moreover, the Compensation Rule initiates a cascade of undisclosed obligations for the home seller. Engaging a seller broker, ostensibly for marketing the property, inadvertently binds the seller to the MLS system, especially if economic viability or benefits like branding and support from Defendants are considerations. This necessitates listing the property on the regional MLS, regardless of the seller's preference. Consequently, this compels the seller to commit to a unilateral compensation offer to an undefined buyer broker, thereby linking the seller's choice of a seller broker to an unknown buyer broker within that MLS region.

94. The NAR's mandate for seller brokers to propose a blanket, unilateral offer incentivizes them to attract buyer brokers with substantial commissions. Moreover, the interchangeable roles of brokers as seller and buyer agents in various transactions further reinforce the anti-competitive nature of the Compensation Rule. This rule

---

[4] National Association of Realtors, Code of Ethics and Standard of Practice (Jan. 1, 2023), *available at* https://www.nar.realtor/about-nar/governing-documents/code-of-ethics/2023-code-of-ethics-standards-of-practice

cultivates a cooperative rather than competitive broker environment, focusing on commission splitting rather than earning client business through quality of service to sellers and buyers.

### NAR'S REGULATION AND IMPLEMENTATION OF ANTICOMPETITIVE POLICIES

95.  The NAR has effectively ensured compliance with its anticompetitive rules and other directives in the Handbook and Code of Ethics among its members. This includes state and local realtor associations within the Subject MLSs, particularly in this District, as well as non-member brokers and agents in regions served by local realtor association-operated MLSs.

96.  The NAR requires its member-owned and operated MLSs to adhere to the imperative clauses in the Handbook and the Code of Ethics. The Handbook specifies that an association's accord to form an MLS must encompass the "roles and responsibilities of each association for enforcement of the Code of Ethics" and the "intent of the multiple listing services(s) to operate in compliance with the multiple listing policies of the National Association."[5]

97.  Each Subject MLS, owned by local realtor associations, is subject to NAR's requirement for vigilant monitoring to guarantee compliance with the NAR Handbook. Consequently, every local realtor association, MLS, and their participants

---

[5] NAR Handbook, at p. 9.

consent to the anticompetitive restrictions at the heart of this lawsuit, playing pivotal roles in the execution and reinforcement of these constraints.

98. Non-compliance with the Code of Ethics may result in the expulsion of both individual and associational members from NAR. Specifically, NAR's Code of Ethics and Arbitration Manual states:

> Any Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association.[6]

99. Likewise, the Handbook further states:

> Those associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation.[7]

100. The NAR's model rules obligate local realtor and brokerage associations within the MLSs of Georgia, and particularly this District, to comply with the NAR Code of Ethics or face the consequences set forth above, among others.

101. The NAR scrutinizes the governing documents of its local realtor associations, particularly those in the Subject MLSs and this District, to affirm adherence to NAR regulations. These associations, including those within the Subject MLSs and this

---

[6] National Association of Realtors, Code of Ethics and Arbitration Manual 2019, at 1, *available at* https://www.nar.realtor/sites/default/files/documents/2019-CEAM.pdf
[7] NAR Handbook, at p. 8.

District, are mandated to periodically submit their governing documents to NAR for evaluation to demonstrate compliance.

### THE DEFENDANTS' COMPLICITY

102. The Defendants have consented to adopt, endorse, execute, and uphold the Compensation Rule through active participation in NAR governance and by mandating adherence to NAR regulations among local real estate associations, as well as their affiliated franchisees, brokers, and employees. Their engagement in an association that prohibits commission competition among associates, coupled with their commitment to these anticompetitive practices, implicates the Defendants in the conspiracy, contributing to its perpetuation and enforcement.

103. The Defendants have engaged in the conspiracy and consciously committed to a common scheme through at least three primary actions: *(1)* they mandate their franchisees, and the agents or realtors under them, within Georgia's, and particularly this District's, MLSs to adhere to the NAR rules, including the Compensation Rule, for MLS access; *(2)* their executives oversee the NAR's operations, particularly the adoption, maintenance, and enforcement of the Compensation Rule within the Subject MLSs; *(3)* they ensure their franchisees sway local realtor associations within the Subject MLSs to implement and enforce the NAR's rules, including the Compensation Rule, as a prerequisite for property listings in Georgia's regional MLSs.

104. *First*, the Defendants have enacted the conspiracy and common scheme by requiring their franchisees, and consequently their agents and realtors in the areas served by the Subject MLSs, to abide by the NAR's rules, inclusive of the Compensation Rule. Franchise agreements between the Defendants and their franchisees stipulate that these franchisees and their agents must: (a) adhere to the NAR's Code of Ethics; (b) become members of and follow the rules of the local realtor association; and (c) engage in the local MLS while complying with its regulations, including the obligatory rules from the NAR Handbook. Each Corporate Defendant is involved in agreements with subsidiaries, franchisees, and/or affiliates located and conducting business in this District.

105. *Second*, the executives of the Defendants, among the nation's largest real estate brokerage franchises or local real estate brokerage firms, have been integrally involved in the NAR's management and operation. These senior executives have held positions on the NAR's governing board of directors, which is responsible for drafting, developing, and promulgating both the NAR's Handbook and its Code of Ethics. Moreover, the day-to-day operations of the NAR are overseen by an eight-person Leadership Team, predominantly consisting of executives from the Defendants' franchisees.

106. *Third*, the Defendants' franchisee executives have engaged in the governance of local realtor associations, including those owning and operating the Subject MLSs,

and other associations. Through these positions, they have facilitated the conspiracy's implementation. These executives, along with the local realtor associations, have enforced compliance with the NAR's rules, such as the Compensation Rule, and have instituted standard form contracts to enforce the NAR mandates.

107. The Defendants robustly advocate for their franchisees' participation in local realtor association governance. For example, Keller Williams, in its "Policy & Guidelines Manual," urges its agents to engage "to the greatest possible extent" in state NAR associations and to play an active role in local realtor associations. The manual also emphasizes a cooperative ethos with other realtors, advocating for a spirit of collaboration with all other realtors and brokers.

108. In each region served by the Subject MLS, including this District, the Defendants' franchisees have advanced the conspiracy. They have done so by colluding with local realtor associations to enact, adhere to, and uphold NAR's regulations, particularly the Compensation Rule.

### EFFECTS OF THE CONSPIRACY

109. The Defendants' conspiracy has resulted in the following anticompetitive consequences, among others, in the regions served by the Subject MLSs within Georgia's real estate market:

a.  Home sellers have been compelled to pay commissions to buyer brokers, their negotiation adversaries, significantly elevating the costs of home sales;

b.  Home sellers have been obligated to offer high buyer broker commissions as an incentive for buyer brokers to showcase their properties to potential clients;

c.  As a consequence of paying elevated buyer broker commissions, home sellers have incurred inflated overall commission costs;

d.  Often, those inflated overall commission costs are passed along in the price of the home, which means that home buyers also have to pay some or all of the inflated costs;

e.  The process of retaining a buyer broker has been decoupled from determining their commission; the home buyer engages the buyer broker, but the commission is set by the seller's agent;

f.  Price competition among brokers for engagement by home buyers, as well as among those vying to sell homes, has been significantly restricted;

g.  Rather than reflecting competitive market values like experience, service level, and local connections, Buyer broker compensation is

predominantly determined by a property's sale price and the customary percentage commission offered;

h.  The inability of home buyers to compete for purchases by reducing the buyer broker commission has curtailed competition among buyer brokers;

i.  The Defendants and their franchisees have significantly boosted their profits through the receipt of inflated buyer broker commissions and artificially high commission rates overall;

j.  The Defendants, through horizontal price fixing, have purposefully inflated or stabilized broker commission rates;

k.  Home sellers have been coerced into buying services they do not desire — namely, those of an unspecified buyer broker — at the time they seek services they do want, such as a seller broker with access to the local geographic MLS, including the Subject MLSs; and

l.  Commissions have been extricated from the negotiation process between seller and buyer, transforming into a non-negotiable, take-it-or-leave-it proposition.

110. Plaintiffs recognize no pro-competitive benefits of Defendants' conspiracy, which is manifestly anticompetitive and detrimental to competition. The conspiracy

represents an effort to sustain the historical system mandating home sellers to cover the buyer broker's commission.

111. Should Defendants contend that the MLS system intrinsically offers pro-competitive advantages, none of these benefits originate from NAR's anticompetitive rules and regulations, which are designed to preserve buyer brokers' inflated commissions. Even if certain purported pro-competitive effects were to exist, they are significantly overshadowed by the overwhelming anticompetitive impacts of the conspiracy.

112. Considerable economic data corroborate the view that Defendants' conspiracy has culminated in elevated total and buyer broker commissions charged to home sellers, surpassing those in comparable markets unaffected by NAR's anticompetitive policies.

113. In comparison with other nations where competitive markets for residential real estate brokerage services exist, the commissions within the MLSs of Georgia, and particularly this District, are markedly higher.

114. For example, economists Natalya Delcoure and Norm Miller compared international real estate commissions with those in the United States concluding:

> Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand . . . In the UK, the [total] commission rates average less than 2% . . . In New

Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%.[8]

115. Delcoure's and Miller's research also revealed intriguing within-country variations. In the UK, they observed that broker commissions typically hover around 1%-2%. However, in highly competitive regions, these rates dip to between 0.5-0.75%, contrasting sharply with less expensive areas where they can escalate to as high as 3.5%.[9] Drawing on global data, these economists ultimately posited that the total US residential brokerage fees ought to align more closely with a 3.0% standard.[10]

116. This analysis contrasts total broker commissions in the regions served by the Subject MLSs, averaging between 5% and 6%. Notably, commissions for buyer brokers alone remain consistent, ranging from 2.5% to 3%. These figures have held steady despite fluctuations in home prices, which typically would increase commission amounts, and despite the diminishing role of buyer brokers in a digital era where prospective buyers increasingly utilize platforms like Zillow or Realtor.com for market research. Intriguingly, evidence suggests that this trend of stability in buyer broker commissions is not isolated. For instance, upon information and belief, a representative from Keller Williams disclosed that in 2015, their buyer brokers

---

[8] *See* Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 Int'l Real Estate Review 12 (2002).
[9] *Id.* at 17.
[10] *Id.* at 13.

received an average commission of 2.7%, a figure nearly unchanged from the 2.8% reported in 2002.

117. Other economists echo these findings. A notable example is a Cornell University Economics Professor, who critically views the NAR's Compensation Rule. The professor labels this a "structural hurdle," impeding innovation and price competition in the real estate sector. According to this perspective, such a hurdle arises not from inherent structural characteristics of real estate markets, but rather because of an alleged anticompetitive conspiracy by the defendants.[11]

118. The Compensation Rule not only facilitates but also encourages anticompetitive behavior, specifically the "steering" away from brokers who depart from "standard" commission practices and rates. Keller Williams, in its educational materials for the "Keller Williams University" used to train realtors, has claimed that standard real estate commissions have stabilized at around six percent. This rule plays a pivotal role in enabling buyer brokers to effortlessly identify and compare the compensation offered by every seller within the MLSs that define Georgia's real estate market. Consequently, this facilitates the steering of clients towards homes offering higher commissions.

---

[11] *See* FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf

119. Further, Keller Williams is reported to have instructed its seller brokers to discourage home sellers from reducing the buyer broker commission. This instruction is based on the presumption that steering, as a practice, is widespread and likely to influence transactional decisions. Moreover, this approach suggests a tacit acknowledgement and potential exploitation of the market dynamics shaped by the Compensation Rule, which underlines the anticompetitive nature of such practices.

120. The practice of steering, as substantiated by economic studies and Defendants' own training materials, is seen to have clear anticompetitive impacts. Steering actively discourages reductions from the "standard" commission rate and permits brokers to sidestep or even penalize buyer brokers who attempt to compete through offering discounts. This practice not only hampers competition but also fosters significant agency costs. It creates a misalignment between the incentives of the buyer brokers and the best interests of their clients. Essentially, buyer brokers may be incentivized to direct their clients towards properties offering higher commissions, rather than those that best meet the clients' needs or preferences, leading to a conflict of interest. This misalignment undermines the principle of buyer brokers acting in the best interest of their clients, a foundational aspect of their professional duty.

121. The Defendants, along with their franchisees, brokers, and purported co-conspirators, also employ software to strategically direct transactions based on MLS commission data, reinforcing the practice of steering. Additionally, they have

deliberately limited buyer awareness of properties linked to reduced buyer broker commissions, effectively constraining market transparency and buyer choice. This dual approach – technologically aided steering and selective information disclosure – epitomizes a calculated effort to maintain higher commission standards, echoing broader anticompetitive concerns within the real estate sector.

122. CoreLogic, a company specializing in software technology and data services, caters to numerous MLSs across the United States, including, upon information and belief, to those within Georgia' real estate market. CoreLogic's primary software offering is known as Matrix.

123. Matrix includes a feature enabling brokers to filter property listings based on the buyer broker commission offered. This functionality allows buyer brokers to use Matrix to selectively present their clients with information about potential homes, specifically those offering a buyer broker commission within a preferred range.

124. Moreover, the NAR has implemented various rules and policies, collaboratively drafted and subsequently adhered to by the Defendants, which intensify the anticompetitive impact of steering. These stipulations particularly govern how the offered buyer broker commission is displayed, ensuring its visibility and comparability among realtor participants.

125. Defendants have ensured that realtors can readily access information about buyer broker commission offers, while ordinary home buyers and sellers remain

uninformed of such details. Additionally, NAR explicitly forbids the dissemination of this information through third-party websites or other MLS syndication services.

126. The NAR and Defendants have orchestrated a one-way flow of price information by requiring its disclosure among realtor participants while prohibiting its access to buyers and sellers. This strategic management of information hinders price competition that could favor consumers and instead encourages realtor participants to collaborate in maximizing their total commission.

127. Moreover, the concealment of pricing details enables realtors, including the Defendants who are intent on maintaining the status quo, to penalize brokers and realtors who deviate from the "standard" commission rates without consequence.

128. Furthermore, the lack of access for home sellers and buyers to the comprehensive, unilateral offer of buyer broker compensation deprives them of the means to identify any steering practices by buyer brokers.

129. The economic evidence plainly indicates that the Compensation Rule restricts competition in various aspects of the real estate market, consequently leading to home sellers paying significantly more than they otherwise would in a more competitive environment.

130. The Defendants' conspiracy, along with the Compensation Rule, was strategically formulated to maintain real estate commissions at artificially high, above-market levels. Despite considerable social and technological advancements that

typically would have reduced these costs, the Defendants have successfully kept the "standard" commission rate at 6%.

131. Furthermore, Defendants' conspiracy and Compensation Rule was designed not only to maintain elevated commission rates but also to sustain real estate agents who might not be competitive in a more rigorous market environment. The establishment of a "standard" commission insulates buyer brokers from market pressures, consequently allowing inefficient agents to remain in business without the necessity to enhance their competitiveness or exit the market.

132. The Defendants, in conjunction with other major realty firms, exert substantial influence over the NAR to the extent that they can effectively dictate its policies. This dominance results in local real estate agents being presented with "take it or leave it" policies. Non-adherence to these policies places these agents in a precarious position, often rendering them unable to sustain their business operations.

## DEFENDANTS' LION'S SHARE OF THE MARKET

133. The service market central to these claims is defined by the array of services offered to home buyers and sellers by residential real estate brokers with access to the Subject MLSs. The Defendants' controls of the Subject MLSs empower them to enforce the Compensation Rule and other restrictive rules from NAR upon Plaintiffs, the Class members and other market actors. In this realm, access to the Subject MLSs

is indispensable for brokers to engage in competition and to adequately serve home buyers and sellers within the territories the Subject MLSs cover.

134. The pertinent geographic scope for the claims set forth herein is the State of Georgia, wherein the Subject MLSs that constitute the state's real estate market are operational. Within these defined areas, most homes sold were listed on these MLSs by brokers who are bound by the rules and standards set by both the MLS and the NAR.

135. Buyers and sellers typically engage with local real estate agents who are members of the local MLS in the area wherein the property intended for purchase or sale is situated.

136. The Defendants, in collaboration with their co-conspirators, possess market power in each relevant market, derived from their control of the local MLSs and their predominant share in the local market, particularly in this District.

137. Within the territories governed by the Subject MLSs, any buyer brokers aspiring to compete outside the Defendants' conspiracy confront formidable, if not insurmountable, obstacles. Defendants, through their co-conspirators, exert a potent control over the Subject MLSs that form the lion's share of Georgia's real estate market. This dominance means that brokers not party to the conspiracy would face the daunting task of either creating an alternative listing service to challenge the conspirators or attempting to compete without any access to a listing service at all.

138. To effectively rival one of the Subject MLSs governed by NAR's rules, an alternative listing service would need to match, or nearly match, the comprehensiveness of the NAR-regulated MLSs. However, brokers and their affiliated realtors or agents, currently benefiting from elevated buyer broker and total commissions, have little motivation to engage with an alternative service that would yield lower overall commissions, including reduced earnings for both buyer and seller brokers.

139. Moreover, many buyers would likely hesitate to engage a buyer broker associated with an alternative listing service that necessitates them paying the buyer broker commission directly, especially when other buyer brokers, operating within an MLS governed by NAR's rules, are fully compensated by home sellers.

140. NAR further impedes potential competition by recommending that MLSs engage in non-compete agreements with third-party websites like Zillow and Realtor.com, to prevent these sites from evolving into competitive entities. NAR's checklist of essential elements dictates that any consumer-facing website must pledge not to compete with brokerage firms or MLSs by either obtaining a brokerage license or offering cooperation and compensation akin to an MLS. These non-compete agreements oblige these websites to refrain from using data in ways that mirror the functions of an MLS. Through such advisements, NAR actively encourages MLSs to

take steps that support the conspiracy, aiming to obstruct third-party websites from emerging as potential market challengers.

141. NAR's history of limiting innovation and competition among real estate brokers is evidenced by past actions, including those that prompted the Antitrust Division of the Department of Justice ("DOJ") to file a lawsuit. The DOJ's lawsuit targeted a NAR policy that hindered brokers using internet-based tools to offer enhanced services and reduced costs to consumers. NAR eventually consented to a Final Judgment, agreeing to modify and abandon the contested policy. The DOJ's lawsuit exemplifies NAR's pattern of developing, implementing, and enforcing anticompetitive policies, such as the Compensation Rule challenged in this case, which suppress innovation and restrict competition, contravening federal law.

142. Furthermore, the history of anticompetitive behavior in the real estate industry traces back to the first half of the 20th century. During this period, realtors adhered to explicit agreements to use set commission percentages in home sale transactions. This practice was eventually deemed an illegal price-fixing arrangement by the United States Supreme Court in *United States v. National Association of Real Estate Boards, et al.*, 339 U.S. 485 (1950).

143. Similarly, in one recent Missouri class action, a federal jury reached a verdict holding the NAR along with some of the nation's biggest real estate brokerages liable for almost $1.8 billion in damages for artificially inflating commissions.

144. Yet, the Defendants still resist a fair, competitive market. For example, in a recent strategic move to consolidate their position and preempt competition, Georgia's preeminent MLS – the GMLS – recently declared its intent to form an alliance with four other major MLSs in the Southeast. This coalition, to be known as the Southeast MLS Alliance, aims to facilitate a data sharing network. The new partnership will grant members access to a vast pool of over 85,000 listings spanning Alabama, Georgia, Kentucky, North Carolina, Tennessee, and South Carolina. The initiative is designed not only to provide real estate agents with expanded data resources but also to significantly boost their referral prospects throughout the Southeast. Richard Boone, CEO of Georgia MLS, emphasized the strategic alignment of these like-minded MLSs in major Southeast markets, underlining the importance of forming a robust referral network for their collective membership. He stressed that the alliance prioritizes member interests and geographical coherence, offering members access to listings in four of the Southeast's most sought-after cities.[12] Indeed, the colossus grows ever more formidable.

### CONTINUOUS ACCRUAL

145. In the four-year period prior to the filing of this Complaint, the Defendants, in concert with realtors and brokers associated with the Subject MLSs, consistently

---

[12] https://www.housingwire.com/articles/four-of-the-biggest-mlss-in-the-southeast-have-formed-an-alliance/

imposed and collected commissions that were artificially high, a direct consequence of a concerted conspiracy. This systematic overcharging, paid by the Plaintiffs and their fellow class members in the course of residential real estate transactions on the Subject MLSs, has not only raised concerns of fairness and legality but has also precipitated individual legal claims. Each instance of these inflated commission payments by the Plaintiffs and class members represents a separate, actionable harm under the law, giving rise to distinct causes of action for each affected transaction.

146. Throughout the four years prior to this Complaint, Defendants, along with their collaborators, have consistently applied and upheld the Compensation Rule and various other restrictive edicts promulgated by the NAR. This enforcement has occurred nationwide, encompassing the regions where the Subject MLSs are operational, and particularly within this District.

## CLASS ACTION ALLEGATIONS

147. Plaintiffs submit this action on their own behalf, and as a class action pursuant to Fed. R. Civ. Pro. 23 on behalf of the members of the "Main Class," asserting Counts One, Two and Three, and defined herein as:

> All persons who, for the period November 22, 2019 through the present, engaged a listing broker affiliated with NAR, HomeServices, HSF Affiliates, HSF Georgia, Harry Norman, BHH, Sotheby's, Atlanta Fine Homes, Keller Williams, Re/Max Holdings, Re/Max LLC, Re/Max Atlanta, Compass, Ansley, Christie's, Solid Source, Homesmart, Palmerhouse, EV Atlanta, Mark Spain, Anywhere, Coldwell Banker, Century 21, Dorsey Alston, and Beacham in the sale of a residential property listed

47

on the Subject MLSs and incurred a commission payment to the buyer's broker in connection therewith.

148. Plaintiffs also submit this action on their own behalf, and as a class action pursuant to Fed. R. Civ. Pro. 23 on behalf of the members of the "Georgia FBPA Class," asserting Counts One, Two and Three, and also Count Four, and defined herein as:

> All persons who, for the period November 22, 2021 through the present, engaged a listing broker affiliated with NAR, HomeServices, HSF Affiliates, HSF Georgia, Harry Norman, BHH, Sotheby's, Atlanta Fine Homes, Keller Williams, Re/Max Holdings, Re/Max LLC, Re/Max Atlanta, Compass, Ansley, Christie's, Solid Source, Homesmart, Palmerhouse, EV Atlanta, Mark Spain, Anywhere, Coldwell Banker, Century 21, Dorsey Alston, and Beacham In the sale of a residential property listed on the Subject MLSs and incurred a commission payment to the buyer's broker in connection therewith.

149. The defined Classes above specifically exclude the Defendants, along with their officers, directors, and employees. Entities in which any Defendant holds a controlling interest, as well as any affiliates, legal representatives, heirs, or assigns of the Defendants, are also not included. Furthermore, this exclusion extends to any judicial officer overseeing this case, along with their immediate family members and judicial staff, the jurors involved, and the counsel representing the Plaintiffs, including the employees of their respective law firms.

150. The Classes are readily ascertainable because residential real estate transactions are meticulously documented, and relevant records should exist in the public domain.

151. The number of Class members is so extensive that joining each individually is not feasible. Given the scope of the trade and commerce implicated, it is the Plaintiffs' belief that the Classes encompass several thousand members. The precise count and identities of these members are presumably known to the Defendants and their co-conspirators.

152. Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes.

153. There are common questions of law and fact that are central to all Class members, and these predominate over any questions relevant only to individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

> m. Whether Defendants, or any of them, engaged in the conspiracy;

> n. Whether the conspiracy was implemented in the geographic areas wherein the Subject MLSs operate;

> o. Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and the other members of the Classes;

p.  Whether the effect of Defendants' conspiracy was to inflate both total commissions and buyer broker commissions in the geographic areas wherein the Subject MLSs operate;

q.  Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits thereof;

r.  Whether Plaintiffs and the other members of the Classes are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

s.  Whether Defendants' conduct is unlawful; and

t.  The appropriate class-wide measures of damages.

154. Plaintiffs' claims are typical of the claims of the members of the Classes because their claims arise from the same course of conduct by Defendants and the relief sought within the Classes is common to each member.

155. Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation to represent themselves and the Classes. Together, Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of the Classes. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

156. A class action is the most effective and equitable method for resolving this dispute. Individual lawsuits by Class members would burden both the Court and the

Defendants, potentially leading to inconsistent decisions on the shared legal and factual questions. Conversely, a class action would consolidate efforts and resources, ensuring consistent outcomes for all similarly situated individuals without compromising fairness or leading to undesirable consequences. Without a class action, it would be impractical for Class members to pursue remedies for the alleged legal violations.

157. Additionally, the Classes may be certified under Rule 23(b)(1) and/or (b)(2) because:

u. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

v. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

w. Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

**ANTITRUST INJURY**

158. Defendants' anti-competitive agreements and actions have led to the following consequences, among others discussed above:

x.  Sellers of residential property have been forced to pay inflated costs to sell their homes through forced and nonnegotiable commissions to buyer brokers;

y.  Home sellers have been compelled to establish buyer broker commissions at certain levels as a means to induce buyer brokers to show the sellers' properties to potential buyers;

z.  Price competition has been restrained among brokers seeking to be retained by home buyers, and by brokers seeking to represent home sellers; and

aa. The Defendants and their franchisees have substantially augmented their profits by a significant margin through the increase of both total and buyer broker commissions.

159. As a consequence of the Defendants' purported violations of antitrust laws, Plaintiffs and the Class members have suffered harm to their businesses or property. This harm is due to the payment of higher total commissions than what would have been paid without the Defendants' anti-competitive conspiracy, thereby leading to incurred damages.

160. Any potential pro-competitive benefits occasioned by Defendants' conspiracy are substantially outweighed by its anti-competitive impacts.

161. Substantial economic data suggests that the Defendants' conspiracy has consequently led to Class members paying buyer-broker commissions and total commissions at levels well above competitive norms in regions served by the Subject MLSs.

162. This constitutes a quintessential antitrust injury, precisely the kind that the framers of the antitrust laws intended to penalize and forestall.

## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15, U.S.C. § 1
### AGAINST ALL DEFENDANTS
### [Brought on behalf of both Classes]

163. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 158 of this Complaint as though fully stated herein.

164. From over four years prior to the filing of this Complaint, and persisting to this day, the Defendants have been actively involved in a continuous contract, combination, or conspiracy, egregiously restraining interstate trade and commerce. This conduct violates Section 1 of the Sherman Act, codified at 15 U.S.C § 1.

165. The conspiracy alleged herein is rooted in an enduring accord among the Defendants and their cohorts, compelling sellers of residential properties to pay

exorbitant commissions to the buyer broker, a clear transgression of straightforward legal principles.

166. In furtherance of the contract, combination, or conspiracy, Defendants and their collaborators have performed one or more of the following overt acts:

        bb. Engaged in the creation, perpetuation, reissuance, and enactment of the Compensation Rule along with other anti-competitive regulations established by the NAR;

        cc. Imposing a mandate on the franchisees of the Defendants, among others, to enforce the Compensation Rule and additional anti-competitive regulations set by the NAR within the regions served by the Subject MLSs. This enforcement is carried out by each Corporate Defendant through its franchise agreements, policy manuals, and other contractual arrangements with its franchisees, affiliates, subsidiaries, and realtors.

167. The Defendants' conspiracy has coerced sellers into compensating buyer brokers with inflated commissions, both for the buyer broker and in total, stifling price competition among buyer brokers in the regions covered by the Subject MLSs. The detriment to competition from this scheme substantially outweighs any conceivable competitive advantages that might be claimed to arise from it.

168. Defendants' conspiracy constitutes a *per se* violation under the federal antitrust laws, specifically 15 U.S.C. § 1.

169. Alternatively, Defendants' conspiracy is illegal under the federal antitrust laws and violates 15 U.S.C. § 1 under a rule-of-reason analysis.

170. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs and the other Class members have been injured in their business and property, suffering damages therefrom in an amount to be proven at trial.

## COUNT TWO
### VIOLATION OF GEORGIA ANTITRUST ACT, O.C.G.A. § 12-8-2
### AGAINST ALL DEFENDANTS
### [Brought on behalf of both Classes]

171. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 166 of this Complaint as though fully stated herein.

172. Under the Georgia Antitrust Act, O.C.G.A. § 13-8-2, *et seq*, contracts against public policy cannot be enforced, including "[c]ontracts in general restraint on trade." O.C.G.A. § 13-8-2(a)(2).

173. The State of Georgia has expressed, both in its constitution and in its statutory law, a strong public policy disfavoring contractual restraints on competition and trade. *See* Ga. Const. art. 3, § 6, ¶ 5(c); O.C.G.A. § 13-8-2(a)(2).

## COUNT THREE

55

### VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
### AGAINST ALL DEFENDANTS
### [Brought on behalf of the Georgia FBPA Class only]

174. Plaintiffs reallege and incorporate by reference the allegations contained in paragraph 1 through 176 of this Complaint as though fully stated herein.

175. In accordance with Georgia's Fair Business Practices Act ("FBPA"), "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful." O.C.G.A. § 10-1-393 (a).

176. The Georgia General Assembly intends for the FBPA "to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in [Georgia]." O.C.G.A. § 10-1-391 (a).

177. Moreover, "[i]t is the intent of the General Assembly that such practices be swiftly stopped, and [the FBPA] shall be liberally construed and applied to promote its underlying purposes and policies." O.C.G.A. § 10-1-391 (a).

178. Under the FBPA, "trade" and "commerce" are defined as the "advertising, distribution, sale, lease, or offering for distribution, sale, or lease of any goods, services, or any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value wherever situate and shall include any trade or commerce directly or indirectly affecting the people of this state." O.C.G.A. § 10-1-392 (a) (28).

179. Plaintiffs engaged in transactions with the Defendants and their conspiratorial associates, acquiring services distinctly characterized as those of real estate brokerage involving the advertising and sale of real property within the state of Georgia.

180. As set forth herein, Defendants' conduct is unlawful and in violation of public policy governing the restraint of trade in Georgia.

181. Moreover, Defendants' conduct and conspiratorial scheme is deceptive, unfair, and affects the public interest at large.

182. Defendants' violations of the FBPA were willful and knowing.

183. Plaintiffs, including the Class members, suffered actual damages as a direct and proximate consequence of Defendants' past and continuing deceptive and unfair business practices, specifically occasioned by the Compensation Rule, which affects the public interest in the state of Georgia.

184. Plaintiffs and Class members seek actual and exemplary damages in amount to be proven at trial; injunctive relief against Defendants' methods, acts and practices that violate the Georgia FBPA; and attorneys' fees and expenses of litigation.

## COUNT FOUR
### VIOLATION OF GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### AGAINST ALL DEFENDANTS
### [Brought on behalf of both Classes]

185. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 169 of this Complaint as though fully stated herein.

186. In accordance with the Georgia Uniform Deceptive Trade Practices Act ("UDTPA"), "[a] person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he: . . . (12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." O.C.G.A. § 10-1-372(a).

187. As set forth herein, Defendants each engage in a business, vocation or occupation in Georgia.

188. As set forth herein, in the course of their business, Defendants engage in conduct that is deceptive and creates a likelihood of confusion or misunderstanding for sellers and the public at large.

189. Defendants' violations of the UDTPA were willful and knowing.

190. Plaintiffs, including the Class members, suffered actual damages as a direct and proximate consequence of Defendants' past and continuing deceptive trade practices, specifically occasioned by the Compensation Rule, which affects the public interest in the state of Georgia.

191. Plaintiffs and Class members seek actual and exemplary damages in amount to be proven at trial; injunctive relief against Defendants' methods, acts and practices that violate the Georgia UDTPA; and attorneys' fees and expenses of litigation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered in their favor against Defendants as follows:

(a) An Order certifying each of the Classes under Rule 23 of the Federal Rule of Civil Procedure, and appointing Plaintiffs and their counsel to represent the Class;

(b) A declaration that the Defendants' actions are unlawful;

(c) A permanent injunction Act enjoining Defendants from (1) requiring that sellers pay buyer brokers, (2) continuing to restrict competition among buyer brokers and seller brokers, and (3) engaging in any other unlawful conduct;

(d) Any other appropriate injunctive and equitable relief;

(e) An award to Plaintiffs and the other members of the Class for damages and/or restitution in an amount to be determined at trial;

(f) An award of exemplary damages in an amount sufficient to punish Defendants and deter future illegal activity;

(g) An award of pre- and post-judgment interest to Plaintiffs;

(h) An award to Plaintiffs for attorneys' fees, expenses, and costs,

(i) Any other award and further relief as the Court deems just and proper.

Respectfully submitted this the 22nd day of November, 2023.

*/s/ Bryan M. Knight*
Bryan M. Knight
Georgia Bar No. 142401
Jonathan M. Palmer
Georgia Bar No. 453452
Nicholas Sears
Georgia Bar No.
W. Lawton Jordan
Georgia Bar No. 119651

KNIGHT PALMER, LLC
One Midtown Plaza
1360 Peachtree Street, Suite 1201
Atlanta, Georgia 30309
P: (404) 228-4822
F: (404) 228-4821
bknight@knightpalmerlaw.com
jpalmer@knightpalmerlaw.com
nsears@knightpalmerlaw.com
ljordan@knightpalmerlaw.com

*/s/ Nathan D. Chapman*
Nathan D. Chapman
Georgia Bar No. 244954
Joshua Y. Joel
Georgia Bar No. 230547

KABAT, CHAPMAN, & OZMER LLP
171 17th Street NW, Suite 1550
Atlanta, GA 30363
Direct: (404) 400-7303
Main: (404) 400-7300
nchapman@kcozlaw.com
jjoel@kcozlaw.com

*Counsel for Plaintiffs*