# EXHIBIT

# 5

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| DANIEL UMPA, on behalf of himself and all others similarly situated, | ) ) ) | |
| | ) | Case No._ |
| Plaintiff, | ) ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| THE NATIONAL ASSOCIATION OF REALTORS, HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., KELLER WILLIAMS REALTY, INC., COMPASS, INC., EXP WORLD HOLDINGS, INC., EXP REALTY, LLC, REDFIN CORPORATION, WEICHERT REALTORS, UNITED REAL ESTATE, HANNA HOLDINGS, INC, DOUGLAS ELLIMAN, INC., DOUGLAS ELLIMAN REALTY, LLC, AT WORLD PROPERTIES, LLC, THE REAL BROKERAGE, INC., REAL BROKER, LLC, REALTY ONE GROUP, INC., HOMESMART INTERNATIONAL, LLC | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## <u>CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 3

II.    JURISDICTION AND VENUE .................................................................................. 12

III.   TRADE AND COMMERCE....................................................................................... 14

IV.    THE PARTIES............................................................................................................ 14
       A.    Plaintiff ........................................................................................................... 14
       B.    Defendants ...................................................................................................... 15
       C.    Co-Conspirators ............................................................................................. 20

V.     BACKGROUND OF THE REAL ESTATE INDUSTRY ........................................... 20

VI.    THE ANTICOMPETITIVE AGREEMENT WITH NAR ............................................ 23

VII.   NAR HAS REQUIRED LOCAL ASSOCIATIONS TO AGREE TO THESE
       ANTICOMPETITIVE RESTRAINTS ....................................................................... 43

VIII.  CORPORATE DEFENDANTS PARTICIPATE IN, FACILITATE, AND
       IMPLEMENT THE CONSPIRACY ........................................................................... 49

IX.    EFFECTS OF THE CONSPIRACY............................................................................ 61

X.     MARKET POWER..................................................................................................... 67

XI.    CONTINUOUS ACCRUAL ...................................................................................... 69

XII.   CLASS ACTION ALLEGATIONS ............................................................................ 70

XIII.  CLAIM FOR RELIEF ................................................................................................ 72

XIV.   REQUESTED RELIEF............................................................................................... 74

## I.      INTRODUCTION

1.      Plaintiff, a home seller who listed his homes on Multiple Listing Services in the United States ("the MLS"), brings this action against the National Association of REALTORS® ("NAR") and thirteen of the largest families of national real estate brokerages, brokerage owners, and franchisors in the United States (collectively, "Corporate Defendants") for agreeing, combining and conspiring to impose, implement and enforce anticompetitive restraints that cause home sellers to pay inflated commissions on the sale of their homes, in violation of federal antitrust law. Defendants' unlawful conduct is also the subject of an active investigation by the Antitrust Division of the United States Department of Justice, which is examining practices in the residential real estate brokerage business, with a focus on compensation paid to brokers, as well as other conduct.

2.      NAR, the Corporate Defendants and their co-conspirators collectively possess market power in local markets for real estate brokerage services through their control of the local MLSs. An MLS is a database of properties listed for sale in a particular geographic region and the marketplace on which the vast majority of homes in the United States are sold. Brokers must list a property for sale to effectively market that property to prospective buyers. The vast majority of MLSs are formally controlled by local NAR associations, and access to such MLSs is conditioned on brokers' agreement to follow all mandatory rules set forth in NAR's Handbook on Multiple Listing Policy, including the rules at issue here.

3.      Pursuant to Defendants' conspiracy, NAR allows brokers representing or otherwise working with home sellers and home buyers to use NAR's MLSs only if those brokers agree to adhere to and help implement terms that significantly restrain competition. Specifically, NAR and its co-conspirators require *every* listing broker (i.e., the broker representing the seller) when listing

3

a property on a Multiple Listing Service, to make a "*blanket unilateral offer[] of compensation*"
to any broker who may work with a buyer in purchasing that property (the "buyer-broker"). This
requirement, and related terms implementing the requirement, are set forth including in Policy
Statement 7.23 in NAR's Handbook on Multiple Listing Policy and is hereafter referred to as the
Buyer Broker Commission Rule or "the Rule."

4.      Only a small number of MLSs are not exclusively owned or operated by NAR
associations. These MLSs are nevertheless typically controlled by REALTOR® associations
and/or NAR-aligned brokerages and are not fully independent from NAR. For example, Midwest
Real Estate Data located in Illinois is partly owned by REALTOR® associations, limits its
membership to REALTORS®, and has adopted rules mandating blanket unilateral offers of
compensation. Central New York Information Service (CNYIS) located in New York State is also
managed by a local REALTOR® association, requires its members to adhere to NAR's Code of
Ethics, and has adopted NAR rules mandating blanket unilateral offers of compensation.

5.      Moreover, all Realtors in the United States are subject to NAR rules. NAR issues a
Code of Ethics, which applies nationwide and is binding on all REALTORS®, regardless of
whether they operate in a NAR-affiliated MLS or an MLS not affiliated with NAR.

6.      Defendants' implementation of and adherence to this agreement is manifestly
anticompetitive:

•       The Rule compels the seller to make an offer of payment to compensate the buyer-
broker even when the buyer-broker is working on behalf of the buyer, not the seller.

•       It requires that this be a blanket offer – i.e., the exact same compensation terms
must be simultaneously offered to every buyer-broker without regard to their experience, the
services they are providing to the buyer, or the financial arrangement they have made with the

4

buyer.

- Because this blanket offer must be made available to every buyer-broker using the MLS (i.e., virtually all buyer-brokers) and can be compared by the buyer-broker with the blanket offers that every other seller must post on the MLS, *the Rule creates tremendous pressure on sellers to offer a high commission that has long been maintained in this industry* so that buyer-brokers will not "steer" buyers away from their property and to properties offering higher buyer-broker commissions.

- The Rule *encourages and facilitates anticompetitive "steering"* by buyer-brokers because it allows them to compare the terms offered for buyer-broker compensation and steer their clients to properties where the listing broker is offering higher commissions. The prevalence of such steering, including its anticompetitive impact on consumers and exclusionary impact on brokers trying to compete with alternative, lower-cost models, is widely recognized in the economic literature. And the harm caused by actual steering is amplified by the perceived threat of steering: sellers are constrained to offer an inflated buyer-broker commission out of the fear that buyer-brokers may steer buyers away from their property.

- These effects are reinforced by the Rule's requirement that the offer of compensation be expressed as a percentage of the gross selling price of the home or a definite dollar amount and the Rule's prohibition on "general invitations by listing [i.e., seller] brokers to other participants to discuss terms and conditions of possible cooperative relationships."

- The anticompetitive effects are further reinforced by NAR's rules providing that after the seller has received purchase offers, the listing broker is prohibited from attempting to unilaterally modify the buyer-broker commission that was offered on the MLS. NAR Standard of Practice 3-2 states: "Any change in compensation offered for cooperative services must be

5

communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction." As a result, a seller cannot respond to a purchase offer with a counteroffer that is conditional on reducing the buyer-broker commission. Nor can the seller, after receiving purchase offers, decide to unilaterally reduce or eliminate the buyer broker commission offered on the MLS.

- Until recently, the anticompetitive effects were compounded by the fact that NAR rules restricted consumers' visibility into the buyer-broker commissions that were being offered to their own brokers. This limited buyers' ability to know whether their brokers were only showing them properties where they would be paid the highest commission amounts. This obfuscation was made even worse by NAR's ethical rule, which was in place until 2022, that permitted buyer brokers to tell clients that their services were free.

7.    There is no pro-competitive justification for this agreement and, to the contrary, the agreement's purpose and effect is to restrain competition. As one industry participant has acknowledged, "[i]t does not make sense for listing brokers to pay buyers' brokers for the services the latter provide to buyers. This is a bit like the lawyers working for one side in a transaction paying the lawyers working for the other side."[1] Stephen Brobeck, the Executive Director of the Consumer Federation of America has testified that "[i]n a rational price system, home sellers and buyers would each pay for real estate brokerage services they receive."[2] "The simple fact is that,

---

[1] Brian N. Larson, *The End of MLS as We Know It*, INMAN (Aug. 15, 2006), https://www.inman.com/2006/08/15/end-mls-we-know-it/.

[2] Stephen Brobeck, *Residential Real Estate Brokerage Services: A Cockamamie System That*

6

for decades, the dominant real estate firms and their trade association have tried, with much success, to maintain high, uniform prices within different geographic areas."[3]

8.      Each of the Corporate Defendants plays an active role in NAR and has mandated and/or encouraged franchisees, brokerages, and individual realtors to join and implement this anticompetitive agreement in order to secure the benefit of each Corporate Defendant's brand, brokerage infrastructure and other support. Indeed, because these are among the leading brokers in the United States, their participation in the conspiracy and implementation and enforcement of its terms is essential to the success of the conspiracy. The unlawful restraints implemented and enforced by the conspirators benefit NAR and the Corporate Defendants and further their common goals by allowing brokers to impose supra-competitive charges on home sellers and restrain competition by forestalling competition from lower-priced alternatives.

9.      Defendants use their control of the MLSs, and Corporate Defendants use their franchise agreements, employee policy and procedures manuals, and leadership roles in NAR and local realtor associations, to require brokers in local residential real estate markets to adhere to NAR's rules, including the Buyer Broker Commission Rule, and thereby help implement and enforce the conspiracy. The Corporate Defendants further implement the conspiracy alleged herein by reviewing and reissuing NAR's rules, including the Buyer Broker Commission Rule, at yearly NAR meetings, and by serving on the boards and committees that enforce compliance with NAR's rules.

10.      By participating in an association that prevents member institutions from allowing

---

*Restricts Competition and Consumer Choice*, CONSUMER FEDERATION OF AMERICA, 4 (2006), http://archives-financialservices.house.gov/media/pdf/072506sb.pdf.

[3] *Id.*

7

its employees and realtors to compete with each other to offer lower commissions, requiring franchisees, groups and individuals to join and adhere to the anticompetitive agreement alleged herein, and taking numerous steps in furtherance of the conspiracy, the Corporate Defendants have agreed to participate in, facilitate, and implement the conspiracy.

11.     The conspiracy has saddled home sellers with costs that would either not exist or often be borne by buyers in a competitive market. Moreover, because most buyer-brokers will not show homes to their clients where the seller is offering a lower buyer-broker commission, or will show homes with higher commission offers first, sellers are incentivized when making required blanket offers to procure the buyer-brokers' cooperation by offering high commissions. Thus, the conspiracy: (a) requires sellers to pay overcharges for services provided by buyer-brokers; (b) raises, fixes and maintains buyer-broker compensation at levels that would not exist in a competitive marketplace; and (c) encourages and facilitates steering and other actions that impede entry and market success by lower-cost real estate brokerage services.

12.     This method of setting buyer-broker commissions is wholly different from the practices that would exist absent the Buyer Broker Commission Rule. Absent the Rule, buyers would have the incentive to set and negotiate buyer-broker pricing (where such brokers are used at all), and buyer-brokers would compete to be retained by offering lower commissions to their prospective clients for their services. The Buyer Broker Commission Rule restrains price competition among buyer-brokers because the clients retaining the buyer-broker, i.e., home buyers, have little incentive or ability to reduce their broker's commission because they are not paying the commissions.

13.     In more competitive but otherwise comparable foreign markets, homebuyers pay their brokers if they choose to use one, and they pay less than half the rate paid to buyer-brokers

8

in the United States. In comparable international markets without a rule like the Buyer Broker Commission Rule, such as the United Kingdom, Australia, and the Netherlands, buyer-brokers, when they are used, are paid directly by home buyers, rather than by home sellers. As an article in the *Wall Street Journal* explained, real estate brokers have "shielded themselves with a skein of anticompetitive 'practices'" that "have kept the high fees they charge unchanged since 1991."[4] The total broker fees that have been imposed are "significantly higher than those paid elsewhere in the developed world," and, if they were instead paid at a competitive level, American consumers would save tens of billions of dollars annually.[5]

14.     Defendants' conspiracy has maintained broker commission levels at remarkably stable and inflated levels for the past two decades, despite the advent of the Internet and the diminishing role of buyer-brokers. According to the Consumer Federation of America, in the United States, the average total commission rates continue to remain between 5% and 6%, which is "no lower than it was in 2001" despite significant technological advances.[6] Approximately one half or more of this amount is the commission for the buyer-broker. At an industry event in 2023, the Chief Executive Officer of Defendant Keller Williams reported to other industry participants that Keller Williams' buyer-brokers were charging an average commission of 2.61% in 2022, an

---

[4] Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J. (Mar. 3, 2019), https://www.wsj.com/articles/when-you-buy-or-sell-a-home- realty-bites-11551649734.

[5] *Id.*

[6] FTC-DOJ Joint Public Workshop, Segment 3 Tr. June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokeragecompetition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_ segment_3.pdf; https://www.realtrends.com/articles/average-real-estate-commission-rate-at-highest-level-since-2013/ ("Average real estate commission rate at highest level since 2013").

9

amount virtually unchanged from the 2.8% it reported that it had charged in 2002.[7]

15.      Moreover, because housing prices have increased substantially during this period (at a rate significantly exceeding inflation), and commissions are charged on a percentage of a home's sale price, the actual dollar commissions imposed on home sellers increased significantly because housing prices were much higher. For example, between 2001 and 2022 the average price of new homes in current dollars sold rose from $213,200 to $540,000, according to U.S. Census Bureau Statistics.[8] As the Consumer Federation of America has observed, "[b]ecause the industry functions as a cartel, it is able to overcharge consumers tens of billions of dollars a year. . . . Consumers are increasingly wondering why they are often charged more to sell a home than to purchase a new car."[9]

16.      Indeed, Defendants have successfully stabilized buyer-broker commissions (and significantly increased the dollar cost) charged despite the diminishing role of buyer-brokers. According to data from NAR, many homebuyers no longer locate prospective homes with the assistance of a broker, but rather independently through online services. Buyer-brokers increasingly have been retained after their client has already found the home the client wishes to buy. Despite their diminishing role, buyer-brokers continue to receive the same artificially elevated percentage of the sales price due to Defendants' conspiracy. Defendants' success in maintaining (and, in inflation-adjusted dollar terms, substantially increasing) the charge imposed by buyer-

---

[7] *Gary Keller – Vision Speech KWRI Family Reunion 2023*, Keller Williams ELITE Lancaster PA, https://www.youtube.com/watch?v=6a4iKlvAIV4.

[8] *New Residential Sales: Historical Data*, U.S. CENSUS BUREAU, https://www.census.gov/construction/nrs/historical_data/index.html (last visited Dec. 22, 2023).

[9] Glen Justice, *Lobbying to Sell Your House*, N.Y. TIMES (Jan. 12, 2006), https://www.nytimes.com/2006/01/12/business/lobbying-to-sell-your-house.html.

brokers despite the advent of new technologies stands in stark contrast to other industries. "[I]n almost every other consumer industry -- booksellers, retailers, home appliances, insurance, banking, stock brokers -- the introduction of Internet and discount sellers has been a phenomenal financial benefit to customers. Discount airlines have cut airfares by 60% or more, to the economic benefit of everyone with the exception of the incumbent competitors. . . . Economists call this process of squeezing out transaction costs 'disintermediation.' If any industry is ripe for this, it is the $70 billion-a-year real estate brokerage market."[10] Instead, "[e]ven as housing prices have changed over time and technological advances have arguably made the broker's job *easier*, commission rates in the industry have remained remarkably steady at around five to six percent."[11]

17.     The conspiracy's effect can also be seen in the disconnect between buyer-broker costs and commissions. Buyer-broker costs are similar regardless of the price of the home, yet buyer-brokers are paid, for example, four times more when their client buys a million-dollar home rather than a $250,000 home. As the *Wall Street Journal* has explained, "many, if not most, of the services that Realtors provide don't vary with the sales price, so the percentage fee should fall as home price rises."[12] Instead, the commissions imposed on home sellers are "unrelated to either the quantity or quality of the service rendered or even to the value provided."[13]

18.     The conspiracy has inflated buyer-broker commissions, which, in turn, have

---

[10] *The Realtor Racket*, WALL ST. J. (Aug. 12, 2005),
https://www.wsj.com/articles/SB112381069428011613.

[11] Beth Nagalski, *Ending the Uniformity of Residential Real Estate Brokerage Services: Analyzing the National Association of Realtors' Multiple Listing Service Under the Sherman Act*, 73 BROOKLYN L. REV. 771, 781-82 (2008).

[12] The Realtor Racket, *supra* note 12.

[13] Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure*, 5 CORNELL REAL ESTATE R. 1, 1 (2007).

inflated the total commissions paid by home sellers such as Plaintiff and the other class members. Plaintiff and the other class members have each incurred, on average, thousands of dollars in overcharges as a result of Defendants' conspiracy. In a competitive market, buyers would have the incentive to set and negotiate buyer-broker prices,  and the total commissions paid in any transaction, including the commissions paid by sellers would be lower.

19.     Plaintiff, on behalf of himself and the class, sue for Defendants' violations of the federal antitrust laws as alleged herein, and seek treble damages, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees, and demand a trial by jury.

## II.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the classes contain more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of each class is a citizen of a State different from Defendants. The Court also has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4, 16 and 28 U.S.C. §§ 1331, 1337.

20.     This Court has personal jurisdiction over Defendants, each of which has been properly served. Defendants have (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District, and/or (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

21.     Defendant have received revenue attributable to business transacted in Missouri and in this District from the brokerage operations of their respective subsidiaries, franchisees, affiliates, and/or transaction counterparts that transact business in Missouri and in this District.

12

22.     For NAR, it collects substantial revenues and fees from its nationwide membership—including substantial numbers of members located and transacting business in Missouri, including in this District—as public estimates suggest that NAR makes more than $200 million in revenue every year, with most of that coming from member dues, including from members located in Missouri. Accordingly, during the Class Period, NAR has collected millions of dollars, if not tens of millions of dollars, in membership fees and revenues attributable to real estate brokerages, brokers, and/or realtors operating in this District.

23.     In addition, NAR conducts and transacts substantial business in this District through its involvement in drafting, reviewing, and publishing regularly updated editions of the "Interpretations of the Code of Ethics," with its 35th Edition published in 2023. NAR's Interpretations of the Code of Ethics reflects that NAR, through its Professional Standards Committee, interacts and conducts business with arbitration Hearing Panels and Boards of Directors of local real estate associations (including local associations operating in this District) to review and articulate purported policies and principles that have been applied in specific disputes involving realtors and that are also forward-looking "official statements of [NAR's] policy and are not merely advisory," thereby governing arbitration of disputes among realtors occurring in this District.

24.     NAR requires each of the Corporate Defendants, as well as other co-conspirators operating in this District, to comply with NAR policies, including its Handbook on Multiple Listing Policy and Code of Ethics. Among the policies that NAR requires the Corporate Defendants and other co-conspirators to follow in this District is the Buyer Broker Commission Rule. Upon information and belief, NAR actively monitored and policed the Corporate Defendants and other co-conspirators operating in this District to ensure full compliance with its Rules and

13

Policies, including the Buyer Broker Rule. Failure to comply with the Buyer Broker Commission Rule can result in expulsion of the entity or individual from MLSs.

25.     NAR also engages in substantial lobbying activities directed at various government entities and political candidates, at the local, state, and federal levels. Indeed, NAR is the country's largest lobbying presence in Washington, D.C. and most state legislatures. Upon information and belief, NAR has transacted such lobbying business directed in Missouri and at this District.

26.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. §1391(b), (c), and (d). Defendants have transacted business, have been found, had agents in and/or resided in this District; a substantial part of the events giving rise to the class's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## III.     TRADE AND COMMERCE

27.     The Buyer Broker Commission Rule and other anticompetitive NAR rules apply and have been implemented and enforced by Defendants and co-conspirators nationwide. These rules govern the conduct of local NAR associations, local brokers, and local realtors nationwide. Defendants' conduct alleged herein has inflated buyer-broker commissions nationwide, and has injured home sellers in those areas and nationwide. Defendant NAR, through its members and other co-conspirators, and Corporate Defendants, through their franchisees, brokers and other co-conspirators, are engaged in interstate commerce, and are engaged in activities affecting interstate commerce, in the United States.

## IV.     THE PARTIES

### A.     **Plaintiff**

28.     Daniel Umpa is a resident of Davidsonville, Maryland. On June 30, 2021, he sold

14

a home located in Canal Winchester, Ohio, which was listed on the Columbus Board of Realtors MLS. Mr. Umpa was represented by Redfin. As part of that sales transaction, Mr. Umpa paid a substantial buyer-broker compensation. On November 30, 2023, Mr. Umpa sold a home in Edgewater, Maryland, which was listed on the Bright MLS. He was represented in that sales transaction by Compass, Inc. As part of that transaction, he paid a substantial buyer-broker compensation.

### B.    Defendants

29.    Defendant National Association of REALTORS® ("NAR") has over 1.5 million individual members and is one of the largest lobbying groups in the country, advocating for the interests of real estate brokers. It has collected hundreds of millions of dollars in dues and membership fees during the Class Period, including millions of dollars in dues and membership fees from NAR members located in this District. NAR oversees fifty-four state and territorial realtor associations and around 1,200 local realtor associations are members of, and overseen by, NAR. NAR is headquartered in Chicago, Illinois.

30.    Defendant HomeServices of America, Inc. ("HSA") is "one of the largest residential real estate brokerage firms in the United States" and in 2022 "closed over $168.3 billion of home sales[.]"[14] HSA is incorporated in Delaware and headquartered in Minnesota. HSA is a majority owner of Defendant HSF Affiliates, LLC ("HSF Affiliates"). During the class period, HSF Affiliates has operated many real estate franchise networks, including Berkshire Hathaway HomeServices and Real Living. Additionally, in 2017, HSA acquired Defendant The Long & Foster Companies, Inc. ("L&F"), a large private residential real estate company in the United

---

[14] Berkshire Hathaway Energy Form 10-K (filed Feb. 24, 2023).

15

States. BHH Affiliates, LLC is a subsidiary of HSF Affiliates LLC and offers real estate brokerage services. This Complaint will refer to HSA, HSF Affiliates, L&F, their predecessors, BHH Affiliates, LLC and their wholly-owned or controlled subsidiaries or affiliates as "HomeServices Defendants."

31.   Defendant Keller Williams Realty, Inc. ("Keller Williams") is one of the nation's largest real estate brokerages. It is headquartered in Austin, Texas. It is a privately-held company. It franchises local Keller Williams brokers, which have more than 1,100 offices and 191,000 sales associates around the country.

32.   Compass, Inc. is a publicly-traded company incorporated in Delaware with its principal place of business in New York. Compass's stock began trading on the New York Stock Exchange after its initial public offering in April 2021. Through 2022, Compass represented sellers or buyers in more than 700,000 transactions totaling more than $780 billion in gross transaction value; Compass is the largest independent real estate brokerage by gross transaction value. Compass has an office in this District.

33.   eXp World Holdings, Inc. is a publicly-traded company incorporated in Delaware with its principal place of business in Bellingham, Washington. eXp offers the bulk of real estate brokerage services through its subsidiary, eXp Realty, LLC. eXp has brokerages in all 50 states in the United States residential real estate market. For the year ended December 31, 2022, eXp's agent count exceeded 86,000 and the company provided brokerage services for over 511,000 transactions. As used herein, the term "eXp" will refer collectively to eXp World Holdings, Inc. and eXp Realty, LLC. eXp has multiple offices in this District.

34.   Redfin Corporation is a publicly traded company incorporated in Delaware with its principal place of business in Seattle, Washington. Redfin operates in more than 100 markets

16

(including in this District) and has developed partnerships with over 8,700 agents at other brokerages. Redfin has over 2,400 agents of its own, and in 2022 provided brokerage services for over 80,000 residential real estate transactions. Redfin has multiple agents operating in this District.

35.     Weichert Realtors is a nationwide real estate brokerage company with its principal place of business in New Jersey. As of July 2022, Weichert operates through 375 franchise offices in 43 states and touts itself as "one of the nation's leading providers of real estate and related services".[15] Weichert has a franchise within the Kansas City metropolitan area that provides real estate services in this District and the entire region; the franchise (Weichert Realtors, Welch & Company) has a team of over 115 real estate agents.[16] Weichert also has franchises within this District, including in Columbia, Missouri (First Tier); Blue Springs, Missouri (CJ Properties); Branson, Missouri (The Griffin Company); and Laurie, Missouri (Laurie Realty).

36.     United Real Estate is a nationwide real estate brokerage company incorporated in Delaware with its principal place of business in Dallas, Texas. It is the sixth largest brokerage in the United States with company-owned brokerages in Dallas, Houston, Chicago, Philadelphia, and Washington, D.C. It also operates through franchises and company-owned brands in several markets, including within this District. In 2022, United merged with Platinum Real Estate. Platinum has over 50 agents in the Kansas City area and a presence in Iowa, Kansas, Missouri, Nebraska, and Oklahoma. United, through Platinum, has at least four offices within this District. Today, United has over 20,000 agents across the United States.

---

[15] *About Weichert*, WEICHERT (2023), https://www.weichert.com/aboutus/ (last visited Dec. 22, 2023).

[16] *Meet The Team*, WEICHERT REALTORS WELCH & CO., https://www.weichertmeskc.com/about-us (last visited Dec. 22, 2023).

37.     Hanna Holdings, Inc. ("Howard Hanna") is a privately held real estate brokerage company incorporated in Delaware with its principal place of business in Pennsylvania. In 2022, Howard Hanna was ranked first as the largest privately held real estate brokerage company in the United States, and ahead of other publicly traded companies such as Redfin and United Real Estate. In 2022 alone, Howard Hanna was engaged in over 113,000 transactions with a sales volume in excess of $36.6 billion.[17] According to Howard Hanna, it is a "powerhouse brand that stretches across the East Coast and into the Midwest . . ." with "15,000 agents across a 13-state footprint."[18]

38.     Douglas Elliman, Inc. is a publicly traded real estate brokerage company incorporated in Delaware with its principal place of business in New York. Douglas Elliman owns Douglas Elliman Realty LLC, which provides residential real estate brokerage services. Douglas Elliman Realty LLC is the sixth-largest residential brokerage company in the United States. In 2022, Douglas Elliman was engaged in over 26,000 transactions with a sales volume valued at over $42 billion. Douglas Elliman has over 20 offices with approximately 6,900 real estate agents. As used herein, the term "Douglas Elliman" will refer collectively to Douglas Elliman, Inc. and Douglas Elliman Realty LLC.

39.     At World Properties, LLC d/b/a @properties Christie's International Real Estate is incorporated in Illinois with its headquarters in Chicago, Illinois. It is one of the nation's largest brokerage firms with over 3,000 agents.[19]

---

[17] *Top Real Estate Brokerages By Sides in 2023*, REAL TRENDS, https://www.realtrends.com/500-by-sides/ (last visited Dec. 22, 2023).

[18] *The Hanna Family of Companies Tops Industry List as #1 Privately Held Real Estate Brokerage in the U.S.*, HOWARD HANNA REAL ESTATE SERVS. (Mar. 27, 2023), https://blog.howardhanna.com/press/the-hanna-family-of-companies-tops-industry-list-as-1-privately-held-real-estate-brokerage-in-the-u-s/.

[19] *Let's talk about affiliate opportunities*, @PROPERTIES, affiliates.atproperties.com (last visited

40.     The Real Brokerage, Inc. is among the fastest-growing publicly traded real estate brokerage firms. It is incorporated in Delaware and headquartered in New York and Toronto, Canada. It serves over 48 states and the District of Columbia, and has over 11,000 agents as of February 2023.[20] In 2022, the total value of homes sold by The Real Brokerage, Inc. was $14.4 billion. Real Broker, LLC is a wholly-owned subsidiary of The Real Brokerage, Inc., which is incorporated in Texas. Real Broker, LLC is a licensed broker in Missouri. As used herein, the term "Real Brokerage" will refer collectively to The Real Brokerage, Inc. and Real Broker, LLC.[21]

41.     Realty ONE Group, Inc. is a real estate brokerage and franchising company headquartered in California and incorporated in Nevada. The firm was ranked on Entrepreneur's list of companies in 2023 with the fastest-growing franchises.[22] The firm is one of the world's largest real estate franchises, serving 49 states, Washington D.C., and sixteen countries and territories with over 19,000 professionals.[23] The firm has an office in Kansas City, Missouri. Since Realty ONE Group started in 2005, it has paid over $4 billion in commissions.

42.     HomeSmart International, LLC ("HomeSmart") is among the largest real estate brokerage firms in the county, and is headquartered and incorporated in Arizona. It has over 26,000

---

Dec. 22, 2023).

[20] *About*, REAL, onereal.com/about (last visited Dec. 22, 2023).

[21] THE REAL BROKERAGE INC. 2022 ANNUAL REPORT AND MD&A (2022), https://investors.onereal.com/static-files/95dd92fd-2d4a-4856-85a4-f9190e4308f7.

[22] *2023 Fastest-Growing Franchises*, ENTREPRENEUR, https://www.entrepreneur.com/franchises/directory/fastest-growing-ranking (last visited Dec. 25, 2023).

[23] *Realty One Group*, ENTREPRENEUR, https://www.entrepreneur.com/franchises/directory/realty-one-group/334570 (last visited Dec. 25, 2023); *Realty One Group Gives Generously While Rapidly Growing Its Global Network In The First Half of 2023*, REALTY ONE GROUP (July 5, 2023), https://www.realtyonegroup.com/newsroom/press/realty-one-group-rapidly-growing-its-global-network-first-half-2023.

agents across 200 offices and 49 states.[24] HomeSmart has agents in Missouri. For eleven consecutive years, the company has ranked as one of the fastest growing private companies in the United States by Inc. Magazine's Inc. 5000 list.[25]

43.     Each Defendant has a significant presence in the nationwide market.

**C.     Co-Conspirators**

44.     Multiple local realtor associations and MLSs not named as Defendants participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.

45.     By adopting the Buyer Broker Compensation Rule, MLSs, among others, have participated as co-conspirators in the antitrust violations alleged herein and performed acts and made statements in furtherance thereof.

46.     Multiple franchisees and brokers of Defendant Corporations participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.

47.     Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as defendants in this Complaint.

**V.     BACKGROUND OF THE REAL ESTATE INDUSTRY**

48.     State licensing laws regulate who can represent sellers and buyers in the real estate market. There are typically two licensee categories: (1) the real estate broker; and (2) the individual

---

[24] *HomeSmart Ranks in Top 100 on RealTrends' 500 List Seven Consecutive Years*, HOMESMART (Mar. 31, 2023), https://homesmart.com/press-room/homesmart-ranks-in-top-10-on-realtrends-500-list-seven-consecutive-years/; *Top Real Estate Brokerages By Sides in 2023*, REAL TRENDS, https://www.realtrends.com/500-by-sides/ (last visited Dec. 25, 2023).

[25] *HomeSmart Included in Inc. 5000 for 11th Consecutive Year*, HOMESMART (Aug. 16, 2023), https://homesmart.com/press-room/homesmart-included-in-inc-5000-for-11th-consecutive-year/.

real estate licensee or agent.

49.     Licensed brokers are typically the only ones permitted by law to be paid to represent buyers or sellers in a real estate transaction. For that reason, real estate brokerage contracts with sellers and buyers are typically required to be with brokers, not agents, and all payments to individual agents must pass through brokers.

50.     According to NAR, 86% of sellers sold their home with the assistance of a real estate broker in 2022, and 86% of buyers purchased their home with the assistance of a real estate broker in 2022.

51.     The standard practice in the residential real estate industry is to compensate brokers and agents with commissions that are calculated as a percentage of a home's sale price. Commissions are paid when the home sells.

52.     Most brokers and their individual agents occupy dual roles: they operate as listing brokers for some home sales and as buyer-brokers for other home sales.

53.     A listing broker's compensation is specified in a listing agreement, a contract between the seller and the listing broker that details the terms of the listing. A listing agreement typically states that the listing broker has the exclusive right to market the seller's home. The listing agreement specifies the total commission that a home seller will pay to the listing broker, often with a portion of that amount earmarked to be paid to the buyer-broker in the event the buyer has a broker (and the seller may retain that overcharge even if a buyer-broker is not used or the buyers-broker attempts to negotiate a different fee for the buyer-broker's services).

54.     If the buyer has a broker, the seller or the listing broker (as the seller's agent) pays the buyer-broker a commission out of the total commission paid by the seller. In other words, buyer-brokers—who assist their clients in negotiating against the seller—receive their

21

compensation from the total commission paid by the seller, not from the buyer they represent. In fact, until 2022, a standard of conduct in NAR's Code of Ethics permitted and encouraged buyer-brokers to tell their clients that their services were free.

55.     In the listing agreement, the seller sets the total commission to be paid to the listing broker with the expectation that a portion of the commission will be paid to a buyer-broker. If, as would happen in the absence of the Buyer Broker Commission Rule, buyers were incentivized to negotiate and set the compensation of their brokers, (i) sellers would typically agree in their listing agreements to pay a commission solely to compensate the listing broker because sellers have no incentive to compensate a buyer-broker negotiating against their interests, and (ii) the listing broker commission would be about half or less of the amount that sellers have paid as a total commission to compensate both the buyer-broker and the listing broker.

56.     When a buyer retains a broker, the buyer sometimes enters into a written contract with that broker. The contract typically discloses that the buyer-broker will be compensated by receiving a commission from the listing broker.

57.     An MLS is a database of properties listed for sale in a defined region that is accessible to real estate brokers and their individual realtors that agree to comply with the rules of the MLS. The vast majority of MLSs are owned and operated by local realtor associations that are affiliated with, and governed by, NAR. Listing brokers list their client's property on an MLS as required by a NAR rule, and to ensure that buyer-brokers and prospective buyers are aware of the property. If a listing broker does not list a client's property on an MLS, most buyer-brokers will not show that property to prospective buyers. MLSs also act as the main source of listings for online websites, such as Zillow, through which many prospective homebuyers find homes. A home that is not listed on an MLS is very hard to find for prospective homebuyers.

22

58.     The Buyer Broker Commission Rule obligates a listing broker, on behalf of the seller, to make blanket, unilateral offers of compensation to buyer-brokers when listing a home on an MLS owned by a local realtor association. If a buyer represented by a broker purchases the home, the buyer-broker receives the offered compensation.

59.     The following example illustrates how this process typically works:

•     A homeowner enters into a contract with a listing broker, in which the seller agrees to pay the listing broker six percent in total commissions in exchange for marketing and facilitating the sale of the home.

•     The listing broker then makes a blanket, unilateral offer of a three percent commission to every buyer-broker when it lists the home on the local MLS.

•     A buyer-broker shows the property to a buyer client, who buys the home for $500,000.

•     The listing broker receives six percent of the sales price ($30,000) from the seller. The listing broker then pays three percent of the sales price ($15,000) to the buyer-broker.

## VI.     THE ANTICOMPETITIVE AGREEMENT WITH NAR

60.     Prior to adoption of the Buyer Broker Commission Rule in 1992 (and its revision in 1996), NAR played the central role in implementing and enforcing, through the MLS system, a market structure in which *all* brokers involved in residential home sales represented the seller either as the seller's broker or the "sub-agent" of the seller's broker. Under this "almost universal sub agency system . . . brokers, even those working solely with buyers, were legally obligated to represent the interests of sellers."[26] Because "nearly all brokers involved in transactions

---

[26] Stephen Brobeck & Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How*

23

represented the seller either as the seller's agent or as the subagent of the listing [i.e., seller's] broker," the seller's broker got paid by the seller and would then compensate the subagent working with the buyer.[27] In fact, "[a]s a rule, MLS's required that offers of compensation be contingent on the cooperating broker acting as a subagent of the listing broker, rather than an agent of the buyer. Subagency allowed cooperating brokers who worked with buyers to collect a share of the commissions paid by sellers without actually representing buyers in an agency capacity."[28]

61.     Under the sub-agency system, homebuyers commonly proceeded on the mistaken understanding that the subagent broker was working on the buyer's behalf (even though the broker, instead owed a fiduciary obligation to *the seller*). "When this sub agency system, in which brokers working with buyers were legally obligated to pass on information disadvantageous to their clients to sellers, was exposed through press coverage, it collapsed almost overnight."[29]

62.     With the emergence of brokers who were no longer sub-agents of the seller's broker, but were instead working for the buyer, there was no justification for requiring the seller to pay this cost. As one industry participant acknowledged, "[w]ith the demise of subagency, there is little reason to keep interbroker compensation. . . . It does not make sense for listing brokers to

---

*Consumers Can Protect Themselves*, CONSUMER FED'N OF AM., 3 (2006), https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

[27] Larson, *supra* note 3.

[28] Matt Carter, *From Subagency to Non-Agency: A History*, INMAN (Feb. 17, 2012), https://www.inman.com/2012/02/17/from-subagency-non-agency-a-history/; *See* Ann Morales Olazabal, *Redefining Realtor Relationships and Responsibilities: The Failure of State Regulatory Responses*, 40 Harv. J. on Legis. 65, 71 (2003) (explaining that for years, the "dominant real estate exchanges" – i.e., the MLS's – permitted cooperating or selling agents (those working with buyers) to split the commission to be paid by the seller only if the cooperating agent agreed to be a subagent of the seller").

[29] Brobeck & Woodall, *supra* note 28.

pay buyers' brokers for the services the latter provides to buyers."[30]

63. Instead of adjusting to this fundamental change in the market—and, in particular, the fact that the buyer's broker was now often working for the buyer—the Defendants have implemented and enforced a scheme designed to maintain supra-competitive commissions and impede lower-priced competition.[31] In 1992, NAR adopted the Buyer Broker Commission Rule as

---

[30] Larson, *supra* note 3.

[31] The NAR, Local Realtor Boards, and MLSs have a long history of anticompetitive actions designed to maintain broker commissions and impede entry by lower-cost alternatives. NAR's predecessor, the National Association of Real Estate Exchanges "institutionalized a commission rate norm when it adopted its first Code of Ethics in 1913. It stated that 'an agent should always exact the regular real estate commission prescribed by the board or exchange of which he is a member.'" P. Barwick, P. Parag, A. Pathak & M. Wong, *Conflicts of Interest and the Realtor Commission Puzzle*, NAT'L BUREAU OF ECON. RESEARCH, 4 (2015), https://www.nber.org/papers/w21489.pdf. In 1950, NAR's code of ethics stated that "every Realtor . . . should maintain the standard rates of commission adopted by the board and no business be solicited at lower rates." After a 1950 Supreme Court decision found brokers guilty of price-fixing in violation of the Sherman Act, *United States v. Nat'l Assn. of Realtors,* 339 U.S. 485, 488, 494-95 (1950), local realtor associations continued to fix prices "for the next twenty-eight years" by recommending or suggesting commission rate schedules or establishing minimum prices. David Barry, *Nine Pillars of the Citadel*, Report Submitted to the FTC/DOJ Workshop on Competition Policy and the Real Estate Industry, 26-27 (2005), https://www.justice.gov/sites/default/files/atr/legacy/2005/12/05/213351.pdf. Since that time, NAR, its affiliates, and other MLSs have continued to implement illegal policies designed to restrain competition. *See, e.g.*, *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980) (holding that MLS was enforcing unreasonable membership criteria restricting access to MLS); *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991) (finding MLS requirement restricting access anticompetitive and unlawful); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) (finding MLS fee for access anticompetitive and unlawful); *In the Matter of MiRealSource, Inc.*, No. 9321 (F.T.C. 2007) (Consent Order regarding MLS rules limiting alternative business models); *United States v. Nat'l Ass'n of Realtors*, No. 05 C 5140, 2006 WL 3434263 (N.D. Ill. Nov. 27, 2006) (Consent Decree forbidding policies adopted by NAR imposing restraints on Virtual Office Websites). The Wall Street Journal has reported that "[i]n its own internal documents," NAR "acknowledges that the purpose of state lobbying is to keep competition out and fees high. In an April 22 memo to its state affiliates, the national office urged members to keep agitating for `state laws that are designed to replace competition with regulation.' The memo added that `Realtors have the right to lobby for legislative and regulatory action – even if the effect

25

part of its Handbook on Multiple Listing Policies.

64.     The NAR Board of Directors, and the Multiple Listing Issues and Policies Committee reporting to it, periodically determine whether to modify any policies in the Handbook on Multiple Listing Policy (for example, certain changes to MLS policies were approved by the Board of Directors and made in 2021). The policies that are retained (and any modifications thereto) are set forth in new editions of the Handbook on Multiple Listing Policy that are issued on or about an annual basis. The Board of Directors, and the Handbook on Multiple Listing Policy, have consistently and repeatedly retained the Buyer Broker Commission Rule.

65.     In setting forth the MLS terms, NAR has successfully invited the Defendants and other co-conspirators to participate in the following agreement, combination and conspiracy: They can participate in the MLS, and gain the benefits provided by NAR and the MLS, but only if they agree to adhere to and enforce the anticompetitive restraints set forth in the Handbook on Multiple Listing Policy.

66.     NAR's Handbook on Multiple Listing Policy provides that "Association and Association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as members boards and to ensure coverage under the master professional liability insurance program."

67.     The Handbook states the Buyer Broker Commission Rule as follows: "In filing a

---

of such action would be anti-competitive." *The Realtor Racket*, *supra* note 12.  As set forth in this complaint, NAR has acted with the same animus outside the lobbying context, through imposition and enforcement of the Buyer Broker Commission Rule and its agreement that the MLS will be made available to brokers who adhere to and enforce these anti-competitive restraints.

property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants." The Handbook further states that "multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."

68.     The Buyer Broker Commission Rule shifts a cost to the seller that would be negotiated and set by the buyer in a competitive market. As the Consumer Federation of America has explained, "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive."[32] The Rule, however, imposes a financial overcharge on home sellers by requiring them to make a "blanket unilateral offer of compensation" to the buyer-broker as a condition of participating on the MLS.[33] As a result of the Rule, listing brokers must make "blanket, unilateral, unconditional offers of compensation to their adversarial buyer brokers. Every MLS in the U.S. requires that listing brokers offer compensation to buyer brokers."[34] As the *Wall Street Journal* reported, "[h]omeowners are required to hire a buying agent if they employ a selling agent through a multiple listing service – a potentially illegal tying arrangement under the Sherman Anti-Trust Act that keeps buying agents paid though they offer almost no useful

---

[32] Brobeck, *supra* note 4, at 4.

[33] *Id.* at 3.

[34] Douglas R. Miller, *Letter to DOJ/FTC*, CONSUMER ADVOCATES IN AMERICAN REAL ESTATE (CAARE), 5 (2018),
https://www.ftc.gov/system/files/documents/public_comments/2018/07/00052-147606.pdf.

27

services."[35]

69.      There is no pro-competitive justification for imposing this overcharge on home sellers. As one commentator has written: the practice of "sellers' brokers specifying the fees that buyers' brokers charge to the latter's own clients, should be recognized" as "at least an attempt to fix market prices. . . . There is no longer any reason to permit listing brokers to set the default prices that these competing buyers' brokers charge to serve their own customers. . . . The elimination of interbroker compensation would diminish the ability of traditional brokers to frustrate vigorous price competition, and thus likely lead to a dramatic fall in broker revenues."[36]

70.      Further, by requiring that this be a "blanket" offer, the Rule compels home sellers to make this financial offer without regard to the experience of the buyer-broker or the services or value they are providing. The same fee must be offered to a new buyer-broker with little or no experience, as that offered to a buyer-broker with many years of experience. As a result, there is a significant level of uniformity in the payments that sellers must pay to buyer-brokers. "One implication of fairly uniform rates is that there is little or no relationship between commission level and service quality. Skilled, experienced agents and brokers charge about the same price as agents with little experience and limited knowledge of how to best serve the consumer clients. In a price-competitive market, less experienced and less skilled agents would be offering consumers lower

---

[35] Ryan & Friedland, *supra* note 6.

[36] Nadel, *supra* note 15, at 64-65. *See also* B. Kaufman, *Why the Class Action Lawsuit Against NAR and the Big Brokers Makes Sense* (June 3, 2019), https://www.inman.com/2019/06/03/why-the-class-action-lawsuit-against-nar -and-the- big-brokers-makes-sense/ (recent article by real estate broker explaining that the buyer- broker commission has been "locked in" at 2.5 – 3 percent).

28

commission rates, but we know of no compelling evidence that they are doing so."[37]

71.     Because the blanket offer must be made available to every buyer-broker using the MLS (i.e., virtually all buyer-brokers), and can be compared to the blanket offers that every other listing broker must post to participate on the MLS, the Rule is designed to create tremendous pressure on sellers to offer the high, standard commission that has long been maintained in this industry. Listing brokers know that if the published, blanket offer is less than the standard commission, many buyer-brokers will "steer" home-buyers to the residential properties that provide the higher standard commission. As discussed in more detail below, the prevalence of such steering has been widely reported in government reports, economic research and the trade press and is well understood by NAR, the Corporate Defendants, and their co-conspirators. Indeed, according to course materials provided at Keller Williams University, offering less than three percent in buyer-broker commission on an MLS "will reduce the number of willing and qualified buyers that will see your home." Other Corporate Defendants make similar statements in their training materials warning agents and sellers that offering a less than standard commission will lead to fewer showings by buyer-brokers. For instance, Weichert Realtors' New Agent Guide, included as part of its PartnerUp program "designed to help a new sales associate get started in the business[,]"[38] directs agents to recommend a 6% commission with the buyer-broker being paid a

---

[37] Brobeck, Comments of Stephen Brobeck, Executive Director Consumer Federation of America Before the Department of Justice-Federal Trade Commission Public Workshop on Competition Issues, CONSUMER FEDERATION OF AMERICA, 3 (2018), https://consumerfed.org/wp-content/uploads/2018/06/CFA-comments-DOJ-FTC- public-workshop-on-competition-issues.pdf.

[38] Weichert Realtors, New Sales Associate Coaching Guide at 24, *available at* https://ftp.weichertonline.com/elearningpromotions/PartnerUp/New%20Sales%20Associate%20Coaching%20Guide.pdf.

29

3% fee.[39] The Guide instructs agents to pushback on a 5% commission and has agents tell sellers: "Can you see how paying an extra half of one percent can be an incentive to get more interest in your home and generate more potential showings?"[40]

72.     The entirely foreseeable result of the Buyer Broker Commission Rule is that the "blanket" offers of compensation to buyer-brokers are overwhelmingly made at or near the high level that prevails in the industry and Defendants are acting to sustain. The Consumer Federation of America has explained, "Typically, on either a 5% or 6% commission, 3% will be offered to brokers with buyer clients, and that commission split is disclosed to brokers on real estate firm and multiple listing service databases." The listing of the 3% split "then acts as a powerful force to discourage lower splits of 2% or even 1% because listing brokers, and their sellers, fear that properties carrying these lower splits will not be shown. As a result, "a listing broker lists a split below" the standard industry level "at their, and their clients', peril because of the risk that traditional brokers working with buyers will avoid this property. . . . This informal discrimination against price competitors is the most important factor that allows dominant brokers to maintain high and uniform prices."[41]

73.     Defendant Keller Williams, for example, instructs listing brokers to tell home sellers that "[t]he standard real estate commission has stabilized, over the years, at right around 6 percent" and that "[y]ou're putting yourself at a disadvantage competitively when you reduce your commission." This is a message that Keller Williams has also broadcast to the entire industry,

---

[39] WEICHERT REALTORS, NEW AGENT GUIDE at 132, *available at* https://ftp.weichertonline.com/elearningpromotions/PartnerUp/New%20Sales%20Associate%20Coaching%20Guide_Print.pdf.

[40] *Id.*

[41] Brobeck, *supra* note 4, at 3-4.

including its purported competitor brokerages. At a major industry event in 2023, the CEO of Keller Williams disclosed the actual commissions it was charging (5.32% the year before, including a buyer-broker commission of 2.61%).

74.     The Buyer Broker Commission Rule facilitates anticompetitive steering away from brokers who deviate significantly from "the standard real estate commission" by enabling buyer-brokers to identify and compare the buyer-broker compensation offered by every seller in the MLS and then steer clients to homes offering higher commissions. As one commentator has explained: "[t]he effects of steering, and its efficiency in curtailing price competition because of the importance of cooperating in the residential real estate industry, have been widely discussed. Brokers are able to engage in steering because 'an MLS listing gives brokers information on the commission that will be paid to the broker who brings the buyer to that property.'"[42]

75.     By encouraging and facilitating steering, the Buyer Broker Commission Rule deters downward departures from the standard commission and enables brokers to avoid doing business with or otherwise retaliate against buyer-brokers who try to compete by offering significant discounts. One discounter explained in an FTC/DOJ workshop that after it offered a lower commission on the MLS, "[w]e've had bricks thrown through car windows. We've had our cars egged. We've had hate mail sent to our sellers." The discounter estimated that "40% of agents will go out of their way, above and beyond, and push hard not to show or sell your home if you don't

---

[42] Bradford W. Muller, *Encouraging Price Competition Among New Jersey's Residential Real Estate Brokers*, 39 SETON HALL L. REV. 665, 682-683, 683 n.100 (2009). *See also* Barwick, Pathak & Wong, *supra* note 33, at 1 ("In the conventional compensation arrangement where sellers pay for the commissions of their listing agents and potential buyers' agents, the latter have an incentive to prioritize properties that offer higher commissions. This kind of steering is thought to lead to uniformly high commissions.").

offer a 2.8% or 3% commission."[43] As another commentator has explained: "Essentially, the MLS listing acts *as a tool which competing brokers can use to help enforce a near-uniform commission rate and drive out discounters.*"[44]

76.     Thus, in his 2016 presentation to competing brokerages and other participants at a major industry event, Defendant Keller William's CEO reported that his firm's research had found that "[l]imited service, discount broker, market share in the United States, is at an all-time low," and he enthusiastically reported that efforts to gain business by offering discounted commissions had become "irrelevant."

77.     The Defendant Corporations' franchisees and brokers, and other co-conspirators, have also utilized software technology to help facilitate steering based on MLS commission data and to impede buyers from learning about properties that offer discount buyer-broker commissions. For example, NAR's affiliate, the Greater Las Vegas Association of Realtors ("GLVAR") uses for its MLS a software program called Matrix, which was designed and sold by CoreLogic. Matrix allows brokers to provide tailored electronic listings to their buyer clients. Matrix automatically generates and regularly sends emails to buyer clients that describe properties for sale that match their search criteria. When brokers set up the Matrix program for their buyer

---

[43] Statement of Joshua Hunt, *What's New in Residential Real Estate Brokerage Competition – An FTC-DOJ Workshop (Segment 2)*, FTC, 7 (2018), https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-2/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_2.pdf.

[44] Muller, *supra* note 44, n.100 (emphasis added). *See also* Barwick, Pathak & Wong, *supra* note 33, at 1 ("In the conventional compensation arrangement where sellers pay for the commissions of their listing agents and potential buyers' agents, the latter have an incentive to prioritize properties that offer higher commissions. This kind of steering is thought to lead to uniformly high commissions.").

clients, one of the fields in the software previously allowed the brokers to filter listings according to the value of the buyer-broker commission being offered. In other words, brokers could program the software to only send property listings to buyers that promise buyer-broker commissions above a specified value.

78.     GLVAR elected to adopt a version of the Matrix software that permitted brokers to *exclude* properties offering discount buyer-broker commissions from Matrix-generated emails to buyer clients. A not insignificant number of franchisees and brokers of the Corporate Defendants in Las Vegas (and potentially other markets) trained their realtors to insert 2.5 percent or higher as the minimum permissible buyer-broker commission when using the Matrix system to send property listings to buyer clients. As a consequence, unbeknownst to them, buyer clients of those realtors often did not receive Matrix-generated emails that included properties offering a buyer-broker commission of less than 2.5 percent or higher, even if that property perfectly matched the buyers' search criteria.

79.     The United States Department of Justice's (DOJ) Antitrust Division is actively "investigating potentially anti-competitive practices in the residential real estate brokerage business, with a focus on compensation to brokers and restrictions on their access to listings."[45] The Antitrust Division served Civil Investigative Demands ("CIDs") pursuant to its investigation into "[p]ractices that may unreasonably restrain competition in the provision of residential real-estate brokerage services."[46] For example, a CID served on CoreLogic directed it to produce "all documents relating to any MLS member's search of, or ability to search, MLS listings on any of

---

[45] David McLaughlin & Patrick Clark, *U.S. Opens Antitrust Probe of Real Estate Brokerage Industry*, BLOOMBERG (May 22, 2019), https://www.bloomberg.com/news/articles/2019-05-22/u-s-opens-antitrust-probe-of-real- estate-brokerage-industry.

[46] Civil Investigative Demand to CoreLogic, U.S. Dep. of Just., No. 29938 (dated May 16, 2019).

33

the Company's multiple listing platforms, based on (i) the amount of compensation offered by listing brokers to buyer brokers; or (ii) the type of compensation, such as a flat fee, offered by listing brokers to buyer brokers."[47] The Antitrust Division entered into and subsequently withdrew from a proposed consent decree that would have resolved some but not all of the rules at issue here (e.g.,  NAR rules encouraging buyer-brokers to represent their services as free to buyers, allowing MLS participants to filter listings based on the amount of the blanket compensation offer, and prohibiting disclosure of the blanket offer to buyers in listings). DOJ indicated that the reason behind its withdrawal was so it could "investigate and challenge additional potential antitrust violations committed by Defendant [NAR]."[48] DOJ has appealed a district court's ruling that its withdrawn settlement agreement barred DOJ from continuing its investigation into certain potential anticompetitive practices by NAR.

80.     The Buyer Broker Commission Rule's facilitation of steering is also magnified by the Rule's requirement that the compensation that home sellers offer to buyer-brokers on MLSs *must* be offered as a percentage of the gross selling price or a definite dollar amount and by the Rule's prohibition on "general invitations by listing [i.e., seller] brokers to other participants to discuss terms and conditions of possible cooperative relationships." By requiring that offers of compensation be expressed in specific dollar or percentage terms, the Rule ensures that buyer-brokers can easily compare the financial compensation offered to them by home sellers and steer buyers away from properties offering materially less than the "standard real estate commission."[49]

---

[47] *Id.*

[48] *See* Notice of Withdrawal of Consent to Entry of Proposed Final Judgment, July 1, 2021, in *U.S. v. National Association of REALTORS®* at 1-2.

[49] Lawrence White, from the Stern School of Business at New York University, has explained that "a fixed percentage fee announced by most or all brokers in a metropolitan area prevents

34

81.     By encouraging and facilitating steering, and adherence to the "standard real estate commission," the Buyer Broker Commission Rule deters downward departures from the standard commission and enables brokers to avoid doing business with or otherwise retaliate against buyer-brokers who try to compete by offering significant discounts.

82.     The purpose and anticompetitive effects of the Buyer Broker Commission Rule were reinforced by the fact that until recently neither the buyer nor the seller was even permitted to view the universe of buyer-broker commission terms and thus had limited means to detect whether the buyer-broker was engaged in steering to higher commission properties. The MLSs utilized hidden fields that only *realtors* (i.e., brokers) subscribed to the MLS could see. Two types of these hidden fields address compensation to buyer-brokers. The first field type consists of the unilateral offer of buyer-broker commission that must be supplied as a condition of listing a home on the MLS. The second field type is called "private remarks," and listing brokers often include additional financial incentives for buyer-brokers in the "private remarks" field. For example, one "private remark" offered buyer-brokers a vacation in Mexico if the buyer-broker purchased three homes from the listing broker.

83.     Until recently, sellers and buyers (and the general public) were precluded from accessing the hidden fields and seeing the universe of buyer-broker commissions and other financial incentives being offered on the MLS. NAR's Handbook on Multiple Listing Policy states: "Any information provided by the multiple listing service to the participants shall be considered

---

the inherent quality differences that surely exist among brokers from being rewarded. It has frequently been noted that sellers that are attempting to coordinate their pricing behavior at above-competitive levels will usually favor simple pricing schedules over more complex ones, even if this simplicity means that quality differences go unrewarded." Laurence J. White, *The Residential Real Estate Brokerage Industry: What Would More Vigorous Competition Look Like*, Stern School of Business, 8 (2006) (Revised Draft).

official information of the service. Such information shall be considered confidential and exclusively for the use of participants and real estate licensees affiliated with such participants and those participants who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property and licensed or certified appraisers affiliated with such participants."

84.    NAR also instituted a series of rules that ensured that commission offers and private remarks were not disclosed through data sharing agreements with third-party websites or other MLS syndication services.

85.    Simultaneously, the NAR rules *mandate* price information sharing among brokers through its MLS rules. This type of one-way information exchange agreement prevents price competition that benefits consumers while allowing brokers to put upward pressure on pricing and to punish brokers who deviate downwards. Moreover, until recently, home sellers and homebuyers, unlike brokers, did *not* have access to the universe of "blanket unilateral offers of compensation" being made to buyer-brokers, significantly impeding their ability to detect steering by buyer-brokers. As one commentator explained, "Buyers are never aware they are being steered. The buyer agent makes a selection of homes to show, and since the public sources of homes never shows the commission offered, buyers are never aware when their agents select out the homes with lower priced commission offerings."[50]

86.    This obfuscation is compounded by the fact that until recently, NAR's ethical rule

---

[50] Magura, *supra* note 45 at n.21. *See also* Peng Liu & Richard Weidel III, *Compensation Structure of Buyer Brokers and Residential Real Estate Transactions*, 7 CORNELL REAL ESTATE REV. 74, 79 (2009) ("The ability to `steer' clients is aided by the practice of never publicly showing the commission rate offered. Only licensed real estate agents have access to the commission rate information, such that a consumer would never know that a broker screened listings based on commission rates.").

expressly permitted buyer-brokers to tell buyers that their services were free. NAR's Code of Ethics Standard 12-2 stated that "REALTORS may represent their services as 'free' or without cost if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR to obtain a benefit from a third party is clearly disclosed at the same time." Because buyer-brokers governed by NAR rules technically receive their compensation from listing brokers, those buyer-brokers could always tell their buyer clients that their services were free. As a result, "most buyers . . . don't really think that they're paying anything for their brokerage services."[51]

87.     By disingenuously marketing their services as free, buyer-brokers were able to discourage home buyers from (1) engaging in any negotiations over buyer-broker commissions and (2) searching for alternative buyer-brokers who might offer discounts or rebates from the commissions they receive.

88.     The Defendants' anticompetitive restraints have had their intended effect of diminishing price competition and stabilizing and fixing the buyer-broker charges imposed on home sellers at or near the "standard real state commission" level and—because the actual dollar charge is calculated as a percentage of rising home prices—*substantially elevating* the actual overcharge. In 2006, the Consumer Federation of America warned that "for decades, the dominant real estate firms and their trade association have tried, with much success, to maintain high,

---

[51] Statement of Stephen Brobeck, *What's New in Residential Real Estate Brokerage Competition – And FTC-DOJ Workshop (Segment 3)*, FTC, 9 (2018), https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf. *See also* Nadel, *supra* note 15*,* at 22 (explaining that most home buyers "have accepted the pervasive myth that their brokers' services cost them nothing, thus reducing the incentive to negotiate over fees").

uniform prices within different geographic areas."[52] That conclusion remains true today, as these overcharges have varied within a limited range and are typically imposed with little or no regard to the quality of the buyer-broker, the work involved, the value of the house being sold, or prevailing market conditions.

89.     Although NAR has widely claimed that real estate commissions are "negotiable," this claim disregards the adverse market impact of the conspiracy's anticompetitive restraints that impede effective negotiation. For the home seller, this is the case for many reasons including, but not limited to, the following.

90.     First, the conspiracy's actions have the purpose and effect of elevating the baseline for any negotiations that could follow. Thus, just as an unlawful agreement to fix list prices (or an agreement to increase price announcement terms) is potentially subject to negotiation by some purchasers, the conspiracy's actions are anticompetitive and unlawful because they elevate the baseline for negotiations.

91.     Second, by requiring sellers to make unilateral blanket offers of buyer-broker compensation as a precondition for listing properties on MLSs, the Buyer Broker Commission Rule compels sellers to offer high buyer-broker commissions to attract potential buyers. Sellers who attempt to negotiate down the amount of buyer-broker commission to be offered on an MLS are customarily informed by listing brokers that reducing that amount will result in materially fewer potential buyers learning about or viewing the property for sale.

92.     In fact, listing brokers are trained to dissuade home sellers from reducing the buyer-broker commission. For example, Defendant Keller Williams operates Keller Williams University

---

[52] Brobeck, *supra* note 4, at 2.

to train its realtors, and some courses at Keller Williams are mandatory. One of the course materials provided to enrollees is a "Script Catalog" for "Working with Sellers," which consists of a collection of recommended scripts for listing brokers to use when communicating with sellers. The "Script Catalog" includes the following recommended script:

### Explaining How Commission Is Used: Script #4

| | | |
|---|---|---|
| SELLER: | *Can you reduce your commission?* | |
| AGENT: | Of course. As you know, commissions are negotiable. But let me ask you—what are you trying to accomplish by getting me to reduce the commission? | |
| SELLER: | *I'm trying to save money.* | |
| AGENT: | I understand. Do you know how a commission structure works? | |
| SELLER: | *Not really. I just know that I have to pay you a certain amount of what I receive for my house, and that means I get to keep less.* | |
| AGENT: | Let me explain what happens when you reduce a commission. First of all, half of the commission usually goes to a cooperating agent. When you reduce the commission, you reduce the incentive for that agent to bring a buyer to your house. If an agent has ten different houses, nine of which come with a 3 percent commission, one of which comes with 2.5 percent commission, which houses do you think they're going to show? | |
| SELLER: | *The ones with the larger commission.* | |
| AGENT: | Absolutely. You're putting yourself at a disadvantage competitively when you reduce your commission, wouldn't you agree? | |
| SELLER: | *I guess that's true.* | |

93.     Third, because NAR requires the listing broker to make a financial offer to the buyer-broker, sellers will build this cost into the total commission they charge the seller. Because the total commission is then a term of contract between the home seller and the listing broker, NAR has created a "Catch 22" and warns MLS participants that actions by the buyer-broker to reduce the total commission could constitute unlawful interference with contract. As a result, if the buyer negotiates a lower commission with a buyer-broker, the seller's agent is still permitted

39

to charge and receive the full amount of the originally negotiated commission from the seller.

94.     Fourth, as explained above, until recently, the NAR Code of Ethics permitted buyer-brokers to tell buyers that their services were free to the homebuyer. As a result, homebuyers were effectively told they had no reason to seek a reduction in the buyer-broker commission.

95.     Fifth, NAR has taken additional actions to restrain such negotiations even further. NAR's ethical rules (and subsequent interpretations) expressly prohibit buyer-brokers from attempting to reduce buyer-broker commissions offered on MLSs through the submission of purchase offers. NAR's Standard of Practice 16-16 states: "REALTORS, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation." In other words, it is an unequivocal violation of NAR's ethics rules for a buyer-broker to even present an offer to a seller that is conditional on the seller reducing the buyer-broker commission.

96.     NAR's Case Interpretations not only underscore the prohibition on purchase offers that reduce buyer-broker commissions, but also illogically instruct buyer-brokers who seek to modify buyer-broker commissions to attempt those modifications *before even showing* the property to any potential buyers. NAR's Case Interpretation #16-15 states: "The Hearing Panel's decision noted that REALTOR® B was indeed entitled to negotiate with REALTOR® A concerning cooperating broker compensation *but that such negotiation should be completed prior to the showing of the property* by Realtor® B. The decision indicated that REALTOR® B was entitled to show property listed by REALTOR® A on the terms offered by the listing broker in the MLS." (Emphasis added). By requiring buyer-brokers seeking to reduce buyer-broker

40

commissions to request those reductions prior to even showing the property to a potential buyer, NAR forecloses virtually all negotiation over the buyer-broker commission.[53] That requirement implausibly contemplates that a buyer-broker will unilaterally contact a selling-broker to request a reduction to the buyer-broker commission before a potential buyer has even seen, let alone expressed an interest in purchasing, the property. Furthermore, even in such highly unusual circumstances, the listing broker is permitted by NAR rules to respond to the request by reducing the buyer-broker commission but simultaneously *increasing* the listing broker's commission by the amount of the reduction, thereby boosting the potential compensation to the listing broker without altering the total commission that the seller has already contractually agreed to pay.

97.     NAR's rules also restrain negotiation of the buyer-broker commission by providing that after the seller has received purchase offers, the listing broker is prohibited from attempting to unilaterally modify the buyer-broker commission that was offered on the MLS. NAR Standard of Practice 3-2 states: "Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction." As a result, a seller cannot respond to a purchase offer with a counteroffer that is conditional on reducing the buyer-broker commission. Nor can the seller, after receiving purchase offers, decide to unilaterally reduce the buyer-broker commission

---

[53] Even if some negotiation does rarely occur, the Buyer Broker Compensation Rule still works to elevate the baseline for any such rare negotiations. Just as an agreement to fix prices (or an agreement to announce uniform price increases) is *per se* unlawful even though the marketplace might reflect some potential negotiation with the conspirators' customers, the Defendants' conspiracy here is unlawful and anticompetitive because it elevates the baseline for any negotiations.

offered on the MLS. Indeed, MLSListings Inc., one of the largest MLSs in Northern California, states the following on its website to help explain the governing NAR rules:

> **Can I change my offer of compensation that I had offered to the cooperating agent in the MLS after the agent produces an offer signed by the buyer?**
>
> No. In no event shall the listing broker revoke or modify the offer of compensation later than the time the cooperating broker produces a prospective buyer who has signed an offer to purchase the property for which the compensation has been offered through the MLS (9.8).

98.     NAR has imposed yet another restraint on negotiation by interpreting its rules to make it unethical for a buyer-broker to urge the buyer to negotiate directly with the seller to reduce commissions. As the vast majority of homebuyers have limited or no familiarity with this market (and, as noted above, until recently were told that the buyer-broker's services to them were "free"), imposing such a restriction on the ability of their fiduciary to take any action encouraging such negotiation, further restrains such negotiations.

99.     In light of the foregoing restraints, it is not surprising that downward negotiation of the buyer-broker commission is extremely limited and the buyer-broker commission has been maintained at a supra-competitive level (and substantially increased in actual dollars charged) for many years. Indeed, listing brokers who initially list property with a buyer-broker commission at 2.5% or above almost always stay at a high commission rate (and, if a listing broker who initially offers a lower buyer-broker commission decides to change the amount, the change ordinarily involves imposition of an *increased* buyer-broker commission).

100.     In short, the Buyer Broker Commission Rule adopted, implemented and enforced by the conspiracy has achieved exactly what it is designed to do: it has imposed significant overcharges on home sellers, it has maintained (and even increased) those overcharges over time notwithstanding technology changes that should have substantially reduced commissions, and it

has significantly impeded the ability of lower-cost alternatives to create a more competitive marketplace.

### VII.   NAR HAS REQUIRED LOCAL ASSOCIATIONS TO AGREE TO THESE ANTICOMPETITIVE RESTRAINTS

101.   NAR successfully requires its affiliates, including state and local realtor associations, as well as non-member brokers and individual realtors operating in areas with MLSs owned and/or operated by local realtor associations, to fully comply with the above anticompetitive rules, and with other rules contained in the NAR Handbook on Multiple Listing Policy and the NAR Code of Ethics.

102.   NAR requires its affiliates that own and/or operate an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. The Handbook states that an agreement by an association for the establishment of an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics" and the "intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."

103.   NAR threatens its individual and associational members with expulsion for failing to comply with the Code of Ethics. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

104.   Local realtor associations are required by NAR to monitor their MLS and the MLS's participants adhere to the mandatory provisions in NAR's Handbook on Multiple Listing Policy. Thus, each local realtor association and MLS agrees to the anticompetitive restraints

43

challenged herein, and plays a central role in implementation and enforcement of those restraints.

105.    Because access to the MLSs is a commercial necessity for brokers and individual realtors, all brokers and individual realtors located throughout most of the United States must comply with the mandatory provisions in NAR's Handbook. Without access to a local MLS, a broker or agent would be unable to list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property.

106.    NAR has established and disseminated model rules for local realtor associations, and for the MLSs that these local associations own and/or operate, and those model rules require adherence to both NAR's Code of Ethics and the Handbook on Multiple Listing Policy.

107.    One of the many benefits NAR provides to its realtor associations and the MLSs owned by those associations is professional liability insurance. To be eligible for this insurance, realtor associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy. NAR threatens to withhold these valuable insurance benefits from realtor associations and MLSs that fail to comply with these mandatory provisions. NAR's Handbook states that "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."

108.    NAR reviews the governing documents of its local realtor associations to ensure compliance with its rules. NAR requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

109.    Recently, while antitrust litigation was pending against it, NAR purportedly sought to "clarify" its position that home sellers are not required to offer any amount of compensation to

44

buyer's agents. NAR's "clarification" contradicts the sworn testimony of its executives and NAR internal documents.[54] NAR's "new" interpretation also does not meaningfully alter the anticompetitive purpose and effects of its prior policy interpretation: "NAR is not requiring or encouraging MLSs to change their data fields to permit $0. We are simply advising that doing so would continue to comply with NAR's MLS policy."[55]

110.    A handful of MLSs—fewer than 5%—are not exclusively owned or operated by NAR associations.[56] These MLSs are nevertheless typically controlled by REALTOR® associations and/or NAR-aligned brokerages and are not fully independent from NAR.  In addition, these MLSs and their participating brokerages are generally subject to the same or similar anticompetitive restraints that apply in MLSs that are under NAR's formal control, including because: (i) all realtor members of non-NAR MLSs are subject to NAR's Code of Ethics; and (ii) each non-NAR MLS has adopted the same or similar anticompetitive restraints as those imposed by NAR on its affiliated MLSs.   These non-NAR MLSs include but are not limited to the following:

- **Midwest Real Estate Data**. Midwest Real Estate Data is located in Illinois. It is partly owned by REALTOR® associations and partly owned by brokerages. Midwest Real

---

[54] Andrea V. Brambila, *In 'sudden' reversal, NAR says listing brokers can offer 0%*, INMAN (Oct. 6, 2023), https://www.inman.com/2023/10/06/in-sudden-reversal-nar-says-listing-brokers-can-offer-0/#:~:text=As%20a%20bombshell%20class%2Daction,called%20a%20%E2%80%9Cstunning%20admission%20of.

[55] *Id.*

[56] *See, e.g.*, T3 Sixty, LLC, Real Estate Almanac 126 (2020), RMLLC-NDIL-01415597 at 5718 ("Of the 565 MLSs in the County, 107 are regional MLSs, either owned by two or more REALTOR® associations or serve regional markets (19 are broker-owned); 458 are local MLSs, which have a single REALTOR® association owner. Just **3 percent of MLSs are not owned by a REALTOR® association or group of associations**" (emphasis added)).

45

Estate Data limits its membership to REALTORS® and has adopted rules mandating blanket unilateral offers of compensation.

- **Garden State MLS**. Garden State MLS is located in New Jersey. Although Garden State MLS permits both REALTORS® and non-REALTORS® to join it has required non-REALTOR® members to agree to abide by NAR's Code of Ethics. Garden State MLS has also adopted rules mandating blanket unilateral offers of compensation.

- **Metrolist MLS**.  Metrolist MLS is located in California. It is part REALTOR® association owned and part broker owned. Metrolist MLS adopted rules mandating blanket unilateral offers of compensation. Metrolist MLS further restricted the display and publication of cooperative commissions through electronic and other means, and adopted a rule comparable to NAR Standard of Practice 16-16.

- **Real Estate Information Network**. Real Estate Information Network is located in Virginia. Real Estate Information Network adopted rules mandating blanket unilateral offers of compensation. Real Estate Information Network also adopted rules making commission fields confidential and generally prohibiting their disclosure to customers and clients.

- **West Penn Multi-List ("WPML")**. West Penn Multi-List is located in Pennsylvania. Since at least 2013, West Penn Multi-List rules mandated unilateral, blanket, fixed offers of compensation set by the seller and listing broker in MLS property listings, though the West Penn Multi-List rules slightly lower the minimum offer from $1 or 1 cent to $0. In addition, West Penn Multi-List rules prohibited the disclosure of buyer-broker compensation on IDX commission fields through IDXs. West Penn Multi-List also

46

incorporated NAR's Code of Ethics into its MLS rules and thus mandated that all its brokers abide by the NAR Code of Ethics, whether or not they are REALTORS®.

- **MiRealSource**. MiRealSource is located in Michigan. MiRealSource adopted rules mandating blanket unilateral offers of compensation. It also prohibited the display of "cooperative compensation" fields on its IDX feeds.

- **SmartMLS**. SmartMLS is located in Connecticut. It is partly REALTOR® association owned and partly REALTOR® broker owned. SmartMLS limits participation to REALTORS®. SmartMLS has expressly modelled its MLS policies after those adopted by NAR, and adopted rules mandating blanket unilateral offers of compensation. SmartMLS also has excluded "cooperative compensation" fields from its IDX and VOW data feeds.

- **Bay Area Real Estate Information Service ("BAREIS")**. BAREIS MLS is located in California. It is partly REALTOR® association owned and partly broker owned. BAREIS rules mandated unilateral, blanket, fixed offers of compensation set by the seller and listing broker in MLS property listings, though by March 31, 2020, BAREIS had lowered the minimum required offer to $0. BAREIS has also had rules that restrained listing brokers or buyer-brokers from negotiating changes from the unilateral blanked fixed offers of compensation made in the listings.

- **Hudson County MLS/Realty MLS ("RMLS")**. RMLS is located in New Jersey. RMLS adopted rules mandating blanket unilateral offers of compensation. RMLS further adopted rules prohibiting the display of commission information, while also expressly permitting the filtering of listings by offered commissions.

47

- **The Residential Listing Service ("RLS") of the Real Estate Board of New York ("REBNY").** The RLS offers an MLS-like service in New York City—primarily in Manhattan.  Until recently, the RLS rules created a default rule that the compensation offered to buyer-brokers would be equal to 50% of the total compensation received by the listing broker. Moreover, the RLS rules required that any change in the original listing had to be entered into RLS, thus requiring that any change had to apply to all buyer-brokers and thus maintaining a requirement of blanket offers. RLS rules also restrained negotiation of offered buyer-broker commissions by providing, "Any negotiation of the reduction of a brokerage commission must be done with both the Exclusive Broker and the Co-Broker's approval of the commission reduction."

- **Mid-Hudson MLS ("MHMLS")**. MHMLS is located in New York State. MHMLS has adopted rules mandating offers of compensation.

- **Consolidated MLS (Columbia MLS) ("CMLS")**. CMLS is located in South Carolina. CMLS adopted rules mandating blanket offers of compensation.

- **Willamette Valley MLS ("WVMLS")**. WVMLS is located in Oregon. WVMLS adopted rules mandating blanket unilateral offers of compensation. WVMLS also prohibited the display of buyer-broker commission fields, and adopted the substance of NAR Standard of Practice 16-16.

- **Central New York Information Service ("CNYIS")**. CNYIS is located in New York State. It is REALTOR® broker owned and managed by a local REALTOR® association. CNYIS limits its membership to REALTORS®. CNYIS has largely adopted NAR's MLS rules largely in their entirety, including NAR rules mandating blanket unilateral

48

offers of compensation. It also included rules prohibiting the disclosure of cooperative commissions. CNYIS requires that all of its members adhere to NAR's Code of Ethics.

- **Upstate New York REIS ("UNYREIS")**. UNYREIS is located in New York State. It is REALTOR® broker owned, and partly managed by a local REALTOR® association. UNYREIS limits its membership to REALTORS®. UNYREIS adopted NAR's MLS rules largely in their entirety, including NAR rules mandating blanket unilateral offers of compensation. It also included rules prohibiting the disclosure of cooperative commissions. UNYREIS has required that all of its members adhere to NAR's Code of Ethics.

- **Western New York REIS ("WNYREIS")**. WNYREIS is located in New York State. It is REALTOR® broker owned, and managed by a local REALTOR® association. WNYREIS limits its membership to REALTORS®. WNYREIS adopted NAR's MLS rules largely in their entirety, including NAR rules mandating blanket unilateral offers of compensation. It also included rules prohibiting the disclosure of cooperative commissions. WNYREIS requires that all of its members adhere to NAR's Code of Ethics.

## VIII. CORPORATE DEFENDANTS PARTICIPATE IN, FACILITATE, AND IMPLEMENT THE CONSPIRACY

111.    The Corporate Defendants have agreed to adopt, promote, implement, and enforce the Buyer Broker Commission Rule through their intimate involvement in NAR governance and imposition of NAR rules on local real estate associations and the Corporate Defendants' affiliated franchisees, brokers and employees. By participating in an association that prevents member institutions from allowing their associates to compete with each other for commissions—and

49

agreeing to follow and enforce its anticompetitive rules—the Corporate Defendants have joined the conspiracy and have played a central role in its implementation and enforcement.

112.    The Corporate Defendants participate in, implement, and facilitate the conspiracy in at least four ways: (1) Defendants' executives and franchisee representatives attend NAR meetings, supervise NAR's operations, and review, lobby for, and vote on NAR rules; (2) Defendants and their franchisees assist in NAR's enforcement of the rules; (3) Defendants require their brokers, agents, and franchisees (and the agents or realtors employed by those franchisees) to comply with NAR rules, including the Buyer Broker Commission Rule; and (4) Defendants and their affiliated brokerages, through their participation in MLSs and their officers' and employees' membership in NAR, agree to adhere to anticompetitive restraints, including those reflected in MLS rules and NAR's Code of Ethics.

113.    First, representatives from each of the Corporate Defendants and their franchisees regularly attend biannual NAR meetings and hold leadership positions in the organization. Senior executives of the Corporate Defendants have served on NAR's governing board of directors. NAR's 2024 leadership team that manages NAR's day-to-day operations includes: Tracy Kasper (President), owner of Berkshire Hathaway HomeServices Silverhawk Realty, and Gregory Hrabcak (Treasurer), Hanna Commercial Real Estate. Both Ronald J. Peltier, the Executive Chairman of HomeServices of America, and Nancy Nagy, the former CEO of Berkshire Hathaway HomeServices KoenigRubloff Realty Group, served as directors of NAR, and Bruce Aydt, the former Senior Vice President and General Counsel of Berkshire Hathaway HomeServices Alliance Real Estate, was a Chair of NAR's Professional Standards Committee. Representatives of franchisees and other affiliates of the Corporate Defendants served as past Presidents of NAR. For example, the immediate past President of NAR, Leslie Rouda Smith, is a broker with Dave Perry-

50

Miller Real Estate in Dallas, a brand of Ebby Halliday, which is part of HomeServices of America. The 2019 President of NAR was John Smaby, a sales agent at Edina Realty, which is a HomeServices of America company. The 2019 leadership team included John Smaby and Tracy Kasper, Vice President of Advocacy and a broker/owner of a Berkshire Hathaway franchisee.

114.    NAR's Real Estate Services (RES) program "works closely with large firm representatives to better understand their business interests and to identify how NAR can bring them tangible value. Through RES, diverse real estate services firms are given an avenue to provide meaningful input to NAR[.]"[57] Members of the RES Advisory Group have seats on NAR's Executive Committee and on its Board of Directors. Senior executives of Corporate Defendants or their franchisees have participated in the RES Advisory Group. For instance, members of the 2019 RES Advisory Group included:

- Dottie Herman (CEO, Douglas Elliman)

- Jim Imhoff (Chairman, First Weber, a HomeServices subsidiary)

- Jeff Barnett (Executive Vice President, Compass)

- Robert Reffkin (Founder & CEO, Compass)

- Gino Blefari (CEO, HomeServices)

- Ron Peltier (Executive Chairman, HomeServices of America, Inc.)

- Jeffrey S. Detwiler (President and CEO, Long & Foster Companies, a HomeServices subsidiary)

- Joan Docktor (President, Berkshire Hathaway HomeServices Fox & Roach, a

---

[57] NAT'L ASSN. OF REALTORS, REAL ESTATE SERVICES (2019), *available at* https://narfocus.com/billdatabase/clientfiles/172/8/3431.pdf.

HomeServices subsidiary)

- Thomas Hosack (President and CEO, Berkshire Hathaway HomeServices The Preferred Realty, a franchise of BHH Affiliates, LLC)

- Chris Kelly (President and CEO, Ebby Halliday Companies, a HomeServices subsidiary)

- Rei Mesa (President and CEO, Berkshire Hathaway HomeServices Florida Realty, a HomeServices subsidiary)

- Glenn Sanford (Founder & CEO, eXp World Holdings)

- Denise D. Smith (President, Real Estate Services Group, Weichert Companies)

- Helen Hanna Casey (CEO, Howard Hanna Real Estate Services)

- Merle L. Whitehead (Chairman, NYS, Howard Hanna Real Estate Services, Inc.)

- Mike Brodie (Regional Owner/Operating Principal, Keller Williams)

- Matt Widdows (Founder & CEO, HomeSmart International)

115.    Steve Wagner, United Real Estate's Executive Vice President of Training, Education, and Development, along with Jason Gesing, Chief Industry Officer at eXp, Kristine Burdick, Howard Hanna's President of Broker Operations, and Donna Kreps, Howard Hanna's President of Real Estate Service, have all also served as NAR Large Board Representatives. Further, Jim Weichert, CEO/President of Weichert Realtors, along with executives at Howard Hanna, including Gary Scott, Pat Riley, Marsha Rand, and Dennis Cestra, have all served on NAR's Board of Directors. The former CEO of Platinum—a merger partner with United—served on NAR's Board of Directors as of 2019.

52

116. Executives from Weichert served on and participated in NAR-affiliated committees related to MLSs and their governance. Douglas Elliman executives also served on NAR-affiliated boards and committees.

117. Further, Howard W. Hanna, CEO of Howard Hanna; Glenn Kelman, CEO of Redfin; and Howard Hanna's Helen Hanna Casey participated in NAR's Multiple Listing Issues and Policies Committee meetings. Howard Hanna representatives, including its CEO, also participated in NAR planning committee meetings, as well as NAR-affiliated advisory boards and its Executive Committee.

118. Defendant HomeServices, for example, has explained its own role as follows: "As an industry leader, we have a responsibility to actively participate in shaping our industry and its current and future business model. The HomeServices executive leadership and CEOs of our operating companies drive these important discussions as leaders within the National Association of Realtors … and at the regional and local levels of the MLS organizations."

119. NAR's Multiple Listing Issues and Policies Committee, which is responsible for reviewing and reissuing the Handbook is chaired by representatives from the Corporate Defendants or their franchisees: Johnny Mowad (Chair), Ebby Halliday which is a HomeServices of America brokerage, and Michelle Bailey (Vice Chair), Keller Williams Realty Boise. In the past, the following representatives from the Corporate Defendants or their franchisees participated in the Committee: Mike Nugent, Berkshire Hathaway, and Sue Cartun, Keller Williams.

120. NAR's Regional Vice Presidents "focus on the issues and specific duties that support NAR initiatives and effective decision making at the national level, as directed by NAR."[58]

---

[58] Nat'l Ass'n of Realtors, Qualifications and Guidelines for Regional Vice President

Regional Vice Presidents are expected to be fully versed in NAR policies, programs, and initiatives. NAR's 2024 Regional Vice Presidents include representatives from the Corporate Defendants or their franchisees: Stephen Medeiros (Keller Williams), Jay Mitchell (Berkshire Hathaway HomeServices RW Towne Realty), Sara Calo (Howard Hanna), Marvin Jolly (Berkshire Hathaway PenFed Realty Texas), and Jennifer Branchini (Compass).

121.     By virtue of their leadership positions in NAR, these and other representatives from the Corporate Defendants are responsible for formulating, reviewing, and approving rules like the Buyer Broker Commission Rule. NAR approves and issues a new MLS Handbook each year; changes to NAR's MLS policy and Professional Standards are discussed and approved at NAR's yearly meetings by NAR committees on which representatives from Corporate Defendant serve. The NAR Board of Directors has final approval on additions and amendments to MLS rules and regulations. Although the Board has modified *other* MLS rules in connection with each reissuance (for example, in 2022), the Board has consistently and repeatedly reissued the Buyer Broker Commission Rule and anticompetitive restraints challenged herein. Corporate Defendants have also sought to shape and lobby for NAR's Clear Cooperation Policy, Sec. 1.01, which requires any MLS participant to list a property on an MLS within one business day of marketing the property to the public.[59] For example, HomeServices executives pushed for and succeeded in getting NAR to adopt the Clear Cooperation Policy.

122.     Second, each Corporate Defendant assists NAR with ensuring compliance with the

---

CANDIDATES (2023), *available at* https://www.nar.realtor/sites/default/files/documents/rvp-qualifications-and-guidelines-rev-022823.pdf.

[59] NAT'L ASS'N OF REALTORS, 2023 HANDBOOK MULTIPLE LISTING POLICY (2023), *available at* https://cdn.nar.realtor/sites/default/files/documents/pdf_mls_handbook-2023-08-11.pdf?_gl=1*1061bas*_gcl_au*ODU4NjMzMjA4LjE3MDE5MjE4MDQ.

54

NAR rules. Local realtor associations and the NAR Board of Directors are responsible for the enforcement of NAR's MLS rules and regulations. As noted above, representatives from Corporate Defendants serve on NAR's Board of Directors, which considers all written complaints involving alleged violations of NAR's rules and regulations. Representatives from the Corporate Defendants also serve on the compliance committees of local realtor organizations. For example, the MLS/Multiple Listing Service Committee of the California Desert Association of REALTORS®, which "[o]versees operation of the MLS and its technological aspects and recommends enhancements, policies and procedures[,]"[60] includes representatives from Corporate Defendants or their franchisees:

- Mike Jeppson – HomeSmart

- Lance Frank – Berkshire Hathaway Home Services California Properties

- Wendy Lapham – HomeSmart

- Sandi Mosley – HomeSmart

- Norman Williams – Compass

123.    Finally, each Corporate Defendant has also agreed to participate in, implement, and/or facilitate the conspiracy by imposing NAR's rules, including the Buyer Broker Commission Rule, on its franchisees, affiliates, and realtors. Each Corporate Defendant mandated or encouraged its franchisees, affiliates, and realtors to join NAR and follow NAR's Code of Ethics, and join a local realtor association and/or MLS, which requires compliance with the Buyer Broker Commission Rule and the other anticompetitive NAR Standards of Practice. Each Corporate

---

[60] *Committees – MLS/Multiple Listing Service*, CAL. DESERT ASS'N OF REALTORS, https://cdaronline.org/member-resources/committees/ (last visited Dec. 25, 2023).

Defendant requires its realtors and franchisees to abide by NAR rules as a condition of doing business with the Corporate Defendants, and to secure the benefits of the Corporate Defendants' brands, infrastructure, and other resources that support their brokerage operations.

124.    Defendant HomeServices requires its franchisees and realtors to comply with NAR rules and regulations, including the Buyer Broker Commission Rule. For example, the Real Living Franchise Disclosure Document makes clear that MLS membership and access is required for franchisees, and the agreement requires the franchisee to provide Real Living with access to the franchisee's MLS data. A Long & Foster Policy manual states that sales associates must agree to adhere to NAR's Code of Ethics and Standards of Practice, and incorporates these NAR rules into the policy manual. A Berkshire Hathaway HomeServices Texas Realty Policy and Procedures Manual states that the company "support[s] the Realtor Code of Ethics [and] the Multiple Listing Rules," requires all associates to belong to a local realtor association and MLS, and states that the company's commission expectation will be calculated based on 3% for the listing broker and 3% on the selling side; a Berkshire Hathaway HomeServices Northwest Real Estate Policy Manual also requires associates to agree to maintain membership in the local realtor association and MLS. Similarly, the Real Living and Berkshire Hathaway HomeServices Franchise Disclosure Documents say that franchisees shall at all times comply with the NAR Code of Ethics.

125.    Defendant Keller Williams requires its franchisees and associated agents to comply with NAR rules and regulations, including the Buyer Broker Commission Rule. The Keller Williams Policies and Guidelines Manual requires all associates to "become members of their local Board/Association of REALTOR® and MLS" and "keep their membership current and active at all times" unless granted an exemption by their team leader, to adhere to the NAR Code of Ethics and Standards of Practice, and directs associates to review and familiarize themselves with the

56

NAR Code of Ethics.  And the Keller Williams training manual, which provides sample broker scenarios for realtors, shows that listing brokers are taught to tell home sellers that the sellers have to pay the buyer-broker's fee and that the fee is non-negotiable.

126.    Defendant Compass admits:

Aside from federal, state and local regulations, ***we are subject to a variety of rules promulgated by trade organizations including the NAR, state and local association of REALTORS, and [MLSs].***

Generally, as members of these organizations, ***we are subject to their policies, bylaws, codes of ethics, and fees and rules***, which govern our dealings with other members, the public, and clients as well as the manner in which we use and display the organization's brand and services.

We have a dedicated team that works with a variety of stakeholders, including our brokers of record, to help manage and comply with these rules and policies.[61]

127.    Like Compass, eXp commits to following NAR's rules and policies. It states:

We primarily serve the residential real estate industry, which is regulated by federal, international, state, provincial and local authorities as well as private associations or state sponsored association or organizations.

***We are required to comply with*** federal, state, provincial and local laws, as well as ***private governing bodies' regulations***, which combined results in a highly-regulated industry.[62]

128.    Weichert also commits to NAR's conspiracy:

In order to be called a REALTOR®, your Weichert Sales Associate must earn a state license and complete additional training. REALTORS are also required to comply with a code of ethics and professional standards, above and beyond federal and state regulations.

***All Weichert Sales Associates are members of the National Association of Realtors***.[63]

---

[61] Compass 2022 Form 10-K at p. 11 (filed Mar. 1, 2023) (emphasis added).

[62] eXp World Holdings, Inc. 2022 Form 10-K (filed February 28, 2023) (emphasis added).

[63] *Selecting a Realtor*, WEICHERT, https://www.weichert.com/guides/buying/find-a-realtor/ (last visited Dec.. 22, 2023) (emphasis added). *See also id.* at "Key Takeaways: Your Weichert Sales

57

129.     Weichert codifies its mandatory participation in NAR in its Franchise Disclosure Document: "You must be and remain a member in good standing of the National Association of Realtors throughout the Term of this Agreement. Your Franchised Business must comply with the Code of Ethics of the National Association of Realtors at all times."[64]

130.     Howard Hanna requires its agents to comply with "any real estate transaction standards adopted by the National Association of Realtors®."[65]

131.     Until October 2023, Redfin's brokers and agents also were members of NAR and subject to the Buyer Broker Commission Rule. In early October 2023, Redfin announced that it would leave NAR and "requir[e] our brokers and agents to leave NAR everywhere we can."[66] This also meant Redfin was resigning from NAR's Board of Directors.[67]

132.     According to Redfin's statement, the company had "already been uncomfortable with the NAR's positions on commissions . . ." and objected to the fact that "NAR still blocks sellers from listing homes that don't pay a commission to the buyer's agent . . ."[68] Through its

---

Associate" ("1. As a REALTOR, every Weichert Sales Associate **must** be a member of the National Association of Realtors and comply with a code of ethics and professional standards.") (emphasis added).

[64] Weichert Realtors Franchise Disclosure Document at § 7.05.

[65] Howard Hanna Franchise Disclosure Document at § 10.11.

[66] Ben Verde, *Redfin leaves NAR—and calls on its brokers and agents to follow suit*, INMAN (Oct. 2, 2023), https://www.inman.com/2023/10/02/redfin-leaves-nar-and-calls-on-its-brokers-and-agents-to-follow-suit/#:~:text=MLS%20%26%20Associations-,Redfin%20leaves%20NAR%20%E2%80%94%20and%20calls%20on%20its,and%20agents%20to%20follow%20suit&text=October%2002%2C%202023-,In%20a%20message%20to%20employees%20on%20Monday%2C%20Redfin%20CEO%20Glenn,1%2C800%20Realtors%20to%20cancel%20memberships.

[67] *Id.*

[68] *Id.*

statement, Redfin admits that NAR's policies were anti-consumer, and that Redfin continued to adhere to them even after it grew "uncomfortable." Despite its adherence to the Buyer Broker Commission Rule and other anti-competitive NAR mandates, Redfin admitted that "[r]emoving these blocks would be easy, and it would make our industry more consumer-friendly and competitive."[69] Redfin called on NAR to "decouple" membership from local access to these tools, saying "[a]gents shouldn't have to underwrite policies and legal efforts that hurt consumers [.]"[70]

133.    Despite Redfin's recent change in position, Redfin adhered to, implemented, and enforced those same anti-consumer rules for years through its membership in and support for NAR and its affiliated MLSs and local associations.

134.    Like the other Corporate Defendants, Douglas Elliman also admits that "Through our brokerages, we participate in MLSs and are a member of the National Association of Realtors ("NAR") and state real estate associations and, accordingly, are subject to each group's rules, policies, data licenses, and terms of service."[71]

135.    Similarly, Real Brokerage follows the "rule of trade organizations such as the National Association of Realtors, local Multiple Listing Services, and state and local Associations of Realtors[.]"[72]

136.    HomeSmart requires that each franchisee "join and remain a member in good standing of any local board of realtors" in its territory "and any applicable national association of realtors."  In addition, HomeSmart acknowledges that it is "subject to rules, policies, data licenses,

---

[69] *Id.*

[70] *Id.*

[71] Douglas Elliman, Inc. 2022 Form  10-K (submitted Mar. 16, 2023).

[72] THE REAL BROKERAGE INC., 2022 ANNUAL REPORT AND MEDIA at 70 (2022), *available at* https://investors.onereal.com/static-files/95dd92fd-2d4a-4856-85a4-f9190e4308f7.

59

and terms of service established by over 90 MLSs of which we are a participant."[73] HomeSmart also complies with NAR as well as state and local associations of realtors "codes of ethics and rules as a result of our membership in these organizations."[74] In its Form S-1 Registration Statement filed with the SEC, HomeSmart acknowledged that "certain industry practices, including MLS rules, have come under regulatory scrutiny[,]" noting the June 2018 DOJ/FTC workshop exploring competition issues in the residential real estate brokerage industry and the industry practice of commission sharing.[75] HomeSmart stated that "[t]here can be no assurances as to whether DOJ or the FTC will determine that any industry practices or developments have an anti-competitive effect on the industry[, which] . . . could have the potential to disrupt our business."[76]

137.    Realty ONE requires that all franchisee brokerages "must join your local Board of Realtors and join and maintain a membership in each MLS applicable to the area in which your Outlet is located."[77]

138.    @Properties requires that franchisees "comply with the Code of Ethics of the National Association of Realtors," as well as "the rules and regulations of the state and local boards of realtors within the geographic area you operate the Franchised Business."[78]  It further states that

---

[73] HomeSmart Holdings, Inc. Form S-1 Registration Statement at 115 (filed Sept. 3, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1867684/000095012321012147/filename1.htm.

[74] *Id.*

[75] *Id.* at 40.

[76] *Id.*

[77] Realty ONE Group, Franchise Disclosure Document (issued Mar. 27, 2020), *available at* https://www.franchimp.com/?page=pdf&f=103214_2020.pdf.

[78] @properties, Franchise Disclosure Document (issued Apr. 16, 2021), *available at* https://www.franchimp.com/?page=pdf&f=113504_2021.pdf.

60

franchisee "need to be a member of the state, local, and national association of Realtors" and also "a member of the local or regional multiple listing services (MLS)."[79]

139.    Thus, by developing and reissuing the Buyer Broker Commission Rule and related Standards of Practice, enforcing the rule through NAR and local realtor association leadership, imposing the rule on local realtor associations and MLSs, and requiring franchisees, realtors, and other affiliates to join NAR, local realtor associations and MLSs, and comply with their rules, each Corporate Defendant has agreed to participate in and implemented and/or facilitated the conspiracy.

## IX.    EFFECTS OF THE CONSPIRACY

140.    Defendants' conspiracy has had the following anticompetitive effects nationwide:

- Home sellers have been forced to pay commissions to buyer-brokers—their adversaries in negotiations to sell their homes— thereby substantially inflating the cost of selling their homes.

- Home sellers have been compelled to set a high buyer-broker commission to induce buyer-brokers to show their homes to home buyers.

- Home sellers have paid inflated buyer-broker commissions and inflated total commissions.

- The retention of a buyer-broker has been severed from the setting of the broker's commission; the home buyer retains the buyer-broker, while the home seller sets the buyer-broker's compensation.

- Price competition among brokers to be retained by home buyers has been restrained.

---

[79] *Id.*

61

- Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer-broker commission.

- Corporate Defendants and their franchisees have increased their profits substantially by receiving inflated buyer-broker commissions and inflated total commissions.

141.    Plaintiff is not aware of any pro-competitive effects of Defendants' conspiracy. Even assuming *arguendo*, that there was any justification for requiring such payments during the sub-agency period much earlier, "[t]here is no longer any reason to permit listing brokers to set the default prices that these competing buyers' brokers charge to serve their own customers."[80] Indeed, none of the purposes of the MLS "has anything to do with interbroker compensation. In fact, MLSs could continue providing every service of significance they provide without addressing compensation at all."[81] No purported pro-competitive benefit explains why the Buyer Broker Commission Rule is mandatory. Moreover, even if there were any plausible pro-competitive effects, they would be substantially outweighed by the conspiracy's anticompetitive effects.

142.    There is substantial economic evidence that Defendants' conspiracy has resulted in buyer-broker commissions and total commissions paid by home sellers that are inflated well above a competitive level nationwide.

---

[80] Nadel, *supra* note 15, at 64-65.

[81] Brian N. Larson, *The End of MLS as We Know It, Redux*, LARSON SKINNER (2010), http://larsonskinner.com/2010/12/15/the-end-of-mls-as-we-know-it-redux-part-i/. *See also* B. Kaufman, *Why the Class Action Lawsuit Against NAR and the Big Brokers Makes Sense* (June 3, 2019), https://www.inman.com/2019/06/03/why-the-class-action- lawsuit-against-nar -and-the-big-brokers-makes-sense/ (explaining that the idea that if buyers pay their agent's commission "this could be the end of the MLS does not make sense. The MLS's value is giving buyers and sellers a centralized place to go for listings. Its value is not in artificially keeping buyer's agents' commissions high.  So, changing the way buyer's agents are paid does not reduce the value of the MLS at all.").

143.    Compared to other similar countries with competitive markets for residential real estate brokerage services, the commissions in the United States are substantially higher. In a 2002 study titled "International Residential Real Estate Brokerage Fees and Implications for the US," economists Natalya Delcoure and Norm Miller compared real estate commissions around the world with those in the United States. They concluded: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand. . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%." Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."[82]  A 2021 update to the original study found that the dynamic had not changed: commission rates in the United States remained stubbornly, even while they had fallen in much of the rest of the world including due to the proliferation of technology making real estate transactions more efficient.  Professor Miller noted "Brokerage firms engaged in residential sales in the U.S., for the most part, resist competing openly on price, especially buyer's agents," concluding that "[t]his agent interdependency and resistance to competing on price would likely break down if buyers and sellers paid fees directly, and without revealing the fees in a Multiple Listing System."[83]

---

[82] Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 INT'L REAL ESTATE REV. 12, 13-14, 17 (2002), https://www.um.edu.mo/fba/irer/papers/past/vol5_pdf/012_039US.pdf.

[83] Norman G. Miller, *Revisiting Residential Brokerage Fees in a More Technologically Advanced World*, 45 REAL ESTATE ISSUES 1 (Jan. 25, 2021), https://cre.org/wp-content/uploads/2021/01/Real-Estate-Issues-Revisiting-Residential-Brokerage-Fees-in-a-More-Technologically-Advanced-World.pdf.

144.    In comparison, the total broker commissions (*i.e.*, the aggregate commission paid to the listing broker and buyer broker) in most areas of the United States average between 5% and 6%, with buyer broker commissions by themselves holding steady in a range between 2.5% and 3%. These numbers have remained stable despite both rising home prices (which leads to larger commission amounts) and the decreasing role of the buyer broker in an age when many prospective home buyers have already scoured the market using Zillow or other websites.

145.    The United States General Accounting Office review of the residential real estate market reported that "commission rates have remained relatively uniform – regardless of market conditions, home prices, or the efforts required to sell a home."[84] This remains true today. In fact, over the past two decades the average total commission on an annual basis has always been maintained between 5.02 percent and 5.4 percent. It was at virtually the same level in 2017, as it was at the time of the GAO's analysis. Similarly, in Defendant Keller Williams' presentation to competitors and other industry participants in 2023, Keller Williams reported that its average buyer-broker commission in 2022 (2.61%) was virtually the same level that was charged in 2002 (2.8%).

146.    As explained above, the stability of the commission rate significantly understates the actual charges that have been imposed on home sellers. The actual dollar commission is determined by applying the rate to the sale price of a home. Since 2000, home prices have approximately doubled, while the total rate of inflation has been below 50%. As Dr. Barwick, an economist at Cornell University, stated at the DOJ/FTC workshop on competition in the residential

---

[84] U.S. Gov't Accountability Office, GAO-05-947, *Real Estate Brokerage: Factors That May Affect Price Competition*, REPORT TO THE COMMITTEE ON FINANCIAL SERVICES, HOUSE OF REPRESENTATIVES 1, 1 (2005).

real estate brokerage industry, "if you look at the commission the consumers are paying today relative to 20 years ago, they're nearly paying twice as much."[85]

147.    Moreover, while "competitive pressures in an industry ordinarily force competitors to adopt fee structures that reflect their costs, this has not occurred for real estate broker fees." Instead, "broker fees are usually set without regard to either the quantity or quality of service rendered."[86]

148.    The stability and maintenance of high broker commissions (and the substantial increase in actual dollar charges for their services) stands in stark contrast to the experience in other industries since the advent of the Internet. "One would have expected that an information and communication-based industry like real estate brokerage, would enjoy tremendous cost efficiencies from the development of the Internet, Databases, and other communication technologies. Yet it appears that traditional brokers generally have not passed on their cost savings to consumers in the form of lower fees."[87]

149.    The adverse economic impact of the conspiracy's restraints on price competition have been severe. The Consumer Federation of America, which has reviewed and criticized the brokerage industry's practices for many years, has indicated that "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear."[88]

150.    Brian Larson, an attorney who represented many MLSs and was previously an MLS

---

[85] Barwick, *supra* note 33, at 10.

[86] Nadel, *supra* note 15*,* at 4.

[87] Nadel, *supra* note 15, at 7.

[88] Brobeck & Woodall, *supra* note 28, at 4.

65

executive, has observed that "[w]ith the demise of subagency, there is little reason to keep interbroker compensation." According to Larson, "[g]etting rid of interbroker compensation" [i.e., payments from listing brokers to buyer-brokers] would improve the market in several areas, including:

- Buyer-broker fees can be commensurate with the skill and experience of the broker and with the buyer's needs."

- "The market benefits from price competition for buyer broker services."

- "The dangers of price fixing, and the claims by industry watchdogs that it exists now, will largely be addressed. Brokers will really be unable to tell what their competitors are charging for services, and there will be no incentive for commissions to be 'standard.'"[89]

151.    Because of the scope and magnitude of the overcharges at issue here, the economic cost to the plaintiff class and other consumers is enormous. Estimates of the amount of "annual broker fees consumers might save if there was effective price competition suggests as much as $30 billion or more annually."[90] Economists Hsieh and Moretti have suggested that "more than half of

---

[89] Larson, *supra* note 83 (Larson has written about the "Danger of price fixing" and explained that because of the publication of buyer-broker compensation on an MLS, "a few market-leading brokers can establish the market-rate cooperating compensation [i.e., buyer-broker commission] without ever speaking directly to each other. They can just watch what happens on MLS. Thanks to the MLS offer of compensation, listing brokers effectively are able to fix service prices of buyers' brokers; many buyers' brokers are loathe to collect more than what is offered in MLS, even if the broker has a written agreement with the buyer providing for a higher payment." Although Larson recognizes that the system facilitates price-fixing, the reality – as described above – has been that it has stabilized commission levels at the "industry standard" (and elevated actual dollar commissions substantially), notwithstanding declining costs).

[90] Nadel, *supra* note 15, at 8.

66

current commissions might be eliminated by competition."[91] Natalya Delcourse and Norm Miller "found that U.S. broker fees should equal something closer to three percent."[92]

## X.    MARKET POWER

152.    A relevant service market for the claims asserted herein is the bundle of services provided to homebuyers and sellers by residential real estate brokers with MLS access. Defendants' control of the MLSs gives Defendants the ability to impose the Buyer Broker Commission Rule and other anticompetitive rules on class members and other market participants. Access to the MLSs is critical for brokers to compete and to assist home buyers and sellers in the areas in which those MLSs operate.

153.    A relevant geographic market for the claims asserted herein the United States. Nearly all homes sold in the United States were listed on MLSs by brokers that are subject to the NAR MLS rules and ethics standards, as well as similar rules adopted by the few non-NAR MLSs. Another set of relevant geographic markets are local and regional markets that are no larger than the area served by an MLS. All brokers in each MLS have the ability to view all other listings made on that MLS and to offer and accept blanket cooperative compensation offers within that

---

[91] *Id.* at 8 n.28 (citing C. Hsieh & E. Moretti, Can Free Entry be Inefficient? Fixed Commissions and Social Waste in the Real Estate Industry, 111 J. POL. ECON. 1076 (2003)).

[92] *Id.* at 9 n.28. *See also* Brobeck & Woodall, *supra* note 28, at 4 (if sellers and buyers separately negotiated compensation with their brokers, uniform 5-6 percent commissions "would quickly disappear"); *The Realtor Racket, supra* note 12 (explaining that "in almost every other consumer industry . . . the introduction of Internet and discount sellers has been a phenomenal financial benefit to customers. Discount airlines have cut airfares by 60% or more, to the economic benefit of everyone with the exception of the incumbent competitors. Economists call this process of squeezing out transaction costs `disintermediation.' If any industry is ripe for this, it is the $70 billion-a-year real estate brokerage market."); B. Kaufman, *Why the Class Action Lawsuit Against NAR and the Big Brokers Makes Sense* (June 3, 2019), https://www.inman.com/2019/06/03/why- the-class-action-lawsuit-against-nar -and-the-big-brokers-makes-sense/ (explaining that if buyers paid their agent's commission this "would immediately generate" discounted options).

MLS, and are subject to the rules imposed by that MLS, including those challenged here.

154.    Corporate Defendants, through their co-conspirator franchisees and other conspiring brokers in the areas in which the MLSs operate, collectively provide the vast majority of the residential real estate broker services in these areas.  As DOJ concluded in 2020: "The membership of an MLS is generally comprised of nearly all residential real estate brokers and their affiliated agents in an MLS's service area."[93]  Indeed, from 2015-2022 86-92% of sellers listed their homes on an MLS.

155.    Defendants and their co-conspirators collectively have market power in each relevant market through their membership in and control of the local MLS and their dominant share of the local market.

156.    Any buyer-brokers in the areas in which the MLSs operate who wished to compete outside of Defendants' conspiracy would face insurmountable barriers. Defendants' effective control of the MLSs through their co-conspirators (*i.e.*, NAR, through their local franchisees, other local brokers, and the local realtor associations) means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service. A listing broker who represented a seller without using a listing service would lose access to the large majority of potential buyers, and a buyer-broker who represented a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot compete effectively without access to a listing service.

157.    For an alternative listing service to compete effectively with an MLS, the alternative would need to have listings as comprehensive (or at least nearly so) as an MLS. Brokers

---

[93] *See* Competitive Impact Statement, *U.S. v. National Association of REALTORS®,* Dec. 10, 2020, at p.4, available at: https://www.justice.gov/atr/case-document/file/1344346/download.

and their individual realtors who currently profit from inflated buyer-broker commissions and total commissions have minimal incentive to participate on an alternative listing service that would generate lower buyer-broker commissions and lower total commissions. Further, many buyers would be very reluctant to retain a buyer broker operating on an alternative listing service that required them to pay the buyer-broker commission, when other buyer-brokers operating on MLSs are entirely compensated by home sellers. Accordingly, listing brokers on an alternative listing service would struggle to attract buyer-brokers and their buyer clients. Moreover, many home sellers would not retain brokers using a new, unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient buyers and buyer-brokers. Accordingly, any listing service attempting to compete with an MLS would likely fail to attract enough property listings to operate profitably and be a competitive constraint on the incumbent MLS. The absence of listing services that compete with the MLSs reflects the very substantial barriers to entry.

158.   Moreover, NAR has advised MLSs to enter into non-compete agreements with third-party websites, so that those websites do not become competitive rivals to MLSs. NAR's checklist of "critical components" states that the consumer-facing website "must agree they will not compete with the brokerage firms or MLS by either becoming a licensed brokerage firm or by providing offers of cooperation and compensation." The non-compete agreement requires the consumer-facing website to agree not to "use the data in a manner that is similar to a Multiple Listing Service." Thus, NAR, in furtherance of the conspiracy, has advised MLSs to take affirmative steps to prevent third-party websites from becoming competitors.

## XI.   CONTINUOUS ACCRUAL

159.   During the four years preceding the filing of this Complaint, Defendants, through their co-conspirator brokers in the areas in which the MLSs operate, repeatedly charged and

received cooperating broker commissions and total commissions that were inflated as a result of the conspiracy. These inflated commissions during the preceding four years were paid by Plaintiff and the other class members in connection with the sale of residential real estate listed on one of the MLSs. Each payment of these inflated commissions by Plaintiff and the other class members during the last four years injured them and gave rise to a new cause of action for that injury.

160.    During the last four years, Defendants and their co-conspirators have maintained, implemented, and enforced the Buyer Broker Commission Rule and other anticompetitive NAR rules nationwide.

## XII.    CLASS ACTION ALLEGATIONS

161.    Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following class:

> All persons in the United States who, from December 27, 2019, through the present, used a listing broker affiliated with any Corporate Defendant in the sale of a home listed on an MLS, and who paid a commission to a cooperating broker in connection with the sale of the home, except as provided below.

> With respect to NAR, Keller Williams, and the HomeServices Defendants, the class shall not include the following home sales in which the listing broker was affiliated with Keller Williams or the HomeServices Defendants:

> 1) Sales that occurred on or before June 30, 2022 in connection with properties that were listed on any of the following MLSs (or their predecessors or successors): Heartland MLS, Columbia Board of Realtors, Mid America Regional Information System, or the Southern Missouri Regional MLS; or

> 2) Sales that occurred on or before December 31, 2020 in connection with properties that were listed on any of the following MLSs (or their predecessors or successors): Bright MLS, Triangle MLS, Stellar MLS, Miami MLS, Florida Gulf Coast MLS, Metro MLS, Canopy MLS, Yes MLS/Metro MLS Now, Columbus Realtors MLS, Northstar MLS, Wasatch Front MLS/Utah Real Estate, REcolorado/Metrolist, Pikes Peak MLS, GLVAR MLS, SABOR MLS, ACTRIS/ABOR MLS, HAR MLS, NTREIS, ARMLS, and Realcomp II.

> 3) Sales in connection with properties that were listed on MLS PIN.

70

162.    Excluded from the Class are Defendants and their officers and directors, the judicial officers presiding over this action and the members of their immediate families and judicial staff, and Plaintiff's counsel and employees of their law firms.

163.    The Class is readily ascertainable because records of the relevant transactions should exist.

164.    Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiff believes that the Class has many thousands of members, the exact number and their identities being known to Defendants and their coconspirators.

165.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class.

166.    There are questions of law and fact common to the members of the Class, including, but not limited to, the following:

A.    Whether Defendants conspired as alleged herein;

B.    Whether the conspiracy harmed competition as alleged herein;

C.    Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

D.    Whether buyer-broker commissions and total commissions were inflated as a result of the conspiracy; and

E.    The appropriate class-wide measures of damages.

167.    Plaintiff has retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent themselves and the Class.

168.    Questions of law or fact that are common to the members of the Class predominate

71

over any questions affecting only individual members of the Class.

169.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

## XIII.   CLAIM FOR RELIEF

## <u>Violation of Section 1 of the Sherman Act, 15 U.S.C § 1</u>

170.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

171.    Beginning more than four years before the filing of this Complaint, and continuing into the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

172.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants and their co-conspirators to require home sellers to pay cooperating brokers and to pay an inflated amount.

173.    In furtherance of the contract, combination, or conspiracy, Defendants and their coconspirators have committed one or more of the following overt acts:

72

a)      Participated in the establishment, implementation and enforcement of the Buyer Broker Commission Rule and other anticompetitive NAR rules;

b)      Participated in the establishment, implementation and enforcement of rules by local NAR associations and MLSs that implemented the Buyer Broker Commission Rule and other anticompetitive NAR rules; and

c)      Included provisions in franchise agreements, policy manuals, and other corporate agreements with franchisees, affiliates, and realtors of Corporate Defendants that required the implementation of and adherence to the Buyer Broker Commission Rule and other anticompetitive NAR rules.

174.    Defendants' conspiracy has required sellers nationwide to pay buyer-brokers, to pay an inflated buyer-broker commission and an inflated total commission, and has restrained price competition among buyer-brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

175.    Defendants' conspiracy has caused buyer-broker commissions and total commissions to be inflated. Plaintiff and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate. Absent Defendants' conspiracy, Plaintiff and the other class members would have paid substantially lower commissions because buyers would have the incentive to set and negotiate buyer-broker prices (and buyer-broker commissions would not be at supra-competitive levels).

176.    Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act.

177.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and the other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

73

178.    In the alternative, Defendants' conspiracy violates section 1 of the Sherman Act under the Rule of Reason.

179.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and the other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

## XIV.    REQUESTED RELIEF

Plaintiff requests relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

C.    That the Court award Plaintiff and the other members of the Class damages and/or restitution in an amount to be determined at trial;

D.    That the Court award Plaintiff pre- and post-judgment interest;

E.    That the Court award Plaintiff their costs of suit, including reasonable attorneys' fees and expenses;

F.    That the Court award Plaintiff and the Class a permanent injunction, under Section 16 of the Clayton Act, enjoining Defendants from continuing conduct determined to be unlawful; and

G.    That the Court award such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial of all issues so triable.

December 27, 2023

/s/    *Brian E. Johnson*
Benjamin D. Brown (*pro hac vice* forthcoming)
 bbrown@cohenmilstein.com
Robert A. Braun (*pro hac vice* forthcoming)
 rbraun@cohenmilstein.com
Brian E. Johnson (Mo. Bar. No. 64938)
 BEJohnson@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600

Daniel Silverman (*pro hac vice* forthcoming)
 dsilverman@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL PLLC
769 Centre Street
Suite 207
Boston, MA 02130
Telephone: (617) 858-1990

Steve W. Berman (*pro hac vice* forthcoming)
 steve@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292

Rio S. Pierce (*pro hac vice* forthcoming)
 riop@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000

Nathan Emmons (Mo. Bar. No. 70046)

75

nathane@hbsslaw.com
Jeannie Evans (*pro hac vice* forthcoming)
jeannie@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949

Marc M. Seltzer (*pro hac vice* forthcoming)
mseltzer@susmangodfrey.com
Steven G. Sklaver (*pro hac vice* forthcoming)
ssklaver@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100

Beatrice C. Franklin (*pro hac vice* forthcoming)
bfranklin@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas
32nd Floor
New York, New York 10019
Telephone: (212) 336-8330

Matthew R. Berry (*pro hac vice* forthcoming)
mberry@susmangodfrey.com
Floyd G. Short (*pro hac vice* forthcoming)
fshort@susmangodfrey.com
Alexander W. Aiken (*pro hac vice* forthcoming)
aaiken@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union St., Suite 3000
Seattle, Washington 98101
Telephone: (206) 516-3880

76

JS 44 (Rev 09/10)

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI

## <u>CIVIL COVER SHEET</u>

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Western District of Missouri.

**The completed cover sheet must be saved as a pdf document and filed as an attachment to the Complaint or Notice of Removal.**

| **Plaintiff(s):** | **Defendant(s):** |
|---|---|
| First Listed Plaintiff: | First Listed Defendant: |
| Daniel Umpa ; | The National Association of Realtors ; |
| **County of Residence:** Outside This District | **County of Residence:** Outside This District |
| | |
| | Additional Defendants(s): |
| | HomeServices of America, Inc. ; |
| | BHH Affiliates, LLC ; |
| | HSF Affiliates, LLC ; |
| | The Long & Foster Companies, Inc. ; |
| | Keller Williams Realty, Inc. ; |
| | Compass, Inc. ; |
| | eXp World Holdings, Inc. ; |
| | eXp Realty, LLC ; |
| | Redfin Corporation ; |
| | Weichert Realtors ; |
| | United Real Estate ; |
| | Hanna Holdings, Inc. ; |
| | Douglas Elliman, Inc. ; |
| | Douglas Elliman Realty, LLC ; |
| | At World Properties, LLC ; |
| | The Real Brokerage, Inc. ; |
| | Real Broker, LLC ; |
| | Realty ONE Group, Inc. ; |
| | HomeSmart International, LLC ; |

**County Where Claim For Relief Arose:** Jackson County

| **Plaintiff's Attorney(s):** | **Defendant's Attorney(s):** |
|---|---|
| Benjamin D. Brown (Daniel Umpa) | |
| Cohen Milstein Sellers & Toll PLLC | |
| 1100 New York Ave. NW, Fifth Floor | |
| Washington, DC 20005 | |
| **Phone:** (202) 408-4600 | |
| **Fax:** | |
| **Email:** bbrown@cohenmilstein.com | |
| | |
| Robert A. Braun (Daniel Umpa) | |
| Cohen Milstein Sellers & Toll PLLC | |
| 1100 New York Ave. NW, Fifth Floor | |
| Washington, DC 20005 | |
| **Phone:** (202) 408-4600 | |

**Fax:**
**Email:** rbraun@cohenmilstein.com

Brian E. Johnson (Daniel Umpa)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
**Phone:** (202) 408-4600
**Fax:**
**Email:** BEJohnson@cohenmilstein.com

Daniel H. Silverman (Daniel Umpa)
Cohen Milstein Sellers & Toll PLLC
769 Centre Street, Suite 207
Boston, Massachusetts 02130
**Phone:** (617) 858-1990
**Fax:**
**Email:** dsilverman@cohenmilstein.com

Steve W. Berman (Daniel Umpa)
Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
**Phone:** (206) 623-7292
**Fax:**
**Email:** steve@hbsslaw.com

Rio S. Pierce (Daniel Umpa)
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
**Phone:** (510) 725-3000
**Fax:**
**Email:** riop@hbsslaw.com

Nathan Emmons (Daniel Umpa)
Hagens Berman Sobol Shapiro LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
**Phone:** (708) 628-4949
**Fax:**
**Email:** nathane@hbsslaw.com

Jeannie Evans (Daniel Umpa)
Hagens Berman Sobol Shapiro LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
**Phone:** (708) 628-4949
**Fax:**
**Email:** jeannie@hbsslaw.com

Marc M. Seltzer (Daniel Umpa)
Susman Godfrey L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
**Phone:** (310) 789-3100
**Fax:**
**Email:** mseltzer@susmangodfrey.com

Steven G. Sklaver (Daniel Umpa)
Susman Godfrey L.L.P.

1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
**Phone:** (310) 789-3100
**Fax:**
**Email:** ssklaver@susmangodfrey.com

Beatrice C. Franklin (Daniel Umpa)
Susman Godfrey L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
**Phone:** (212) 336-8330
**Fax:**
**Email:** bfranklin@susmangodfrey.com

Matthew R. Berry (Daniel Umpa)
Susman Godfrey L.L.P.
401 Union St., Suite 3000
Seattle, Washington 98101
**Phone:** (206) 516-3880
**Fax:**
**Email:** mberry@susmangodfrey.com

Floyd G. Short (Daniel Umpa)
Susman Godfrey L.L.P.
401 Union St., Suite 3000
Seattle, Washington 98101
**Phone:** (206) 516-3880
**Fax:**
**Email:** fshort@susmangodfrey.com

Alexander W. Aiken (Daniel Umpa)
Susman Godfrey L.L.P.
401 Union St., Suite 3000
Seattle, Washington 98101
**Phone:** (206) 516-3880
**Fax:**
**Email:** aaiken@susmangodfrey.com

**Basis of Jurisdiction:** 3. Federal Question (U.S. not a party)

**Citizenship of Principal Parties** (Diversity Cases Only)

    **Plaintiff:** N/A

    **Defendant:** N/A

**Origin:** 1. Original Proceeding

**Nature of Suit:** 410 Antitrust

**Cause of Action:** 15 U.S.C § 1

**Requested in Complaint**

    **Class Action:** Class Action Under FRCP23

    **Monetary Demand (in Thousands):**

    **Jury Demand:** Yes

    **Related Cases:** RELATED to case number 4:19-cv-00332; 4:23-cv-00788, assigned to Judge Stephen R. Bough

**Signature:** /s/ Brian E. Johnson

**Date:**  12/27/2023

If any of this information is incorrect, please close this window and go back to the Civil Cover Sheet Input form to make the correction and generate the updated JS44. Once corrected, print this form, sign and date it, and submit it with your new civil action.