WEISMAN

# United States District Court
## Northern District of Illinois – CM/ECF NextGen 1.7.1.1 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:24–cv–00150

Tuccori v. At World Properties, LLC
Assigned to: Honorable Lindsay C. Jenkins
Case in other court:  Circuit Court of Cook County, Illinois,
2023 CH 09928
Cause: 15:1 Antitrust Litigation

Date Filed: 01/05/2024
Jury Demand: Both
Nature of Suit: 410 Anti–Trust
Jurisdiction: Federal Question

**Plaintiff**

**James Tuccori**
*individually and on behalf of similarly
situated individuals*

represented by  **Brendan James Duffner**
Mcguire Law, P.C.
55 West Wacker Dr. 9th Fl.
Chicago, IL 60601
(312) 893–7002
Fax: Not a member
Email: bduffner@mcgpc.com
*ATTORNEY TO BE NOTICED*

**Colin Primo Buscarini**
Mcguire Law P.c.
55 W. Wacker 9th Floor
Chicago, IL 60601
(312) 893–7002
Fax: Not a member
Email: cbuscarini@mcgpc.com
*ATTORNEY TO BE NOTICED*

**Evan M Meyers**
McGuire Law, P.C.
55 W. Wacker Drive
9th Floor
Chicago, IL 60601
312 893 7002
Fax: Not a member
Email: emeyers@mcgpc.com
*ATTORNEY TO BE NOTICED*

**Paul T. Geske**
McGuire Law, P.C.
55 W. Wacker Dr.
9th Floor
Chicago, IL 60601
(312) 893–7002
Fax: Not a member
Email: pgeske@mcgpc.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**At World Properties, LLC**
*an Illinois Limited Liability Company*

represented by  **Robert John Palmersheim**
155 N. Wacker Drive
Suite 3100
Chicago, IL 60606
312–701–9393
Fax: Active
Email: rpalmersheim@honigman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Molly K. McGinley**
Honigman LLP
IL
70 W. Madison St.
Suite 3100
Chicago, Suite 3100
Chicago, IL 60602
312–807–4419
Email: MMcGinley@honigman.com
*ATTORNEY TO BE NOTICED*

**Timothy Gerrit Parilla**
155 N. Wacker Drive
Suite 3100
Chicago, IL 60606
312–429–6026
Email: tparilla@honigman.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/05/2024 | 1 | NOTICE of Removal from Circuit Court of Cook County, Illinois, County Department, Chancery Division, case number (2023 CH 09928) filed by At World Properties, LLC Filing fee $ 405, receipt number AILNDC–21492694. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Palmersheim, Robert) (Entered: 01/05/2024) |
| 01/05/2024 | 2 | CIVIL Cover Sheet (Palmersheim, Robert) (Entered: 01/05/2024) |
| 01/05/2024 | 3 | ATTORNEY Appearance for Defendant At World Properties, LLC by Robert John Palmersheim (Palmersheim, Robert) (Entered: 01/05/2024) |
| 01/05/2024 | 4 | ATTORNEY Appearance for Defendant At World Properties, LLC by Timothy Gerrit Parilla (Parilla, Timothy) (Entered: 01/05/2024) |
| 01/05/2024 | 5 | ATTORNEY Appearance for Defendant At World Properties, LLC by Molly K. McGinley (McGinley, Molly) (Entered: 01/05/2024) |
| 01/05/2024 | 6 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by At World Properties, LLC (Palmersheim, Robert) (Entered: 01/05/2024) |
| 01/05/2024 | | CASE ASSIGNED to the Honorable Lindsay C. Jenkins. Designated as Magistrate Judge the Honorable M. David Weisman. Case assignment: Random assignment. (Civil Category 1). (sxh, ) (Entered: 01/05/2024) |
| 01/05/2024 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post–trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (sxh, ) (Entered: 01/05/2024) |
| 01/08/2024 | 7 | MINUTE entry before the Honorable Lindsay C. Jenkins:In person initial status hearing set for March 19, 2024 at 9:00 a.m. in Courtroom 2119. Initial Status Report shall be filed by March 12, 2024. The report should comply with the requirements set forth in the Initial Status Report standing order, which can be found at Judge Jenkins's web page @ (http://www.ilnd.uscourts.gov, "District Judges", to "Judge Lindsay Jenkins", to "Initial Status Hearings" under Case Management Procedures"). The parties must follow all the standing orders for Judge Jenkins and all Local Rules, which can be found at the same web page. At the Initial Status hearing, the parties are to report on the following: (1) Possibility of settlement in the case; (2) if no possibility of settlement exists, the nature and length of discovery necessary (with specific dates) |

| | | |
|---|---|---|
| | | to get the case ready for trial; and (3) whether the parties jointly consent to proceed before the Magistrate Judge. At the Initial Status Hearing, the Parties shall be prepared to inform the Court about the extent of monetary damages in order for the Court to address the proportionality of discovery as required by Fed. R. Civ. P. 26. If you need to appear virtually, contact Judge Jenkins' courtroom deputy at least three business days in advance of the hearing to make the request. The courtroom deputy will inform you as to whether your request has been approved. Mailed notice. (jlj, ) (Entered: 01/08/2024) |
| 01/08/2024 | 8 | MOTION by Defendant At World Properties, LLC for extension of time *to Respond to Plaintiff's Complaint* <br><br> (Palmersheim, Robert) (Entered: 01/08/2024) |
| 01/09/2024 | 9 | ATTORNEY Appearance for Plaintiff James Tuccori by Paul T. Geske (Geske, Paul) (Entered: 01/09/2024) |
| 01/09/2024 | 10 | MAILED Notice of Removal letter to counsel of record. (aee, ) (Entered: 01/09/2024) |
| 01/09/2024 | 11 | MINUTE entry before the Honorable Lindsay C. Jenkins: Defendant's unopposed motion for extension of time 8 is granted. Defendant's responsive pleading is due by February 2, 2024. Mailed notice. (jlj, ) (Entered: 01/09/2024) |
| 01/10/2024 | 12 | ATTORNEY Appearance for Plaintiff James Tuccori by Colin Primo Buscarini (Buscarini, Colin) (Entered: 01/10/2024) |

Hearing Date: 4/9/2024 10:30 AM
Location: Court Room 2102
Judge: Atkins, David B.

12-Person Jury

FILED
12/8/2023 4:55 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023CH09928
Calendar, 16
25530114

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

## CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| JAMES TUCCORI, individually and on behalf of similarly situated individuals, )<br><br>*Plaintiff,* )<br><br>v. )<br><br>AT WORLD PROPERTIES, LLC, an Illinois Limited Liability Company, )<br><br>*Defendant.* ) | Case No. **2023CH09928**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, James Tuccori, individually and on behalf of other similarly situated individuals, brings this Class Action Complaint against Defendant At World Properties, LLC, d/b/a @properties Christies International Real Estate (hereinafter "Defendant" or "At World Properties") and alleges as follows based on personal knowledge as to his own acts and experiences, and as to all other matters, on information and belief, including an investigation by his attorneys.

## NATURE OF THE ACTION

1.       This lawsuit is brought against Defendant – the largest residential real estate brokerage firm in Illinois by both sales volume and total number of deals and the eighth largest by dollar volume in the United States – for engaging in a conspiracy that perpetuates anti-competitive measures in the real estate broker market that harm homebuyers by, among other things, inflating and concealing commissions paid to real estate brokers. Defendant's anti-competitive practices burden homebuyers nationwide with increased home prices and unnecessarily high costs.

1

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

2.      Defendant and its co-conspirators are members of the National Association of Realtors ("NAR"), a national trade association that offers advantages to its members, including access to the primary Multiple Listing Services ("MLSs") with detailed information on available properties. NAR and its members establish and enforces rules, policies, and practices that are adopted by NAR's 1,400+ local associations and their affiliated MLSs ("NAR MLSs"). According to its website, more than 1.5 million real estate professionals across thousands of different brokerages and real estate firms are members of NAR.[1]

3.      The typical residential real estate transaction includes a real estate professional on the buy-side ("buyer-agent") and a sell-side broker ("seller-agent" or "seller-broker") that work for brokerage firms like Defendant and are paid commissions based on a percentage of the home's sale price. The seller-broker lists the seller's property on an MLS, while the buyer-agent searches the MLS to find properties to propose to their buyer. The vast majority of residential real estate transactions are facilitated through listings made available on an MLS.

4.      Both the supply side and the demand side of the housing market depend on MLSs. In order to effectively market and sell a property, a seller-broker has little choice but to list that property on an MLS because that is where buyer-agents search for properties. Similarly, in order to understand the marketplace and determine which homes are listed for sale, a buyer-agent has little choice but to search an MLS for properties. In this way, MLSs are the digital gateway to homebuying and selling and few sales occur outside of the use of MLSs.

5.      Seller-brokers and buyer-agents utilize MLSs to share and obtain information about properties for sale. An MLS is a searchable database that is essentially a marketplace for properties that are listed for sale. According to the Department of Justice ("DOJ") MLSs are a joint venture

---

[1] https://www.nar.realtor/

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

among competing brokers to facilitate the publishing and sharing of information about homes for sale in a geographic area.[2]

6.      MLSs are regional by nature and serve certain geographic areas. According to the DOJ, membership of an MLS is generally comprised of nearly all residential real estate brokers and their affiliated agents in an MLS's service area. In each area an MLS serves, the MLS will include or "list" the vast majority of homes that are for sale through a residential real estate broker in that area. In most areas, the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings.

7.      There are hundreds of MLSs in the United States, which are tailored to specific regions. For example, the Midwest Real Estate Data is an MLS that covers the Chicago Metro Area and is NAR-associated, requiring NAR membership for access. A substantial number of MLSs, including most large regional MLSs require NAR membership for access to listings.

8.      To be a member of NAR, real estate brokerage firms such as Defendant must adhere to NAR's regulations and guidelines, including those which apply to broker commissions.

9.      Defendant is heavily intertwined with NAR, which is also headquartered in Chicago. NAR frequently names brokers from large residential real estate firms such as Defendant to serve in leadership positions concurrently with their position as real estate brokers. For example, in 2020, Mabel Guzman, then a broker with At World Properties LLC, was named a member of NAR's Leadership Team.[3] These individuals guide NAR's strategic direction and policymaking

---

[2]   See DOJ Backgrounder Q&A: National Association of REALTORS®, available at: https://www.justice.gov/opa/press-release/file/1338606/download#:~:text=NAR's%20Commission%2DConcealment%20Rules%20recommend,commission%20offered%20to%20buyer%20brokers.

[3]   Former CAR President Named 2020 NAR Vice President of Association Affairs, available at: https://chicagorealtor.com/former-c-a-r-president-named-2020-nar-vice-president-of-association-affairs/

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

in such areas as legislation, professional standards, and business services—influencing the NAR rules that apply to their industry.

10.     NAR has promulgated anti-competitive regulations related to broker commissions that include mandatory (i.e. non-negotiable) up-front unilateral allocation of a portion of the sale price toward buyer-agent commissions (the "Mandatory Commission Rule").[4] This rule eliminates competition between buyer-agents with respect to their commission rate and the quality of their services. This lack of competition leads to homebuyers paying inflated commission rates and receiving lower quality services. This Mandatory Commission Rule overcompensates buyer-agents at the homebuyers' expense.

11.     Moreover, during the relevant time period, NAR and its co-conspirators such as Defendant exacerbated the anti-competitive effect of its Mandatory Commission Rule through other rules which prohibit buyer-agents from making home purchase offers contingent upon a reduction of the buyer-agent's commission ("Non-Modification Rules")[5] and prohibit the disclosure to buyers of the commission to be paid to buyer-agents ("Commission Concealment Rule").[6]

12.     The result is that the amounts of buyer-agents' commissions are inflated, and this fact is opaque and ill-understood by the homebuyers whose home prices fund those commissions.

---

[4] 2023 Handbook on Multiple Listing Policy, National Association of REALTORS®, at p. 41 MLS Policy Statement 7.31 available at:
https://cdn.nar.realtor/sites/default/files/documents/pdf_mls_handbook-2023-08-11.pdf?_gl=1*6co9sx*_gcl_au*ODk0MjQ3MzYxLjE3MDE2NjYyNjQ. (hereinafter "NAR MLS Handbook 2023")

[5] Code of Ethics and Arbitration Manual 2023, National Association of REALTORS®, at Standard of Practice 16-16 available at: https://cdn.nar.realtor/sites/default/files/documents/2023-coe-standards-of-practice-2022-12-28.pdf (hereinafter "NAR Code of Ethics 2023")

[6] NAR MLS Handbook 2023 at p. 40, Policy Statement 7.23

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

13.     These anti-competitive rules permit Defendant and other NAR members to sustain buyer-agent fees at artificially high levels which would not exist in a competitive marketplace.

14.     Defendant and the members of NAR further protect and promote their conspiracy by exerting control over and manipulating the MLSs, which constitute the gateway to homebuying and selling. As set forth above, NAR offers its members access to NAR MLSs that are widely used to facilitate homebuying and selling.

15.     NAR MLSs permit buyer-agents to filter searches for properties by commission amount, and during the relevant time period, NAR ethics rules permitted buyer-agents to show these filtered properties with high commissions to buyers ("MLS Manipulation Practices").[7] Naturally, this conflict of interest led to buyer-agents promoting properties that will maximize their commission, which lowers demand for properties that offer lower commissions and thus eliminates competition from discount brokers. This harms homebuyers, who receive diminished, biased services from buyer-agents who prefer that the homebuyers only purchase homes that offer high commissions.

16.     Defendant and the members of NAR also protected and promoted their conspiracy by exerting control over and manipulating the homebuying experience. During the relevant time period, the NAR ethics code permitted and encouraged buyer-agents to advertise their services as "free," despite the fact that buyer-agents are in fact paid a commission from the sale price of the

---

[7] 2018 Handbook on Multiple Listing Policy, National Association of REALTORS®, at p. 23 Policy Statement 7.58; P. 81 Section 18.2.4 available at: https://www.nar.realtor/sites/default/files/documents/2018-HMLP-v1.pdf (hereinafter "NAR MLS Handbook 2018")

FILED DATE: 12/8/2023 4:55 PM    2023CH09928

home that the buyer pays.[8] Current NAR regulations also limit physical access to houses for sale to only NAR members, further reducing competition from unaffiliated brokers.[9]

17.    This anti-competitive behavior has led to buyers paying inflated fees for misrepresented "free" broker services, overpaying for properties (whose purchase price necessarily includes the inflated commissions that cannot be reduced), and receiving overpriced and biased broker services. This collusion, which begins at the very gateway to homebuying (the MLSs) and extends through the homebuying process, also drives competitors out of business.

18.    These rules and practices, adopted and enforced by NAR members including Defendant constitute agreements among real estate brokers who would otherwise be competing. Defendant's implementation of these agreements is clearly anti-competitive, is an unreasonable restraint on trade, and benefits only Defendant and other NAR members.

19.    Since late 2020, when the Department of Justice sued NAR for antitrust violations, NAR has begun walking back from certain anti-competitive rules discussed herein. However, the harms caused to American homebuyers for decades have not been remedied, nor have the billions in ill-gotten commissions been disgorged. During the relevant time period and prior to NAR's rules and policies receiving challenges however, the rules, regulations and practices that further the conspiracy remained materially consistent.

20.    Defendant wields significant market power, as the eighth largest real estate brokerage by dollar volume in the United States and the largest in Illinois with nearly $30 billion worth of sales volume in 2022. Defendant's prominent market position means that its involvement

---

[8] Code of Ethics and Arbitration Manual 2018, National Association of REALTORS®, at p. 10 Standard of Practice 12-2, available at: https://www.nar.realtor/sites/default/files/documents/2018-CEAM-v1.pdf (hereinafter "NAR Code of Ethics 2018")

[9] NAR MLS Handbook 2023, at p. 41 MLS Policy Statement 7.31.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

is crucial to the success of the conspiracy with NAR and other brokers. Defendant has consented to engage in, facilitate, and execute this conspiracy, playing a significant role within NAR and mandating its affiliates to comply with NAR's anti-competitive agreements as a prerequisite for accessing the benefits of Defendant's brand and infrastructure, including MLSs.

21.     Defendant's and its co-conspirators' advancement of the conspiracy has markedly diminished competitive practices in the buyer-agent service sector, negatively impacting homebuyers. This conspiracy has empowered Defendant and other market participants to elevate and stabilize buyer-agent fees at levels that are unnaturally high compared to those supported by a competitive market, thus harming homebuyers. Among other anti-competitive effects, the conspiracy allows brokers to favor properties that offer higher commissions by overlooking or concealing lower commission options that might better suit the buyers' requirements.

22.     The result of the conspiracy has been inflated buyer-agent commissions, higher average cost of homes, and lower quality services provided to homebuyers as a result of buyer-agents who are incentivized to avoid lower commission properties and receive supracompetitive commissions regardless of their experience or the level of services they provide.

23.     Plaintiff and the other Class and Subclass members have suffered significant monetary damages, each incurring thousands of dollars in excess commission fees, due to Defendant's engagement in the conspiracy.

24.     Defendant's participation in the conspiracy has unreasonably restrained trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), as well Illinois antitrust and consumer protection laws, and the common law. Accordingly, Plaintiff, on his own behalf and on behalf of the Class and Subclass members, brings suit against the Defendant for these infractions, seeking treble damages, an order for injunctive relief, and reasonable attorneys' fees.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

**PARTIES**

25.     Plaintiff, James Tuccori, is a resident and citizen of Illinois. In 2018, Plaintiff purchased a home in Chicago using a buyer-agent affiliated with At World Properties, LLC. The home Plaintiff purchased was listed on a local MLS service that, on information and belief, was run by associations with boards of directors comprised entirely of NAR members who must adhere to NAR's guidelines and policies.

26.     Defendant, At World Properties, LLC, is an Illinois limited liability company organized under the laws of Illinois with its principal place of business in Cook County, Illinois. At World Properties also has several offices in Cook County and transacts business in Cook County.

**JURISDICTION AND VENUE**

27.     This Court may assert personal jurisdiction over Defendant pursuant to 735 ILCS 5/2-209 in accordance with the Illinois Constitution and the Constitution of the United States because Defendant is organized under the laws of this state, Defendant is doing business within this state, and because Plaintiff's claims arise out of Defendant's unlawful in-state actions, as Defendant's conduct as alleged herein emanated from its offices located within this state.

28.     Venue is proper in in the Circuit Court of Cook County pursuant to 735 ILCS 5/2-101, because Defendant is doing business in Cook County and thus resides there under 735 ILCS § 5/2-102(a), and because the transactions or occurrences, or some part thereof, out of which Plaintiff's and the putative Class and Subclass members' claims arose occurred in Cook County.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

## COMMON FACTUAL ALLEGATIONS

**A.      Broker Compensation in Real Estate Transactions is Opaque for Buyers.**

29.      For the vast majority of residential real estate transactions, brokers and agents on the buy and sell sides are paid based on a percentage of the property's sale price.

30.      State laws control who can represent sellers and buyers in real estate transactions. There are two types of licenses: (1) for real estate brokers (or brokerage firms such as Defendant), and (2) for individual agents (such as Defendant's employees). Only licensed brokers can legally be paid for representing buyers or sellers in real estate deals, according to state law. So all real estate contracts and payments are made to brokers, not agents. Brokers then pay their agents and are legally responsible for their agents' actions.

31.      A typical home sale begins with a homeowner (seller) entering into a contract with a seller-broker whereby the seller typically agrees to pay the seller-broker 6% in total commissions for facilitating the sale of the home. When the seller-broker lists the house on the MLS, they typically make a unilateral offer of 3% commission to any buyer-agent that can bring a buyer to the table to complete the sale.

32.      When the house is purchased, the buyer pays the purchase price into an escrow account where it is then paid to the seller, less the commissions, which are paid to the seller-broker and the buyer-broker.

33.      Because the escrow company distributes the commission, buyers often don't realize that they're effectively sharing the commission cost with the seller. Moreover, during the relevant time period, as part of the conspiracy alleged herein, NAR's Code of Ethics encouraged buyer-

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

agents to represent that their services are "free."[10] In reality, however, buyers pay for these "free" services through higher purchase prices and elevated commission rates.

**B.   Home Buying in America Runs Through NAR and its Conspirators Like Defendant, Who Dominate the MLSs.**

34.   According to its website, NAR is the largest trade group in the U.S.[11] It includes over 1.5 million members in the real estate field including real estate agents, brokers, managers, and appraisers. Being a NAR member carries benefits like insurance, access to property listings on preferred MLSs, training, and more.

35.   NAR promulgates and enforces rules and policies that its members follow in real estate transactions. On a yearly basis, NAR issues its Handbook on Multiple Listing Policy which requires, *inter alia,* that NAR members align their policies with those set by NAR's board of directors. Regional brokerages and MLSs abide by these rules, and real estate agents must likewise obey them.

36.   In 2020, NAR reported that nearly 90% of buyers used a broker to buy a home.

37.   Both the supply and demand side of the residential real estate market rely on MLSs. Buyer-agents use MLSs to find real estate listing information. And if a seller's broker doesn't list a property on an MLS, many buyer-agents will not show it to their clients.

38.   Numerous additional entities, including NAR-affiliated MLSs, real estate brokerages, and local realtor associations, although not listed as defendants in this case, have actively engaged with Defendant and NAR as co-conspirators. In particular, each of the local realtor associations responsible for owning and managing NAR MLSs consented to, adhered to, and executed the "Mandatory Commission Rule." This rule mandates that a seller-broker must

---

[10] NAR Code of Ethics 2018, at p. 10 Standard of Practice 12-2.

[11] https://www.nar.realtor/

10

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

define a fixed, unilateral commission for the buyer-broker, which is to be disbursed upon the sale of the property, either as a specific dollar value or as a percentage of the sale price.

39.    The NAR MLSs, along with others, have been active co-conspirators in the offenses detailed herein, executing actions that promote these violations. This includes the adoption of the Mandatory Commission Rule within their respective rules and regulations.

40.    Defendant specifically complied with and implemented the Mandatory Commission Rule in Illinois. In addition, other brokers in Illinois have participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.

41.    Defendant is liable for the acts of its co-conspirators, whether named or not named as defendants in this Complaint.

42.    Defendant and its co-conspirators have significant market power. They collectively control the primary MLSs and have a major share of many local and national markets. For instance, with respect to Illinois, Defendant self-describes as "a driving force in Chicago real estate and beyond" and otherwise markets itself as "one of the nation's largest brokerage firms."[12]

43.    Defendant and its co-conspirators dominate the buyer-agent services market. The relevant geographic market is the set of regions in which MLSs in which Defendant participates are active. This market includes the market for services provided to homebuyers by residential real estate brokers with access to MLSs in which Defendant operates. Defendant and its co-conspirators, by controlling the MLSs, can enforce the Mandatory Commission Rule and other anti-competitive NAR rules on Class members, Subclass members, and other market participants. Access to MLSs is vital for brokers to compete and work with homebuyers in those areas.

---

[12] https://www.atproperties.com/chicagoland/pages/about-us

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

Defendant, through its co-conspirator franchisees and other affiliates, provides a significant portion of the residential real estate broker services in the following areas: Texas, Illinois, Iowa, Wisconsin, Michigan, Indiana, and Washington, D.C.

44. Buyer-brokers operating in regions covered by the primary MLSs would face overwhelming obstacles if they tried to compete outside of the MLSs. Due to Defendant's and its co-conspirators' dominance over the MLSs, brokers not involved in the conspiracy would have to create a new listing service to rival the conspirators or try to compete without one. Seller-brokers not using an MLS would miss out on most potential buyers, while buyer-agents not using an MLS would miss out on most sellers. Essentially, without access to a listing service, brokers cannot compete effectively.

45. To effectively rival a NAR MLS, any new listing service must offer as extensive a range of listings. Brokers and their agents, who benefit from high buyer-agent commissions, have little reason to join a new service that could lead to increased competition and reduced commissions. Moreover, many buyers would hesitate to hire agents from such a service, especially since buyer agents on NAR MLSs claimed their services were free to buyers and fully paid by sellers during most of the relevant time period. Consequently, seller-brokers on alternative services would find it hard to attract agents and their clients. Also, buyer-agents would be wary of using a service with fewer property options. Hence, a listing service trying to compete with a NAR MLS would likely struggle to gather enough listings to be profitable and challenge the established MLSs. The current lack of competitive listing services indicates significant entry barriers.

46. To further limit competitive pricing pressure, NAR recommends that MLSs include non-compete clauses as a vital part of their agreements with third-party listing websites like Zillow seeking MLS data access. According to NAR's list of "critical components," such non-compete

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

agreements should ensure that the third-party website agrees not to rival brokerage firms like Defendant or MLSs by either turning into a licensed brokerage or offering cooperation and compensation deals. NAR also recommends that these agreements should prevent the third-party website from using the data in ways that mirror the functions of an MLS. Therefore, as part of the conspiracy, NAR advises MLSs to actively work to stop third-party websites from emerging as competitors.

**C.     Defendant and its Conspirators Have Adhered to NAR's Anti-competitive Rules, Regulations, and Standards of Practice.**

47.     NAR suppresses competition in a number of ways, primarily through requiring buyer-agents and seller-brokers to conform to NAR's regulations as a condition of membership. NAR's Handbook, Code of Ethics, and Standards of Practice enforce various rules, policies, and practices on all NAR members, including NAR MLSs and Defendant.

48.     As NAR's Code of Ethics specified during the relevant time period: "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."[13]

49.     Furthermore, the NAR's Handbook on Multiple Listing Policy stipulates that association and association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program.[14]

---

[13] NAR Code of Ethics 2018, at p. 241 Section 2.

[14] NAR MLS Handbook 2018 at p. 161; NAR MLS Handbook 2023, at p. 169.

FILED DATE: 12/8/2023 4:55 PM    2023CH09928

50.     NAR empowers its MLSs to fine, suspend, and revoke the membership of MLS users that do not comply with NAR regulations. Given the commercial necessity of access to the NAR MLSs, brokers and agents are compelled to adhere to these mandatory provisions. Without access to local MLSs, a broker or agent would be incapable of listing or viewing properties for sale in the centralized database.

51.     To ensure that its rules are being followed, NAR also conducts examinations of the governing documents of its local realtor associations to verify their adherence to its rules. Further, NAR obligates its local realtor associations to prove their compliance with these rules by periodically submitting their governing documents to NAR for evaluation.

52.     NAR offers many benefits to its realtor associations and the MLSs they own, including professional liability insurance. To qualify for this insurance, however, realtor associations and their MLSs must adhere to the mandatory provisions in the Handbook on Multiple Listing Policy. NAR withholds these insurance benefits from realtor associations and MLSs that fail to comply with its mandatory provisions. Indeed, NAR's Handbook currently reads: "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."[15]

53.     During the relevant time period, NAR's rules and policies have included numerous collusive and anti-competitive requirements: (i) the Mandatory Commission Rule; (ii) rules preventing the disclosure to buyers of the total broker commissions in a home sale ("Commission Concealment Rules"); (iii) policies limiting the ability of sellers and seller-brokers to change the commissions offered to buyer-agents after a purchase offer is made ("Non-Modification Rules");

---

[15] NAR MLS Handbook 2023, at p. 8 Policy Statement 7.17

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

(iv) policies that allow and encourage buyer-agents to inform homebuyers that their services come at no cost ("Free-Service Rule"); (v) guidelines enabling buyer-agents to filter MLS listings based on commission levels ("MLS Manipulation Practices"); and (vi) a policy restricting access to key-holding lockboxes to NAR members only ("Lockbox Policy").[16]

54.     NAR and its affiliates maintain a defined arrangement: Members can join the MLS and receive benefits from NAR and NAR MLSs, but only if they commit to follow and implement the anti-competitive restraints outlined in NAR's rules, practices, and policies. As a result, the implementation and enforcement of these guidelines by NAR and NAR MLSs constitute coordinated actions among parallel competitors, forming agreements among (should-be) rival real estate brokers. These agreements diminish price competition among brokers, resulting in increased costs and lesser service quality for American homebuyers.

55.     Defendant has played a pivotal role in the conspiracy described above by, among other things: mandating that its employees, franchisees, and the agents working under them adhere to NAR rules, including the anti-competitive rules listed above; and exerting influence over local realtor associations by, for instance, requiring adoption of NAR's rules, such as the Mandatory Commission Rule.

56.     Defendant's rules and policies require its franchisees and agents to (1) adhere to NAR's Code of Ethics; (2) become members of and follow local realtor association rules; and (3) participate in and comply with the rules of the local MLS, which include the mandatory provisions of NAR's Handbook on Multiple Listing Policy.

---

[16] Numerous of these anti-competitive rules were implicated in the DOJ's investigation of NAR. https://www.justice.gov/opa/press-release/file/1338606/download#:~:text=NAR's%20Commission%2DConcealment%20Rules%20recomm end,commission%20offered%20to%20buyer%20brokers.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

**D.    The Mandatory Commission Rule, Commission Concealment Rule, and Anti-Modification Rule are Unreasonable Restraints on Trade.**

57.    During the relevant time period, and to this day, the Mandatory Commission Rule reads: "In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants."[17]

58.    The Mandatory Commission Rule has further stated throughout the relevant time period that: "multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[18]

59.    This practice has been widely, if not universally, adopted. Indeed, nearly every MLS in the U.S. requires listing brokers to extend a blanket offer of compensation to buyer-agents.

60.    The Mandatory Commission Rule prevents buyer-agents from competing on terms such as price and service quality. Therefore, the Mandatory Commission Rule curtails competition in the market for buyer-agent services, adversely affecting homebuyers in various ways.

61.    Moreover, because NAR and its members provide blanket, unilateral, unconditional commissions, brokers have little incentive to compete in terms of service quality to earn higher commissions. For instance, new brokers who have only recently obtained their licenses can charge the same rates as seasoned, highly skilled brokers. Similarly, when broker commissions are based on a percentage of the gross selling price, a buyer-agent assisting in an $800,000 home purchase

---

[17] NAR MLS Handbook 2018, at p. 65 Section 5; NAR MLS Handbook 2023, at p. 69 Section 5.

[18] NAR MLS Handbook 2018, at p. 35 Section 5; NAR MLS Handbook 2023, at p. 40 Section 5.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

could earn potentially double compared to one assisting in a $400,000 home purchase, irrespective of whether the higher compensation matches the level and nature of services rendered.

62.     This practice has drawn the ire of consumer watchdog organizations. Indeed, the Consumer Federation has called brokers "a price-setting cartel." As the Federation explained, "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive."[19] But, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform [] commissions would quickly disappear."[20]

63.     The Mandatory Commission Rule lacks any pro-competitive rationale. Before the early 1990s, all brokers either represented sellers or were subagents of those representing sellers. Under this almost universal sub agency system brokers, even those working solely with buyers, were legally obligated to represent the interests of sellers. Because nearly all brokers involved in transactions represented the seller either as the seller's agent or as the subagent of the listing (i.e., seller's) broker, the seller's broker, who received payment from the seller, would then remunerate the subagent assisting the buyer.

64.     But with the advent of brokers representing buyers directly, payment of buyer-agents' commissions from the total commission is no longer justified. Real estate industry insiders have conceded that the practice of seller-brokers dictating the fees that buyer-agents charge to their own clients should be recognized as potentially fixing market prices. There is no pro-competitive justification for allowing seller-brokers to determine the default commissions charged by

---

[19] Testimony of Stephen Brobeck, *Residential Real Estate Brokerage Services: a Cockamamie System that Restricts Competition and Consumer Choice*, CONSUMER FED'N OF AM., at 3-4 (July 25, 2006), available at https://consumerfed.org/wp-content/uploads/2006/07/7-25-06-Residential-Real-Estate-Brokerage_Testimony.pdf.

[20] Stephen Brobeck and Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, CONSUMER FED'N OF AM., at 4 (June 2006), available at https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

competing buyer-agents to their clients. Rather, removing inter-broker compensation would reduce brokers' ability to impede price competition, likely resulting in a significant decrease in broker commissions.

65.     The reason for the Mandatory Commission Rule is clear: to maintain high broker commissions for NAR members at the expense of homebuyers. In the absence of the Rule, buyers rather than sellers would negotiate buyer-agent commissions, and brokers would compete with one another by offering lower commission rates and/or higher quality services.

66.     The Commission Concealment Rules protect the Mandatory Commission Rule and exacerbates its anti-competitive effects. These rules bar disclosure of the offered buyer-agent commission to potential buyers.

67.     The Commission Concealment Rules are laid out in several places in NAR's current Handbook and in those during the relevant time period, including Policy Statement 7.23, which states: "the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant. The multiple listing service shall not disclose in any way the total commission negotiated between the seller and the listing broker."[21]

68.     Hence, while buyer-agents are aware of the commission they'll receive if their client buys a property, NAR MLSs keep this fee hidden from the homebuyers who ultimately pay the commission through the property's purchase price.

69.     At the same time, NAR rules require brokers to share pricing information among themselves. This kind of unilateral information sharing agreement is collusive and further diminishes the incentive for buyer-agents to compete on pricing, whether by offering rebates or

---

[21] NAR MLS Handbook 2018, at p. 34 Section 1 Policy Statement 7.23; NAR MLS Handbook 2023, at p. 40 Section 1 Policy Statement 7.23

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

accepting reduced commissions. It also promotes and facilitates the setting of consistently high commission rates by brokers, leading to increased costs for buyer-agent services. Moreover, because buyers are unable to view commission offers, they are unable to identify when they are being steered towards a property with a high commission. As explained below, this type of steering leads to higher prices and diminishes the quality of services provided by buyer-agents to homebuyers.

70.     NAR's ethical rules explicitly forbid buyer-agents from attempting to decrease the buyer-agent commissions listed on MLSs when submitting purchase offers ("Non-Modification Rules"). Therefore, even if a homebuyer were able to access sufficient information to negotiate a reduced buyer-agent commission, NAR's rules wouldn't allow such negotiations. Although NAR frequently claims in litigation that brokers can purportedly negotiate their fees at any point in the transaction, NAR's Standard of Practice 16-16 currently states:

> REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[22]

71.     In other words, a buyer-agent cannot even present an offer to a seller that is conditional on the seller reducing the buyer-agent commission without violating the NAR's ethics rules. This does nothing but unreasonably restrain homebuyers to the benefit of NAR members such as Defendant.

72.     When buyer-agents do try to alter buyer-agent commissions, NAR advises them to initiate these modifications before they even show the property to prospective buyers. By obliging

---

[22] NAR Code of Ethics 2018, at Standard of Practice 16-16; NAR Code of Ethics 2023, at Standard of Practice 16-16.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

buyer-agents who are open to reducing their commissions to seek these reductions before showing the property to a potential buyer, NAR effectively shuts down most negotiation over the buyer-agent commission. To adhere to this, a buyer-agent would have to independently approach a seller-broker to negotiate a cut in their own commission, even before their client has viewed the potential home. In practice, this is unlikely to occur because it would require buyer-agents to proactively approach seller-brokers and negotiate commissions where no buyer has yet been identified. As NAR knows, this will be seen by most individuals as a speculative waste of time.

73.     NAR's rules also limit the negotiation of the buyer-agent commission by stipulating that once the seller has received purchase offers, the seller-broker is not allowed to unilaterally alter the buyer-agent commission originally offered on the MLS. This is outlined in NAR Standard of Practice 3-2, which states:

> Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction.[23]

74.     Consistent with NAR's rule, the Midwest Real Estate Data Rules and Regulations, for example, state that a listing broker may only offer a buyer-agent compensation that differs from the compensation indicated on the listing if the seller-broker "informs the other broker in writing or in accordance through the Service in advance of his producing an offer to purchase . . . ."[24]

---

[23] NAR Code of Ethics 2018, at Standard of Practice 3-2; NAR Code of Ethics 2023, at Standard of Practice 3-2.

[24] Section 5: Division of Commissions, Rules and Regulations, Midwest Real Estate Data, MRED Quick Reference Guide. (Revised Feb. 2019), https://ww2.mredllc.com/wp-content/uploads/2018/07/MRED-Rules-and-Regulations.pdf.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

75.     NAR further restricts negotiation by deeming it unethical for a buyer-agent to suggest that the buyer directly negotiate with the seller to lower commissions. Given that most homebuyers have little to no understanding of this market and are under the impression that the buyer-agent's services are "free," this limitation additionally curbs negotiations concerning buyer-agent commissions.

**E.     The Free-Service Rule and MLS Manipulation Practices Allow Defendant and its Co-Conspirators to Dominate the Homebuying Process and Improperly Steer Homebuyers to Higher-Commission Properties.**

76.     During the relevant time period, Defendant and its brokers also adopted NAR's Free-Service Rule, which encouraged buyer-agents to mislead buyers into thinking that the buyer-agent's services are free when actually they are not.

77.     During the relevant time period and until January 2021, NAR Ethics Standard 12-2 stated "REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR to obtain a benefit from a third party is clearly disclosed at the same time." Because buyer-agents governed by NAR are technically paid out of funds paid to the seller-broker, those buyer-agents can misleadingly tell their buyer clients that their services are "free." As a result, homebuyers think they are paying nothing for buyer-agent services, when in reality the buyer-agent's commissions are incorporated into the purchase price of the home.

78.     Because buyers were led to believe that they were not paying for brokerage services, they were not inclined to negotiate for a lower buyer-agent commission or seek out or discover appealing rebate offers or other discounts from buyer-agents. As such, NAR's Free-Service Rule contributed to elevated costs for services rendered by buyer-agents.

79.     NAR's MLS Manipulation Practices are yet another set of rules that hinder competition and contribute to elevated commissions.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

80.     During the relevant time period, NAR's MLS Manipulation Practices enabled buyer-agents to curate MLS listings according to the amount of buyer-agent commissions being offered. Additionally, some MLSs even allow buyer-agents to exclude homes from potential homebuyers when they offer lower commissions, despite meeting the buyer's search requirements.

81.     For instance, during the relevant time period, Policy Statement 7.58 in NAR's Handbook read: "Participants may select the IDX listings they choose to display based only on objective criteria including . . . cooperative compensation offered by listing brokers."[25]

82.     The MLS Manipulation Practices, adopted by Defendant and NAR MLSs during the relevant time period, aid in steering by enabling buyer-agents to selectively hide from potential homebuyers those property listings that offer lower buyer-agent commissions. This practice, which has since been repealed,[26] diminished the quality of services provided by buyer-agents and increases the cost of these services for homebuyers.

**F.     The Lockbox Policy Shuts out Competitors.**

83.     Further reducing competition for buyer-agent services, NAR and its member brokers also restrict physical access to listed properties through the use of lockboxes that are available only to real estate brokers who are part of a NAR MLS. These brokers, with the consent of the sellers, store keys to the homes listed for sale in lockboxes, enabling them to grant potential buyers access to the properties while ensuring their security. Access to these lockboxes is controlled by real estate brokers using either a numerical code or a digital Bluetooth 'key' which is not provided to non-members of NAR.

84.     NAR and NAR MLSs have implemented a set of rules (outlined in the NAR

---

[25] NAR MLS Handbook 2018, at p. 23 Policy Statement 7.58; P. 81 Section 18.2.4.

[26] NAR MLS Handbook 2023, at p. 23 Policy Statement 7.58; P. 87 Section 18.2.4.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

Handbook, Policy Statement 7.31) that limit lockbox access solely to real estate brokers who are members of NAR and subscribe to the NAR MLS.[27] Brokers not affiliated with NAR are denied access to these lockboxes, preventing them from showing their clients homes listed for sale, which in turn diminishes competition in the realm of buyer-broker services.

**G.      The Conspiracy Harms Homebuyers.**

85.     These rules and practices have collectively functioned to sustain elevated commission rates and deteriorate the quality of services that homebuyers receive from buyer-brokers. These regulations have led to increased buyer-broker commissions despite technological advancements and other changes that should have noticeably decreased commissions. Additionally, they have considerably hindered the capacity of more cost-effective alternatives to foster a more competitive market.

86.     There is no pro-competitive benefit to the conspiracy. Defendant and its co-conspirators have effectively maintained and significantly raised the financial costs of buyer-broker commissions, despite the diminishing role of such buyer-brokers due to the emergence of third-party listing websites. NAR data indicates that many homebuyers now prefer to search for prospective homes independently through online services, rather than with a broker's help, and buyer-brokers are increasingly engaged only after their client has identified the desired home. Yet, despite the reduced involvement of buyer-brokers, buyer-agents still receive the same artificially high commission due to the conspiracy among Defendant and other brokers.

87.     The conspiracy between Defendant and other brokers has had many anti-competitive effects, including:

        a.  Homebuyers have incurred elevated buyer-broker commissions and total

[27] NAR MLS Handbook 2018, at p. 36 Policy Statement 7.31; NAR MLS Handbook 2023, at p. 41 Policy Statement 7.31.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

commissions, which are integrated into the purchase price of their homes;

b. Seller-brokers are disinclined to offer commissions below market rate for fear that the seller's house will not be shown;

c. The engagement of a buyer-broker has become disconnected from the determination of the broker's commission; while the homebuyer hires the buyer-broker, the home seller determines the buyer-broker's compensation;

d. There has been a suppression of price competition among brokers for retention by homebuyers;

e. Home buyers' competitive ability has been hindered due to their inability to compete for home purchases by reducing the buyer-broker commission;

f. The quality of services provided by buyer-brokers has declined, as they are motivated to direct their clients towards homes offering higher commissions;

g. The quality of buyer-broker services has further deteriorated due to obstacles that impede buyer-brokers from presenting and receiving purchase offers that lower the buyer-broker commission, thereby making these offers more appealing and acceptable to sellers; and

h. Brokers have significantly increased their profits by obtaining inflated buyer-broker commissions and total commissions.

88.     Defendant and its co-conspirators have not only maintained but, in terms of inflation-adjusted dollars, significantly increased the fees charged by buyer-brokers, a situation that markedly contrasts with trends in other industries. In almost every consumer sector — including bookselling, retail, home appliances, insurance, banking, and stock brokering — the emergence of technology and the proliferation of internet and discount sellers has tremendously benefited customers financially. Economists refer to this reduction of transaction costs as "disintermediation." The real estate brokerage market, worth approximately $70 billion annually, is particularly suited for such a transformation. Yet, despite the technological advancements that have diminished the role of brokers and the considerable fluctuations in housing market prices, brokerage fees have not adapted to these changes. This resilience, or "stickiness" in commissions

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

is attributable to the collusive conspiracy alleged herein.

89.     There is also a notable discrepancy between buyer-broker costs and the commissions they earn. In a competitive market, pressure from and among competitors forces prices toward the marginal cost of goods (or services) sold. However, this pattern is not evident in real estate brokerage fees. For instance, the costs incurred by buyer-brokers are generally consistent, and have trended downward with technology, irrespective of the home's price. As noted by the Wall Street Journal, "many, if not most, of the services that Realtors provide don't vary with the sales price, so the percentage fee should fall as home price rises." Contrary to this expectation, broker commissions remain disconnected from the amount, quality, and value of the services provided.

90.     Even if there were any plausible pro-competitive effects of Defendant's and its co-conspirators' conspiracy, those effects would be substantially outweighed by the conspiracy's anti-competitive effects.

91.     There is considerable economic evidence that Defendant's and its co-conspirators' conspiracy has inflated buyer-broker commissions and total commissions to well above a competitive level nationwide.

92.     The conspiracy among Defendant and its co-conspirators has consistently kept broker commission rates at exceptionally stable and elevated levels over the past two decades. This trend persists despite the emergence of the internet and the reduced role of buyer-brokers. From 2000 to 2017, the average national commission rate remained consistently high, between 5% and 5.4%, irrespective of varying market conditions.

93.     Housing prices in many areas have risen significantly recently, surpassing the rate of inflation. Given that commissions are calculated as a percentage of a home's sale price, the real

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

dollar value of commissions has substantially increased alongside the price of homes. "For example, between 2001 and 2017, the average price of new homes in current dollars sold rose from $213,200 to $384,900, according to U.S. Census Bureau Statistics." [28]

94.      As the Consumer Federation of America points out: "[b]ecause the industry functions as a cartel, it is able to overcharge consumers tens of billions of dollars a year. . . . Consumers are increasingly wondering why they are often charged more to sell a home than to purchase a new car."[29]

95.      The typical total broker commissions (i.e., the combined commission for the seller-broker and buyer-broker) in regions with NAR MLSs range from 5% to 6%, markedly higher than in countries with competitive residential real estate brokerage markets. In their 2002 study "International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry," economists Natalya Delcoure and Norm Miller observed: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand. . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%."[30]

96.      Delcoure and Miller also noted variations within countries. For instance, in the

---

[28] *Comments of Stephen Brobeck, Executive Director Consumer Federation of America Before the Department of Justice-Federal Trade Commission Public Workshop on Competition Issues*, CFA, 2 n.4 (June 5, 2018), https://consumerfed.org/wp-content/uploads/2018/06/CFA-comments-DOJ-FTC-publicworkshop-on-competition-issues.pdf.

[29] Glen Justice, *Lobbying to Sell Your House*, N.Y. TIMES (Jan. 12, 2006), https://www.nytimes.com/2006/01/12/business/lobbying-to-sell-your-house.html.

[30] Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 INTL. REAL ESTATE REV. 12, 14 (2002).

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

United Kingdom, Delcoure and Miller found that "1%-2% is typical; in very competitive areas 0.5- 0.75%; in low priced areas [for homes] as high as 3.5%."[31] Ultimately, they concluded that, "[b]ased on global data . . . [total] US residential brokerage fees should equal something closer to 3.0%."[32] That is approximately <u>half</u> of what such fees are now.

97.     Indeed, economists Chang-Tai Hsieh and Enrico Moretti have proposed that competition could potentially eliminate over half of the current commission rates. [33]

98.     The conspiracy to restrict price competition for commissions has had a significant negative economic impact. The Consumer Federation of America noted, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear."[34] This suggests that the current uniform commission rates are maintained by the lack of individual negotiation and competition.

99.     The extent and significance of the overcharges at issue in this case have resulted in a tremendous economic burden for the putative class members and other consumers. Experts have estimated that consumers could save approximately $30 billion or more each year if there were price competition among brokers. [35]

**H.     Due to Defendant's Concealment of the Conspiracy and Plaintiff's Reasonable Lack of Knowledge Thereof, the Statute of Limitations has Been Tolled.**

100.     In the years leading up to the filing of this Complaint, Defendant continuously engaged in anti-competitive behavior. This includes the implementation and enforcement of the

---

[31] *Id.* at 17.

[32] *Id.* at 29.

[33] *See* Chang-Tai Hsieh & Enrico Moretti, *Can Free Entry be Inefficient? Fixed Commissions and Social Waste in the Real Estate Industry*, 111 J. POL. ECON. 1076, 1116 (2003).

[34] Brobeck & Woodall, *Supra* n.6.

[35] Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure (Abridged)*, 5 CORNELL REAL ESTATE REV. 26, 26 n.1 (2007).

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

Mandatory Commission Rule and other anti-competitive NAR rules. Defendant continues many of these practices to this day.

101.    As a result of its conspiracy, Defendant has consistently charged and collected, and continues to charge and collect, excessive buyer-broker commissions and total commissions. These were paid by Plaintiff and the other Class and Subclass members in connection with their purchase of residential real estate. Every instance of paying these inflated commissions by the Plaintiff and the Class and Subclass members during the class period resulted in harm to them and created a new cause of action. Plaintiff and the other Class and Subclass members had no knowledge of Defendant's unlawful conspiracy and could not have discovered it by the exercise of due diligence until, at the earliest, November 19, 2020, the date the DOJ announced the settlement of its antitrust claims against NAR.

102.    It was reasonable for Plaintiff and the Class and Subclass Members not to suspect Defendant of engaging in illegal anti-competitive conduct. Plaintiff and the members of the Class and Subclass, as typical homebuyers, lack extensive knowledge or insights about the real estate industry and are not familiar with NAR's operations. Furthermore, as explained above, NAR's policies, rules, and practices explicitly forbid revealing the total broker commissions to homebuyers and encourage buyer-brokers to convey to their clients that they are receiving the brokers' services at no cost. Consequently, the average homebuyer is not aware that they are incurring costs for buyer-broker services, much less that Defendant is conspiring to uphold excessively high broker commissions.

103.    For these reasons, the statutes of limitation applicable to Plaintiff's and the other Class and Subclass members' claims have been tolled with respect to the claims asserted herein.

104.    Additionally, or alternatively, application of the doctrine of fraudulent concealment

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

tolled the statutes of limitation on Plaintiff's and the Class and Subclass members' claims until at least November 19, 2020.

105.    Defendant actively concealed the conspiracy by, for example, prohibiting the disclosure of total commissions to homebuyers and encouraging brokers to represent to homebuyers that their services are free of charge.

106.    Moreover, Defendant's anti-competitive behavior was intrinsically self-concealing given NAR's strict control over its regulated MLSs, agents, and brokers. A reasonable buyer, under the circumstances, would not have had grounds to suspect exposure to anti-competitive actions. The policy that prevents NAR MLSs from disclosing to prospective buyers the commission a buyer-broker will receive for a home purchase on the MLS naturally hides the conspiracy's existence. Similarly, practices that allow buyer-agents to falsely claim their services are complimentary to buyers, and actions by the Defendant to filter MLS listings based on buyer-broker commission levels and exclude homes offering lower commissions, are also inherently self-concealing.

## CLASS ALLEGATIONS

107.    Pursuant to 735 ILCS 5/2-801, Plaintiff brings this action on his own behalf and on behalf of a Class (the "Class") and Subclass (the "Subclass") of similarly situated individuals defined as follows:

> **Nationwide Class:** All persons who, from March 17, 2000 through the present, purchased in the United States residential real estate listed on a NAR MLS in a transaction with a buyer-agent and/or seller-agent employed by or otherwise affiliated with Defendant or any of its franchisees, subsidiaries, agencies, or otherwise affiliated entities.

> **Illinois Subclass:** All persons who, from March 17, 2000 through the present, purchased in the state of Illinois residential real estate listed on a NAR MLS with a buyer-agent and/or seller-agent employed by or otherwise affiliated with Defendant or any of its franchisees, subsidiaries, agencies, or otherwise affiliated entities.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

108.     Expressly excluded from the Class and Subclass are any members of the judiciary assigned to preside over this matter and their staff; Plaintiff's counsel and Defendant's counsel; any officer, director, or employee of Defendant and its affiliates; and any immediate family members of such officers, directors, or employees.

109.     On information and belief, there are at least tens of thousands, if not hundreds of thousands, of members of the Class and Subclass, making the members of the Class and Subclass so numerous that joinder of all members is impracticable. Although the exact number of Class and Subclass members is unknown to Plaintiff, the members can easily be ascertained through Defendant's records.

110.     Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other members of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class and Subclass.

111.     Plaintiff's claims are typical of the claims of the other members of the Class and Subclass, in that the factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class and Subclass are the same. Plaintiff and the other members of the Class and Subclass have all suffered similar harms and damages as a result of Defendant's collection of unlawfully excessive commissions.

112.     There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not limited to:

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

a.   Whether Defendant conspired with its co-conspirators as alleged herein;

b.   Whether the conspiracy harmed competition as alleged herein;

c.   Whether homebuyers were harmed as a result of Defendant's anti-competitive conduct as alleged herein;

d.   Whether buyer-agent commissions were inflated as a result of the conspiracy;

e.   Whether the quality of buyer-agent services was diminished as a result of the conspiracy;

f.   Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

g.   Whether Defendant committed deceptive acts under the ICFA by representing to the members of the Subclass that buyer-agent fees were free, paid by the seller, or otherwise not ultimately paid by the buyer;

h.   Whether Defendant should be enjoined from engaging in such conduct in the future;

i.   The appropriate class-wide measures of damages; and

j.   Whether Defendant should be ordered to disgorge all unlawful fees collected by it or on its behalf during the applicable limitations period.

113.   This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class and Subclass is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision making.

114.   Absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitive and would have no effective remedy. Unless the Class is certified,

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

Defendant will retain the monies it received from the members of the Class as a result of its unfair and deceptive conduct.

## COUNT I
### Section 1 of the Sherman Act, 15 U.S.C § 1
### (On Behalf of the Plaintiff and the Class)

115.    Plaintiff realleges and incorporates by reference each of the foregoing allegations as though stated herein.

116.    Beginning in at least 2000, Defendant engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

117.    The misrepresentation as to the payment of brokerage commissions and the increased price of houses sold is an actual and proximate cause of harm to homebuyers. The contract, combination, or conspiracy alleged herein has consisted of continuing agreements among Defendant and its co-conspirators to set, raise, and maintain the level of broker commissions.

118.    In furtherance of the contract, combination, or conspiracy, Defendant and its co-conspirators have committed one or more of the following overt acts:

   a.  participated in the establishment, maintenance, and implementation of the Mandatory Commission Rule and other anti-competitive NAR rules;

   b.  participated in the establishment, maintenance, and implementation of rules by NAR associations and MLSs that implemented the Mandatory Commission Rule and other anti-competitive NAR rules; and

   c.  used their control over the NAR MLSs to force affiliated brokers, members, and franchisees to implement and adhere to the Mandatory Commission Rule and other anti-competitive NAR rules in the areas in which the NAR MLSs operate.

119.    Defendant's conspiracy has caused buyer-agents to conceal total commissions, to misrepresent to buyers that buyer-agents' services are free, to steer homebuyers towards high

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

commission listings, and to diminish the value of buyer-agent services by restraining competition on buyer-agent commission fees in the home buying process. Defendant's conspiracy has also had the effect of excluding non-NAR-affiliated brokers from competing in the market for buyer-agent services by restricting access to lockboxes, which is required in order for buyer-agents to show houses for sale to their clients.

120.    Defendant's conspiracy has also reduced competition among buyer-agents, thereby requiring buyers to pay inflated prices for their homes and inflated buyer-agent commissions. Reduced price competition among buyer-agents has also reduced the quality of broker services provided to homebuyers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

121.    Plaintiff and the other Class Members paid inflated home purchase prices and broker commissions throughout the class period in connection with the purchase of residential real estate listed on the NAR MLSs. Absent Defendant's conspiracy, Plaintiff and the other class members would have paid lower prices for their homes and lower commissions.

122.    Plaintiff and Class Members also received diminished services from buyer-agents as a result of the conspiracy. Absent this conspiracy, Plaintiff would have received improved services in negotiating and reducing the purchase prices of their homes.

123.    As a direct and proximate result of Defendant's past and continuing violations, Plaintiff and Class Members have been injured in their business and property.

124.    Plaintiff and the members of the Class are entitled to an injunction against Defendant, preventing and restraining the violations alleged herein, and to damages as permitted by law for the injuries they suffered as a result of Defendant's anti-competitive conduct.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

125.     Accordingly, with respect to Count I, Plaintiff, individually and on behalf of the proposed Class, prays for the relief set forth below.

**<u>COUNT II</u>**
**Commission-Fixing Conspiracy in Violation of the Illinois Antitrust Act**
**740 ILCS 10/1 *et seq.***
**(On Behalf of Plaintiff and the Illinois Subclass)**

126.     Plaintiff realleges and incorporates by reference each of the foregoing allegations as though stated herein.

127.     Beginning at least in 2000, Defendant engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Illinois for the purpose and with the effect of fixing, controlling, or maintaining the commissions paid to Defendant's buyer-agents. Defendant's conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Illinois.

128.     Defendant's agreement to uphold NAR rules, policies, and procedures related to buyer-agent compensation is *per se* unlawful under 740 ILCS 10/3(1) because Defendant and its co-conspirators agreed to fix the commissions to be paid to buyer-agents. Defendant's commission-fixing conspiracy was not reasonably necessary to any separate, legitimate business purpose, transaction, or collaboration.

129.     Defendant's acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services within Illinois.

130.     As a result of Defendant's unlawful conduct, Plaintiff and other members of the Subclass have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services.

131.     By engaging in the aforementioned conduct, Defendant intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*

132.    Plaintiff and the other Illinois Subclass members seek damages as permitted by law for the injuries they suffered as a result of Defendant's anti-competitive conduct.

133.    Accordingly, with respect to Count II, Plaintiff, individually and on behalf of the proposed Class, prays for the relief set forth below.

**<u>COUNT III</u>**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 ILCS 505/1 *et seq.***
**(On Behalf of Plaintiff and the Illinois Subclass)**

134.    Plaintiff realleges and incorporates by reference each of the foregoing allegations as if fully set forth herein.

135.    Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act provides in relevant part that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

136.    Plaintiff and the other members of the Subclass are "consumers" within the meaning of Section 1(e) of the ICFA, because Defendant's business activities involve trade or commerce, are addressed to the market generally, and implicate consumer protection concerns.

137.    Defendant's conduct in misrepresenting its buyer-agents' services as being provided free of charge to buyers is a deceptive practice in violation of Section 2 of the ICFA.

138.    As explained above, Defendant misrepresented to Plaintiff and the other Subclass members that:

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

a.  Its buyer-agents' services are provided free of charge to buyers;

b.  Buyer-brokers' commissions are paid by the seller; and

c.  Buyer-brokers' commissions must be paid uniformly regardless of the broker's experience, skill, or contribution to the homebuying process.

139.    Additionally, Defendant deceptively omitted and concealed the amounts of buyer-agent commissions offered to potential buyer-agents on MLSs and concealed that its listing software steered buyers toward properties with higher buyer-agent commissions.

140.    Defendant intended that Plaintiff and the other Subclass members rely on its misrepresentations. Indeed, Defendant knowingly and intentionally made the deceptive representations as to buyer-agent commissions in order to maintain the commissions at an artificially elevated rate.

141.    Plaintiff and the other Subclass members did actually rely upon and were actually deceived by Defendant's misrepresentations. Plaintiff and the other members of the Subclass would have acted differently had they known that Defendant's buyer-agent were inflated, such as by, among other things, seeking out buyer-agents with discounted commissions or negotiating lower commission rates.

142.    As a direct and proximate result of Defendant's anti-competitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiff and the Illinois Subclass Members have been harmed and suffered actual damages through payment of higher prices for their homes and inflated buyer-agent commissions in exchange for lower quality of services.

143.    Further, Defendant's violations of the Sherman Act, 15 U.S.C § 1, and the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*, constitute unfair business practices under the ICFA. Defendant's actions unfairly imposed additional, unlawful costs on Plaintiff and the other Subclass members in the form of elevated home prices and excessive buyer-agent commissions.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

Defendant's actions are thus oppressive, unethical, and unscrupulous, and have caused substantial injury to consumers.

144.    Plaintiff brings this claim on his own behalf and on behalf of the other Subclass members pursuant to Section 10a of the ICFA, which permits Plaintiff to bring a private cause of action for the above violations and entitles Plaintiff and the other Subclass members to actual damages, injunctive relief, as well as costs and reasonable attorney's fees.

145.    Accordingly, with respect to Count III, Plaintiff, individually and on behalf of the proposed Class, prays for the relief set forth below.

**<ins>COUNT IV</ins>**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

146.    Plaintiff realleges and incorporates by reference each of the foregoing allegations as if fully set forth herein.

147.    Defendant received benefits from Plaintiff and the Class members and unjustly retained those benefits at their expense. For example, Plaintiff and the Class Members paid supracompetitive commissions to agents employed by Defendant or its co-conspirators. Defendant's financial benefits resulting from its unlawful and inequitable conduct are economically traceable to overpayments for buyer-agent commissions by Plaintiff and the Class members.

148.    Additionally, Defendant promulgated and enforced anti-competitive rules, including the Mandatory Commission Rule, Commission Concealment Rules, Free-Service Rule, Non-Modification Rules, MLS Manipulation Practice and Lockbox Policy in order to raise, set, and maintain high commission rates and otherwise reduce competition in the market for buyer-agent services for its own gain, providing Defendant with economic, intangible, and other benefits.

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

149.    Defendant unjustly retained those benefits at the expense of Plaintiff and Class members because Defendant's conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and the Class.

150.    The benefits that Defendant derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

151.    Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds it received, and such other relief as the Court may deem just and proper.

152.    Accordingly, with respect to Count IV, Plaintiff, individually and on behalf of the proposed Class, prays for the relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the other Class and Subclass members, prays that the Court enter an order:

A.    Certifying the Class and Subclass proposed above, appointing Plaintiff as class representative of the Class and Subclass, and appointing the undersigned counsel as Class counsel;

B.    Declaring that Defendant's actions, as set forth in this Complaint, violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Declaring that Defendant's actions, as set forth in this Complaint, violate the Illinois Antitrust Act and the Illinois Consumer Fraud and Deceptive Business Practices Act;

D.    Awarding Plaintiff and the other members of the Class and Subclass all available damages and/or restitution in an amount to be determined at trial;

E.    Awarding Plaintiff pre- and post-judgment interest;

FILED DATE: 12/8/2023 4:55 PM   2023CH09928

F.      Awarding Plaintiff his costs of suit, including reasonable attorney's fees and expenses;

G.      Awarding Plaintiff and the Class and Subclass a permanent injunction to permanently enjoin and restrain Defendant from maintaining or re-establishing the same or similar anti-competitive rules, policies, or practices as those challenged in this action in the future; and

H.      Awarding such further and additional relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury of all claims that can be so tried.

Dated: December 8, 2023                         Respectfully submitted,

                                                JAMES TUCCORI, individually and on behalf of similarly situated individuals

                                                By: */s/ Paul T. Geske*
                                                One of Plaintiff's attorneys

                                                Evan Meyers
                                                Paul T. Geske
                                                Brendan Duffner
                                                MCGUIRE LAW, P.C.
                                                55 W. Wacker Drive, 9th Fl.
                                                Chicago, IL 60601
                                                Tel: (312) 893-7002
                                                Fax: (312) 275-7895
                                                emeyers@mcgpc.com
                                                pgeske@mcgpc.com
                                                bduffner@mcgpc.com

                                                *Counsel for Plaintiff and the putative Class and Subclass*