25MAG,STD

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:24−cv−00045−JZB

Masiello v. Arizona Association of Realtors et al
Assigned to: Magistrate Judge John Z Boyle
Cause: 15:1 Antitrust Litigation

Date Filed: 01/05/2024
Jury Demand: Plaintiff
Nature of Suit: 410 Other Statutes:
Anti−Trust
Jurisdiction: Federal Question

**Plaintiff**

**Joseph Masiello**
*individually, and on behalf of those*
*similarly situated*

represented by **Daniel E Gustafson**
Gustafson Gluek PLLC
120 S 6th St., Ste. 2600
Minneapolis, MN 55402
612−333−8844
Fax: 612−339−6622
Email: dgustafson@gustafsongluek.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel C Hedlund**
Gustafson Gluek PLLC
120 S 6th St., Ste. 2600
Minneapolis, MN 55402
612−333−8844
Fax: 612−339−6622
Email: dhedlund@gustafsongluek.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel J Nordin**
Gustafson Gluek PLLC
120 S 6th St., Ste. 2600
Minneapolis, MN 55402
612−333−8844
Fax: 612−339−6622
Email: dnordin@gustafsongluek.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David M. Cialkowski**
Zimmerman Reed LLP − Minneapolis,
MN
1100 IDS Ctr.
80 S 8th St.
Minneapolis, MN 55402
612−341−0400
Fax: 612−341−0844
Email: david.cialkowski@zimmreed.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hart Lawrence Robinovitch**
Zimmerman Reed PLLP − Scottsdale, AZ
14648 N Scottsdale Rd., Ste. 130
Scottsdale, AZ 85254−2762
480−285−2165
Email: hlr@zimmreed.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary M Nikolai**
Gustafson Gluek PLLC
120 S 6th St., Ste. 2600
Minneapolis, MN 55402
612−333−8844
Fax: 612−339−6622
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan J Ellersick**
Zimmerman Reed PLLP − Scottsdale, AZ
14648 N Scottsdale Rd., Ste. 130
Scottsdale, AZ 85254−2762
480−348−6400
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Arizona Association of Realtors**

**Defendant**

**Phoenix Board of Realtors
Incorporated**
*doing business as*
Phoenix Association of Realtors

**Defendant**

**Scottsdale Area Association of Realtors**

**Defendant**

**West and Southeast Realtors of the
Valley Incorporated**

**Defendant**

**Tucson Association of Realtors
Incorporated**

**Defendant**

**HomeSmart Holdings Incorporated**

**Defendant**

**My Home Group LLC**

**Defendant**

**Realty One Group Arizona
Incorporated**

**Defendant**

**West USA Realty Incorporated**

**Defendant**

**Hague Partners Holdings LLC**

**Defendant**

**Realty Executives LLC**

**Defendant**

**Valley Metro Investments
Incorporated**
*doing business as*
Arizona Best Real Estate

**Defendant**

**Corduroy IP LLC**
*doing business as*
North&Company

**Defendant**

**Silverleaf Realty LLC**

**Defendant**

**Retsy LLC**

**Defendant**

**Walt Danley Realty LLC**
*doing business as*
Walty Danley Local Luxury

**Defendant**

**Christie's International Real Estate**

**Defendant**

**Bortlock LLC**
*doing business as*
Brokery

**Defendant**

**Roy H Long Realty Company
Incorporated**
*doing business as*
Long Realty

**Defendant**

**Tierra Antigua Realty LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/05/2024 | 1 | COMPLAINT. Filing fee received: $405.00, receipt number AAZDC–22632571 filed by Joseph Masiello. (submitted by Hart Robinovitch) (Attachments: # 1 Civil Cover Sheet) (REK) (Entered: 01/09/2024) |
| 01/05/2024 | 2 | Filing fee paid, receipt number AAZDC–22632571. This case has been assigned to the Honorable John Z Boyle. All future pleadings or documents should bear the correct case number: CV–24–00045–PHX–JZB. Magistrate Election form attached. (Attachments: # 1 Magistrate Consent Form)(REK) (Entered: 01/09/2024) |
| 01/10/2024 | 3 | SUMMONS Submitted by Joseph Masiello. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons, # 14 Summons, # 15 Summons, # 16 Summons, # 17 Summons, # 18 Summons)(Robinovitch, Hart) (Entered: 01/10/2024) |
| 01/11/2024 | 4 | Summons Issued as to Arizona Association of Realtors, Bortlock LLC, Corduroy IP LLC, Hague Partners Holdings LLC, HomeSmart Holdings Incorporated, Phoenix Board of Realtors Incorporated, Realty Executives LLC, Realty One Group Arizona |

| | | |
|---|---|---|
| | | Incorporated, Retsy LLC, Roy H Long Realty Company Incorporated, Scottsdale Area Association of Realtors, Silverleaf Realty LLC, Tierra Antigua Realty LLC, Tucson Association of Realtors Incorporated, Valley Metro Investments Incorporated, Walt Danley Realty LLC, West USA Realty Incorporated, West and Southeast Realtors of the Valley Incorporated. (BAS). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 01/11/2024) |
| 01/11/2024 | 5 | NOTICE OF DEFICIENCY re: 3 Summons Submitted filed by Joseph Masiello. Description of deficiency: Defendant name does not match complaint. Please resubmit amended version within one business day. (BAS) (Entered: 01/11/2024) |
| 01/11/2024 | 6 | SUMMONS Submitted by Joseph Masiello. (Robinovitch, Hart) (Entered: 01/11/2024) |
| 01/12/2024 | 7 | Summons Issued as to My Home Group LLC. (BAS). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 01/12/2024) |

Hart L. Robinovitch (AZ #020910)
Ryan J. Ellersick (AZ #038805)
**ZIMMERMAN REED LLP**
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Telephone: (480) 348-6400
hart.robinovitch@zimmreed.com
ryan.ellersick@zimmreed.com

David M. Cialkowski*
**ZIMMERMAN REED LLP**
80 S 8th Street, 1100 IDS Center
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
david.cialkowski@zimmreed.com

*(Additional Counsel Listed Below)*
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph Masiello, individually, and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Arizona Association of Realtors; The Phoenix Board of Realtors, Inc., d/b/a The Phoenix Association of Realtors; Scottsdale Area Association of Realtors; West and Southeast Realtors of the Valley, Inc.; Tucson Association of Realtors, Inc.; HomeSmart Holdings, Inc.; My Home Group, LLC; Realty One Group Arizona, Inc.; West USA Realty, Inc.; Hague Partners Holdings, LLC; Realty Executives, LLC; Valley Metro Investments, Inc., d/b/a Arizona Best Real Estate; Corduroy IP, LLC, d/b/a North&Co.; Silverleaf Realty, LLC; Retsy, LLC; Walt Danley Realty, LLC, d/b/a Walty Danley Local Luxury, Christie's International Real Estate; Bortlock, LLC, d/b/a The Brokery; Roy H. Long Realty Company, Inc., d/b/a Long Realty; Tierra Antigua Realty, LLC.<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded |

1

Plaintiff Joseph Masiello, on behalf of himself and all others similarly situated, files this Class Action Complaint against the largest REALTORS® associations in Arizona and the largest Arizona-based real estate brokerages for conspiring to violate federal and state antitrust law, and in support states the following:

## I.    INTRODUCTION

1.    When Arizona homeowners sell a home, they pay a standard commission to the broker who listed the property for sale.  Like other home sellers across the nation, Arizona home sellers also typically pay the commission of the broker who represented the buyer.  For several decades, these combined commissions have remained fixed at approximately 4.5 to 6 percent of the total sale price of the home, despite the advent of technology and other innovations that, in a functioning free market, would generally drive commissions down.

2.    This archaic commission structure has remained insulated from market forces for almost 30 years because of a long-running conspiracy among Defendants to implement and enforce anticompetitive restraints in the residential real estate market.  Specifically, rules created by the National Association of REALTORS® ("NAR")—and implemented and enforced by Defendants in Arizona—compel home sellers to pay inflated commissions to the home buyer's broker, even though the buyer's broker does not represent the seller.  Further, NAR rules stifle negotiation over buyer-broker commissions, fixing the commissions at an inflated rate regardless of the experience or actual services rendered by the buyer broker.  These restraints violate federal and state antitrust law and are the subject of an ongoing investigation by the United States Department of Justice.[1]

3.    At the center of the conspiracy is the Buyer Broker Commission Rule, conceived by the NAR, which requires all home sellers to make a blanket, unilateral, and effectively non-negotiable offer of buyer-broker compensation when listing a property for sale on a Multiple Listing Service ("MLS"), a database where virtually all homes in Arizona are sold.

---

[1]    Jordan Yadoo & Leah Nylen, *Real Estate Brokers Pocketing Up to 6% in Fees Draw Antitrust Scrutiny*, https://www.bloomberg.com/news/articles/2023-10-16/us-realtors-lucrative-fee-system-faces-mounting-antitrust-risk

4.     The MLSs in Arizona are controlled by local realtor associations, and access to the MLSs is conditioned on brokers agreeing to adopt and follow all NAR rules, including the Buyer Broker Commission Rule.

5.     The Arizona Association of REALTORS® ("AAR"), and the four major regional realtor associations in Arizona—the Phoenix Association of REALTORS®, the Scottsdale Area Association of REALTORS®, the West and Southeast REALTORS® of the Valley, and the Tucson Association of REALTORS®—(collectively, "Association Defendants"), participate in and further the conspiracy by agreeing to adopt, implementing, and enforcing rules in Arizona identical to those promulgated by the NAR, including through their control of the Arizona MLSs.

6.     The Brokerage Defendants also participate and further the conspiracy by compelling and/or encouraging their franchisees, brokers, and agents to belong to NAR and/or its local associations and adhere to NAR's rules when listing properties for sale on the MLS. The Brokerage Defendants also further the conspiracy by serving in leadership roles with the Association Defendants and by implementing NAR's rules in the day-to-day transactions involving home sales in Arizona.

7.     Defendants' conspiracy has multiple anticompetitive effects. As a result of the conspiracy, home sellers are compelled to bear the costs of compensating a broker who does not represent them, and, in fact, represents the counterparty in the sales transaction.  In a competitive market absent Defendants' unlawful restraints, these costs would typically be borne by the homebuyer, and buyer brokers would have to compete by offering lower commission rates.

8.     Defendants' conspiracy also compels home sellers to make blanket offers of compensation to buyer brokers regardless of the buyer broker's experience, the services provided, or any financial arrangement between the buyer broker and the buyer.

9.     Defendants' conspiracy has further anticompetitive results, including creating incentives for buyer brokers to "steer" buyers toward properties where high commissions are offered and away from properties where commissions are lower.  Because blanket offers of

compensation are displayed to buyer brokers on the MLS, buyer brokers can compare commissions offered on different properties and "steer" buyers toward high-commission properties.

10.    Similarly, Defendants' conspiracy puts pressure on sellers to offer the inflated commission rates for buyer brokers so buyer brokers do not "steer" the seller's property away from prospective buyers.

11.    In short, Defendants' conspiracy: (a) requires sellers to pay inflated commissions for services provided by buyer-brokers; (b) raises, fixes, and maintains buyer-broker compensation at levels that would not exist in a competitive marketplace; and (c) encourages and facilitates steering and other actions that impede entry and market success by lower-cost real estate brokerage services.

12.    No pro-competitive justification exists for the Buyer Broker Commission Rule and the related rules and regulations to which Defendants have agreed to implement and obey. On the contrary, the purpose of Defendants' conspiracy is to restrain competition and enrich members of the conspiracy through inflated commission rates—all at the expense of home sellers in Arizona.

13.    Plaintiff brings this class action on behalf of home sellers who paid a buyer-broker commission through one of the Brokerage Defendants in connection with the sale of residential real estate on an Arizona MLS in the last four years.

## II.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the class contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the class is a citizen of a State different from Defendants. The Court also has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4, 16 and 28 U.S.C. §§ 1331, 1337.  This Court has supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367.

15.    This Court has personal jurisdiction over Defendants, all of which maintain their headquarters and/or principal places of business in the District of Arizona.   In addition,

Defendants: (1) transact substantial business in this District; (2) transacted with members of the Class in this District; and (3) committed substantial acts in furtherance of the unlawful scheme in this District.

16.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)-(c). Each Defendant transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

### III.     PARTIES

#### A. Plaintiff

17.     Plaintiff Joseph Masiello is an Arizona resident.  In or about October 2021, while residing in Arizona, Masiello listed and sold a home on an Arizona MLS through Defendant Brokerage HomeSmart.  As part of the sale transaction, Masiello was required to pay a 2% commission ($8,200) to the seller broker and a 2.5% commission ($10,250) to the buyer broker.

#### B. Defendants

18.     Defendant Arizona Association of REALTORS® is an Arizona nonprofit corporation.  Its statutory agent is Scott Drucker at 255 E. Osborn Road, Suite 200, Phoenix, AZ 85012.

19.     Defendant Phoenix Board of Realtors, Inc., aka the Phoenix Association of REALTORS®, is an Arizona nonprofit corporation.  Its statutory agent is Andrew Fegley at 7878 N 16th St, Suite 150, Phoenix, AZ 85020.

20.     Defendant Scottsdale Area Association of REALTORS® is an Arizona nonprofit corporation. Its statutory agent is Rebecca Grossman at 8600 E. Anderson Dr., Suite 200, Scottsdale, AZ 85255.

21.     Defendant West and Southeast REALTORS® of the Valley, Inc., is an Arizona nonprofit corporation.  Its statutory agent is Richard Mack at 3636 N Central Ave, # 11, Phoenix, AZ 85012.

22.     Defendant Tucson Association of REALTORS®, Inc., is an Arizona nonprofit corporation.  Its statutory agent is Judy Lowe at 5288 N. Camino De La Cumbre, Tucson, AZ 85750.

23.     Defendant HomeSmart Holdings, Inc., is a foreign corporation incorporated under the laws of Delaware, with its principal place of business in Scottsdale, Arizona.  Its statutory agent is CT Corporation System at 3800 N Central Ave Ste 460, Phoenix, AZ 85012.

24.     Defendant My Home Group Real Estate, LLC is an Arizona limited liability company.  Its statutory agent is Jereme Kleven at 8360 E Raintree Dr #120, Scottsdale, AZ 85260.

25.     Defendant Realty One Group Arizona, Inc., is a foreign corporation incorporated under the laws of Nevada, with its principal place of business in Pheonix, Arizona.  Its statutory agent is CT Corporation System at 3800 N. Central Ave. Suite 460, Phoenix, AZ 85012.

26.     Defendant West USA Realty, Inc. is an Arizona corporation.  Its statutory agent is Clinton Fouts at 2355 W. Utopia Road, Phoenix, AZ 85027.

27.     Defendant Hague Partners Holdings, LLC, is an Arizona limited liability company.  Its statutory agent is James Palecek at 6263 N. Scottsdale Road, Suite 144, Scottsdale, AZ 85250.

28.     Defendant Realty Executives, LLC, is an Arizona limited liability company.  Its statutory agent is Capitol Corporate Services, Inc., at 8825 N. 23rd Ave., Suite 100, Phoenix, AZ 85021.

29.     Defendant Valley Metro Investments, Inc., d/b/a Arizona Best Real Estate, is an Arizona corporation.  Its statutory agent is JWSA LLC at 3200 N. Central Ave., Suite 2000, Phoenix, AZ 85012.

30.     Defendant Corduroy IP, LLC, d/b/a North&Co., is an Arizona limited liability company.  Its statutory agent is Brian North at 3335 N. Rose Circle Dr., Phoenix, AZ 85018.

31.     Defendant Silverleaf Realty, LLC, is an Arizona limited liability company.  Its statutory agent is Robert Stewart & Associates, PC, at 3707 E. Shea Boulevard, Suite 100, Phoenix, AZ, 85028.

32.     Defendant Retsy, LLC, is an Arizona limited liability company.  Its statutory agent is CKM Management, LLC, at 4115 N. 50th Pl, Phoenix, AZ 85018.

33.     Defendant Walt Danley Realty, LLC, d/b/a Walty Danley Local Luxury, Christie's International Real Estate, is an Arizona limited liability company.  Its statutory agent is Charles Wasson at 9000 N. 60th St., Paradise Valley, AZ 85253.

34.     Defendant Bortlock LLC, d/b/a The Brokery, is an Arizona limited liability company.  Its statutory agent is Tucker Blalock at 4546 North 40th St., Phoenix, AZ 85018.

35.     Defendant Roy H. Long Realty Company, Inc., d/b/a Long Realty, is an Arizona corporation.  Its statutory agent is CT Corporation System at 3800 North Central Ave., Suite 460, Phoenix, AZ 85012.

36.     Defendant Tierra Antigua Realty, LLC, is an Arizona limited liability company. Its statutory agent is Kimberly Clifton at 1650 E. River Road, #202, Tucson, AZ 85718.

**C. Co-Conspirators**

37.     Multiple individuals and entities not named as Defendants participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance of the conspiracy.  Specifically, the NAR promulgated the Buyer Broker Commission Rule and related rules and regulations at issue in this case, and NAR enforced adherence to these rules in Arizona through AAR and the local NAR organizations that control Arizona's regional MLSs.

38.     Other unnamed co-conspirators include national brokerages that are the subject of nationwide class action lawsuits in the Northern District of Illinois, the Western District of Missouri, and elsewhere, whose members served in leadership roles with the Association Defendants in Arizona.

## IV. FACTUAL BACKGROUND

### A. History of Anticompetitive Conduct in the Real Estate Industry

39.     NAR, NAR's state and local realtor organizations, and their associated MLSs have a long history of anticompetitive actions designed to maintain inflated broker commissions and impede entry by lower-cost alternatives. NAR's predecessor, the National Association of Real Estate Exchanges "institutionalized a commission rate norm when it adopted its first Code of Ethics in 1913. It stated that 'an agent should always exact the regular real estate commission prescribed by the board or exchange of which he is a member.'" P. Barwick, P. Parag, A. Pathak & M. Wong, *Conflicts of Interest and the Realtor Commission Puzzle*, NAT'L BUREAU OF ECON. RESEARCH, 4 (2015), https://www.nber.org/papers/w21489.pdf.

40.     In 1950, NAR's code of ethics stated that "every Realtor . . . should maintain the standard rates of commission adopted by the board and no business should be solicited at lower rates." After a 1950 Supreme Court decision found brokers guilty of price-fixing in violation of the Sherman Act, *United States v. Nat'l Assn. of Realtors*, 339 U.S. 485, 488, 494-95 (1950), local realtor associations continued to fix prices "for the next twenty-eight years" by recommending or suggesting commission rate schedules or establishing minimum prices. David Barry, *Nine Pillars of the Citadel*, Report Submitted to the FTC/DOJ Workshop on Competition Policy and the Real Estate Industry, 47 (2005), https://www.justice.gov/sites/default/files/atr/legacy/2005/12/05/213351.pdf

41.     Since that time, NAR, its affiliates, and other MLSs have continued to implement illegal policies designed to restrain competition. *See, e.g., United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980) (holding that MLS was enforcing unreasonable membership criteria restricting access to MLS); *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991) (finding MLS requirement restricting access anticompetitive and unlawful); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) (finding MLS fee for access anticompetitive and unlawful); *In the Matter of MiRealSource, Inc.*, No. 9321 (F.T.C. 2007) (Consent Order regarding MLS rules limiting alternative business

models); *United States v. Nat'l Ass'n of Realtors*, No. 05 C 5140, 2006 WL 3434263 (N.D. Ill. Nov. 27, 2006) (Consent Decree forbidding policies adopted by NAR imposing restraints on Virtual Office Websites).

42.     The Wall Street Journal has reported that "[i]n its own internal documents," NAR:

> acknowledges that the purpose of state lobbying is to keep competition out and fees high. In an April 22 memo to its state affiliates, the national office urged members to keep agitating for 'state laws that are designed to replace competition with regulation.' The memo added that 'Realtors have the right to lobby for legislative and regulatory action – even if the effect of such action would be anti-competitive.'[2]

43.     As set forth in this complaint, Defendants have conspired to impose and enforce the Buyer Broker Commission Rule even though the "effect of such action [is] anti-competitive" and harmful to Arizona homeowners.

## B.     Evolution of Real Estate Commissions

44.     Prior to adoption of the Buyer Broker Compensation Rule in 1996, NAR rules provided that all brokers in a sales transaction were representatives of the seller either as the seller's broker or a "sub-agent" of the seller's broker.  Under this "almost universal sub agency system . . . brokers, even those working solely with buyers, were legally obligated to represent the interests of sellers."[3]  Because both brokers represented the seller, the common practice was for the seller to pay the seller's broker and for the seller's broker, in turn, to compensate the "sub-agent" who brought the buyer to the deal.  In fact, "[a]s a rule, MLS's required that offers of compensation be contingent on the cooperating broker acting as a subagent of the listing broker, rather than an agent of the buyer. Subagency allowed cooperating brokers who

---

[2]     *The Realtor Racket*, Wall Street Journal, Aug. 12, 2005, https://www.wsj.com/articles/SB112381069428011613

[3]     Stephen Brobeck & Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, CONSUMER FED'N OF AM., 3 (2006), https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf

worked with buyers to collect a share of the commissions paid by sellers without actually representing buyers in an agency capacity."[4]

45.     This sub-agency system and its associated commission-sharing structure prevailed for a time.  But by the early 1990s the system collapsed under the weight of conflicts that arose from sub-agents sharing confidential buyer information with sellers.

46.     In 1996, NAR formerly adopted the Buyer Broker Commission Rule as part of its Handbook on Multiple Listing Policies.  NAR's Buyer Broker Commission Rule enshrined in NAR policy the requirement that sellers pay the commission of buyer brokers for all MLS transactions, despite the fact that buyer brokers were no longer considered "sub-agents" of the seller broker.  As the Handbook on Multiple Listing Policies went through revisions over the years, NAR repeatedly affirmed and maintained the Buyer Broker Commission Rule.

47.     NAR ensures compliance with the Buyer Broker Commission Rule by conditioning access to MLSs on brokers agreeing to abide by the rule.  Specifically, NAR's Handbook on Multiple Listing Policy provides that, "Association and Association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as members boards and to ensure coverage under the master professional liability insurance program."[5]

48.     One of these "mandatory MLS policies" is the Buyer Broker Commission Rule, which states, "In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on

---

[4]     Matt Carter, *From Subagency to Non-Agency: A History*, INMAN (Feb. 17, 2012), https://www.inman.com/2012/02/17/from-subagency-non-agency-a-history/; *see also* Ann Morales Olazabal, *Redefining Realtor Relationships and Responsibilities: The Failure of State Regulatory Responses*, 40 Harv. J. on Legis. 65, 71 (2003) (explaining that for years, the "dominant real estate exchanges" – i.e., the MLS's – permitted cooperating or selling agents (those working with buyers) to split the commission to be paid by the seller only if the cooperating agent agreed to be a subagent of the seller").

[5]     The National Association of Realtors, 2023 Handbook on Multiple Listing Policy iii, https://cdn.nar.realtor/sites/default/files/documents/pdf_mls_handbook-2023-08-11.pdf?_gl=1*aieyvj*_gcl_au*MzIxNDM1NTg0LjE3MDQzOTg0MzE.

each listing filed with the service the compensation being offered by the listing broker to the other MLS participants."[6]

49.     NAR's Handbook on Multiple Listing Policies further states that "Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[7]

50.     Under the Buyer-Broker Commission Rule, a seller-broker is not allowed to submit, and an MLS is not allowed to publish, a listing that does not include a blanket unilateral offer of compensation to the broker that finds a buyer for the home.  Brokers who violate these MLS rules can face fines or the suspension of their MLS access.

51.     NAR has additional rules that effectively prevent negotiations over the commission paid to the buyer-broker.  For example, the NAR's Code of Ethics Standard of Practice 16-16 prohibits buyer-brokers from "us[ing] the terms of an offer to purchase[] to attempt to modify the listing broker's offer of compensation."  In other words, the buyer-broker cannot attempt to condition the purchase of a home on the seller-broker's agreement to adjust the amount of compensation offered to the buyer-broker.

52.     In addition, the Code of Ethics Standard of Practice 3-2 requires that any modification in the compensation offered to the buyer-broker "must be communicated to the [buyer-broker] prior to the time that [buyer-broker] submits an offer to purchase[] the property."  Further, once a buyer-broker "has submitted an offer to purchase . . . property, the listing broker may not attempt to unilaterally modify the offered compensation."

53.     The NAR also issues Case Interpretations, which constitute official NAR policy with respect to situations involving charges of unethical conduct.  Consistent with the Code of Ethics sections referenced above, Case Interpretation #16-15 advises that any negotiations

---

[6]     *Id.* at 39.

[7]     *Id.* at 40.

11

regarding the buyer-broker's commission "should be completed prior to the showing of the property." By requiring buyer-brokers seeking to reduce buyer-broker commissions to request those reductions before showing the property to a potential buyer, these rules foreclose virtually all negotiation over the buyer-broker commission. Indeed, the rules implausibly contemplate that a buyer-broker will unilaterally contact a selling-broker to request a reduction to the buyer-broker commission before a potential buyer has even seen, let alone expressed an interest in purchasing, the property.

54.     Additional NAR rules compound the anticompetitive effects of the Buyer Broker Commission Rule and associated Ethics Standards.  For example, MLS Rules permit buyer-brokers to select the listings that they display to consumers on their personal broker websites based on buyer-broker commission offers.  At the same time, other NAR rules prevent *consumers* from viewing the universe of buyer-broker commissions offered on the MLS. Further, until January 1, 2020, the Code of Ethics permitted buyer-brokers to represent to their clients that their services were free, "provided that all terms governing availability of the offered . . . service are clearly disclosed at the same time" and the potential for the broker "to obtain a benefit from a third party is clearly disclosed at the same time."

55.     The combined effect of these rules is to maintain and extend an anticompetitive market for real estate broker services by causing home sellers to pay supra-competitive rates of commission to buyer-brokers. As the driving force behind the conspiracy, NAR offers the following deal to co-conspirators: in exchange for adhering to and enforcing the Buyer Broker Commission Rule and associated policies, the co-conspirators will be allowed to participate in the MLSs and gain the attendant benefits of supra-competitive commission rates and protection from competition.

56.     By accepting and complying with the Buyer Broker Commission Rule and associated policies, Defendants became knowing and willing participants in the conspiracy.

1

**C.** **Defendants Implement and Enforce NAR's Rules in Arizona**

2      57.      AAR is NAR's umbrella organization in Arizona, with oversight of 14 additional

3    local NAR associations in the state.



21      58.      AAR is Arizona's largest trade organization with a membership of over 55,000

22    real estate professionals.  By joining AAR, agents and brokers agree to follow NAR's Code of

23    Ethics, including the Standards of Practice and Case Interpretations related to the Buyer

24    Broker Commission Rule.  AAR participates in and furthers the conspiracy by ensuring

25    compliance with the Code of Ethics and enforcing violations through disciplinary proceedings.

26

27

28

59.     Like in most other parts of the country, Arizona is divided into regional MLS boundaries:



60.     The local NAR associations control access to the Arizona MLSs.  For example, the Arizona Regional MLS, which covers the greater Phoenix area and southeast Arizona, is controlled by the Phoenix Association of REALTORS®, the Scottsdale Area Association of REALTORS®, and the West & Southeast REALTORS® of the Valley.  Similarly, the Tucson Association of REALTORS® controls access to the MLS of Southern Arizona.

61.     The Arizona MLSs implement the same policies set forth in NAR's Handbook on Multiple Listing Properties, including the Buyer Broker Commission Rule.  Rule 12.1 of the Arizona Regional MLS, for example, sets forth the Buyer Broker Commission Rule as follows: "The Listing Participant shall specify, on each Listing that is [filed with Arizona Regional MLS], the compensation being offered to Participants for their services in the sale[] of such Listing. The compensation amount shall be either a percentage of the gross selling[] price or a definite dollar amount. Compensation amounts that are not based on the gross sales[] price (e. g., compensation is based on the base price of a new home) must be shown as a fixed dollar amount."[8]

62.     Consistent with NAR's policies, the Arizona Regional MLS rules also provide that, "ARMLS shall not accept or publish any Listing that does not include an offer of compensation, nor shall ARMLS include general invitations by Listing Participants to Subscribers to discuss the terms and conditions of possible cooperative relationships."

63.     The Arizona Regional MLS rules also make clear that one of the primary purposes of the MLS is to serve as "[a] means by which Participants make blanket unilateral offers of compensation to other Participants."

64.     The regional Arizona realtor associations also enforce compliance with NAR's MLS policies by imposing fines and suspending membership for rule violations.  For example, prior to November 9, 2023, seller brokers were subject to a $200 fine for violating Rule 12.1 by "Publishing a Conditional Offer of Compensation and/or offering a zero commission amount."[9]  In other words, if a seller broker listed a property on the MLS and offered no

---

[8]     Prior to November 9, 2023, Rule 12.1 read, "The compensation amount shall be either a percentage of the gross selling[] price or a definite dollar *(non-zero)* amount. Compensation amounts that are not based on the gross sales[] price (e. g., compensation is based on the base price of a new home) must be shown as a fixed dollar *(non-zero)* amount."  (emphasis added).  On November 9, 2023, the Arizona Regional MLS published its current policy and removed Rule 12.1's reference to "non-zero."  This change came on the heels of a similar change in policy by NAR.  *See* https://therealdeal.com/national/2023/10/09/nar-changes-interpretation-of-participation-rule/

[9]     On November 9, 2023, the penalty provision removed the phrase "and/or offering a zero commission amount."

commission to the buyer broker, the seller broker could be fined $200. Repeat violations are punishable by suspension of MLS privileges.

65.    While the Association Defendants participate in and further the conspiracy by enforcing compliance with NAR's anticompetitive policies, the Brokerage Defendants likewise play an essential role in the conspiracy.

66.    First, the Brokerage Defendants require and/or encourage their brokers, franchisees, and agents to join one of the local NAR associations, participate in the MLS, and comply with the associated MLS rules, including the Buyer Broker Commission Rule. For example, an article posted on My Home Group's website in 2022 under the title "What Realtors Association is Right for You?" highlighted the three main local associations in the Phoenix area and emphasized, "[m]ost importantly, once an agent is signed up with an association, then an agent can pay to get access to the Multiple Listing Services (MLS)."[10] The article advised agents to "[k]eep in mind that an agent only needs to sign up with one of these associations and agents should always research what associations give them access to specific areas and the MLS associated with it. To gain access to the MLS in Phoenix an agent can pick any association that recognizes Phoenix as its domain."

67.    Given this reality, membership of the Association Defendants is dominated by agents and brokers associated with the various Brokerage Defendants. By joining one of the local NAR associations, agents and brokers automatically become members of AAR and NAR with its attendant benefits and obligations, including compliance with the Buyer Broker Commission Rule and related Ethics rules.

68.    The Brokerage Defendants also participate in and further the conspiracy by serving in leadership positions with AAR, local associations, and the association-controlled Arizona MLSs. The incoming AAR President for 2024, for example, is associated with Realty One Group, and the AAR Executive Committee likewise includes members from Realty One

---

[10]    MHG Mktg., *What Realtors Association is Right for an Agent?,* Aug. 9, 2022, https://www.myhomegroup.com/what-realtors-association-is-right-for-an-agent/

Group.   The 2023 leadership of the Phoenix Association of REALTORS® consists of members from Realty Executives, North & Co., West USA Realty, and Realty One Group. The immediate past president of the Scottsdale Association of REALTORS® is associated with Arizona Best Real Estate.  The leadership of the Tucson Association of REALTORS® is composed of members from Long Realty, Tierra Antigua, and Realty One Group.

69.   The Arizona MLSs are also dominated by members of the Defendant Brokerages, who enforce NAR's policies under penalty of fines and suspension of MLS privileges.  The directors for Arizona Regional MLS include members from West USA Realty, HomeSmart, and Realty Executives.   The officers and directors of the MLS of Southern Arizona include members from Realty Executives, Long Realty, and Tierra Antigua.

70.   Finally, the Brokerage Defendants serve an essential role in the conspiracy by executing the conspiracy's objectives on the ground.  In the day-to-day transactions involving the sale of Arizona homes and the payment of commissions to seller and buyer brokers, the Brokerage Defendants implement the Buyer Broker Commission Rule and perpetuate the inflated and anticompetitive commission structure that is the object of Defendants' conspiracy.

71.   In doing so, the Brokerage Defendants enrich themselves and their co-conspirators at the expense of homeowners.  For example, according to filings by HomeSmart with the Securities and Exchange Commission, HomeSmart, "generate[s] the majority of [its] revenues from the real estate transactions executed by our corporate real estate brokerage where our agents represent consumers buying or selling homes."  As a result of Defendants' conspiracy, these revenues are the inflated product of anticompetitive restraints.

**D.   Anticompetetive Effects of the Conspiracy in Arizona**

72.   Defendants' conspiracy has had several anticompetitive effects in Arizona, including,

- Home sellers have been forced to pay commissions to buyer-brokers, despite the fact that buyer-brokers do not represent sellers in the transaction;

- Home sellers have been compelled to offer high buyer-broker commission to induce buyer-brokers to show their homes to buyers and to avoid buyer-brokers "steering" their homes away from prospective buyers;

- Home sellers have been compelled to pay high buyer-broker commissions regardless of the buyer-broker's experience level, diligence, or services rendered;

- Home sellers have paid inflated buyer-broker commissions and inflated total commissions;

- The retention of a buyer-broker has been severed from the setting of the broker's commission; the home buyer retains the buyer-broker, while the home seller sets the buyer-broker's compensation;

- Price competition among brokers to be retained by home buyers has been restrained.

- Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer-broker commission; and

- Brokerage Defendants have increased their profits substantially by receiving inflated buyer-broker commissions and inflated total commissions.

73.    No pro-competitive justification exists for Defendants' conspiracy, which functions to perpetuate inflated commissions to the detriment of Arizona homeowners.  Even if some pro-competitive benefit did come from Defendants' conspiracy, that alleged benefit would be substantially outweighed by the conspiracy's anticompetitive effects and would therefore not be justified.

74.    There is substantial economic evidence that Defendants' conspiracy has resulted in buyer-broker commissions and total commissions paid by home sellers in Arizona that are inflated well above a competitive level. The aggregate commissions paid to the seller-broker and buyer-broker in Arizona average between 4.5 and 6 percent.  This figure is substantially higher than in countries with competitive markets for residential real estate brokerage services.

75.     In a 2002 study titled "International Residential Real Estate Brokerage Fees and Implications for the US," economists compared real estate commissions around the world with those in the United States. The study concluded:

> Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand . . . . In the UK, the [total] commission rates average less than 2%. In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%.[11]

76.     The study also found variation within countries; in the United Kingdom, for example, Delcoure and Miller found that "1%-2% is typical; in very competitive areas 0.5-0.75%; in low priced areas [for homes] as high as 3.5%."[12] Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."[13]

77.     Defendants' conspiracy has insulated the Arizona real estate industry from market forces that would otherwise impose a deflationary effect on commissions. "One would have expected that an information and communication-based industry like real estate brokerage, would enjoy tremendous cost efficiencies from the development of the Internet, Databases, and other communication technologies. Yet it appears that traditional brokers generally have not passed on their cost savings to consumers in the form of lower fees."[14]

78.     The adverse economic impact of the conspiracy's restraints on price competition has been severe, causing home sellers in Arizona to pay grossly inflated commissions that are as much as double what they would pay in a competitive market. Indeed, the Consumer Federation of America, which has reviewed and criticized the brokerage industry's practices

---

[11]     Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 INT'L REAL ESTATE REV. 12, 13-14 (2002).

[12]     *Id.* at 17.

[13]     *Id.* at 13.

[14]     Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure*, 5 CORNELL REAL ESTATE R. 1, 7 (2007).

for many years, has indicated that "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear."[15] Instead, commissions would resemble those in other highly industrialized nations.

79.    These anticompetitive effects on Arizona homeowners are not just academic. Discussing the issue of "steering," for example, an article posted by Hague Partners candidly acknowledged, "Agents who represent buyers in markets across the country typically expect to be paid 2 ½% – 3%, half the typical commission of 5%-6%. If they don't see their 'expected amount' of compensation in MLS, they are unlikely to show the home. That's a realism that any listing agent would be remiss not to point out to sellers."[16]

**E.    Defendants' Market Power Over the Arizona Real Estate Industry**

80.    The relevant market for the claims herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with access to MLSs. Defendants' control of MLSs allows them to impose anticompetitive rules, including the Buyer Broker Commission Rule, on Class members and other market participants.

81.    The relevant geographic market for the claims is Arizona. Nearly all homes sold in Arizona were listed on MLSs by brokers subject to MLS and local rules and standards that adopted, wholesale, the NAR model.

82.    Brokerage Defendants collectively possess significant market power over the Arizona market. Brokerage Defendants provide the vast majority of the residential real estate broker services in Arizona.  Their influence is achieved through their participation and control over the local MLSs and their substantial share of the local market.

83.    Non-conspiring brokers who aim to compete outside the conspiracy face insurmountable barriers.  Access to MLSs is essential for brokers to effectively serve buyers

---

[15]    Stephen Brobeck & Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, CONSUMER FED'N OF AM., 4 (2006), https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

[16]    Greg Hague, *How Smart Are the Attorneys?*, Sept. 15, 2023, https://greghague.com/how-smart-are-the-attorneys/

and sellers in the market.  An alternative listing service aiming to compete with an MLS would require listings that are as comprehensive as an MLS, but brokers within the conspiracy lack the incentive to participate in such a service.  Furthermore, home buyers and sellers would be reluctant to use a new alternative listing service without a proven track record.  NAR advises MLSs to enter into non-compete agreements with third-party websites.

### F.    Continuous Accrual

84.    In the four years leading up to the filing of this Complaint, Brokerage Defendants repeatedly charged and received buyer broker commissions and total commissions at inflated rates, all in furtherance of Defendants' ongoing conspiracy. These inflated commissions during the preceding four years were paid by Plaintiff and the other class members in connection with the sale of residential real estate listed by the Brokerage Defendants on an Arizona MLS.  Each payment of these inflated commissions by Plaintiff and the other class members during the last four years injured them and gave rise to a new cause of action for that injury.

85.    Throughout the preceding four years, Defendants and their co-conspirators have consistently maintained, implemented, and enforced the Buyer Broker Commission Rule and other anticompetitive NAR rules in Arizona.

### V.    ANTITRUST INJURY

86.    Defendants' anticompetitive agreements and conduct have had the following effects, among others:

- Sellers of residential property have been forced to pay inflated costs to sell their homes through forced payments of commissions to buyer brokers;

- Home sellers have been faced with the fear of steering, such that they set high buyer broker commissions to induce buyer brokers to show the sellers' homes to prospective buyers;

- Price competition has been restrained among brokers seeking to be retained by home buyers, and by brokers seeking to represent home sellers; and

- Brokerage Defendants have inflated their profits by a significant margin by the increased total commissions and increased buyer broker commissions.

87.     By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher total commissions than they would have paid in the absence of Defendants' anticompetitive conspiracy, and as a result have suffered damages.

88.     There are no pro-competitive effects of Defendants' conspiracy that are not substantially outweighed by the conspiracy's anticompetitive effects.

89.     Significant economic evidence supports concluding that Defendants' conspiracy has resulted in Class members paying buyer broker commissions and total commissions that have been inflated to a supra-competitive level.

90.     This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VI.     TRADE AND COMMERCE

91.     The Buyer Broker Commission Rule and other anticompetitive NAR rules apply and have been implemented and enforced by Defendants and co-conspirators in Arizona and nationwide.   These rules govern the conduct of local NAR associations, local brokers, and local realtors in Arizona and nationwide. Defendants' conduct alleged herein has inflated buyer-broker commissions and injured home sellers in Arizona and nationwide.  NAR, the Association Defendants, the Brokerage Defendants, and their co-conspirators, are engaged in interstate commerce, and are engaged in activities substantially affecting interstate commerce, in the United States.

## VII.   CLASS ALLEGATIONS

92.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and all others similarly situated, as representative of the following Class:

> All persons who, from January 5, 2020, through the present, used any Brokerage Defendant to list a home on an Arizona MLS, and who paid a commission to the buyer's broker in connection with the sale of the home.

93.     Excluded from the Class are Defendants; officers, directors, and employees of Defendants; any entity in which Defendants have a controlling interest in, is a parent or subsidiary of, or which is otherwise controlled by Defendants; and Defendants' affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assignees.  Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

94.     Plaintiff reserves the right to modify and/or amend the Class definition as necessary.

95.     All members of the proposed Class are readily identifiable through Defendants' records.

96.     All requirements for class certification under Fed.R.Civ.P. 23(a), 23(b)(2) and 23(b)(3) are satisfied.

97.     **Numerosity.**  The members of the Class are so numerous that joinder of all members of the Class is impracticable.  According to AAR's November 2023 housing report, approximately 5,800 homes were sold in Arizona in November 2023 alone.  The number of homes sold—and the size of the class—would therefore likely number in the tens of thousands during the entire class period.  The precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendants' records.

98.     **Commonality and Predominance.**  This action involves common questions of law and fact to the Plaintiff and Class Members, which predominate over any questions only affecting individual Class Members.   These common legal and factual questions include, without limitation:

a.  Whether Defendants engaged in the alleged conspiracy;

b.  Whether the conspiracy harmed competition as alleged herein;

c.  Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

d.  Whether the effect of Defendants' conspiracy was to inflate both total commissions and buyer broker commissions;

e.  The appropriate class-wide measures of damages.

Defendants engaged in a common course of conduct giving rise to the claims asserted by Plaintiff on behalf of himself and the Class.  Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.

99.    **Typicality.**  Plaintiff's claims are typical of those of other Class Members because Plaintiff, like every other Class member, sold a home in Arizona through a Brokerage Defendant and paid a buyer-broker commission.  Defendants' unlawful conduct impacted all Class Members in a similar manner.

100.    **Adequacy.**  Plaintiff will fairly and adequately represent and protect the interest of the members of the Class and has retained counsel experienced in complex class action litigation and intends to prosecute this action vigorously.  Plaintiff has no adverse or antagonistic interests to those of the Class.

101.    **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants.  The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims.  There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court.  Absent a class action, individuals like Plaintiff would find the cost of litigating their claims prohibitively high and would have no effective remedy for monetary relief.

102.    Class Certification under Fed.R.Civ.P. 23(b)(2) is also appropriate.  Defendants have acted or refused to act on grounds that apply generally to the Class, thereby making monetary, injunctive, equitable, declaratory, or a combination of such relief appropriate. As Defendants continue to engage in the practices described herein, the risk of future harm to Plaintiff and the Class remains, making injunctive relief appropriate. The prosecution of separate actions by all affected individuals with claims similar to Plaintiff's, even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to

24

individual homeowners, which would establish potentially incompatible standards of conduct for Defendant, and/or (b) adjudications with respect to individual homeowners that would, as a practical matter, be dispositive of the interests of the other homeowners not parties to the adjudications, or which would substantially impair or impede the ability to protect the interests of the Class. Further, the claims of individual homeowners in the defined Class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

## VIII.  CAUSES OF ACTION
### COUNT I
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### 15 U.S.C. § 1
### (By Plaintiff and the Class Against All Defendants)

103.   Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

104.   Beginning more than four years before the filing of this Complaint, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

105.   The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants and their co-conspirators to require home sellers to pay the buyer-broker and to pay an inflated amount.

106.   In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

a.   Participated in the establishment, implementation, and enforcement of the Buyer Broker Commission Rule and other anticompetitive NAR rules in Arizona;

b.   Participated in the establishment, implementation, and enforcement of rules by local NAR associations and MLSs that implemented the Buyer Broker Commission Rule and other anticompetitive NAR rules in Arizona; and

c.   Included provisions in franchise agreements, policy manuals, and other corporate agreements with franchisees, affiliates, and realtors of the Brokerage

Defendants that required the implementation of and adherence to the Buyer Broker Commission Rule and other anticompetitive NAR rules in Arizona.

107. Defendants' conspiracy has required sellers in Arizona to pay buyer-brokers, to pay an inflated buyer-broker commission and an inflated total commission, and has restrained price competition among buyer-brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

108. Defendants' conspiracy has caused buyer-broker commissions and total commissions in Arizona to be inflated. Plaintiff and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate listed on an MLS in Arizona. Absent Defendants' conspiracy, Plaintiff and the other class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer (and buyer-broker commissions would not be at supra-competitive levels).

109. Defendants' conspiracy is a per se violation of Section 1 of the Sherman Act.

110. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and the other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

111. In the alternative, Defendants' conspiracy violates section 1 of the Sherman Act under the Rule of Reason.

112. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and the other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

**COUNT II**
**VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT**
**A.R.S. § 44-1402**
**(By Plaintiff and the Class Against All Defendants)**

113. Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

114.    Defendants have engaged in an unlawful combination or conspiracy in unreasonable restraint of trade in violation of Section 44-1402 of Arizona's Uniform State Antitrust Act, A.R.S. § 44-1402.

115.    Defendants entered into agreements in unreasonable restraint of trade that caused Plaintiff and members of the Class to pay inflated commissions in connection with the sale of their homes, among other anticompetitive effects.

116.    These agreements were an unreasonable restraint of trade and affected trade in interstate commerce.

117.    Defendants' conspiracy is a per se violation of Arizona's Uniform State Antitrust Act.

118.    Plaintiff and members of the Class have been injured in their business or property by Defendants' antitrust violations. The injury to Plaintiff and the Class consists of, *inter alia*, paying inflated commissions in connection with the sale of their homes, including commissions to buyer brokers.  Such injury, in the form of overcharges, is the type of injury antitrust laws were designed to prevent and flows from Defendants' unlawful conduct.

119.    Defendants' conduct in causing the injury was flagrant, entitling Plaintiff and the Class to treble damages.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment in his favor as follows:

a.    Certification of the Class pursuant to the provisions of Fed. R. Civ. P. 23 and an order that notice be provided to all Class Members;

b.    Designation of Plaintiff as representative of the Class and the undersigned counsel as Class Counsel;

c.    An award of damages in an amount to be determined at trial or by this Court;

d.    An order for injunctive relief, enjoining Defendant from engaging in the wrongful and unlawful acts described herein;

e.    An order for declaratory relief as may be appropriate;

f.    An award of statutory interest and penalties;

1    g.      An award of costs and attorneys' fees; and

2    h.      Such other relief the Court may deem just and proper.

3                        **X.      DEMAND FOR TRIAL BY JURY**

4    Plaintiff hereby demands a trial by jury of all issues so triable.

6                                              Respectfully submitted,

7                                              **ZIMMERMAN REED LLP**

8    Dated: January 5, 2024              By:   /s/ Hart Robinovitch
9                                              Hart L. Robinovitch (AZ #020910)
                                               Ryan J. Ellersick (AZ #038805)
10                                             14648 N. Scottsdale Road, Suite 130
                                               Scottsdale, AZ 85254
11                                             Telephone: (480) 348-6400
                                               hart.robinovitch@zimmreed.com
12                                             ryan.ellersick@zimmreed.com

13                                             **ZIMMERMAN REED LLP**

14                                             David M. Cialkowski*
                                               80 S 8th Street, 1100 IDS Center
15                                             Minneapolis, MN 55402
                                               Telephone: (612) 341-0400
16                                             Facsimile: (612) 341-0844
                                               david.cialkowski@zimmreed.com
17

18                                             **GUSTAFSON GLUEK PLLC**

19                                             Daniel E. Gustafson*
                                               Daniel C. Hedlund*
20                                             Daniel J. Nordin*
                                               Mary M. Nikolai*
21                                             Canadian Pacific Plaza
                                               120 South Sixth Street, Suite 2600
22                                             Minneapolis, MN 55402
                                               Telephone: (612) 333-8844
23                                             Facsimile: (612) 339-6622
                                               dgustafson@gustafsongluek.com
24                                             dhedlund@gustafsongluek.com
                                               dnordin@gustafsongluek.com
25                                             mnikolai@gustafsongluek.com

26                                             *Attorneys for Plaintiff*
                                               *Pro Hac Vice applications forthcoming*
27

28