# United States District Court
## District of Nevada (Las Vegas)
## CIVIL DOCKET FOR CASE #: 2:24–cv–00105–ART–MDC

Whaley v. National Association of Realtors et al
Assigned to: District Judge Anne R. Traum
Referred to: Magistrate Judge Maximiliano D. Couvillier, III
Demand: $500,000,000
Cause: 15:1 Antitrust Litigation

Date Filed: 01/15/2024
Jury Demand: Plaintiff
Nature of Suit: 410 Anti–Trust
Jurisdiction: Federal Question

**Plaintiff**

**Nathaniel Whaley**                                   represented by   **Stefany A Tewell**
Cokinos Young
900 S. Capital of Texas Hwy.
Suite 425
Austin, TX 78746
512–476–1080
Email: stewell@cokinoslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ben Lehavi**
Ben's Law
5940 South Rainbow Boulevard
Las Vegas, NV 89118
702–518–9236
Email: ben@benslaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**National Association of Realtors**

**Defendant**

**Las Vegas Realtors**

**Defendant**

**Nevada Realtors**

**Defendant**

**Sierra Nevada Realty**

**Defendant**

**Elko County Realtors**

**Defendant**

**Incline Village Realtors**

**Defendant**

**Mesquite Real Estate Association**

**Defendant**

**Northern Nevada Regional MLS**

| Date Filed | # | Docket Text |
|---|---|---|

| 01/15/2024 | 1 | COMPLAINT against All Plaintiffs (Filing fee $405 receipt number ANVDC−7554250) by Nathaniel Whaley. Certificate of Interested Parties due by 1/25/2024. Proof of service due by 4/14/2024. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons) (Lehavi, Ben) <br><br> NOTICE of Certificate of Interested Parties requirement: Under Local Rule 7.1−1, a party must immediately file its disclosure statement with its first appearance, pleading, petition, motion, response, or other request addressed to the court. (Entered: 01/15/2024) |
|---|---|---|
| 01/15/2024 |  | Case randomly assigned to Judge Gloria M. Navarro and Magistrate Judge Maximiliano D. Couvillier, III. (CAH) (Entered: 01/16/2024) |
| 01/15/2024 | 2 | SUMMONS ISSUED as to Elko County Realtors, Incline Village Realtors, Las Vegas Realtors, Mesquite Real Estate Association, National Association of Realtors, Nevada Realtors, Northern Nevada Regional MLS, and Sierra Nevada Realty re 1 Complaint. (CAH) (Entered: 01/16/2024) |
| 01/16/2024 | 3 | STANDING ORDER. This case has been assigned to the Honorable Judge Gloria M. Navarro. Judge Navarro's Chambers Practices, which are posted on the U.S. District Court, District of Nevada public website, may also be accessed directly via this hyperlink www.nvd.uscourts.gov. (Copies have been distributed pursuant to the NEF − NEV) (Entered: 01/16/2024) |
| 01/16/2024 | 4 | MINUTE ORDER IN CHAMBERS of the Honorable Judge Gloria M. Navarro on 1/16/2024. By Deputy Clerk: NEV. <br><br> With good cause appearing, the Honorable Judge Gloria M. Navarro recuses herself in this action. IT IS ORDERED that this action is referred to the Clerk for random reassignment of this case for all further proceedings. <br><br> **(no image attached)** (Copies have been distributed pursuant to the NEF − NEV) (Entered: 01/16/2024) |
| 01/17/2024 | 5 | CLERK'S NOTICE that this case is randomly reassigned to District Judge Anne R. Traum for all further proceedings. All further documents must bear the correct case number **2:24−cv−00105−ART−MDC**. **(no image attached)** (WJ) (Entered: 01/17/2024) |

STEFANY "MILEY" TEWELL, ESQ.
Nevada Bar No. 6144
BEN LEHAVI, ESQ.
Nevada Bar No. 14564
BEN'S LAW
5940 South Rainbow Boulevard
Las Vegas, Nevada 89118
Email: judgestefany@benslaw.com
Phone: (702) 518-9236
*Attorneys for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| NATHANIEL WHALEY,<br><br>                     Plaintiff,<br><br>vs.<br><br>NATIONAL ASSOCIATION OF REALTORS; LAS VEGAS REALTORS©; NEVADA REALTORS; SIERRA NEVADA REALTY; INCLINE VILLAGE REALTORS©; ELKO COUNTY REALTORS; MESQUITE REAL ESTATE ASSOCIATION; and NORTHERN NEVADA REGIONAL MLS,<br><br>                     Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff NATHANIEL WHALEY ("Plaintiff"), brings this action on behalf of himself and on behalf of the plaintiff classes (the "Classes") consisting of all persons who listed properties on one of eight Multiple Listing Services (the "Subject MLS") and paid a buyer broker commission from at least January 15, 2020 until the Present (the "Subject MLS Class Period"). Defendants are the National Association of Realtors, Las Vegas Realtors, Nevada Realtors, Sierra Nevada Realty, Incline Village Realtors, Elko County Realtors, Mesquite Real Estate Association and Northern Nevada Regional MLS (collectively "Defendants") each of which has a significant presence in Nevada. Together, Defendants have conspired to require home sellers to pay the broker representing the buyer of their homes, and to pay an inflated amount, in violation of federal

antitrust law, the Nevada Deceptive Trade Practices Act ("NDTA"), and the Nevada Antitrust Law, NRS 598A.010, et seq.

Plaintiff seeks treble damages under federal antitrust law, threefold damages under the Nevada Antitrust Law, punitive damages under the NDTA, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees, and demand a trial by jury.

## NATURE OF THE ACTION

1.      When Nevada homeowners sell a home, they pay a standard commission to the broker who listed the property for sale. Like other home sellers across the country, Nevada home sellers also typically pay the commission of the broker who represented the buyer. For several decades, these combined commissions have remained fixed at approximately 4.5 to 6 percent of the total sale price of the home despite the advent of technology and other innovations that, in a functioning free market would generally drive commissions down.

2.      Plaintiff, home sellers who listed their homes on one of seven Multiple Listing Services (identified below), bring this action against Defendants for agreeing, combining, and conspiring to impose and enforce an anticompetitive restraint that requires home sellers to pay the broker representing the buyer of their homes, and to pay an inflated amount, in violation of Nevada Law.

3.      This commission structure has remained isolated from market forces because of a long running conspiracy among Defendants to implement and enforce anticompetitive restraints in the residential real estate market. Specifically, rules created by Defendant, the National Association of Realtors (hereinafter "NAR"), which are implemented and enforced by the other Defendants named herein.

///

///

///

# INTRODUCTION

4.   Each Defendant named herein has conspired to violate federal and state anti-trust laws by forcing home sellers to pay inflated commissions to the home buyer's broker, even though the buyer's broker did not represent the seller.

5.   As set forth herein, the NAR rules followed by the named Defendants prevent any negotiation over buyer-broker commissions.

6.   At the center of the conspiracy is the Buyer Broker Commission Rule, conceived by the NAR, which requires all home sellers to make a blanket, unilateral and effectively non-negotiable offer of buyer-broker compensation in order to list a property on a Multiple Listing Service ("MLS"), a database where virtually all homes in Nevada are sold.  The Buyer Broker Commission Rule is designed to incentivize buyer-brokers.

7.   The MLSs in Nevada are controlled by local realtor associations who adopt and enforce the NAR rules.  Access to their MLSs is conditioned on brokers agreeing to follow all mandatory rules set forth in NAR's Handbook on Multiple Listing Policy, including the Buyer Broker Commission Rule.

8.   These Nevada Realtor Associations include the Las Vegas Realtors, Sierra Nevada Realty, Incline Village Realtors, Elko County Realtors, Mesquite Real Estate Association and Northern Nevada Regional MLS (collectively the "Association Defendants").

9.   An MLS is a database of properties listed for sale in a particular geographic region. The vast majority of homes in the United States, and in Nevada, are sold on an MLS marketplace. Brokers, if they are members of an MLS, are required to list all properties on the MLS.

10.   Defendants, collectively, possess market power in local markets for real estate broker services through their control of the local MLS.

11.   NAR conditions a broker's access to and use of NAR's MLSs on a broker's agreement to adhere to and implement terms that restrain competition.

12.     The anti-competition rules created by NAR are implemented through a conspiracy with the Association Defendants.

13.     In furtherance of its conspiracy with NAR, each of the Association Defendants mandates that Nevada franchisees, brokerages, and individual realtors join, implement and enforce NAR's anticompetitive rules. Otherwise, these parties will not receive the benefit of the Defendants' branding, brokerage infrastructure, and other support.

14.     The unlawful restraints implemented and enforced by Defendants' conspiracy, further the common goals of permitting Defendants herein to impose supra-competitive charges on home sellers and restrain competition by precluding competition from innovative or lower-priced alternatives.

15.     Defendants' conspiracy also forces home sellers to pay a cost that, in a competitive market and but for Defendants' anticompetitive restraint, would be paid by the buyer.

16.     Defendants' conspiracy also compels home sellers to make blanket offers of compensation to buyer brokers regardless of the buyer broker's experience, the services provided, or any financial arrangement between the buyer broker and buyer. All of this is done so buyer brokers do not "steer" the seller's property away from prospective buyers.

17.     Defendants' conspiracy has other anticompetitive results including creating incentives for buyer brokers to "steer" buyers toward properties where higher commissions are offered.

18.     Because blanket offers of compensation are displayed to buyer brokers on the MLS, buyer brokers can compare commissions on different properties. Most buyer brokers will not show homes to their clients where the seller is offering a lower adversary/buyer commission, or they will give priority to showing homes with higher adversary/buyer commission offers first. As a result of this Adversary Commission Rule, home sellers are forced to offer a higher adversary/buyer broker commission to gain the cooperation of buyer brokers.

19.     The Adversary Commission Rule requires a seller broker, on behalf of the seller, to make a blanket, unilateral and effectively non-negotiable offer of compensation to buyer brokers whenever listing a home on an MLS owned by a local NAR association. If a buyer represented by a broker purchases the home, then the buyer broker receives the offered compensation.

20.     If a home seller chooses not to comply with the Adversary Commission Rule, per NAR rules which have been adopted by the Association Defendants herein, that home seller will not have access to the MLS, which negatively affects the home seller's ability to market and sell their home.

21.     If NAR's Adversary Commission Rule were not in place, then the cost of buyer broker commissions would be paid by their clients (home buyers). Buyer brokers would thus have to compete with one another by offering a lower commission rate. The Adversary Commission Rule thereby restrains price competition among buyer brokers because the person who actually hires the buyer broker — the home buyer — does not negotiate or pay the commission for his or her broker.

22.     Deepening the anticompetitive effects of the Adversary Commission Rule, NAR rules also prohibit buyer brokers from making home purchase offers contingent on the reduction of the buyer broker commission.  In furtherance of this conspiracy, this rule is enforced by the Association Defendants.

23.     Real estate brokers handle most residential real estate sales in the United States. In a typical transaction, one broker will represent the seller, and another broker will represent the buyer of a home. Both the buyer broker and seller broker (also known as the listing broker) are paid a percentage of the property's sales price. Currently, total broker compensation in the United States is typically five to six percent of the home sales price, with approximately half of that amount paid to the buyer broker.

///

24.     In competitive foreign markets, home buyers pay their brokers, if they choose to use one, and they pay less than half the rate paid to buyer brokers in the United States. These international markets include United Kingdom, Germany, Israel, Australia, and New Zealand. In these markets, which are not affected by any policy like the Adversary Commission Rule, buyer brokers are paid by home buyers, rather than home sellers. According to the Executive Director of the Consumer Federation of America, total commission rates in "a number of developed countries" range "between 1% and 4%" whereas in contrast, in the United States the average total commission rates continue to remain between 5% and 6%, which is "no lower than it was in 2001" despite significant advances in technology.[1]

25.     A 2015 report, commissioned by NAR to study negative emerging trends in the real estate industry, highlighted concerns that total commissions in the United States are inflated compared to international markets, such as the United Kingdom, Singapore, the Netherlands, Australia, and Belgium. According to the report commissioned by NAR, in those countries the average total commissions ranges between 1% and 3%.[2]

26.     As a representative of a brokerage that operates in both the United States and internationally observed at an FTC/DOJ Joint Public Workshop on the real estate industry, "[i]t's hard to believe it's 2018 and we're in the US and the average commission fee is still between 5% and 6% when we have one of the largest, most developed markets in the [world]. But we still maintain that elevated level of commission expense." (emphasis added).[3]

---

[1]  FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, available at https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokercompetition-part3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf.

[2]  Swanepoel Group, D.A.N.G.E.R Report, at 22 (definitive analysis of negative game changers emerging in real estate) (2015). The report also suggests that total commissions in Germany range between 3% and 6%.

[3]  FTC-DOJ Joint Public Workshop, Segment 2 Tr., June 5, 2018, available at https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokercompetition-part-2/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_2.pdf.

27.     The Adversary Commission Rule and other anti-competition rules created by NAR and enforced by the Association Defendants through their ongoing conspiracy, explains why commissions in the United States remain artificially and anticompetitively "elevated."

28.     Defendants herein use their control of the MLSs, the agreements with their local franchisees, their employee policy and procedures manuals, and leadership roles in NAR and local realtor associations — to require brokers in local residential real estate markets to adhere to NAR's rules, thus implementing and enforcing the conspiracy.

29.     The Association Defendants ensure that the conspiracy continues year after year by reviewing NAR's Rules and agreeing to them at yearly meetings.

30.     NAR also advances the conspiracy by re-issuing its Rules (including the Adversary Commission Rule).

31.     Members of Association Defendants participate in and continue the conspiracy by serving on boards and committees that enforce compliance with NAR Rules.

32.     Through these actions, and others alleged in this Complaint, each of the Association Defendants, and NAR, have taken actions to further the conspiracy and thereby have agreed to join, participate in, facilitate, and implement the conspiracy.

33.     Defendants' conspiracy has kept buyer broker commissions in the 2.5 to 3.0 percent range for many years despite the diminishing role of buyer brokers. Many home buyers no longer search for prospective homes with the assistance of a broker, but rather independently through online services.

34.     Upon information and belief, NAR and the Association Defendants have studied and are aware of this trend and fact.  Due to increased online services, prospective home buyers increasingly retain a buyer broker after the client has already found the home the client wishes to buy. Despite this diminishing role for buyer brokers, their percentage of commission has remained steady, due to Defendants' conspiracy. And at the same time, because housing prices have

significantly increased during the last several years (far outpacing inflation) and because commissions are calculated as a percentage of the home's sale price, the actual dollar amounts have substantially risen as well.

35.    Defendants' success in maintaining (and, in inflation-adjusted dollars, increasing) the same artificially and anticompetitively inflated commission rates despite these technological and social changes starkly contrasts with results in other industries. For example, the introduction of the Internet and innovative or discount service providers have provided enormous financial benefits to consumers of numerous goods and services in various sectors, such as travel booking, insurance, banking, and stock brokering, as well as retailing and bookselling. Despite transaction costs dramatically decreasing in myriad other sectors and industries, real estate commission rates have persisted and remained steady in a range of 5% to 6%.

36.    The disconnect between buyer broker costs and commissions illustrates the effect of Defendants' conspiracy. Whether a home purchased by their client costs $250,000 or $2,500,000, the buyer broker's costs are roughly similar. But the sum received by the buyer broker as a commission is significantly greater for the more costly property. Why? Many if not most of the services that buyer brokers provide do not vary based on the sale price, so in a rational, competitive market the percentage fee should decrease as the home price increases. Instead, due to Defendants' conspiracy and anticompetitive practices such as the Adversary Commission Rule, the commission overcharges imposed on home sellers bear little relation to the quantity or quality of the services or value allegedly provided by the brokers who are paid the commissions. This structure results from a lack of competition and makes no economic sense, except for the buyer broker.

37.    Given that buyer brokers will not show homes to their clients where the seller broker is offering a lower buyer-broker commission (or will show such homes later), seller brokers face pressure in making their unilateral blanket offers to provide high commissions to buyer

brokers. This conspiracy has had multiple illogical, harmful, irrational, and anticompetitive effects, including that it: (a) requires sellers to pay overcharges for services provided by buyer-brokers to the buyer, who is seller's adversary in the transaction; (b) raises, fixes, and maintains buyer-broker compensation at levels that would not exist in a competitive marketplace; and (c) encourages and facilitates steering and other actions that impede innovation and entry by new and lower-cost real estate brokerage service providers.

38. Defendants' conspiracy has inflated buyer broker commissions, which, in turn, have inflated the total commissions paid by home sellers such as Plaintiff and the other Class members. Plaintiff and the other Class members have each incurred, on average, thousands of dollars in overcharges and damages as a result of Defendants' conspiracy.

39. For example, a class member who sells a house for $400,000 would have paid roughly $10,000 to $12,000 in additional commissions to the buyer's broker due to the conspiracy.

40. In a competitive market not affected by Defendants' anticompetitive restraint, the seller would pay nothing to the buyer broker, who would be paid instead by the buyer (their client), and the total commission paid by the seller would be set at a level to compensate only the seller broker. And even assuming arguendo that in a competitive market the seller would pay all or a portion of the buyer broker's commission, the commission would be far less than the 2.5 to 3.0 percent that is currently and typically paid to buyer brokers.

41. Moreover, in the absence of the Adversary Commission Rule, seller brokers would likely face additional competitive pressures. That is, instead of following long-time practice of setting total commissions *at or near 6% and assigning roughly half of that amount to themselves and roughly* the other half to the buyer broker commission (and selecting that amount at a level to remain in the good graces of buyer brokers), seller brokers would set a commission to pay themselves alone and would likely begin to engage in more vigorous competition with one another to lower their rates and/or provide additional services to justify their newly transparent rates.

42. In short, Defendants' conspiracy requires sellers to pay inflated commissions for services provided by buyer-brokers; raises, fixes, and maintains buyer-broker compensation at levels that would not exist in a competitive marketplace; and encourages and facilitates steering and other actions that impede entry and market success by lower cost real estate brokerage services.

43. No pro-competitive justification exists for the commission rules and regulations which Defendants have agreed to conspire together to implement and enforce. On the contrary, the purpose of Defendants' conspiracy is to restrain competition and enrich members of the conspiracy through inflated commission rates all to the detriment and expenses of Nevada home sellers.

44. Plaintiff brings this lawsuit as a class action on behalf of home sellers who paid a broker commission in the last four years in connection with the sale of residential real estate listed on one of the following MLSs ("Subject MLS" or "Subject MLSs"):

   o The Northern Nevada Regional MLS";
   o Elko County MLS;
   o Incline Village MLS; and
   o Mesquite MREA MLS

## JURISDICTION AND VENUE

45. This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the class contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the class is a citizen of a State different from Defendants. The Court also has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4, 16 and under 28 U.S.C. §§ 1331, 1337.

46. This Court has supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367.

47. This Court has personal jurisdiction over Association Defendants, all of which maintain their headquarters and/or principal places of business in the District of Nevada.

48.     In addition, the Defendants have: (1) transacted substantial business in this District; (2) transacted with members of the Class in this District; and (3) have committed substantial acts in furtherance of the unlawful scheme in this District.

49.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)-(c). Each Defendant transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## THE PARTIES

**Plaintiff**

50.     Plaintiff NATHANIEL WHALEY is a citizen of Nevada and resident of Las Vegas, Nevada.  On April 11, 2022, he sold a home located in the Las Vegas metropolitan area.  The home was listed on Northern Nevada Regional MLS for $805,00.00.   In that sales transaction, the Plaintiff was represented by Evolve Realty, an NAR affiliate, and the buyer was represented by Simply Vegas, an NAR affiliate.  As a part of the sales transaction, the Plaintiff paid a substantial buyer-broker commission of $40,250.00, with a total broker commission of 5%, of which 3% was paid to the buyer's broker.

**Defendants**

51.     Defendant National Association of Realtors (hereinafter "NAR"), a lobbying group that advocates for the interests of real estate brokers, has over 1.2 million individual members from whom it has collected hundreds of millions of dollars in dues and membership fees during the Subject MLS Class Period, including millions of dollars in dues and membership fees from NAR members located in this District. NAR oversees fifty-four state and territorial realtor associations and over 1,200 local realtor associations. NAR is headquartered in Chicago, Illinois.

52.     Defendant, Las Vegas Realtors (hereinafter "LVR") is a Nevada Nonprofit Corporation located at 6360 S. Rainbow Boulevard, Las Vegas, Nevada 89118 which holds itself

out as an association whose mission is as the authoritative voice for REALTORS and real estate consumers in Southern Nevada who also provides access to quality data and analysis, professional development, technical tools, and standards of professionalism.

53.     Defendant, Nevada REALTORS (hereinafter "Nevada Realtors") is a Nevada Nonprofit Corporation located at 760 Margrave Drive #200, Reno, Nevada 89502 whose mission is to enhance the success of its members while protecting private property rights and advocating for its members' interests.

54.     Defendant, Sierra Nevada REALTORS (hereinafter "Sierra Realtors") is a Nevada Nonprofit Corporation located at 300 S. Curry Street, Ste 3, Carson City, Nevada 89703 whose mission is to empower industry professionals who are focused on education, advocacy and providing value to members and their communities.

55.     Defendant, Elko County REALTORS (herein after "Elko Realtors") is a Nevada Nonprofit Corporation located at 557 W. Silver Street, Ste. 201B, Elko, Nevada 89801-7717 whose mission is to provide education and training through association meetings, seminars, classes, common forms, etc. to its members.

56.     Defendant, Incline Village REALTORS, (hereinafter "Incline Realtors") is Nevada Nonprofit Corporation located at 940 Southwood, Suite 103, Incline Village, Nevada 89451 whose mission statement is to unite those engage in the recognized branches of the real estate profession for the purpose of exerting a beneficial influence on the profession and related interests; to promote and maintain high standards of conduct in the real estate profession as expressed in the Code of Ethics of the National Association of Realtors; to provide a uniform medium for real estate owners and those engaged in the real estate profession whereby their interest may be safeguarded and advanced; and to further the interest of home and other real property ownership.

57.     Defendant, Mesquite Real Estate Association (hereinafter "Mesquite Realtors") is a Nevada Nonprofit Corporation located at 10 E. Mesquite Boulevard, Mesquite, Nevada 89027

whose mission is to operate a multiple listing service for the Greater Mesquite area and to ensure compliance with MMLS policies, rules and regulations while holding its members accountable to upholding the highest professional standards and ethical conduct as mandated by NAR's Code of Ethics.

58.     Defendant, Northern Nevada Regional MLS is a company located at 691 Sierra Rose Drive, Unit A, Reno, Nevada 89511 which holds itself out as offering the most accurate and up to date information on property available in Northern Nevada.

**Co-Conspirators**

59.     Multiple individuals and entitles not yet named as Defendants participated as co-conspirators in the violations alleged herein and performed the acts and made statements in furtherance of the conspiracy. Specifically, the NAR promulgated the Buyer Broker Commission Rule/Adversary Commission Rule and the other related rules and regulations at issue in this case. NAR enforced adherence to these rules in Nevada through its conspiracy with the Association Defendants their control Nevada's regional MLSs.

60.     Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as defendants in this Complaint.

## FACTUAL ALLEGATIONS

**Real Estate Industry Background**

61.     State licensing laws regulate who can represent sellers and buyers in the real estate market. There are two licensee categories: (1) the real estate broker (also known as a "brokerage firm"), and (2) the individual real estate licensee or agent. Brokerage firms license individual real estate realtors or agents and are legally responsible for the actions of their licensed realtors or agents.

62.     Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction. That is why real estate brokerage contracts with sellers

and buyers are required to be with brokers, not agents, and all payments to individual realtors or agents pass through brokers.

63. Most brokers and their individual realtors or agents occupy dual roles: that is, a broker may act as a seller broker for some home sales and act as a buyer broker for other home sales.

64. According to NAR, 92% of sellers sold their home with the assistance of a real estate broker in 2017, and 87% of buyers purchased their home with the assistance of a real estate broker in 2017.

65. In typical residential real estate transactions, real estate brokers and agents receive compensation through commissions that are calculated as a percentage of a home's sale price, and the commissions are paid when the home sells.

66. A seller broker's compensation is set forth in a listing agreement, a contract between the seller and the seller broker. The listing agreement includes the terms of the listing and often provides that the seller broker has the exclusive right to market the seller's home. Notably, due to the Adversary Commission Rule, the listing agreement specifies the total commission that a home seller will pay to the seller broker and also specifies the amount earmarked to be paid to the buyer broker (in the event the buyer has a broker).

67. When a buyer retains a broker, the buyer enters into a contract with that broker. The contract typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker.

68. If the buyer has a broker, the seller broker pays the buyer broker a commission out of the total commission paid by the seller. In fact, a standard of conduct in NAR's Code of Ethics permits and encourages buyer brokers to tell their clients that their services are free, which obviously is not a true statement.

///

69.     The result of these agreements and the Adversary Commission Rule is that buyer brokers — who are supposed to assist their clients in negotiating against the seller — receive their compensation from the total commission paid by the seller, not from the buyer they represent.

70.     Real estate insiders recognize that the Adversary Commission Rule leads to a marketplace where there is "a lot of confusion around how commissions work" and that most consumers don't understand how the commission works.

71.     Absent the Adversary Commission Rule and in a competitive market (after all, a seller has no incentive to compensate a buyer broker for actively negotiating against a seller's interests), a buyer would instead pay his or her broker, and a seller would agree to a pay a commission that would go solely toward the seller's own broker. The seller's total broker commission would thus be approximately half (or less) than the amount that sellers have paid as a total commission to compensate both their selling broker and their adversary's broker, the buying broker.

**Multiple Listing Services (MLSs) and the Adversary Commission Rule**

72.     An MLS is a database of properties listed for sale in a defined region that is accessible to real estate brokers and their realtors or agents, so long as they comply with the rules of the MLS as drafted by NAR and implemented by Association Defendants.

73.     These MLSs are owned and operated by local realtor associations that are members of, and governed by, NAR.

74.     As required by NAR rules, seller brokers list their clients' property on an MLS. If a seller broker does not list a client's property on an MLS, most buyer brokers will not show that property to prospective buyers. MLSs also act as the main source of listings for online websites, such as Zillow, through which many prospective home buyers find homes.

75.     The Adversary Commission Rule requires a seller broker, on behalf of the seller, to make a blanket, unilateral and effectively non-negotiable offer of compensation to buyer brokers

1  whenever listing a home on an MLS owned by a local NAR association. If a buyer represented by

2  a broker purchases the home, then the buyer broker receives the offered compensation.

3  **Anticompetitive NAR Rules**

4  76.    The Adversary Commission Rule was adopted by NAR in 1996 in its Handbook on

5  Multiple Listing Policy (the "Handbook"). The rule has been in effect ever since.

6  77.    Before the adoption of the Adversary Commission Rule in 1996, NAR played a

7  central role in designing, implementing, and enforcing through the MLS system a similar and also

8  deceptive and flawed market structure in which all brokers involved in residential home sales

9  tended to represent the seller, either as the seller's broker or as the "sub-agent" of the seller's

10 broker.

11 78.    Under this prevailing system of sub-agency, even if a broker was primarily working

12 with buyers, the broker remained legally obligated to represent the interests of sellers.[4]

13 Accordingly, when a transaction closed, the seller would pay a total commission to the seller

14 broker, who would in turn compensate the "sub-agent" broker who had been working with the

15 buyer, albeit while owing legal and fiduciary obligations to the seller.

16 79.    As a result of this confusing and misleading marketplace practice, many

17 homebuyers believed (mistakenly) that the sub-agent broker was working on their behalf. "When

18 this sub agency system, in which brokers working with buyers were legally obligated to pass on

19 information disadvantageous to their clients to sellers, was exposed through press coverage, it

20 collapsed almost overnight."[5]

21 80.    Once brokers working with buyers were no longer serving as "sub-agents" for the

22 seller's broker, the prior practice of the seller paying commission to both brokers involved in the

---

[4] Further information regarding the system of sub-agency is set forth in the following publication: Stephen Brobeck & Patrick Woodall, How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves, CONSUMER FED'N OF AM. (2006), *available* at
https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

[5] *Id.* at 3, *available* at https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

transaction should have disappeared, as no justification remained to warrant it. However, that is around when NAR and its co-conspirators stepped in to implement and enforce an anticompetitive and deceptive scheme designed to continue and maintain supra-competitive commissions and impede innovation and lower-priced competition by requiring, through the Adversary Commission Rule, that seller brokers make blanket, unilateral offers of compensation to buyer brokers when listing a home on an MLS.

81. Specifically, in November 1996, NAR adopted the Adversary Commission Rule in its Handbook on Multiple Listing Policy (the "Handbook").

82. The NAR Board of Directors, and committees reporting to it, determine from time to time whether to modify any policies in the Handbook, and the Board has approved certain changes in recent years within the Subject MLS Class Period, however, the Adversary Commission Rule has remained.

83. All policies that remain unchanged, and all modified or revised or new policies, are then set forth in new editions of the Handbook that tend to be issued annually. The Board of Directors of NAR have consistently and repeatedly agreed and chosen to retain the Adversary Commission Rule in the Handbook even in the face of criticism by economists and industry experts that the Adversary Commission Rule is anticompetitive and causes supra-competitive commission rates.

84. In revising and re-issuing the Handbook, NAR has invited each of the Defendants named herein and other co-conspirators to participate in the following agreement, combination, and conspiracy: They can participate in the MLS, and gain the benefits provided by NAR and the MLS, but only upon the condition that they agree to adhere to and enforce the anticompetitive restraints set forth in the Handbook. Thus, to the extent any other named Defendant argues that it was not involved in the initial drafting or adoption of the Adversary Commission Rule, that

argument lacks legal significance because each of the named Defendants have joined the conspiracy and agreed to abide by, implement, and enforce the Adversary Commission Rule.

85. The Handbook states the Adversary Commission Rule as follows:

> In filing a property with the multiple listing service of an association of Realtors®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants.[6]

86. The Handbook further states that "[m]ultiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[7]

87. The Adversary Commission Rule shifts a cost to the seller that would otherwise be paid by the buyer in a competitive market. As the Wall Street Journal recently opined, the result is that home sellers are effectively required to hire a buyer broker if they wish to list their home on an MLS, which requires the services of a seller broker, and that this system is a "potentially illegal tying arrangement under the Sherman Anti-Trust Act that keeps buying agents paid though they offer almost no useful services."[8]

88. Moreover, the NAR requirement that the seller broker make a blanket, unilateral offer provides an incentive for seller brokers to cooperate with buyer brokers by offering a high commission for the buyer broker. And, of course, brokers often act as a selling broker in one transaction but as a buyer broker in another, which fact further contributes to the competition restraining effects of the Adversary Commission Rule in that it fosters an environment in which brokers work cooperatively to split a total commission, instead of openly competing to earn the

---

[6] NAR Handbook, at 65.
[7] NAR Handbook, at 35.
[8] Jack Ryan & Jonathan Friedland, When You Buy or Sell a Home, Realty Bites, WALL ST. J. (Mar. 3, 2019), https://www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734.

business of both potential home sellers and potential home buyers based solely on the services to be provided to that represented party.[9]

89.     As to the potential possibility that a buyer might seek to reduce his or her broker's commission by making that reduction a condition of a purchase offer, NAR has adopted another rule that prevents this.  Specifically, NAR's Code of Ethics, Standard Practice 16-16, states:

> REALTORS, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/le*ase* to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[10]

90.     In other words, for a buyer broker even to present an offer to a seller that is conditional on the seller reducing the buyer-broker commission would expressly violate NAR's ethics rules. There is nothing ethical or economically rational about Standard Practice 16-16, especially when coupled with the Adversary Commission Rule.

91.     NAR has published "Case Interpretations" that exacerbate the anticompetitive effects of its ethics rules and provide a mirage of potential negotiation regarding the buyer broker commission. For example, NAR's Case Interpretation #16-15 states that negotiation over the amount of a buyer broker's commission may only occur if it is "completed prior to showing of the property" by the buyer broker to the potential buyer. That is, the buyer broker, if inclined to reduce

---

[9] In addition, the requirement that the offer of compensation be "blanket" means that the Adversary Commission Rule compels home sellers to make this financial offer without regard to the experience or quality of the buyer-broker and without regard to the services or value being provided by that buyer broker. The same "blanket" fee must be offered to a brand new buyer-broker with no experience as that offered to a buyer-broker with many years of experience. In a competitive and rational market, competitors with more experience and a track record of results tend to command higher prices than new entrants with no experience or track record, but the Adversary Commission Rule blocks this kind of competitive differentiation. Moreover, because the offer is blanket and can be easily compared to the blanket offers that every other seller broker must include and publish (to fellow brokers only) on the MLS, the Adversary Commission Rule by design creates strong incentives for sellers and seller brokers to offer the high, standard commission rates to buyer brokers that the conspiracy has long sought to maintain. Seller brokers know that if they list a home and include a lower blanket offer of compensation to buyer brokers, then due to the practice of "steering" the community of buyer brokers is likely to avoid showing that home to their clients (potential home buyers).

[10] National Association of Realtors, Code of Ethics and Standard of Practice (Jan. 1, 2019), *available* at https://www.nar.realtor/sites/default/files/documents/2019-COE.pdf.

1  the amount of buyer broker commission, must request a commission reduction before the broker

2  can even show the property to his or her client (the potential buyer). Obviously, the NAR Rule and

3  Case Interpretation practically and effectively guarantee that no such negotiations will ever take

4  place.[11]

5       92.    But for the Adversary Commission Rule and other anticompetitive rules and

6  policies of NAR, buyers (not sellers) would pay the commission to their broker, and brokers would

7  have to engage in competition by offering lower commissions to prospective buyers.  Selling

8  brokers would then face pressure to negotiate and make commissions competitive within the

9  market place and would also be subject to competition in order to earn business from home sellers,

10  as seller brokers would no longer be calculating their commission rates to include any

11  compensation for the buyer broker.[12]

12  **NAR's Oversight and Enforcement of its Anticompetitive Rules**

13       93.    NAR has experienced success in requiring that its members — which include state

14  and local realtor associations in the Subject MLSs and, as well as non-member brokers and agents

15  who operate in geographic areas with MLSs operated by local realtor associations — to comply

16  with its anticompetitive rules and with other rules set out in the Handbook and NAR's Code of

17  Ethics.

18       94.    NAR requires that its members which own and operate MLSs comply with the

19  mandatory provisions in the Handbook and the Code of Ethics. The Handbook states that an

20  agreement by an association to establish an MLS must include "roles and responsibilities of each

21

22

---

[11]  Even if some negotiation does rarely occur, the Adversary Commission Rule still works to elevate the baseline for
any such rare negotiations. Just as an agreement to fix prices (or an agreement to announce uniform price increases)
is per se unlawful even though the marketplace might reflect some potential negotiation with the conspirators'
customers, the Defendants' conspiracy here is unlawful and anticompetitive because it elevates the baseline for any
negotiations.

[12]  Even if one assumes for the sake of argument that, in a market free of the Adversary Commission Rule, a seller
continue to pay all or a portion of the buyer broker's commission, the commission would be far less than the 2.5 to
3.0 percent currently charged to home sellers like Plaintiff and paid to buyer brokers.

association for enforcement of the Code of Ethics" and the "intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."[13]

95.     Association Defendants own each of the Subject MLS and are required by NAR to monitor their MLS and the MLS's participants to ensure that they comply with mandatory provisions from the NAR Handbook. Thus, each local realtor association and MLS, and each participant in those associations and MLSs, agrees to the anticompetitive restraints challenged in this lawsuit, and they all play important roles in implementing and enforcing those restraints.

96.     Failure to strictly comply with the Code of Ethics can lead to expulsion for NAR's individual and association members.  NAR's Code of Ethics and Arbitration Manual states:

> Any Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association.[14]

97.     If a broker or agent were denied access to a local MLS, including the Subject MLS, then that broker and its agents could not list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property. NAR's model rules for local realtor associations operating in the Subject MLSs also require adherence to NAR's Code of Ethics.

98.     NAR further penalizes and discourages potential noncompliance with its anticompetitive rules by withholding professional liability insurance from any associations operating under any bylaws or rules not approved by NAR.[15] NAR's position and monitoring of potential non-compliance includes conduct to oversee and monitor associations that operate in and transact business in the areas covered by the Subject MLSs.

---

[13] NAR Handbook, at 9.
[14] National Association of Realtors, Code of Ethics and Arbitration Manual 2019, at 1, *available* at https://www.nar.realtor/sites/default/files/documents/2019-CEAM.pdf.

[15] NAR Handbook, at 8.

99. NAR reviews the governing documents of its local realtor associations, including those operating in the Subject MLSs to ensure compliance with NAR rules. NAR requires its local realtor associations, including those operating in the Subject MLSs to demonstrate their compliance with these rules by periodically NAR rules.

### ANTICOMPETITVE EFFECTS OF THE CONSPIRACY IN NEVADA
### AND ANTITRUST INJURY

100. Defendants' conspiracy has had the following anticompetitive effects, among others, in each area in which a Subject MLS operates:

a.  Home sellers have been forced to pay commissions to buyer brokers — who represent their adversaries in negotiations to sell their homes — thereby substantially inflating the cost of selling their homes.

b.  Home sellers have been compelled to set a high buyer-broker commission to induce buyer brokers to show their homes to the buyer brokers' clients.

c.  Home sellers have paid inflated buyer-broker commissions and inflated total commissions.

d.  The retention of a buyer broker has been severed from the setting of the broker's commission; the home buyer retains the buyer broker, while the home seller's agent actually sets the buyer broker's compensation.

e.  Price competition among brokers to be retained by home buyers has been restrained, as has price competition among brokers seeking to be retained to sell homes.

f.  Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer-broker commission.

g.    Defendants and their franchisees have increased their profits substantially by receiving inflated buyer-broker commissions and inflated total commissions.

101.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher total commissions than they would have paid in the absence of Defendants' anticompetitive conspiracy, and as a result have suffered damages.

102.    Plaintiff is not aware of any pro-competitive effects of Defendants' conspiracy, which is plainly anticompetitive and injurious to competition. While the prior system of subagency might partially explain the historical practice of sellers paying commission to both the selling agent or broker and to the agent or broker working with and/or procuring the buyer, with the demise of that confusing and misleading system no such justification remains for the seller to continue paying the broker now working for and retained by the buyer.

103.    To the extent Defendants may seek to argue that the MLS system in some abstract fashion has certain pro-competitive benefits, none of these purported benefits includes specifying brokers' respective commission rates.

104.    Even if any alleged pro-competitive effects exist, they are substantially outweighed by the conspiracy's anticompetitive effects.

105.    Substantial economic evidence supports the view that Defendants' conspiracy has resulted in inflated total commissions and inflated buyer-broker commissions paid by home sellers, at levels far above what a competitive market would produce.

106.    Compared to other countries with competitive markets for residential real estate brokerage services, the commissions in the Subject MLSs are substantially higher. Economists

Natalya Delcoure and Norm Miller compared international real estate commissions with those in the United States.[16] They concluded:

> Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand . . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%.[17]

107.    Delcoure and Miller also found variation within countries. For example, in the UK, they found that "1%-2% is typical" for total broker commissions, but that in "very competitive areas" the total rates ranged between "0.5-0.75%" whereas in lower priced areas the range was "as high as 3.5%."[18] Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."[19]

108.    In comparison, the total broker commissions (i.e., the aggregate commission paid to the seller broker and buyer broker) in the areas in which the Subject MLSs operate average between 5% and 6%, with buyer broker commissions holding steady in a range between 2.5% and 3%. These numbers have remained stable despite both rising home prices (which lead to larger commission amounts) and the decreasing role of the buyer broker in an age when many prospective home buyers have already scoured the market using Zillow or other websites.

109.    Other economists have reached similar conclusions. A Professor of Economics from Cornell University has described the Adversary Commission Rule — that is, the NAR requirement of having "the seller pay[] for the commission of both the listing [selling] agent and the cooperative [buyer's] agent" — as a "structural hurdle" that has prevented innovation and price

---

[16] *See* Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 Int'l Real Estate Review 12 (2002).

[17] *Id*. at 14.
[18] *Id. at 17.*
[19] *Id*. at 13.

competition in the real estate market.[20] This "hurdle" exists only because of Defendants' anticompetitive conspiracy and does not stem from any actual or unique structural aspect of real estate markets.

110.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## TRADE AND COMMERCE

111.    The Buyer Broker Commission Rule and other anticompetitive NAR rules any and have been implemented and enforced by Defendants and co-conspirators in Nevada and nationwide. These rules govern the conduct of local NAR associations, local brokers, and local realtors in Nevada and nationwide. Defendants' conduct alleged herein had inflated the buyer-broker commissions and injured home seller in Nevada and nationwide. NAR, and the other Defendants named herein, are engaged in activities substantially affecting interstate commerce in the United States.

## RELEVANT MARKETS AND DEFENDANTS' POWER OVER THE NEVADA REAL ESTATE INDUSTRY

112.    The relevant service market for the claims asserted herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with access to the Subject MLSs.

113.    Defendants' control of the Subject MLSs allows Defendants to impose the Adversary Commission Rule and other anticompetitive NAR rules on Class members and other market participants. Access to the Subject MLSs is critical for brokers to compete and to assist home buyers and sellers in the areas in which those MLSs operate.

---

[20] *See* FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, available at https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf

114.     The relevant geographic markets for the claims asserted herein are no broader than the geographic areas in which the Defendants operate. Nearly all homes sold in these geographic areas were listed on the MLS by brokers that are subject to the MLS and NAR rules and standards.

115.     The residential real estate business is local in nature. Most sellers prefer to work with a broker who is familiar with local market conditions and who maintains an office or affiliated sales associates located reasonably near the seller's property. Likewise, most buyers seek to purchase property in a particular city, community, or neighborhood, and typically prefer to work with a broker who has knowledge of the area where the buyer has an interest.

116.     Defendants and their co-conspirators collectively have market power in each relevant market through their control of the local MLS and their dominant share of the local market.

117.     Any non-conspiring buyer brokers in the areas in which the Subject MLSs operate who wish to compete would face insurmountable barriers.

118.     Defendants' effective control of the Subject MLSs means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service. This is impractical, if not impossible.

119.     A seller's broker without access to a listing service like the Subject MLS would be unable to reach the large majority of potential buyers, and a broker who represented a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot compete effectively without access to a listing service.

120.     For an alternative listing service to compete effectively with one of the Subject MLSs, the alternative would need to have listings as comprehensive (or at least nearly so) as the Subject MLS.

///

121.     However, Brokers and their individual realtors or agents who currently profit from inflated buyer broker commissions and total commissions have minimal incentive to participate on an alternative listing service that would generate lower total commissions and lower buyer broker commissions and seller broker commissions. Further, many buyers would be reluctant to retain a buyer broker operating on an alternative listing service that required them to pay the buyer broker commission, when other buyer brokers operating on the Subject MLSs are entirely compensated by home sellers. Accordingly, seller brokers on an alternative listing service would struggle to attract buyer brokers and their buyer clients.

122.     Moreover, many home sellers would not retain brokers using a new, unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient buyers and buyer brokers.

123.     Any listing service attempting to compete with any of the Subject MLSs would most likely fail to attract enough property listings to operate profitably and be a competitive constraint on the incumbent MLS. The absence of listing services that compete with the Subject MLSs (or other MLSs) reflects the very substantial barriers to entry.

124.     As an additional impediment to potential competition, NAR advises MLSs to enter into non-compete agreements with third-party websites, such as Zillow, so that those websites do not become competitive rivals to MLSs.

124.     NAR's checklist of "critical components" states that the consumer-facing website (ex. Zillow) "must agree they will not compete with the brokerage firms or MLS by either becoming a licensed brokerage firm or by providing offers of cooperation and compensation." The non-compete agreement requires the consumer-facing website to agree not to "use the data in a manner that is similar to a Multiple Listing Service." NAR has thus advised MLSs to take affirmative steps to further the alleged conspiracy by preventing third-party websites from becoming possible competitors.

125.    NAR has also previously taken actions to stifle innovation and competition among real estate brokers, including actions which led to the Antitrust Division of the Department of Justice ("DOJ") filing a lawsuit to enjoin a NAR "policy that obstruct[ed] real estate brokers who use innovative Internet-based tools to offer better services and lower costs to consumers." NAR ultimately agreed to a Final Judgment in which it agreed to modify and abandon its challenged policy.[21]  The DOJ's lawsuit illustrates that NAR has a history of formulating, adopting, and enforcing anticompetitive policies — like the Adversary Commission Rule challenged in this case — that stifle innovation and restrain competition in violation of federal law. NAR and the real estate industry's history of anticompetitive conduct extends much farther back as well, in that for much of the first half of the 20th Century realtors operated under express agreements to use specified commission percentages in home sale transactions, until the United States Supreme Court declared that scheme an illegal price-fixing arrangement under the federal antitrust laws in *United States v. Nat'l Ass'n of Real Estate Bds., et al.*, 339 U.S. 485 (1950).

## **CONTINUOUS ACCRUAL**

126.    During the six years preceding the filing of this Complaint, Defendants repeatedly charged and received buyer-broker commissions and total commissions that were inflated because of the conspiracy. These inflated commissions during the preceding four years were paid by Plaintiff and the other Class members in connection with the sale of residential real estate listed on one of the Subject MLSs. Each payment of these inflated commissions by Plaintiff and the other Class Members during the last six years injured them and gave rise to a new cause of action for that injury.

///

///

---

[21]    *See*    https://www.justice.gov/archive/atr/public/press_releases/2005/211008.htm;    *see    also*    https://www.justice.gov/atr/case-document/final-judgment-142.

127.    During the last four years, Defendants and their co-conspirators have maintained, implemented, and enforced the Adversary Commission Rule and other anticompetitive NAR rules nationwide, including in the areas in which the Subject MLSs operate.

## CLASS ACTION ALLEGATIONS

128.    Plaintiff brings this action on behalf of themselves, and as a class action under Federal Rule of Civil Procedure 23, on behalf of the members of "the Subject MLS Class," asserting Count I, defined as:

> All persons who, from January 15, 2018 through the present used any Defendant named herein to list a home on the Nevada MLS and who paid a commission to the buyer's broker in connection with the sale of the home.

129.    Excluded from the Class are Defendants; officers, directors, and employees of Defendants; any entity in which Defendants have a controlling interest in, is a parent of subsidiary of, or which is otherwise controlled by Defendants; and Defendants; affiliates, legal representative, attorneys, heirs, predecessors, successors and assignees.  Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

130.    Plaintiff reserves the right to modify and/or amend the Class definition as necessary.

131.    All members of the proposed Class are readily identifiable through Defendants' records.

132.    All requirements for class certification under Fed.R.Civ.P. 23(a), 23(b)(2) and 23(b)(3) are satisfied.

133.    **Numerosity.** The Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiff believes that the Classes have many thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

///

134. **Commonality and Predominance**. This action involved common questions of law and fact to the Plaintiff and Class Members, which predominate over any questions only affecting individual Class Members. The common legal and factual questions include, without limitation:

    a.    Whether Defendants engaged in the alleged conspiracy;

    b.    Whether the conspiracy harmed competition as alleged herein;

    c.    Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

    d.    Whether the effect of the Defendants' conspiracy was to inflate both total commissions and buyer broker commissions; and

    e.    The appropriate class-wide measure of damages.

135. Defendants engaged in a common course of conduct giving rise to the claims asserted by Plaintiff on behalf of himself and the Class. Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.

136. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff, like every other Class Member, sold a home in Nevada through a Brokerage Defendant and paid a buyer-broker commission. Defendants' unlawful conduct impacted all Class Members in a similar manner.

137. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the members of the Classes. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Classes.

138. Plaintiff has retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent themselves and the Classes. Together Plaintiff and his counsel intend to prosecute this action vigorously for the benefit of the Classes. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

///

139.     **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Classes would impose heavy burdens on the Court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Classes to seek redress for the violations of law alleged herein.

140.     Additionally, class certification under Rule 23(b)(1) and/or (b)(2) is appropriate because Defendants have acted or refused to act on grounds that apply generally to the Class, thereby making monetary, injunctive, equitable, declaratory, or a combination of such relief appropriate.  As Defendants continue to engage in the practices described herein, the risk of future harm to the Plaintiff and the Class remains, making injunctive relief appropriate.  The prosecution of separate actions by individual Class members would (a) create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants and/or (b) adjudications with respect to individual homeowners that would, as a practical matter, be dispositive of the interests of the other homeowners not parties to the adjudications, or which would substantially impair or impeded the ability to protect the interests of the Class.  Further, the claims of individual homeowners in the defined Class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

///

///

///

# CLAIMS FOR RELIEF

## COUNT I:
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### (By Plaintiff and the Class against All Defendants)

141.  Plaintiff repeats and incorporate by reference each paragraph above and in any other count of this Complaint.

142.  Beginning more than four years before the filing of this Complaint, and continuing into the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

143.  The conspiracy alleged herein consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make inflated payments to the buyer broker.

144.  In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

    a.    Participated in the creation, maintenance, re-publication, and implementation of the Adversary Commission Rule and other anticompetitive NAR rules in Nevada;

    b.    Participated in the establishment, maintenance, and implementation of rules by local NAR associations and MLSs that implemented the Adversary Commission Rule and other anticompetitive NAR rules in Nevada; and

    c.    Included provisions in franchise agreements, policy manuals, and other corporate agreements with franchisees, affiliates and realtors associated with the Defendants that required implementation of and adherence to the Buyer Broker Commission Rule/Adversary Commission Rule and other anticompetitive NAR rules in Nevada.

145.    Defendants' conspiracy has required sellers to pay buyer brokers, to pay an inflated buyer-broker commission and an inflated total commission, and it has restrained price competition among buyer brokers in the areas in which the Subject MLSs operate. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

146.    Defendants' conspiracy has caused buyer-broker commissions and total commissions in the areas in which the Subject MLSs operate to be inflated.  Plaintiff and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate listed on one of the Subject MLSs. Absent Defendants' conspiracy, Plaintiff and the other Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer.

147.    Defendants' conspiracy is a per se violation under the federal antitrust laws, specifically 15 U.S.C. § 1.

148.    In the alternative, Defendants' conspiracy is illegal under the federal antitrust laws and violates 15 U.S.C. § 1 under a Rule-of-Reason analysis.

149.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiff and the other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

**COUNT II:**
**Violation of NRS Chapter 598.0915, Nevada's Unfair Trade Practices**
**(By Plaintiff and the Class against All Defendants)**

150.    Plaintiff repeats and incorporates by reference each paragraph above and in any other count of this Complaint.

151.    Under Nevada Revised Statutes section 598.0915(15) "[a] person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she….knowingly makes any other false representation in a transaction."

152.    Plaintiff has a private right of action to pursue this deceptive trade practice claim pursuant to Nevada Revised Statutes Section 41.600(1), (2)(c) which provides that "[a]n action may be brought by any person who is a victim of consumer fraud [such as]…[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive."

153.    Defendants engaged in deceptive trade practices when they falsely advertised to buyers that there was no fee for their services when they in fact knew they would be receiving a commission pursuant to the Buyer Broker Commission Rule.

154.    Defendants engaged in deceptive trade practices by requiring sellers to offer commissions pursuant to the Adversary Commission Rule in order for their residence to be marketed and/or placed on the MLS.

155.    Defendants engaged in deceptive trade practices by splitting commissions with Buyer Brokers even though all Defendants named herein knew that negotiating with Buyer Brokers was contrary to the best interests of sellers.

156.    Defendants did not inform the Plaintiff that they would have to pay a buyer broker who would work against them in receiving the highest sales price for their residence.

157.    As set forth herein, Defendants' conduct is unlawful and in violation of public policy governing the restraint of trade.

158.    Defendant's violations of the Act were willful and knowing.

159.    Plaintiff and Class members seek actual damages; a declaration that Defendants' methods, acts and practices violate unlawful conduct; pre-and post-judgment interest; punitive damages, and attorneys' fees and costs.

**COUNT III:**
**Violation of NRS Chapter 598.0923, Nevada's Unfair Trade Practices**
**(By Plaintiff and the Class against All Defendants)**

160.    Plaintiff repeats and incorporates by reference each paragraph above and in any other count of this Complaint.

161.    Under Nevada Revised Statutes section 598.0923(2), "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly…[f]ails to disclose a material fact in connection the sale or lease of goods or services."

162.    Plaintiff has a private right of action to pursue this deceptive trade practice claim pursuant to Nevada Revised Statutes Section 41.600(1), (2)(c) which provides that "[a]n action may be brought by any person who is a victim of consumer fraud [such as]…[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive."

163.    Defendants engaged in deceptive trade practices when they knowingly failed to disclose a material fact by falsely advertising to buyers that there was no fee for their services when they in fact knew they would be receiving a commission pursuant to the Buyer Broker Commission Rule.

164.    Defendants engaged in deceptive trade practices by convincing sellers to offer commissions pursuant to the Adversary Commission Rule in order for their residence to be marketed and/or placed on the MLS.

165.    Defendants engaged in deceptive trade practices by knowingly failing to notify sellers they were splitting commissions with Buyer Brokers who would attempt to work against the best interest of the seller by forcing the seller to lower their sales price.

166.    As set forth herein, Defendants' conduct is unlawful and in violation of public policy governing the restraint of trade.

167.    Defendant's violations of the Act were willful and knowing.

168.    Plaintiff and Class members seek actual damages; a declaration that Defendants' methods, acts and practices violate unlawful conduct; pre-and post-judgment interest; punitive damages, and attorneys' fees and costs.

///

///

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, request relief and pray for judgment against Defendants as follows:

a.  An Order certifying the Classes under the appropriate provisions of Rule 23 of the Federal Rule of Civil Procedure and an order that notice be provided to all Class Members;

b.  Designation of Plaintiff as representative of the Class and the undersigned counsel as Class Counsel;

c.  An award of damages in an amount to be determined at trial or by this Court;

d.  An order for injunctive relief, enjoining Defendants from engaging in the wrongful and unlawful acts described herein;

e.  An order for declaratory relief as may be appropriate;

f.  An award of statutory interest and penalties;

h.  An award to Plaintiff for his costs of suit, including reasonable attorneys' fees and expenses;

i.  An award of such other relief as the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiff, on behalf of himself and all others similarly situated, hereby demand a jury trial of all issues so triable.

DATED this 15th day of January, 2024.          **BEN'S LAW**

*/s/ Stefany "Miley" Tewell*
**STEFANY "MILEY" TEWELL, ESQ.**
Nevada Bar No. 6144
**BEN LEHAVI, ESQ.**
Nevada Bar No. 14564
5940 South Rainbow Boulevard
Las Vegas, Nevada 89118
*Attorneys for Plaintiff and the Class*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25