BEFORE THE
UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| IN RE: REAL ESTATE COMMISSION | ) | MDL No. 3100 |
| ANTITRUST LITIGATION | ) | |
| | ) | |
| | ) | |

**THE HOMESERVICES DEFENDANTS' BRIEF IN OPPOSITION TO MOTION FOR TRANSFER AND CENTRALIZATION**

The HomeServices Defendants[1] have as much experience as anyone with the factual and legal questions at issue in the pending real estate commission antitrust lawsuits. They are defendants in the *Burnett* case that went to verdict in Missouri; they are defendants in the *Moehrl* and *Batton I* cases in Chicago and the *Nosalek* case in Boston (which are ***not*** subject to the Moving Plaintiffs' centralization request); and they are defendants in multiple cases filed in multiple districts that the Moving Plaintiffs seek to centralize in an MDL.

Thus, if any defendant could realize benefits from centralization, it would be the HomeServices Defendants. But based on their extensive litigation experience built up over more than four years of defending these cases, the HomeServices Defendants have concluded that centralization would ***not*** be convenient for the parties and witnesses and would ***not*** promote the litigation's "just and efficient" resolution. To the contrary, each of the new cases will necessarily involve highly localized and individualized discovery that is particular to the defendants in that case, the characteristics of the local residential real estate markets at issue in that case, and the

---

[1] For the purposes of this Opposition, the "HomeServices Defendants" refers to HomeServices of America, Inc. and its various subsidiaries who are named as defendants in any of the cases at issue.

customs and practices in that local market, meaning that centralization would make the cases far less convenient and less efficient for most parties and witnesses, without providing any real, concrete benefit.

Indeed, the same attorneys who are now representing the Moving Plaintiffs vehemently **opposed** efforts to combine the *Burnett* and *Moehrl* cases back in 2019, notwithstanding their legal and factual overlap, precisely because localized issues would dominate discovery in each case. At that time, the defendants in *Burnett* sought to transfer the case from the Western District of Missouri to the Northern District of Illinois for consolidation with the *Moehrl* case. In opposing transfer, plaintiffs' counsel emphasized the highly localized nature that discovery would take and the "significant inconvenience" to the parties and witnesses if the two cases were to be consolidated:

> Because of these distinct markets, the discovery [in each case] will focus on the implementation of the Adversary Commission Rule in each market, the impact of the Adversary Commission Rule on market forces in each market, the degree and effect of any "steering" that takes place in each market . . . , and the damages arising out of the enactment of the Adversary Commission Rule in each market. ***These important topics of discovery will be localized and specific to each lawsuit, and this case will involve entirely separate non-party co-conspirator witnesses located in [the Western District of Missouri], and for such witnesses it will be a significant inconvenience to become involved in litigation pending in Illinois compared to here.***[2]

The *Burnett* plaintiffs then acknowledged that, even though some discovery might overlap between the two cases, the parties could work cooperatively to minimize duplication and unnecessary burden.[3]

---

[2] *Burnett v. Nat'l Ass'n of Realtors*, 19-cv-332 (W.D. Mo. Apr. 29, 2019), ECF 66 p. 14 (emphasis added).

[3] *Id.*

The *Burnett* court (the Honorable Judge Bough) accepted the plaintiffs' position and denied transfer.[4] And, in hindsight, the *Burnett* court and the plaintiffs were correct. The *Moehrl* and *Burnett* cases have proceeded efficiently; common discovery has been routinely coordinated and shared; and formal consolidation was unnecessary. Indeed, even as the discovery cutoff approached, counsel for the *Burnett* plaintiffs reiterated his view that requiring the *Burnett* and *Moehrl* lawyers to take joint depositions would have been a "waste" of his time.[5]

The pending motion for centralization ignores these concrete lessons learned from the *Burnett* and *Moehrl* cases, as well as those learned from a third, related case pending in Boston— the *Nosalek* case. Those three lawsuits show that any common discovery among the newly filed cases can be efficiently coordinated and shared. In fact, much of any common discovery—such as discovery relating to the adoption, implementation, and enforcement of the rules of the National Association of REALTORS® ("NAR") that are at the heart of these cases—has already been thoroughly explored through document requests, interrogatories, depositions, and even trial testimony in *Burnett* and/or *Moehrl* and can be shared with the new plaintiffs. Moreover, any common legal issues among the cases are already the subject of extensive motion practice and written opinions from Judge Bough, Judge Wood in the Northern District of Illinois, and Judge Saris in the District of Massachusetts. The parties and judges in the newly filed cases can easily access these opinions and take them into consideration when evaluating the individualized issues before them and moving their cases forward without imposing the burdens associated with centralization.

---

[4] *Burnett v. Nat'l Ass'n of Realtors*, 19-cv-332 (W.D. Mo. Apr. 29, 2019), ECF 84 (The Honorable Judge Bough's order denying the Corporate Defendants' Motion to Transfer.)

[5] February 9, 2022 letter from Michael Ketchmark to Judge Bough (copy attached as Exhibit A).

As this Panel has repeatedly observed, centralization is a tool of last resort, and it should not be used reflexively to create industry-specific MDLs just because there are multiple cases filed in multiple courts with overlapping facts. *See, e.g., In re Baby Food Mktg., Sales Practices & Prods. Liab. Litig.,* 544 F. Supp. 3d 1375, 1377 (J.P.M.L. 2021) ("[w]e have been cautious when considering industry-wide centralization"). Because centralization here would not promote the convenience of the parties or witnesses, it would not promote the just and efficient conduct of the actions, and alternative means of cooperation and coordination are readily available, the motion to centralize should be denied.

## OVERVIEW OF CASES AT ISSUE

As of the filing of this Opposition, the Motion for Transfer and Centralization would apply to 14 cases pending in 11 districts.[6] All these cases are modelled after the *Burnett* and *Moehrl* cases, which were filed in 2019. *Moehrl* was filed first in the Northern District of Illinois, and it was brought on behalf of a class of home sellers from 25 metropolitan areas around the country. *Burnett* was filed second in the Western District of Missouri and was primarily focused on certain home sellers in Missouri. Both cases named NAR and a handful of national companies involved in the residential real estate brokerage market. The gist of the *Burnett* and *Moehrl* plaintiffs' claims is that NAR and the other defendants participated in a conspiracy to adopt, implement, and enforce certain NAR rules that govern listings on local, NAR-affiliated multiple listing services ("MLSs"). The plaintiffs allege that these NAR rules are anticompetitive, causing residential real estate brokerage commissions to be higher than they

---

[6] These numbers include the cases identified by the Moving Plaintiffs in their Motion and the additional cases that have been filed since. They do not include the previously filed cases that the Moving Plaintiffs expressly carved out from their motion (such as *Moehrl, Nosalek, Batton I,* and *Batton II*). A list of the cases that the HomeServices Defendants understand would be subject to centralization under the Moving Plaintiffs' request is included as Exhibit B.

otherwise would be, and that NAR, the corporate defendants, and other members of the conspiracy are liable for these supposedly supracompetitive commissions.

The *Burnett* and *Moehrl* cases generated additional follow-on litigation, which the Moving Plaintiffs intentionally excluded from their motion to centralize. In 2020, the *Nosalek*[7] case was filed in the District of Massachusetts on behalf of home sellers whose homes were sold on a particular MLS in Boston and who used real estate brokers affiliated with the same companies named as defendants in *Burnett* and *Moehrl.* Then, in 2021 and 2023, the *Batton I* and *Batton II* cases were filed in the Northern District of Illinois. Although the *Batton* cases deal with the same NAR rules as the other cases already discussed, they were brought on behalf of homebuyers rather than home sellers. Notably, the Moving Plaintiffs do not seek to centralize *Moehrl*, *Nosalek*, *Batton I*, or *Batton II* as part of this motion. Thus, even if the Panel were to grant the Moving Plaintiffs' request, these cases in the Northern District of Illinois and the District of Massachusetts would continue.

After the *Burnett* case went to trial and ended in a verdict in plaintiffs' favor, additional follow-on cases were immediately filed, including the *Umpa* and *Gibson* cases, which were filed by the same law firms that represent the plaintiffs in *Burnett* and *Moehrl*. All these cases—which are subject to the motion to centralize—challenge the same NAR rules at issue in the other cases. But most of the new cases focus on different groups of defendants, including local and regional brokers, and different geographic areas. Many do not name NAR as a defendant and instead focus on local REALTOR® associations and MLSs. We discuss these differences and the impact more fully in the argument sections below.

---

[7] The case was initially called *Bauman* based on the original lead plaintiffs, who subsequently dismissed their claims voluntarily.

**ARGUMENT**

Despite the fact that the *Burnett* and *Moehrl* cases were filed in 2019, more than four years ago, the motion at issue would apply to only 14 cases. This Panel has repeatedly observed that where "only a minimal number of actions are involved, the proponent of centralization bears a heavier burden to demonstrate that centralization is appropriate." *In re Atrium Med. Corp. Prolite & Proloop Hernia Mesh Prods. Liab. Litig.,* 600 F. Supp. 3d 1340, 1341 (J.P.M.L. 2022) (citing In re Hyundai and Kia GDI Engine Mktg., Sales Practices & Prods. Liab. Liti, 412 F. Supp. 3d 1341, 1343 (J.P.M.L. 2019)) (denying centralization and applying higher standard where 10 actions (including related actions) had been filed); *In re Covidien Hernia Mesh Prods. Liab. Litig.,* 481 F. Supp. 3d 1348 (J.P.M.L. 2020) (denying centralization and applying heightened standard to 12 actions filed in 9 districts).

Moreover, the Panel has refused to speculate as to the potential for additional filings when considering whether to centralize. As the Panel observed in *In re Atrium*, "[w]e generally are disinclined to take into account the mere possibility of future filings in our centralization calculus." 600 F. Supp. 3d at 1342 (internal quotation marks omitted). That is particularly true where the first cases have been pending for several years and only a small number of additional cases have been subsequently filed. *Id* at 1341-42 (denying centralization where only 11 actions had been filed from 2017 to 2022).

Finally, centralization under 28 U.S.C. § 1407 is a tool of last resort: "centralization . . . should be the last solution after considered review of all other options." *In re Best Buy Co.,* 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011). Where the parties and courts can minimize duplication in pretrial proceedings through other means, including informal cooperation and coordination, centralization is not appropriate. *In re Atrium*, 600 F. Supp. 3d at 1342. Such alternatives are

particularly likely to exist where there is "overlapping counsel" among the cases who can "facilitate informal coordination . . . ." *Id.*

      Applying these standards here, centralization is not appropriate. The fact that the new cases involve different, distinct defendants and different geographic markets is key to assessing what—if any—benefits would accrue from centralization. The experiences in the *Burnett*, *Moehrl*, and *Nosalek* cases show that alternative means for coordinating the cases exist, including the presence of overlapping counsel, access to well-developed common discovery, and access to extensive opinions generated in the *Burnett, Moehrl,* and *Nosalek* cases to date. Because centralization would increase—not decrease—the cost and effort necessary to prosecute and defend these cases, the Moving Plaintiffs' request for centralization should be denied.

## I.    The Moving Plaintiffs have not identified how centralization would make litigating their own cases more convenient or efficient.

      As a preliminary matter, the Moving Plaintiffs have not even attempted to explain how their own two cases—the *Gibson* and *Umpa* cases—would benefit from centralization. That is likely because they would not.

      Both *Gibson* and *Umpa* were filed in the Western District of Missouri, and they are both already pending before Judge Bough, the Moving Plaintiffs' preferred venue and judge. Thus, to the extent there is any benefit to be had from prosecuting these cases before a judge who is already familiar with the legal theories being pursued and the NAR rules at issue, the Moving Plaintiffs are already beneficiaries of such efficiencies, even without centralization.

      Similarly, the *Gibson* and *Umpa* plaintiffs are already being represented by the same law firms who represent the *Burnett* plaintiffs before Judge Bough and the *Moehrl* plaintiffs in the Northern District of Illinois. Thus, to the extent there is any benefit to be had from sharing common discovery relating to NAR and its rules, the Moving Plaintiffs will already be the

beneficiaries of such sharing through their existing law firms and overlapping counsel, even without centralization.

Finally, to the extent there are any benefits to be had from formally consolidating multiple cases, the *Gibson* and *Umpa* plaintiffs can ask Judge Bough to consolidate their two cases; pulling in other cases from other districts is not necessary for the Moving Plaintiffs to obtain this benefit.[8]

Given the absence of any obvious benefits to these Moving Plaintiffs from centralization, presumably the Moving Plaintiffs would point to benefits that centralization would confer on the other parties, non-party witnesses, and/or the courts. But, as set forth below, centralization would likely increase—not decrease—the burden of these lawsuits on other parties and witnesses, and any benefit to the courts would be minimal.

## II. The vast majority of defendants who would be affected by centralization are currently named in only one jurisdiction—centralization would thus be likely to increase, not decrease, their defense costs.

The Motion seeks to centralize 14 cases that are currently pending in 11 districts across the country.[9] A total of 214 entities are named as defendants in these cases. But of these 214

---

[8] Interestingly (and paradoxically), in a meet and confer on scheduling issues on January 19, 2024, counsel for the *Gibson* plaintiffs (and a signatory to the Moving Plaintiffs' motion to centralize) stated that he did not think it was necessary at this time to consolidate the *Umpa* and *Gibson* cases for the purpose of putting together a coordinated scheduling order that would apply to the defendants' initial responses to the complaints filed in those actions. This suggests that there may be "other considerations" at play which are driving the Moving Plaintiffs' centralization request. *See, e.g., In re CVS Caremark Corp. Wage & Hour Empl. Practices Litig.,* 684 F. Supp. 2d 1377, 1379 (J.P.M.L. 2010) ("where a Section 1407 motion appears intended to further the interests of particular counsel more than those of the statute, we would certainly find less favor with it.").

[9] The Motion filed by the Moving Plaintiffs seeks centralization of *Grace*, *Hooper*, *Gibson*, *Umpa*, *March*, *Spring Way*, *QJ Team*, *Martin* and *Burton*. Since then, *Masiello*, *Whaley*, *Friedman*, *Fierro* and *Lantham* have been filed and could be classified as tag-along actions. *See* Exhibit B.

defendants, 201[10] are named as defendants in only one case or two cases that are pending in the same judicial district and will presumably be consolidated.[11] This means that, if the motion to centralize is granted, more than 93% of the defendants at issue would be drawn into a complex MDL proceeding who would otherwise be faced with defending against only one set of claims in one jurisdiction.

To further illustrate this point, consider the following chart, which shows that only 9 defendants out of 214 (or 4.2%) are named as defendants in 3 or more cases; 4 defendants (or 1.9%) are named in only 2 cases that are not pending in the same district; and 201 defendants (or 93.9%) are named in only 1 judicial district.

| | Number of Defendants | Percentage of Defendants |
|---|---|---|
| Total Number of Defendants Across All Cases | 214 | 100% |
| Unrelated Defendants Named in 3 or More Cases | 9 | 4.2% |
| Defendants Named in Only 2 Cases (Not in Same District) | 4 | 1.9% |
| Defendants Named in Only 1 or 2 Cases Pending in Same District | 201 | 93.9% |

At least for the 93.9% of the defendants who are currently named in only 1 or 2 actions pending in the same judicial district, centralization would dramatically complicate their defenses rather than simplifying them, given the additional time and costs of coordinating the defenses of

[10] This number includes RE/MAX, as they have been named in two cases and the purported national settlement has not yet been finalized.

[11] Of the 38 defendants that are named in 2 cases, 29 are named in the *QJ* and *Martin* cases which are likely to be consolidated soon.

such a large group of defendants, almost all of whom are located in different geographic markets and represented by different counsel. This fact alone weighs heavily against centralization.  *See, e.g., In re Paycheck Prot. Program (PPP) Agent Fees Litig.,* 481 F. Supp. 3d 1335, 1337 (J.P.M.L. 2020) (denying centralization where "the vast majority of defendants are named in only one action, further indicating a lack of common questions of fact.").

**III.**   **Fact discovery in these cases will focus on highly individualized issues particular to each defendant and local residential real estate market; centralization will not make this discovery more efficient or convenient.**

The Moving Plaintiffs have not come close to satisfying their burden of demonstrating how centralization would make discovery in the new cases more convenient or efficient. In fact, they do not really even try. Instead, they limit their attempted justification to five bullet points of supposedly "common questions of fact" (Doc. No. 1-1 at 7) and three paragraphs of generic assertions, such as "[c]entralization will also reduce duplicative discovery" (*id.* at 8); "discovery disputes . . . should be decided by a single judge" (*id.* at 9); and "centralization eliminates the risk of inconsistent rulings . . . ." *Id.*

But even a cursory review of the bullet points listing these "common questions of fact" reveal that the discovery into each of these questions will be highly individualized and particular to each of the 214 defendants and local real estate markets at issue in each case. Far from being a list of "common questions of fact" that justify centralization, these bullet points actually demonstrate why centralization would not be efficient or convenient.

We consider each bullet point below:

**A.**   **"Whether defendants entered into an agreement or conspiracy based on the Buyer Broker Commission Rules"**

The Moving Plaintiffs assert that "[w]hether defendants entered into an agreement or conspiracy based on the Buyer Broker Commission Rules" is a common question of fact that

justifies centralization. But whether any particular defendant played any role with respect to NAR or its rules or otherwise entered into a conspiratorial agreement with anyone else is a highly individualized question that will require detailed evidence particular to each defendant. Evidence relating to the HomeServices Defendants' supposed participation in the purported conspiracy is unique to the HomeServices Defendants and does not overlap with evidence relating to Keller Williams' supposed participation, Compass' supposed participation, or the alleged participation of any other defendant. Because evidence of any particular defendant's supposed participation in the alleged conspiracy would be unique to that defendant, centralizing the cases ***will not*** eliminate or reduce any discovery that must be taken from that defendant.

Moreover, there is individual variation among the Buyer Broker Commission Rules at issue in the various cases. Some MLSs are not affiliated with NAR and operate under rules that did not originate from NAR, and some of those rules do not require offers of cooperative compensation. There may also be variation in the ways that different MLSs, whether affiliated with NAR or not, interpret and apply their rules. Fleshing these issues out will require discovery unique to each MLS, and centralization will not reduce such discovery or make it more efficient.

There are also variations among state laws that require individual consideration and discovery. Many states have laws that expressly recognize and permit the sharing of commissions between listing and buyer brokers. *See, e.g.,* Mo. Rev. Stat. § 339.800 ("In any real estate transaction, the designated broker's compensation may be paid by . . . sharing the compensation between designated brokers."). Discovery and testimony relating to the impact of these laws will be unique to the defendants operating in those states.

Further, even for those defendants who have been named in multiple cases across multiple districts, there are other, more efficient ways to coordinate discovery relating to their

alleged participation in the conspiracy without centralization. For example, in the *Burnett* and *Moehrl* cases, the parties were able to coordinate depositions across the cases; they coordinated and shared document productions; and they were able to use deposition transcripts from one case in the other. There is no reason to think that such formal and informal coordination could not continue going forward in the new cases, particularly given that 93.9% of the defendants at issue have a case pending in only a single judicial district.

**B.**     **"Whether defendants possess market power in the relevant markets"**

The Moving Plaintiffs also attempt to justify centralization by asserting that "[w]hether defendants possess market power in the relevant markets" is a common question of fact across the cases. But, again, the Moving Plaintiffs ignore the highly individualized nature of this inquiry. Real estate markets are inherently local. Whether any particular broker, association or MLS of the 214 defendants at issue has market power in Austin, Texas has nothing to do with whether that broker (or any other broker) or association or MLS has market power in Atlanta, Georgia. Thus, centralizing cases involving different local markets and/or different defendants will not reduce the discovery necessary to prove each defendants' market power in a particular geographic market.

Conversely, to the extent particular defendants are subject to more than one case for conduct in the same market, those defendants can easily coordinate discovery with counsel among the subset of cases in which they are parties. Centralization is not necessary to achieve these efficiencies.

**C.**     **"Whether defendants engage in or promote steering"**

The Moving Plaintiffs point to "[w]hether defendants engage in or promote steering" as another common fact question that justifies centralization. "Steering" refers to the plaintiffs' allegation that certain real estate agents working with buyers may refuse to show a home to their

clients if the home's MLS listing contains an insufficient offer of compensation to the buyer agent. The existence of any such evidence as to a particular defendant will be specific to that defendant and the markets in which that defendant does business. Centralizing cases against different defendants will not reduce the amount of discovery relating to each defendant's alleged steering or otherwise generate any efficiencies, particularly for those 93.9% of defendants who are defending cases in only one judicial district.

Moreover, any defendant facing multiple claims in multiple districts can easily coordinate discovery on this issue among the cases. Considering Defendants have successfully coordinated discovery on this issue in prior cases, centralization is not necessary to achieve these efficiencies.

**D.    "Whether the effect of the agreement was to inflate total commissions and buyer broker commissions" and "[w]hether the competitive harm from the conspiracy substantially outweighs any competitive benefits"**

Finally, the Moving Plaintiffs assert that common questions exist as to "whether the effect of the agreement was to inflate . . . commissions" and "whether the competitive harm from the conspiracy substantially outweighs any competitive benefits." Again, both these questions will involve detailed, individualized discovery and analysis into the particular commission levels of the distinct, local real estate markets at issue in each case. Centralizing cases involving different defendants and different geographic markets will not eliminate or reduce this required discovery and analysis.

As just one example, discovery and expert work in the *Moehrl* case showed that the overall average rate of offers to buyer agents using the Brooklyn MLS was around 1.5%, while evidence in the *Burnett* case showed that the overall average rate of offers to buyer agents in Kansas City using the Heartland MLS was close to 3.0% and the average offer to buyer agents in St. Louis using the MARIS MLS was around 2.7%. This variation occurs despite the fact that all these MLSs have the rules being challenged as anticompetitive in the lawsuits at issue here. The

evidence required to assess whether the commissions in any particular local market are "inflated" and whether any harm to competition in those markets is offset by competitive benefits will vary from market to market. Centralization will not decrease the amount of such discovery that must occur.

**IV.    To the extent there is common discovery across the cases, there are other, more effective ways to coordinate than centralization.**

The Moving Plaintiffs make much of the fact that all of the pending cases focus on certain NAR rules, meaning that there will necessarily be some common discovery across the cases that focuses on these rules. However, the Moving Plaintiffs ignore the fact that most—if not all—of this discovery has already been gathered and produced in the *Burnett* and *Moehrl* cases and can thus be shared across the cases without imposing the burdens of centralization.

As an example, the *Burnett* and *Moehrl* plaintiffs have already served voluminous documents requests on NAR and taken numerous depositions of NAR witnesses. All these documents were collected and produced electronically, and all could be shared with the new plaintiffs. Similarly, all the NAR depositions were videotaped and are available electronically. And NAR witness trial testimony transcripts from the *Burnett* case are also available. All this common discovery and testimony can be shared with all of the new plaintiffs without centralization.

In fact, the *Nosalek* case in Boston has been very efficiently litigated to date by taking advantage of work that was done in *Burnett* and *Moehrl* cases. *Nosalek* was filed in December 2020 in the District of Massachusetts and is pending before Judge Saris. Most fact discovery is currently set to close on March 1, 2024. The *Nosalek* plaintiffs and the defendants in that case have been able to proceed very efficiently by sharing much of the *Burnett* and *Moehrl* document productions and deposition transcripts/videos. Because of this informal coordination, the *Nosalek*

plaintiffs have chosen to take only a single *Nosalek*-specific deposition to date (which lasted approximately 2 hours and 30 minutes); they participated in one joint deposition of a third party with the *Moehrl* and *Burnett* plaintiffs (at which they asked about 15 minutes of questions); they have provided notice that they will take only three fact depositions from the defendants; and they have also found it unnecessary to take their own deposition of NAR. This means that the *Nosalek* Plaintiffs will be taking a total of only five fact depositions. There is no reason to think that the plaintiffs in the new cases could not proceed just as efficiently, even without centralization.

## V.   Centralization will not eliminate the risk of inconsistent rulings.

The Moving Plaintiffs also assert that centralization will "eliminate" the "substantial" risk of inconsistent rulings across the cases. They are wrong.

By design, the Moving Plaintiffs chose to omit *Moehrl*, *Batton I*, *Batton II*, and *Nosalek* from their request for centralization. All four of these cases involve legal and factual questions that overlap with the cases sought to be centralized. The fact that these four cases will remain in their home districts means that, even if Moving Plaintiffs' centralization request is granted, there will be multiple courts considering the same or related questions, and those courts may reach different results. Centralization will not eliminate this risk.[12]

---

[12] In its response to the Moving Plaintiffs' submission, NAR took the position that these other cases, including *Moehrl*, *Nosalek*, and *Batton I*, should be included in any resulting MDL. But these cases have been pending for years; their judges are intimately familiar with them; and significant substantive motions are either pending or currently being briefed (summary judgment and motions to compel arbitration in *Moehrl*; summary judgment in *Nosalek*; and motions to dismiss in *Batton I*). As this Panel has recognized, it would not make sense to move these cases. *See In re Covidien Hernia Mesh Prods. Liab. Litig.,* 481 F. Supp. 3d 1348, 1348 (J.P.M.L. 2020) ("We are not persuaded under the present circumstances that the benefits of centralization outweigh the disruption to the pending actions, some of which have been pending in federal court for two or three years.").

Moreover, the premise of Moving Plaintiffs' position also overstates the likelihood that any judge in the constituent cases will encounter identical legal issues that raise the specter of inconsistency in rulings. Because, as stated above, virtually all important issues in these cases will turn on specific facts relating to the specific defendants in each specific case, important legal decisions that involve applying the law to those specific facts might very well result in different outcomes—but those outcomes would not be "inconsistent" and avoidable through centralization.

**VI.    Several of the defendants facing multiple cases in multiple districts oppose centralization—this fact should carry substantial weight with the Panel.**

The HomeServices Defendants are among those who have been named in multiple cases in multiple districts. In fact, one or more of the HomeServices Defendants has been named in *Burnett*, *Moehrl*, *Batton I*, *Nosalek*, *Umpa*, *Gibson*, *QJ Team*, *Martin*, *Masiello* and *Fiero*. Thus, of anyone, the HomeServices Defendants would presumably realize the greatest efficiency gains from centralization, if such gains were to be had by anyone.

Yet the HomeServices Defendants oppose centralization. Why?

Through their direct experience in *Burnett*, *Moehrl*, *Batton I* and *Nosalek*, the HomeServices Defendants have seen how efficiently they have been able to share discovery across the cases and coordinate depositions of their common witnesses (either through joint depositions or sharing transcripts after the fact). The HomeServices Defendants are confident that they will be able to realize similar efficiencies in the new cases going forward, without centralization.

In contrast, the HomeServices Defendants fear that centralization will introduce many inefficiencies into the system that can otherwise be avoided. For example, the HomeServices

Defendants are not a party to the following 8 cases which the Moving Plaintiffs seek to centralize:

- *Phillips* (N.D. Ga.), which includes 41 defendants;

- *March* (S.D.N.Y.), which includes 28 defendants;

- *Friedman* (S.D.N.Y.), which includes 18 defendants;

- *Grace* (N.D. Cal.), which includes 11 defendants;

- *Whaley* (D. Nev.), which includes 8 defendants;

- *Spring Way Center* (W.D. Pa.), which includes 8 defendants;

- *Burton* (D.S.C.), which includes 3 defendants; and

- *Latham* (E.D Cal.) which includes 19 defendants.

The HomeServices Defendants have no interest in attending joint hearings with these dozens of defendants; they have no interest in getting involved in the intricate, localized discovery that will relate to those defendants; and they have no interest in attempting to coordinate motion practice or briefing with them. And forcing such coordination would not eliminate or reduce any discovery that would otherwise have to be taken by any plaintiff, because the evidence relating to each defendant's alleged participation in the alleged conspiracies will be unique, as will the evidence relating to each local residential real estate market at issue in these cases.

Of course, to the extent any plaintiffs in the pending cases want to cooperate to take depositions of common witnesses beyond what is already available through sharing the *Burnett* and *Moehrl* transcripts, the HomeServices Defendants will be happy to cooperate, whether informally or through a joint order to be entered across the cases. But the HomeServices Defendants believe that such coordination can occur without centralization, as has already been amply demonstrated through the *Burnett*, *Moehrl* and *Nosalek* cases to date.

**VII.    Alternatively, if the Panel determines that centralization is appropriate, other defendants have offered persuasive arguments for alternative sites.**

As stated above, the HomeServices Defendants contend that the Panel should decline to centralize the pending cases. However, if the Panel reaches a contrary conclusion, then the HomeServices Defendants agree with the other defendants that there are more compelling sites for an MDL than the Western District of Missouri.

First, Defendant Keller Williams and the other defendants in the two cases pending in the Eastern District of Texas before Judge Jordan have offered compelling arguments for excluding the Texas cases (which are likely to be consolidated and which include dozens of Texas-based defendants who are not involved in any other cases). Alternatively, these defendants suggest that Judge Jordan and the Eastern District of Texas would be a more convenient forum for any MDL. The HomeServices Defendants join in these arguments.

Second, Defendant NAR has suggested that the Northern District of Illinois would be an appropriate venue for any MDL. The HomeServices Defendants agree that, if an MDL is to be created that does not include the Texas cases, the Northern District of Illinois would be a more convenient and appropriate forum than the Western District of Missouri for the reasons stated by NAR.

## CONCLUSION

The Moving Plaintiffs have not carried the heavy burden of demonstrating the necessity of centralization in these cases. To the contrary, even a cursory review of the number of defendants involved, the highly individualized nature of the fact issues particular to each defendant, and the parties' experience in efficiently coordinating discovery in the cases that have been moving forward over the last several years demonstrates that there are alternative, more

efficient means of coordinating the newly filed cases. The HomeServices Defendants

respectfully suggest that the Panel should deny the motion for centralization.


Dated: January 25, 2024                    */s/ Robert D. MacGill*
                                           Robert D. MacGill
                                           Robert.MacGill@MacGillLaw.com
                                           **MACGILL PC**
                                           156 E. Market St.
                                           Suite 1200
                                           Indianapolis, IN 46204
                                           (317) 721-1253

                                           *Counsel for the*
                                           *HomeServices-related Defendants*[13]

---

[13] In *Umpa*, 4:23-cv-00945 (W.D. Mo.), counsel for: HomeServices of America, Inc.; BHH
Affiliates, LLC; HSF Affiliates, LLC; The Long & Foster Companies, Inc.

In *QJ Team*, 4:23-cv-01013 (E.D. Tex.), counsel for: ABA Management, LLC; Ebby Halliday
Real Estate, LLC; The Dave Perry-Miller Company; HomeServices of America, Inc.

In *Martin*, 4:23-cv-01104 (E.D. Tex.), counsel for: ABA Management, LLC; Ebby Halliday Real
Estate, LLC; The Dave Perry-Miller Company; HomeServices of America, Inc.

I reserve the right to appear for other HomeServices-related defendants as additional cases are
brought before the Panel.

All HomeServices-related defendants' participation in the JPML proceedings and any other
proceedings are without waiver of the HomeServices-related defendants' binding arbitration
rights.