**BEFORE THE UNITED STATED JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **In re: REAL ESTATE COMMISSION LITIGATION**<br><br>This document relates to: *March v. REBNY et al.*,<br>Case No. 1: 23- cv-09995-JGLC-RWL, In the United States<br>District Court for the Southern District of New York | MDL No. 3100 |

**DEFENDANTS BROWN HARRIS STEVENS RESIDENTIAL SALES, LLC AND
HALSTEAD MANHATTAN, LLC'S RESPONSE IN OPPOSITION
TO MOTION FOR CENTRALIZATION AND TRANSFER OF ACTIONS
<u>PURSUANT TO 28 U.S.C. § 1407</u>**

**SERPE LLC**

Silvia L. Serpe
Kimberly L. Friedman
16 Madison Square West
New York, New York 10010
(212) 257-5010
sserpe@serpellc.com
kfriedman@serpellc.com

*Attorneys for Defendants Brown Harris Stevens
Residential Sales, LLC and Halstead Manhattan,
LLC*

**<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT……………………………………………… 1

BACKGROUND………………………………………………………… 3

ARGUMENT…………………………………………………………. 6

   I.  Standard of Law………………………………………….…... 6

   II.  Centralization is Not Appropriate Under Section 1407……………….... 8

     (1)  Individual Issues Exceed Any Common Question of Fact…………... 8

     (2)  Centralization Will Inconvenience Parties and Witnesses…………… 11

     (3)  Centralization Will Not Further the Just and Efficient Conduct of The *REBNY* Actions………………………………………………... 12

CONCLUSION…..…………………………….…………………………. 16

## <u>TABLE OF AUTHORITIES</u>

Cases

*In re Abbott Labs., Inc., Similac Prods. Liab. Litig.*, 763 F. Supp. 2d
1376 (J.P.M.L. 2011)……………………………………………….. 13

*In re Baby Food Mktg., Sales Practices & Prods. Liab. Litig.*, 544 F. Supp.
3d 1375 (J.P.M.L. 2021) ……………………………………………….. 9, 11, 12, 13, 14

*In re Bear Creek Techs., Inc., ('722) Patent Litig.*, 858 F. Supp. 2d
1375 (J.P.M.L. 2012) ………………………………………………… 7

*In re Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d
1376 (J.P.M.L. 2011) ………………………………………………… 7, 13

*In re Chilean Nitrate Products Liab. Litig.*, 787 F. Supp. 2d 1347
(J.P.M.L. 2011) ………………………………………………… 13, 14

*In re Covidient Hernia Mesh Prods. Liabl. Litig.*, 481 F. Supp. 3d 1348
(J.P.M.L. 2020) ………………………………………………… 15

*In re Equinox Fitness Wage & Hour Emp't Practices Litig.*, 764 F. Supp. 2d 1347
(J.P.M.L. 2011) ………………………………………………… 7

*In re Gaiam, Inc., Water Bottle Mktg., Sales Practices & Prods. Liab. Litig.*, 672
F.Supp.2d 1373 (J.P.M.L. 2010) ……………………………………….. 13

*In re Geico Customer Data Sec. Breach Litig.*, No. MDL 3013, 2021 WL 4704797
(J.P.M.L. Oct. 4, 2021) ………………………………………………… 7, 12

*In re Gen. Mills, Inc. Yoplus Yogurt Prods. Mktg. & Sales Practices Litig.*, 716 F. Supp.
2d 1371 (J.P.M.L. 2010) …………………………………………. 14

*In re Gerber Probiotic Prods. Mktg. & Sales Practices Litig.*, 899 F. Supp. 2d 1378,
(J.P.M.L. 2012) ………………………………………………… 14

*In re Google Antitrust Litig.*, 521 F. Supp. 3d 1358 (J.P.M.L. 2021)……………………….. 8

*In re Google Inc. St. View Elec. Commc'ns Litig.*, 733 F. Supp. 2d 1381
(J.P.M.L. 2010) ………………………………………………… 11

*In re IBM Antitrust Litig.*, 328 F. Supp. 509 (J.P.M.L. 1971) …………………….. 8

*In re Iowa Beef Packers, Inc.*, 309 F. Supp. 1259 (J.P.M.L. 1970)……………………. 6

*In re Kmart Corp. Customer Data Sec. Breach Litig.*, 109 F. Supp. 3d 1368
(J.P.M.L. 2015)……………………………………………………….. 12

*In re Kronos Customer Data Sec. Breach Litig.*, 619 F. Supp. 3d 1354
(J.P.M.L. 2022)………………………………………………………….. 12

*In re Medi-Cal Reimb. Rate Reduction Litig.*, 652 F. Supp. 2d 1378
(J.P.M.L. 2009)………………………………………………………….. 15

*In re Ne. Contaminated Beef Prods. Liab. Litig.*, 856 F. Supp. 2d 1354
(J.P.M.L. 2012) …………………………………………………………… 7, 13

*In re Removal from U.S. Marine Corps Reserve Active Status List Litig.,* 787 F. Supp. 2d
1350 (J.P.M.L. 2011) …………………………………………………… 14

*In re Republic Western Ins. Co. Ins. Coverage Litig.*, 206 F.Supp.2d 1364
(J.P.M.L. 2002) …………………………………………………………… 13

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, 381 F.Supp.2d 1383
(J.P.M.L. 2005) …………………………………………………………… 11

*In re Secondary Ticket Market Refund Litig.*, 481 F. Supp. 3d 1345
(J.P.M.L. 2020) …………………………………………………………… 9

*In re Sorin 3T Heater-Cooler Sys. Prods. Liab. Litig.*, 273 F. Supp. 3d 1357
(J.P.M.L. 2017) …………………………………………………………… 12

*In re St. Jude Med., Inc., Silzone Heart Valves Products Liab. Litig.*, MDL No. 1396,
2001 WL 36292052 (J.P.M.L. Apr. 18, 2001) ………………………………... 11

*In re: Student–Athlete Name & Likeness Litig.*, 763 F. Supp. 2d 1379
(J.P.M.L. 2011) …………………………………………………………… 12

*In re TD Bank, N.A.*, 703 F. Supp. 2d 1380 (J.P.M.L. 2010)…………………….. 6

*In re Varsity Spirit Athlete Abuse Litig.*, No. MDL 3077, 2023 WL 3828645
(J.P.M.L. June 5, 2023). …………………………………………………… 8, 9, 11, 14

## STATUTES

15 U.S.C. § 1…………………...…………………………………...…………… 4

28 U.S.C. § 1407 ……………...…………………………………… 1, 2, 6, 11, 16

New York General Business Law § 340………………….………………… 4

## OTHER

*Manual for Complex Litigation*, § 20.131 (4th ed. 2004). 7

Defendants Brown Harris Stevens Residential Sales, LLC (misnamed as Brown Harris Stevens, LLC) and Halstead Manhattan, LLC (misnamed as Halstead Real Estate LLC) (collectively, "BHS"), by and through their undersigned attorneys, hereby submit this response memorandum of law in opposition to Plaintiffs' Motion for Transfer and Centralization Pursuant to 28 U.S.C. § 1407 (Case MDL No. 3100, ECF 1-1) ("Plaintiffs' Motion").[1]

## PRELIMINARY STATEMENT

On December 27, 2023, the Plaintiffs in *Gibson et al. v. National Association of Realtors et al.*, 4:23-cv-7822-SRB (W.D. Mo.) and *Umpa v. Nat'l Ass'n of Realtors*, 4:23-cv-945 (W.D. Mo.) (collectively, "the Moving Plaintiffs") filed a motion seeking to centralize nine actions against various defendants in the Western District of Missouri. The Moving Plaintiffs contend that each of the actions allege similar anti-competitive conduct amongst brokerage firms arising from certain rules by the National Association of Realtors (NAR) and Multiple Listing Services (MLSs) governing broker commissions. Each of the actions, however, name *different* defendants, in *different* distinct markets, following *different* rules that govern the practice of brokerage commissions.

Notably, BHS is a named defendant in only one of the nine actions originally listed in Plaintiffs' Motion, *see* MDL No. 3100, ECF 2 (Revised Schedule of Actions), and two of the eighteen total actions in NAR's proposed schedule of actions. *See* MDL No. 3100, ECF 196-1 (NAR's Schedule of Actions). The two actions in which BHS is a defendant relate to REBNY and are currently pending in the Southern District of New York. *See March v. REBNY, et al.*, 23-cv-09995 (S.D.N.Y. Nov. 13, 2023) and *Friedman v. REBNY, et. al*, 24-cv-00405-JGLC-RWL (S.D.N.Y. Jan. 18, 2024) (the "REBNY Actions"). The cases set forth in the NAR's Schedule of Actions, with the

---

[1] BHS joins the arguments set forth in The Real Estate Board of New York, Inc.'s ("REBNY") and The REBNY Listing Service's ("RLS") Brief in Opposition to Plaintiffs' Motion for Transfer to the Western District of Missouri Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings, dated January 26, 2024.

exception of the *March* and *Friedman* cases, are referred to hereafter collectively as the "NAR Actions."

Specifically, the *March v. REBNY, et al.*, 1:23-cv-09995 JGLC-RWL (S.D.N.Y. Nov. 13, 2023) action (the "*March* Action"), deals exclusively with sales in the Borough of Manhattan in New York City by cooperating brokers who do not operate under the rules of NAR and the MLSs. Similarly, the *Friedman v. REBNY, et. al*, 24-cv-00405-JGLC-RWL (S.D.N.Y. Jan. 18, 2024) action (the "*Friedman* Action") deals exclusively with sales in the Borough of Brooklyn in New York City by cooperating brokers who do not operate under the rules of NAR and the MLSs. BHS, along with other defendants to the *March* and *Friedman* Actions (collectively, the "REBNY Actions"), are members of the Real Estate Board of New York ("REBNY"), which has its own unique rules, constitution, and listing exchange (known as the "RLS"), and thus are not party to rules promulgated by NAR that are the subject of the NAR Actions.

Plaintiffs' Motion fails to show that centralization by this Panel is warranted for the REBNY Actions. *First*, and foremost, the REBNY Actions present a different context in which alleged antitrust violations will be adjudicated. The distinctions between NAR and REBNY and the brokerage firms that operate thereunder are significant. For example, REBNY has no standard form agreement governing brokers' commissions, whereas in general the affiliated NAR MLSs do. Indeed, in the REBNY Actions each defendant has their *own form agreement*—with the terms of those agreements further negotiated by the broker and owner parties, transaction-by-transaction. Additionally, the New York City residential real estate market is uniquely dominated by cooperative and condominium apartments whose sales require approvals by demanding cooperative and condominium boards with lengthy application, interview, and approval processes.  In other markets, single family sales generally predominate and do not require these extensive additional steps to conclude a sale.

*Second*, centralization of the REBNY Actions will inconvenience not only the parties, but the witnesses central to the litigation, thus thwarting the just and efficient conduct of these actions. Most of the Defendants in the REBNY Actions are headquartered in New York City, conduct the majority of their business in New York City, and do not have any business in, familiarity with, or connection to, Missouri. Indeed, most if not all of the documents, witnesses, and discovery in the REBNY Actions will be based in New York.

*Third*, requiring BHS to be hauled into court in Kansas City, Missouri (or anywhere outside of New York) to defend itself against claims pertaining exclusively to business conducted in New York City—pursuant to REBNY specific rules—does not further the just and efficient conduct of the litigation. This is why, notably, most—if not all—of the parties in the REBNY Actions, including the plaintiffs, oppose centralization. While certain overlap amongst the cases may exist, it is clear that unique factual and legal issues predominate the REBNY Actions and that therefore continued informal coordination and cooperation amongst the parties in the *March* and *Friedman* Actions is more than sufficient.[2] Accordingly, this Panel should deny Plaintiffs' Motion because centralization of the REBNY Actions is not necessary for the convenience of the parties and witnesses or to further the just and efficient conduct of this litigation.[3]

## BACKGROUND

BHS is headquartered in New York City and does the majority of its business in Manhattan's residential real estate market. New York City's residential real estate market is—both in volume and

---

[2] On December 23, 2023, Plaintiff in *Friedman v. REBNY* filed its Complaint in the Eastern District of New York. *See Friedman v. REBNY, et. al*, No. 1:23-cv-09601 (E.D.N.Y. Dec. 23, 2023). Subsequently, after coordinating with the parties in the *March* Action, the *Friedman* case was filed in the Southern District of New York as a related action to *March. See Friedman v. REBNY, et. al*, 24-cv-00405-JGLC-RWL (S.D.N.Y. Jan. 18, 2024) (MDL No. 3100 ECF 197-20).

[3] BHS does not take a position with respect to whether centralization of the NAR Cases is appropriate.

expense—one of the largest markets for residential real estate in the world. It is not only that the residential real estate market in New York City is expensive and competitive, it is also uniquely nuanced by legal vehicles, processes, and procedures that do not exist in other markets. Unlike the rest of the country, the Manhattan and Brooklyn residential real estate market is dominated by condominium and coop sales which require complicated submissions and board packages.[4]

On November 13, 2023, Plaintiff Monty March filed a class action complaint in *March v. REBNY, et al.*, 1:23-cv-09995 JGLC-RWL (S.D.N.Y.) ("*March* Complaint"), alleging REBNY rules "forced" sellers of residential real estate in Manhattan to pay artificially inflated commissions in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *See* Ex. 6, Plaintiffs' Motion, *March* Complaint, at ¶¶ 1, 2 (MDL No. 3100, ECF 1-8).[5] The *March* Plaintiffs also allege violations under the New York anti-trust law (New York General Business Law § 340), as well as unjust enrichment claims under New York law. *Id.* The purported class in *March* is defined as "[a]ll persons and entities that sold Manhattan residential real estate and paid a Buyer-Broker's commission in accordance with the [REBNY Listing Service rules] since November 8, 2019 to present." *Id.* at ¶ 112. The referenced rule that the *March* Plaintiffs rely on provides:

> With respect to the sale of an Exclusive Property, *if* a sale is consummate with a Buyer procured by a Co-Broker, *unless* the Exclusive Listing specifies otherwise *or* absent some other written agreement between an Owner and their Exclusive Broker(s), the Exclusive Broker and the Co-Broker shall each be paid an equal share of the commission as specified in the Exclusive Listing.

---

[4] Notably, while other BHS affiliates conduct some business in Connecticut, New Jersey, and Florida, there are currently no allegations pertaining to BHS affiliates in those states.

[5] While the *Friedman* Action cites to REBNY membership and relies on identical REBNY rules as the *March* Action, only the *March* Complaint was attached to Plaintiffs' Motion. *See* MDL No. 3100, ECF 1-8. As such, all quotations and citations will be made exclusively to the *March* Complaint.

*Id.* at ¶ 59 (emphasis added). This language on its face necessarily means that under REBNY, variations in the commission rate exist, and can be negotiated and memorialized in the exclusive agreements or in another written agreement.

Thus, the REBNY rule that is the gravamen of the REBNY Actions differs significantly from the NAR rule that is the focus of Plaintiffs' Motion and the NAR Actions. Most significantly, the anti-competitive behavior alleged in the NAR Actions arises from the terms of NAR's standard form—a form that REBNY does not use. The NAR rule for the "Mandatory Offer of Compensation" is set forth in Policy Statement 7.23 of NAR's Handbook on Multiple Listing Policy. The NAR rule requires brokers to make a "blanket offer of compensation" to a co-broker in connection with the sale of a property. As explained by one NAR Action plaintiff, "[t]he requirement that the offer of compensation be 'blanket' means that the Mandatory Offer of Compensation Rule compels home sellers to make this financial offer without regard to the experience or quality of the buyer broker and without regard to the services or value being provided by that buyer broker. The same "blanket" fee must be offered to a brand-new buyer broker with no experience as that offered to a buyer broker with many years of experience." *See* Ex. 4, Plaintiffs' Motion, at p. 23, n.18 (MDL No. 3100, ECF 1-6).

This NAR rule—and its functional equivalent which was adopted by the remaining MLSs— is the gravamen of the NAR Actions and **does not** appear in any form in REBNY's rules. Indeed, while the other MLSs employ a standardized form to enforce this uniform rule, REBNY does not. Accordingly, the REBNY Actions do not utilize the NAR rule or have a functional equivalent to the NAR rule at issue in the NAR Actions. In fact, REBNY allows each brokerage firm to create its own form governing exclusive listings of residential property in Manhattan. This practice—of brokerage firms using their own forms when offering exclusives and then having those terms negotiated on a transaction-by-transaction basis—is unique to New York City, and operates, in part,

to foster healthy competition amongst brokerage firms. Indeed, where Plaintiffs' Motion states that NAR's practice "restrict[s] the negotiation," REBNY's practice of requiring each firm to have their own form, which is, in turn, further negotiated by the parties, does precisely the opposite. *See* Plaintiffs' Motion, at 1 (MDL No. 3100, ECF 1-1).

The Moving Plaintiffs contend that in all nine actions the plaintiffs allege that the "Buyer Compensation Rules" "require" home sellers to make blanket unilateral offers of compensation to cooperating brokers and "restrict the negotiation of such offers". *See* Plaintiffs' Motion, at 1 (MDL No. 3100, ECF 1-1). There are, however, in the REBNY Actions, no allegations that Defendants employed the standard NAR form that is at issue in the NAR Actions.  Indeed, the rule relied on by the plaintiffs in *March* on its face belies the Moving Plaintiffs' contention because it allows for a defendant's Exclusive Listing agreement or some other written agreement to set the commission rates. Quite simply, there is no conspiracy or agreement to follow NAR amongst the defendants in the REBNY Actions.

## ARGUMENT

### I.   STANDARD OF LAW

The Panel will grant a Section 1407 motion only if so doing "would serve the convenience of the parties and witnesses or further the just and efficient conduct of [the] litigation." *In re TD Bank, N.A.*, 703 F. Supp. 2d 1380, 1381 (J.P.M.L. 2010). Section 1407 requires that each of the following three criteria are met in order to create an MDL proceeding. *First*, the actions must share a "common question of fact[]." *See* 28 U.S.C. § 1407(a). *Second*, the transfer must be for "the convenience of the parties and the witnesses." *Id. Third*, the transfer must advance "the just and efficient conduct" of the litigation. *Id. See In re Iowa Beef Packers, Inc.*, 309 F. Supp. 1259, 1260 (J.P.M.L. 1970) (centralization requires there be "common questions of fact," that it serve "the convenience of the parties and witnesses," and will "promote the just and efficient conduct of such

actions."). The parties moving for transfer and consolidation under Section 1407 bear the burden of establishing that the statutory criteria is met, and that transfer is otherwise proper.

Centralization is in no way preordained. *In re Bear Creek Techs., Inc., ('722) Patent Litig.*, 858 F. Supp. 2d 1375, 1379 (J.P.M.L. 2012) ("Centralization of any litigation... is not automatic, and will necessarily depend on the facts, parties, procedural history and other circumstances in a given litigation."). Each motion is reviewed, and a determination will be made by the Panel on its merits. *In re Equinox Fitness Wage & Hour Emp't Practices Litig.*, 764 F. Supp. 2d 1347, 1348 (J.P.M.L. 2011) (denying unopposed motion for centralization because "the Panel has an institutional responsibility that goes beyond simply accommodating the particular wishes of the parties.").

In order to determine whether a transfer is warranted under Section 1407, the Panel will look at the following factors, including, but not limited to: convenience of counsel, convenience of witnesses, minimizing duplicative discovery, and minimizing risk of conflicting rulings. *See Manual for Complex Litigation*, § 20.131 (4th ed. 2004).  The Panel has repeatedly denied a motion to transfer where, as here, alternatives to centralization exist such as the consolidation of REBNY Actions, and counsel thereto coordinating discovery and pretrial proceedings. *See In re Geico Customer Data Sec. Breach Litig.*, No. MDL 3013, 2021 WL 4704797, at *1 (J.P.M.L. Oct. 4, 2021); *see also In re Ne. Contaminated Beef Prods. Liab. Litig.*, 856 F. Supp. 2d 1354, 1355 (J.P.M.L. 2012) ("informal cooperation among the involved attorneys and courts is both practicable and preferable."). Indeed, this Panel has repeatedly held that "centralization under Section 1407 should be the last solution after considered review of all other options." *In re Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011).

## II.   CENTRALIZATION IS NOT APPROPRIATE UNDER SECTION 1407

### (1)   Individual Issues Exceed Any Common Question of Fact

The first condition for Section 1407 transfer is that the actions must share a "common question of fact[]." *See* 28 U.S.C. § 1407(a). Where, as here, significant questions of fact vary from case to case, centralization is unlikely to promote fairness or efficiency. *In re Varsity Spirit Athlete Abuse Litig.*, No. MDL 3077, 2023 WL 3828645, at *1 (J.P.M.L. June 5, 2023). Plaintiffs' Motion argues that "[e]ach action pleads an identical or similar course[] of conduct in which residential real estate associations, including NAR, and various residential real estate brokerage companies agreed to promulgate, follow, and enforce Buyer Broker Compensation Rules." *See* Plaintiffs' Motion, at 1-2 (MDL No. 3100, ECF 1-1). Plaintiffs' Motion defines Buyer Broker Compensation Rules as those that "require home sellers to make blanket unilateral offers of compensation to cooperating brokers when listing a residential property for sale on an MLS and restrict the negotiation of such offers." *Id.* at 1. Indeed, Plaintiffs' Motion fails to address that the REBNY Actions are against *different* defendants who follow *different* rules in a completely *different* market. Notably, BHS is not a defendant in any of the NAR Actions that allege standard listing forms require "blanket unilateral offers" of compensation to co-brokers.

The Panel has long recognized that it may be inappropriate to centralize antitrust actions arising in distinct markets. *See In re IBM Antitrust Litig.*, 328 F. Supp. 509, 510-11 (J.P.M.L. 1971).[6] This is because different markets operate pursuant to different rules, players, and practices and "any

---

[6] Plaintiffs' Motion argues that the risk of inconsistent rulings in anti-trust cases warrants centralization of these actions. *See* Plaintiffs' Motion, at 9 (MDL No. 3100, ECF 1-1). This, however, wholly ignores the fact that rulings in the *March* Action and *Friedman* Action will pertain to REBNY and thus could not serve to undermine rulings relating to NAR. Further, the cases Plaintiffs cite in furtherance of this argument are easily distinguishable as they include a single corporate defendant, product, or market. *See, e.g. In re Google Antitrust Litig.*, 521 F. Supp. 3d 1358, 1359 (J.P.M.L. 2021) (denying centralization of certain claims that "involve different relevant markets" and "the alleged anticompetitive conduct differs substantially.").

efficiencies to be gained by centralization may be diminished by unique factual issues." *In re Varsity Spirit Athlete Abuse Litig.*, No. MDL 3077, 2023 WL 3828645, at *1 (J.P.M.L. June 5, 2023). Each of the nine cases Moving Plaintiffs seek to centralize name different groups of defendants—many, like BHS, unique to the *March* Action—a factor weighing against centralization. The Panel is traditionally "skeptical of requests to centralize claims filed against multiple defendants… in a single MDL because it often will not promote judicial efficiency or serve the convenience of the parties and witnesses." *In re Secondary Ticket Market Refund Litig.*, 481 F. Supp. 3d 1345, 1346 (J.P.M.L. 2020). *See In re Baby Food Mktg., Sales Practices & Prods. Liab. Litig.*, 544 F. Supp. 3d 1375, 1376 (J.P.M.L. 2021) (denying centralization because "the potential for a multi-defendant MDL to introduce added complexity to this litigation."). Centralization in cases with multiple defendants is also disfavored because "[m]uch of the discovery and pretrial practice will be defendant-specific." *In re Baby Food Mktg., Sales Pracs. & Prod. Liab. Litig.*, 544 F. Supp. 3d at 1376–77 (denying transfer where, "[a]t a general level, the[] actions are similar…[but since] each defendant manufactures, markets, and distributes its own [] products subject to different manufacturing processes, suppliers, and quality control procedures," "the claims against each defendant [] are likely to rise or fall on facts specific to that defendant.").

BHS, along with other defendants in the REBNY Actions, is a New York City-based brokerage house. BHS uses its own form with its own specified terms therein, to govern sales of residential real estate in New York City. While the NAR Actions and REBNY Actions arguably all explore potential liability based on set brokerage commission rates, those rates and the practices and procedures that set them, are regionally specific and geographically unique. Indeed, broker's commissions vary immensely—and are permitted to vary under REBNY—in New York City depending on the type of property, the geographical location, whether rebates are used, and additional terms that are buyer specific. Thus, centralization is not appropriate here because the

REBNY Actions allege *different* anticompetitive conduct arising in *different* markets—each replete with varying business considerations, rules, and economic realities—than the NAR Actions.

Put simply, the core factual questions surrounding brokerage commissions vary and are oft unique to each defendant. Plaintiffs' Motion lists a number of alleged "common questions of fact" amongst the actions which only further illustrate the uniqueness of the REBNY Actions. For example, Plaintiffs note "[w]hether defendants enter into an agreement or conspiracy based on the Buyer Broker Compensation Rules." *See* Plaintiffs' Motion, at 7 (MDL No. 3100, ECF 1-1). However, defendants in the REBNY Actions are not alleged to have followed NAR's Buyer Broker Compensation Rules by using a standard listing agreement—indeed, Plaintiffs' Motion cites to a conclusory paragraph of the *March* Complaint that merely references "unlawful agreements and scheme." *Id.* at 7; *see also* Ex. 6, Plaintiffs' Motion, *March* Complaint at ¶ 117 (MDL No. 3100, ECF 1-8).

Centralization is unlikely to promote fairness or efficiency because many of the significant questions of law and fact in the cases do not overlap.  Discovery detailing the fact intensive questions of what terms each brokerage firm uses in its exclusive form, and then how it is further negotiated for each sale, would not be made more efficient by consolidation with nationwide brokerage houses that employ a standard NAR form.[7] BHS, along with the other defendants in the REBNY Actions, are answering distinct claims that arise exclusively out of their business in New York City's residential real estate market. As such, discovery is destined to be both defendant and region specific, and "any efficiencies to be gained by centralization" will likely be "diminished by

---

[7] Plaintiffs contend that discovery "disputes should be decided by a single judge familiar with the holistic scope of discovery across the actions." Plaintiffs' Motion, at 9 (MDL No. 3100, ECF 1-1). There is, however, no single judge familiar with the discovery to be collected in the *March* Action pertaining to REBNY. Plaintiffs' argument that Judge Bough "is amply familiar with the factual and legal issues that will arise in the centralized case" is equally flawed because Judge Bough did not interpret REBNY nor practices in the New York City residential real estate market when presiding over the trial in *Burnett v. Nat'l Ass'n of Realtors*, 4:19-cv-332-SRB (W.D. Mo.). *See id.* at 10.

unique factual issues." *In re Varsity Spirit Athlete Abuse Litig.*, No. MDL 3077, 2023 WL 3828645, at

*1 (J.P.M.L. June 5, 2023).

### (2)    Centralization Will Inconvenience Parties and Witnesses

In order to be proper, transfer must be for "the convenience of the parties and the

witnesses." *See* 28 U.S.C. § 1407(a). Plaintiffs' Motion fails to show how centralization of the *March*

Action (along with eight other actions) in the Western District of Missouri would serve to

"conserve" resources for BHS, a business headquartered in New York City that is being sued

exclusively in connection with its real estate practices in New York City. *See* Plaintiffs' Motion, at 8

(MDL No. 3100, ECF 1-1).[8] Notably, New York City is not only BHS's corporate headquarters, but

it is also the situs of all the events underlying the allegations in the *March* Action. This Panel has held

that a forum in the location of defendant's headquarters is oft preferable because the "most

relevant documents and witnesses are likely located there." *In re Google Inc. St. View Elec. Commc'ns*

*Litig.*, 733 F. Supp. 2d 1381, 1382 (J.P.M.L. 2010); *see also In re Sears, Roebuck & Co. Tools Mktg. &*

*Sales Practices Litig.*, 381 F.Supp.2d 1383, 1384 (J.P.M.L. 2005) ("relevant discovery will likely be

found within th[e] district… [of Defendant's] corporate headquarters" and "many of its documents

and witnesses are located there"); *St. Jude Med., Inc., Silzone Heart Valves Products Liab. Litig.*, MDL

No. 1396, 2001 WL 36292052, at *2 (J.P.M.L. Apr. 18, 2001) (transferring litigation to district

because "as the situs of the headquarters of the sole defendant in all actions, the district is likely to

be a substantial source of witnesses and documents subject to discovery."). As such, the Panel is

reluctant to centralize multi-defendant actions that are proceeding in the defendant's "home

district." *See In re Baby Food Mktg., Sales Pracs. & Prod. Liab. Litig.*, 544 F. Supp. 3d 1375, 1377

---

[8] Two additional districts were suggested as potential MDL venues in a recent filing by NAR in
support of centralization. *See* MDL No. 3100 ECF 196. All arguments regarding the burden on BHS
of litigating the MDL in Missouri equally apply to both Illinois and Texas (or any other district
outside of New York City).

(J.P.M.L. 2021) (denying transfer where "[m]ost of the 73 defendant-specific actions in this litigation have been filed or transferred to the district where that defendant is (or was) headquartered," which promotes the economy and efficiency of justice).

Finally, most—if not all—of the parties in the REBNY Actions (including *March*) oppose centralization—a position the Panel weighs significantly in determining whether or not transfer would be beneficial. *See In re: Student–Athlete Name & Likeness Litig.*, 763 F. Supp. 2d 1379 (J.P.M.L. 2011) (denying centralization and noting "[w]e find most persuasive that, of all responding parties, those who would be most affected by centralization…do not believe that centralization would be beneficial."); *In re Sorin 3T Heater-Cooler Sys. Prods. Liab. Litig.*, 273 F. Supp. 3d 1357, 1358 (J.P.M.L. 2017) ("Critically, not a single party to any of the six actions pending outside the District of South Carolina supports centralization."); *In re Kronos Customer Data Sec. Breach Litig.*, 619 F. Supp. 3d 1354, 1355 (J.P.M.L. 2022) (same). It is undisputed that centralization will inconvenience the New York City based parties and witnesses in the REBNY Actions by hauling them to Missouri to defend themselves against allegations of misconduct occurring exclusively in New York, and thus Plaintiffs' Motion should be denied with respect to the REBNY Actions.

### (3)     Centralization Will Not Further the Just and Efficient Conduct of the REBNY Actions

Finally, in order to be proper, the transfer must advance "the just and efficient conduct" of the litigation. 28 U.S.C. § 1407(a). The Panel has repeatedly denied a motion to transfer where, as here, alternatives to centralization exist such as counsel coordinating discovery and pretrial proceedings. *In re Geico Customer Data Sec. Breach Litig.*, No. MDL 3013, 2021 WL 4704797, at *1 (J.P.M.L. Oct. 4, 2021); *see also In re Kmart Corp. Customer Data Sec. Breach Litig.*, 109 F. Supp. 3d 1368, 1368-69 (J.P.M.L. 2015) ("These options include transfer pursuant to 28 U.S.C. § 1404, as well as voluntary cooperation and coordination among the parties and the involved courts to avoid duplicative discovery or inconsistent rulings."). BHS has, and is willing to continue to, work with all

parties to ensure that pretrial proceedings and discovery are undergone efficiently. Indeed, all parties in the *March* Action have committed considerable time and resources in order to cooperate and coordinate and have made considerable progress in this regard. *In re Ne. Contaminated Beef Prods. Liab. Litig.*, 856 F. Supp. 2d 1354, 1355 (J.P.M.L. 2012) ("informal cooperation among the involved attorneys and courts is both practicable and preferable."). Allowing the parties to continue to self-organize will serve to streamline the litigation most efficiently. *In re Baby Food Mktg., Sales Pracs. & Prod. Liab. Litig.,* 544 F. Supp. 3d 1375, 1377-78 (J.P.M.L. 2021) (holding we "believe it better to allow the parties' attempts to self-organize play out before centralizing any part of this litigation."); *In re Abbott Labs., Inc., Similac Prods. Liab. Litig.*, 763 F. Supp. 2d 1376, 1377 (J.P.M.L. 2011) ("We consider voluntary coordination among the parties and the involved courts of these relatively few actions to be a preferable alternative to centralization at this time."). Indeed, the Panel has held that "centralization under Section 1407 should be the last solution after considered review of all other options." *In re Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011).

Significantly, coordination has already yielded significant results for the efficiency of the litigation. Parties in the *March* Action actively worked with the plaintiffs in the *Friedman* Action in the Eastern District of New York in order to consolidate their cases resulting in the *Friedman* Action being withdrawn and refiled as a related case in the Southern District of New York. In both cases, counsel have coordinated and all parties consented to the voluntarily dismissal and refiling of the *Friedman* Action in the SDNY as a related case. *See In re Gaiam, Inc., Water Bottle Mktg., Sales Practices & Prods. Liab. Litig.,* 672 F.Supp.2d 1373, 1374–75 (J.P.M.L.2010) ("Where there are only a limited number of actions and the involved parties are amenable to Section 1404 transfer, such transfer is generally preferable to centralization under Section 1407."). Thus, denial of a Section 1407 motion is appropriate where, as here, suitable alternatives exist to minimize the possibility of duplicative

13

discovery. "[W]here a reasonable prospect exists that the resolution of a Section 1404 motion or motions could eliminate the multidistrict character of a litigation, transfer under Section 1404 is preferable to Section 1407 centralization." *In re Gerber Probiotic Prods. Mktg. & Sales Practices Litig.*, 899 F. Supp. 2d 1378, 1379-80 (J.P.M.L. 2012). *See also In re: Best Buy Co., Inc.,* 804 F. Supp. 2d at 1378–79 (denying centralization "where there is a 'reasonable prospect' that the resolution of Section 1404 motions would eliminate the multidistrict character of the actions before us.")(*citing In re Republic Western Ins. Co. Ins. Coverage Litig.*, 206 F.Supp.2d 1364, 1365 (J.P.M.L. 2002)).

Defendants in the REBNY Actions remain ready and willing to continue in the spirit of cooperation that has so far existed to minimize any duplicative efforts related to any common questions of fact presented in the REBNY Actions. *See In re Chilean Nitrate Products Liab. Litig.*, 787 F. Supp. 2d 1347, 1347-48 (J.P.M.L. 2011) (denying transfer because defendant offered to coordinate discovery and depositions in the few cases presented for consolidation); *In re Removal from U.S. Marine Corps Reserve Active Status List Litig.,* 787 F. Supp. 2d 1350, 1351 (J.P.M.L. 2011) (denying centralization in two record review cases where voluntary coordination among the parties and the involved courts appeared feasible). The continued informal cooperation amongst the parties to consolidate REBNY-related cases will obviate the risk of duplicative discovery, and thus weighs heavily against centralization. *In re Gen. Mills, Inc. Yoplus Yogurt Prods. Mktg. & Sales Practices Litig.*, 716 F. Supp. 2d 1371, 1372 (J.P.M.L. 2010) (finding transfer unnecessary where the parties had "every ability to cooperate and minimize the possibilities of duplicative discovery and/or inconsistent pretrial rulings"); *In re Varsity Spirit Athlete Abuse Litig.*, No. MDL 3077, 2023 WL 3828645, at *2 (J.P.M.L. June 5, 2023) (denying motion where "informal coordination of these actions is feasible and Section 1407 centralization is unnecessary" where "[t]he parties and the involved courts already have demonstrated they are willing to informally coordinate, as they implemented a staggered briefing schedule across the actions for motions to dismiss.").

Should the Panel deem that centralization is appropriate for the NAR Actions, it would not preclude the REBNY Actions from continuing course. Indeed, contrary to Plaintiffs' claim, precluding the REBNY Actions from centralization will not create a "significant" risk of inconsistent rulings because, as explained, rulings in the REBNY Actions will pertain exclusively to REBNY and will have no bearing on the NAR Actions. Parties may not use the centralization process "merely to avoid two [or more] federal courts having to decide the same issue." *In re Medi-Cal Reimb. Rate Reduction Litig.*, 652 F. Supp. 2d 1378, 1378 (J.P.M.L. 2009). Indeed, the REBNY Actions can and should be excluded from centralization. *See In re Covident Hernia Mesh Prods. Liabl. Litig.*, 481 F. Supp. 3d 1348, 1349 (J.P.M.L. 2020) ("[G]rant of centralization… does not guarantee that we will find centralization appropriate in another litigation alleging similar claims, and the Panel makes each of its decisions based on the circumstances presented by a particular litigation at the time.").[9]

---

[9] Nothing herein shall be deemed an admission, or a waiver of any defense by BHS in any current or future REBNY and/or NAR Actions pertaining to BHS (or any of its affiliates).

**<u>CONCLUSION</u>**

For the foregoing reasons, BHS respectfully requests that the Panel deny Plaintiffs' Motion for Transfer and Centralization Pursuant to 28 U.S.C. § 1407 for any current or future REBNY Actions.

Date:   January 26, 2024                           **SERPE LLC**

<u>/s/ Silvia L. Serpe</u>
 Silvia L. Serpe
 Kimberly L. Friedman
 16 Madison Sq. West, 10th Floor
 New York, NY 10010
 (212) 257-5010 (phone)
 (212) 981-2720 (fax)
 sserpe@serpellc.com

*Attorneys for Defendants Brown Harris Stevens Residential Sales, LLC and Halstead Manhattan, LLC*