**BEFORE THE UNITED STATES
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| In re: Real Estate Commission | ) | MDL No. 3100 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

---

**MEMORANDUM IN OPPOSITION TO MDL CENTRALIZATION
BUT, SHOULD CERTIFICATION BE GRANTED, IN FAVOR
OF MOVANTS' CHOICE OF THE WESTERN DISTRICT OF
MISSOURI AND JUDGE BOUGH**

---

**Knie & Shealy**
P.O. Box 5159
Spartanburg, S.C.  29304
Tel:  (864) 582-5118

*Counsel for Plaintiffs
Shauntel Burton and on
behalf of those similarly
situated*

January 26, 2024

## TABLE OF CONTENTS

TABLE OF CONTENTS                                                    i

TABLE OF AUTHORITIES.....................................ii,iii

BACKGROUND...................................................1

ARGUMENT.....................................................3

      I.    This Matter has not been Properly Served on
           the District Court for South Carolina.............3

      II.  Centralization is Not Appropriate.................4

           A.  Local Issues Dominate this Litigation.........5

           B.  National Discovery has Largely Been Completed..7

           C.  There Are Few Enough Cases that Coordination
              is Possible Without Centralization............8

           D.  The Panel Does Not Centralize Antitrust Cases
              as a Matter of Course........................10

      III. Should the Panel Decide to Centralize These Cases,
           It Should Centralize Those Requested by Movants in
           the Western District of Missouri...................11

           A.  The Panel Should Not Include *Nosalek, Moehrl,*
              *Batton I, Batton II, or Tuccori* in Any
              Centralization Order.........................11

           B.  The Northern District of Illinois is Not the
               Appropriate Transferee Court.................16

           C.  The Western District of Missouri is the
               Appropriate Transferee Court.................18

CONCLUSION..................................................19

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*In Re: Best Buy Co., Inc. Cal. Song.-Beverley
Credit Card Litig.*
        804 F.Supp.2d 1376 (J.P.M.L. 2011)....................5, 15

*In Re: Bank of America Fraudulent Account Litig.*
        2023 WL 8538726 (J.P.M.L. 2023)............................5

*In Re: Crest Sensitivity Treatment and Prot.
Toothpaste Mktg. And Sales Pract. Litig.*
        867 F.Supp.2d. 1348 (J.P.M.L. 2012).......................8

*In Re: Geico Security Breach Litig.*
        568 F.Supp.3d 1406 (J.P.M.L. 2021).......................8-9

*In Re: Transocean Ltd. Sec. Litig. (II)*
        753 F.Supp.2d 1373 (J.P.M.L. 2010).......................8-9

*In Re: Baby Food Mktg., Sales Pract. And Prods.
Liab. Litig.*
        544 F.Supp.3d 1375 (J.P.M.L. 2021).........................9

*In Re: Varsity Spirit Athlete Abuse Litig.*
        2023 WL 3828645 (J.P.M.L. 2023).........................9-10

*In Re: Direct Purchaser Plaintiff Beef Antitrust Litig.*
        609 F.Supp.3d 1412 (J.P.M.L. 2022)........................10

*In Re: Deere and Co. Repair Services Antitrust Litig.*
        607 F.Supp.3d 1350 (J.P.M.L. 2022)........................10

*In Re: Digital Advertising Antitrust Litig.*
        555 F.Supp.3d 1372 (J.P.M.L. 2021)........................10

*In Re: Inclusive Access Course Materials Antitrust Litig.*
        482 F.Supp.3d 1358 (J.P.M.L.2020)....................12, 13

*In Re: Insulin Pricing Litig.*
        2023 U.S. Dist. LEXIS 136067 (J.P.M.L., 2023).....13, 15, 18

*In Re: Future Motion, Inc. Prods. Liab. Litig.*
    2023 WL 8539210(J.P.M.L. Dec. 8, 2023)....................13

*Illinois Brick v. Illinois*
    431 U.S. 720 (1977).......................................14

*In Re: IBM Antitrust Litig.*
    328 F.Supp. 509 (J.P.M.L. 1971)..........................15

**Statutes and Rules**

Rule 4.1(b) Rules of Proc. Of J.P.M.L. .........................3

28 U.S.C. 1407(a)..............................................4

The Plaintiff, Shauntell Burton, by and through her attorneys, submits the following Memorandum in Opposition to MDL Centralization of *Shauntell Burton, and on behalf of those similarly situated, Plaintiffs, vs. National Association of Realtors, Keller Williams, LLC, and Keller Williams Realty, Inc., Defendants,* C/A No. 7:23-c05666-JD, U.S.D.C. South Carolina, Spartanburg Division.

### BACKGROUND

The United States real estate industry has been openly acting in an anti-competitive conspiracy for the last several decades.  A federal jury ruled on October 31, 2023 that the powerful National Association of Realtors and several other large brokerages had conspired to artificially inflate commissions paid to real estate agents, a decision that could radically alter the home buying process in the United States.

The N.A.R. is the largest professional organization in the United States.  It has more than $1 Billion Dollars in assets and owns the trademark to the word "Realtor."  The Kansas City lawsuit had a two pronged theory of liability.  First, the N.A.R. and Keller Williams, among other national real estate firms, have conspired to create a system that requires real estate agents to demand that the seller pay the buyer broker's commission.  Secondly, real estate commissions have become disproportionately inflated because the percentage commission for buyer brokers has

1

remained the same, despite the rising costs of homes and the advent of technology which make real estate sales much less time consuming and more efficient.  Each case for which centralization is sought argues essentially this premise and that this conduct violates the Section 1 of the Sherman Antitrust Act.

Each Complaint in the Movants' schedule of cases argues that the NAR, Keller Williams, and other members of the NAR accomplished their conspiracy by way of a rule the NAR calls the "clear cooperation rule."  It institutes this rule as part of the Multiple Listing Service, a geographically limited database of real estate listings generally run by the local NAR board of REALTORS. Without using this database, local real estate agents would not have access to the vast majority of real estate listings in a particular region.  For this reason, most homes are sold after having been listed in the local MLS.  The conspiracy is furthered by various other rules and a Code of Ethics promulgated by the NAR and assented to by the real estate brokerage conspirators.

The South Carolina class action in which Ms. Burton is a class representative was filed on November 6, 2023.  South Carolina is one of the hottest housing markets in the country and it is common for homes to sell for prices in excess of the listing price.

The Plaintiffs in *Gibson, et al. v. the National Association*

2

*of Realtors, et al.* And *Umpa v. National Association of REALTORs, et al.* moved before this panel on December 27, 2023 for transfers of seven (7) pending cases in other federal jurisdictions, arguing that centralization before Judge Bough in the Western District of Missouri would promote just and efficient conduct of these actions, reduce duplicative discovery, and conserve judicial and party resources.  For the reasons set forth below, Shauntell Burton, individually and on behalf of all South Carolinians affected by the anti-competitive conduct alleged, would respectfully show the Court the argument which follows:

**ARGUMENT**

**I.    This Matter has not been Properly Served on the District Court for South Carolina.**

Rule 4.1(b) of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation requires that

> The proof of service pertaining to motions for a transfer  ... pursuant to 28 U.S.C. § 1407 shall certify that counsel has transmitted a copy of the motion for filing to the clerk of each district court where an affected action is pending.

In this case, the proof of service filed with the Panel asserts that the "Clerk, District of South Carolina" was served by mail at the address 180 Magnolia Street Ste 500, Spartanburg, SC 29306.  (ECF 1-3 at 45).  That address is a courthouse in Spartanburg, but it is not the South Carolina Federal Courthouse for Spartanburg.  Indeed, even had it been, there is no clerk's

3

office at that location. Rather, the appropriate Clerk's Office would have been the Courthouse in Greenville, with a courtesy copy to Judge Dawson, located in Florence, South Carolina. Understanding that the lawyers who filed this motion may not be familiar with South Carolina's Federal Court system, undersigned's law partner wrote an email to Marc Seltzer and Eric Dirks, attached as Exhibit 1, informing them of their mistake on January 3, 2024.  When Undersigned served his Notice of Appearance with this Panel on the would-be transferor court, he was informed that there is no pending action on the that court's docket to which it could associate that Notice.

## II.  Centralization is Not Appropriate.

Section 1407 allows the Panel to transfer "civil actions involving one or more common questions of fact" to a district judge or judges for "coordinated or consolidated pretrial proceedings."  28 U.S.C. 1407(a).  28 U.S.C. 1407(a) goes on to require the Panel to determine that such transfer "is for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions."  In this case, it is unclear for whose convenience this transfer is sought other than the Plaintiffs moving for centralization. Further, there is no reason that these actions may not be conducted efficiently and justly in the districts in which they are pending.

Historically, the panel on multi-district litigation has

4

followed simple and well thought out guidelines in considering whether to centralize litigation to an MDL.  The panel has repeatedly emphasized that "centralization under Section 407 should be the last solution after considered review of all other options."  *In RE: Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litigation*, 804 F.Supp.2d 1376, 1378 (J.P.M.L. 2011).  See also most recently, *IN RE: Bank of America Fraudulent Account Litigation*, 2023 WL 8538726 (J.P.M.L. 2023).

As an initial matter, it is disingenuous to claim that the Plaintiffs in each of these cases overlap.  They do not. Only the national classes as defined by *Umpa* and *Gibson* overlap with any of the other actions.  Each other class limits its definition either to those who listed in a particular state or those who listed on a particular MLS or MLSs.[2]


A.   **Local Issues Dominate this Litigation.**

While it is true that there are substantial common issues between these cases, in each case other than the putative national class cases those issues must be viewed within the geographical limitations of each complaint.  The conspiracy, in other words, while formulated and directed at a national level, was largely carried out within each MLS.  Each Multiple Listing

---

[2]*Grace* comp. ¶ 115.  *Phillips* comp. ¶ 147 with reference to a definition on p. 2.  *QJ Team* comp. ¶¶ 96-97.  *Burton* comp. ¶. *March* ¶ 112.

Service was responsible for enforcing the clear cooperation rule. Each franchisee of the national brokerage firms was responsible for ensuring that the training and direction provided to them by the franchisor was implemented.  There are substantial numbers of unnamed co-conspirators in every MLS that are unaffiliated with any of the national brands named in either the *Gibson* or *Umpa* case.

Further, real estate is licensed on a state-to-state basis and rarely do these markets overlap.  Real estate professionals may be licensed in multiple states, but that is the exception rather than the rule.  Agents are rarely knowledgeable outside of the area in which they are licensed and may be knowledgeable in even smaller subdivisions of a particular state.  Because of this, fact witnesses are unlikely to overlap between these cases. It certainly would not be convenient for fact witnesses for South Carolina's real estate market to have to testify anywhere other than South Carolina.  These local witnesses would likely lack the resources that NAR and the large franchisors have to travel and/or create the digital information sharing networks.

Beyond just fact witnesses, there is likely to be a great deal of other local discovery, to include third party discovery, that must be undertaken for each of these cases.  Experts will need to be familiar with each MLS for which they are asked to render an opinion and it is a fool's errand to ask a common

expert to be familiar with each of the 600 or so MLSs in the country.  Experts will need to be familiar with each MLS to render an opinion on damages caused by the conspiracy, as well as whether the participants in that MLS carried out the conspiracy.

Movants have not explained how they can overcome the local nature of these cases to promote the just and efficient conduct of the pretrial matters of each case in a centralized fashion.

**B.  National Discovery has Largely Been Completed.**

To the extent that there is national discovery, nearly all of it has been previously accomplished in the *Burnett* case. Much, if not most, of the discovery that would be taken in a clean sheet proceeding would be accomplished simply by unsealing those Memoranda and supporting documents regarding the motions for summary judgment filed in that case.  Further, many of the national figures, like Mr. Keller of Keller Williams and Mr. Goldberg of the National Association of REALTORS, testified in the trial of the *Burnett* case. The national discovery ground has largely been plowed.  Because of this, most of, if not all of, the discovery rulings will be regarding the local discovery discussed above.

To the extent national discovery needs to be done, there are not so many lawyers involved that informal or formal cooperation cannot be had.  Indeed, those Plaintiffs not involved in moving for this motion have accomplished a weekly meeting to coordinate

7

opposition, though the fruit of that labor remains to be seen. This meeting, with the inclusion of the other counsel moving for centralization, can continue for the foreseeable future.

These cases are in the same position that those litigants in *In Re: Crest Sensitivity Treatment and Prot. Toothpaste Mktg. And Sales Practices Litig.*, 867 F.Supp.2d 1348 (J.P.M.L. 2012) would have found themselves in had two of the cases been stayed in favor of a third going forward. In that case, the Panel pointed out that, if the three cases for which a request for centralization had been made simply could not effectively coordinate their discovery efforts, two of the Courts could stay their proceedings and allow a third to go forward.  That would allow most of the common discovery to be had and then the local discovery for each of the other cases could be had.  Here, *Burnett* has accomplished that, eliciting hundreds if not thousands of pages of documents and testimony.


### C.    There Are Few Enough Cases that Coordination is Possible Without Centralization.

The number of total cases here, 9, is historically minimal for centralization.  Where only a minimal number of cases is involved, the proponent of centralization bears a heavier burden to demonstrate that centralization is appropriate.  *In Re: Geico Customer Data Security Breach Litigation*, 568 F.Supp.3d 1406 (J.P.M.L. 2021), see also, *In Re: Transocean Ltd. Sec. Litig.*

*(II)*, 753 F.Supp.2d 1373, 1374 (J.P.M.L. 2010).

In so ruling, the Panel further commented: "In the circumstances presented here, informal coordination among the small number of parties and involved courts appears imminently feasible." *Geico*, at 1407.

As pointed out above, Plaintiff's counsel in the seven (7) cases impacted have all been coordinating their efforts in a positive fashion with weekly zoom meetings since notified of the Motion seeking centralization. Speaking at least for the South Carolina litigation, this cooperation has been extremely effective and would be valuable in planning coordinated discovery going forward. In *In re: Baby Food Marketing, Sales Practices and Products Liability Litigation*, 544 F.Supp.3d 1375, 1378 (J.P.M.L. 2021), the Panel denying centralization stated "we believe it is better to allow the parties attempts to self-organize play out before centralizing any part of this litigation." The Panel went on to say "if alternate means of informal coordination and cooperation are ineffective with respect to any actions that remain outside the defendant's home district, the parties at any time may pursue a more focused request for centralization." *Id.*.

We believe that the defendants in the *Burton* case, at least, as well as the seven (7) plaintiffs in the lawsuits which are sought to be centralized, oppose centralization. This Panel In Re *Varsity Spirt Athlete Abuse Litigation*, 2023 WL 3828645

(J.P.M.L. 2023), commented "we have found persuasive that of the responding parties those who would most be affected by centralization...do not believe that centralization would be beneficial.".

### D. The Panel Does Not Centralize Antitrust Cases as a Matter of Course.

While Movants are correct when they argue that the Panel often centralize antitrust actions, the Panel often does not.  Further, of the three cases to which the Movants point the Panel, in only one was centralization a contested issue.  Both *In Re: Direct Purchaser Plaintiff Beef Antitrust Litig.,* 609 F.Supp.3d 1412 (J.P.M.L. 2022)*, and In Re: Deere and Company Repair Services Antitrust Litig.*, 607 F.Supp.3d 1350 *(*J.P.M.L. 2022), all parties consented to the centralization, with the only issue being the district in which it should be centralized. While the Panel may centralize a case over unanimous objection of the litigants, that is an exceptionally rare occurrence. Centralization was certainly hotly debated in *In Re: Digital Advertising Antitrust Litig.*, 555 F.Supp.3d 1372 (J.P.M.L. 2021), but in finding for centralization, the Panel focused on the third-party discovery that was likely going to be required of Facebook in that case, common discovery, and the number of Plaintiff's counsel.  All of these issues, as discussed above, militate against centralization because the discovery issues that

10

may arise are largely unique to each case, rather than for
centralization.

### III. Should the Panel Decide to Centralize These Cases, It Should Centralize Those Requested By Movants in the Western District of Missouri.

The Plaintiff in *Burnett* would prefer to remain in South
Carolina, where she was injured, and Undersigned believes that
there are substantial reasons not to centralize these cases, as
argued above.  Should the Panel choose to centralize these cases,
however, the Western District of Missouri is the logical District
and Judge Bough is the logical judge before whom these cases
should be put.  Further, the Panel should not include *Nosalek v.
MLS Prop. Info. Network, Inc.*, 20-cv-12244 (D. Mass. Dec. 17,
2020)*, Moehrl v. Nat'l Ass'n of Realtors*, 19-cv-1610 (N.D. Ill.
Mar. 6, 2019), *Batton v. Nat'l Ass'n of Realtors*, 21-cv-430 (N.D.
Ill. July 6, 2022), *Batton v. Compass, Inc.*, 23-cv-15618 (N.D.
Ill. Nov. 2, 2023), and *Tuccori v. At World Props.*, 24-cv-150
(N.D. Ill. Jan. 5, 2024) in any order centralizing these cases.

### A.   The Panel Should Not Include *Nosalek, Moehrl, Batton I, Batton II,* or *Tuccori* in Any Centralization Order.

In its brief, the National Association of REALTORS argues
that the Movants have failed to include related cases that should
be included in any centralization motion.  Those cases should not

be included.

    *Nosalek v. MLS Prop. Info. Network, Inc.*, 20-cv-12244 (D.
Mass. Dec. 17, 2020) and *Moehrl v. Nat'l Ass'n of Realtors*,
19-cv-1610 (N.D. Ill. Mar. 6, 2019) are in vastly different
procedural postures than the newly filed cases generally before
this Panel.  Both cases have proceeded past motions to dismiss
and are presently briefing summary judgement.  Undersigned has no
reason to disbelieve the NAR's assertion that that briefing is
due in *Nosalek* in June, 2025 or that *Moehrl's* briefing is due
sometime after April of this year.  However, most of the
presently filed cases are well behind that schedule.  To require
*Nosalek* and *Moehrl* to stop in their tracks while these other
cases catch up, likely to be a years long process, is absurd.

    NAR relies on *In re Inclusive Access Course Materials
Antitrust Litig.*, 482 F. Supp. 3d 1358, 1359 (J.P.M.L. 2020) to
argue that the Panel has before centralized case in different
procedural postures.  In *Inclusive Access*, Plaintiffs sought to
avoid centralization by arguing one of the related cases, *Campus
Book*, was procedurally more advanced than the other cases.
However, it was procedurally advanced only in that it had been
filed one and a half months prior to the first of the consumer
actions and motions to dismiss were already pending.  Brief of
Plaintiff Kaitlyn Belen, *In re: Inclusive Access Course Materials
Antitrust Litig.*, MDL No. 2946 at ECF 15, p. 8.  This naturally

led the Panel to conclude that *Campus Book* was very "marginally more advanced" than those other suits.  *In re: Inclusive Access Course Materials Antitrust Litig.*, 482 F.Supp.3d 1358, 1359 (J.P.M.L. 2020).  NAR then cites *In re Insulin Pricing Litig.*, 2023 U.S. Dist. LEXIS 136037,(J.P.M.L. Aug. 4, 2023) and *In re Future Motion, Inc. Prods. Liab. Litig.*, 2023 WL 8539210 (J.P.M.L. Dec. 8, 2023), both of which are not applicable here. *Insulin Pricing*, as pointed out in the NAR's explanatory parenthetical, did not take a position on whether the much earlier filed insulin pricing cases should be included in the MDL formed.  Here, NAR is asking the Panel specifically to include the much earlier filed case.  The Panel in *Future Motion,* in consolidating three much earlier filed cases, points out that "notably, however, all parties to these three actions — which are significantly more advanced than *Russo* — support centralization." *Future Motion* at *2.  The Panel went on to point out that there were common experts between the parties and that centralization would "eliminate inconsistent rulings on evidentiary and dispositive motions." *Id.*  The same efficiencies do not lie here as no experts have been named in these three month old cases.

    *Batton v. Nat'l Ass'n of Realtors*, 21-cv-430 (N.D. Ill. July 6, 2022) *(Batton I)* also is in a procedurally advanced posture than was seen in *Inclusive Access*.  It has been dismissed previously and a motion to dismiss the amended complaint has been

13

pending before Judge Wood for a year.  While an order may be forthcoming soon, it is not clear when that will be or whether that order will again rely on *Illinois Brick*, a case that has no bearing on the vast majority of the suits currently pending. Further, at a status conference in *Batton I* held on January 25, 2023, prior to *Batton II's* filing, Judge Wood pointed out the disparate procedural postures of *Batton I* and a case that appeared to be *Moerhl*, saying "this is a related case to another case that's on a very different track in terms of stage of the case" and that, at that time, she saw no "benefit to trying to coordinate the hearings themselves in the two cases."  Transcript of Proceedings, ECF 103 at pp. 7-8, *Batton v. Nat'l Ass'n of Realtors*, 21-cv-430 (N.D. Ill. Jan. 25, 2023).  The Judge in front of whom NAR has moved to centralize this case does not believe that *Moehrl* and *Batton I* should be coordinated, or did not in January, 2023.  This view presumably would extend to the later filed cases to be centralized.  *Batton I* is, at this point, two years old.

The factors for transfer of *Tuccori v. At World Props.*, 24-cv-150 (N.D. Ill. Jan. 5, 2024) and *Batton v. Compass, Inc.*, 23-cv-15618 (N.D. Ill. Nov. 2, 2023) are ambivalent and so transfer should not occur, since, as pointed out above "centralization under Section 407 should be the last solution after considered review of all other options."  *Best Buy Co.,*

14

*Inc.* at 1378 (J.P.M.L. 2011).   *Tuccori* is a class action brought by an Illinois resident against an Illinois Defendant.   NAR is not presently a party to that suit, though it is referred to as a co-conspirator and its rules are the basis for the suit.   *Tuccori* would not benefit from consolidation or coordination.   While there may be some overlapping class or discovery, the sole defendant is not named in any other suit.   The Panel has historically been concerned about forcing a party into an MDL when its necessary discovery is substantially more limited than the cases with which it would be consolidated.   *In Re: IBM Antitrust Litigation,* 328 F.Supp. 509, 510 (J.P.M.L. 1971).

Given the familiarity that Judge Wood has with the course of conduct of *Batton I*, as well as the fact that a motion to dismiss is presently pending before her in that case that may well be dispositive of the theories advanced in *Batton II*, it would be a mistake to remove it from her docket. As pointed out in *Insulin Pricing*, there is value in putting cases where the Judge is most familiar with the issues.   *Batton II* appears to be more or less a carbon copy of *Batton I*, but with different defendants.   As such, given transfer of *Batton I* would be inappropriate as discussed above, it would be more beneficial from a judicial economy standpoint to keep this home buyer action in the same district as the other home buyer action.

**B.    The Northern District of Illinois is Not the Appropriate Transferee Court.**

As argued above, consolidation of the Northern District of Illinois actions are not indicated in this present MDL motion. The Northern District of Illinois is not an appropriate transferee court.

While the NAR's headquarters, and thus a great deal of the discovery, is located in Chicago, NAR's desire to locate the MDL in Chicago stems much more from parochial interests than reasonable discovery access.  Transfer to the Western District of Missouri does not require that depositions must be held in Kansas City or that paper discovery must be flown there.  Represented by White and Case in this matter, one of the largest and most well respected law firms with offices around the world, NAR asks the court to forget the digital world in which we presently live. Its argument that the location of digital documents matter evokes the long past era of the document warehouse.  NAR certainly has the ability to create a digital reading room in which discovery is accessible from anywhere in the world at any time of day.  NAR will likely do this to reduce its own litigation costs regardless of the location of the MDL. Depositions can be held over videoconference, at the office of White & Case in Chicago, which is large enough for 49 attorneys, or at the NAR's headquarters at 430 N. Michigan Avenue in Chicago.

Many of the other Defendants are not located in the Northern

16

District of Illinois.  The conspiracy complained of is far flung,
possibly promulgated in Illinois but directed from cities and
towns throughout the nation. Most of the current Plaintiffs are
located elsewhere, as well.  As argued in the second section of
this brief, most of the discovery in these actions is likely to
take place in many states where no one will propose
centralization - this litigation is unlikely to go to Florence,
South Carolina, where Plaintiff's case is presently.  There will
likely be discovery and depositions in every state of the Union
and, while NAR's discovery obligation may be the single largest,
it is unclear that the total discovery burden in Illinois will be
the largest.  It very well could be that Texas's or California's
burden, shared amongst the various Plaintiffs and Defendants,
will be the largest. In this circumstance, where the discovery
burden for all the litigants is likely to be high and spread
rather evenly over the country, one can not get much more central
than the Western District of Missouri.  This is particularly
important to many of the smaller Defendants and Plaintiffs given
that they do not have the resources of the NAR.

Further, Judge Wood and Judge Sarris, known around the
country as excellent, respected, and thorough Judges,
respectfully do not have the same depth of experience with the
issues presented here that Judge Bough has.  Certainly either is
quite capable of presiding over an MDL, but neither have yet

17

dealt with summary judgment, *Daubert*, or evidentiary issues in these NAR cases. Judge Bough has.

### C. The Western District of Missouri is the Appropriate Transferee Court.

While the NAR is correct when it pedantically points out that the *Burnett* case is currently in its post trial phase and so is not eligible for consolidation, it fails to reckon with the fact that Judge Bough has guided a lawsuit that is very similar to the ones presently before the Panel to a jury verdict and done so quite expeditiously. As NAR repeatedly points out, *Burnett* was the second filed case, yet it cleared summary judgement in July, 2022, while *Moerhl* does not yet have a date for briefing for summary judgment to finish, though it apparently will not be before April, 2024.

NAR further evidences a great deal of concern for the possibility of inconsistent rulings if all of these cases are not centralized before Judge Wood. Given that many of the same rulings that will be required in the Movants's cases have already been made in *Burnett* by Judge Bough, centralization in front of any other judge would not ameliorate the risk of inconsistent rulings. The teaching in *Insulin Pricing* is that, even where a case can not or may not be included in an MDL, a judge's experience with the issues present in the MDL should be leveraged. While certainly Judge Wood and Judge Sarris have experience in these issues, Judge Bough has more. He has

presided over a tried case, making all of the necessary rulings in that tried case.  He is presently presiding over a settlement. As such, he is best positioned to handle this case in a way consistent with the handling of *Burnett*.

As to Judge Bough's presently pending MDL, one of the constituent cases is apparently scheduled for trial August 24, 2024 in front of him.  Even should that date slip, that MDL will likely be disposed of, either by settlement or remand for trial, soon enough that it would not be an impediment to Judge Bough's ability to devote sufficient time and resources to this MDL. Indeed, that Judge Bough has been able to move so expeditiously on *In re: Smitty's/Cam2 303 Tractor Hydraulic Fluid Marketing, Sales Practices and Products Liability Litigation* after having received the MDL weighs in favor of selecting him as the transferee judge.

<u>**CONCLUSION**</u>

For all the foregoing reasons, the Plaintiff Shauntell Burton opposes the centralization of these cases, but believes that, should centralization be granted, the proper transferee court would be Judge Bough of the Western District of Missouri.

**Signature Page to Follow**

19

KNIE & SHEALY

*/s/ Patrick E. Knie*
Patrick E. Knie
Federal I.D. No. 2370
P.O. Box 5159
250 Magnolia Street
Spartanburg, S.C.  29304
Telephone No.  (864) 582-5118
Telefax No.    (864) 585-1615

January 26, 2024

20