# BEFORE THE UNITED STATES
# JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| IN RE: REAL ESTATE COMMISSION ) | MDL No. 3100 |
| ANTITRUST LITIGATION ) | |
| ) | |
| ) | |

## ERRATA

I, WENDELYNNE J. NEWTON, hereby declare as follows:

1. I am the attorney of record for Defendant West Penn Multi-List, Inc. ("WPML") in *In re: Real Estate Commission Antitrust Litigation*, MDL No. 3100. I am fully qualified to practice and in good standing in the Commonwealth of Pennsylvania. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2. On January 26, 2024 at approximately 6:36 p.m. Eastern Standard Time ("EST"), I filed before the Judicial Panel on Multidistrict Litigation (the "Panel") a document captioned "Response of Defendant West Penn Multi-List Inc. Opposing Plaintiffs' Motion for Transfer and Centralization Pursuant to 28 U.S.C. § 1407" (the "Opposition").

3. At approximately 9:00 p.m. EST, counsel for Plaintiffs in *SPRING WAY CENTER, LLC et al v. WEST PENN MULTI-LIST, INC. et al*, Docket No. 2:23-cv-02061 (W.D. Pa., Dec 4, 2023) filed an Amended Complaint (Doc. 30).  A true and correct copy of the Amended Complaint is attached hereto as **Exhibit A**.

4. The new operative Amended Complaint in *Spring Way* (now captioned as *Kay, et. al., v. West Penn Multi-List et. al.*) (hereinafter "the WPML case") has rendered certain statements in the Opposition inaccurate.  This Errata corrects those statements.

5. On Page 1, the Opposition states that WPML is one of five remaining defendants in the WPML case.  With the filing of the Amended Complaint, there are now a total of twelve defendants including WPML.

**6.** On pages 1 and 5, the Opposition states that the WPML case is the only case in which WPML and the remaining Pennsylvania defendants are named.  With the filing of the Amended Complaint, Howard Hanna Company is now named in the WPML case, and is also named in another suit tagged for consolidation (W.D. Missouri, No. 4:23-cv-00788-SRB).  **Ex. A ¶¶ 1, 23.**

7.  On page 4, the Opposition states that *March*, *Phillips*, *Grace*, *QJ Team* and *Martin* also include state law claims that cannot be applied to parties in any of the other cases.   The Amended Complaint now alleges a state law claim against WPML and its co-defendants under the Pennsylvania Consumer Protection Law (73 P.S. §§ 210-1 *et seq.*), and therefore the WPML case should be added to that list.  **Ex. A at ¶¶ 134-140.**

8.  On pages 5-6, the Opposition discusses how WPML rules differ from NAR rules but acknowledges that the plaintiffs in the WPML case do suggest that WPML rules "flow from" or are "similar to" the NAR rules.  The Amended Complaint materially changes those allegations because it focuses on WPML rules and removes some of the allegations that WPML rules "flow from" NAR Rules.  **Ex. A at ¶ 68.**  In this Amended Complaint, Plaintiffs include new allegations that:

> i.    NAR's rules are only mandatory for MLSs owned and/or controlled by state or local REALTOR associations.  (**Ex. A. at ¶ 3**).
>
> ii.   WPML itself is not owned or controlled by any state or local REALTOR association.  (**Ex. A ¶ 4**).
>
> iii.  The relevant geographic market is "no broader than the geographic area covered by the West Penn MLS" and "[t]he residential real estate business is inherently local" (**Ex. A. ¶¶ 95-108**).

**9.** On pages 10-11, the Opposition discusses Judge Wiegand's qualifications.  Following the filing of the Amended Complaint in the WPML case, Judge Wiegand recused herself.  **Ex. B.**

10. On page 11, the Opposition identifies defendants in the nine cases the Missouri Plaintiffs seek to be consolidated that are headquartered in the Pittsburgh area and incorporated in Pennsylvania.  In addition to the six defendants identified (WPML, Hanna Holdings, Pirain

Enterprises, Inc., MHDM LLC, SF, LLC and Realty One Group Horizon), there are now five additional defendants in the WPML case—River Point Realty, LLC, Bovard-Anderson Co., Priority Realty, LLC, Rubinoff Realty Services, LLC and Fount It PA, LLC—that are either headquartered, formed and/or with a principal office in Western Pennsylvania. **Ex. A. ¶¶ 28-32.**

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on January 29, 2024, in Pittsburgh, Pennsylvania.

Dated: January 29, 2024                    */s/ Wendelynne J. Newton*

Wendelynne J. Newton
Buchanan Ingersoll & Rooney PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA  15219-4413
Telephone (412)-562-8932
Facsimile (412) 562-1041
wendelynne.newton@bipc.com

Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIELLE and JESSIE KAY; and JOHN and NANCY MORATIS, | Civil Action No. 2:23-cv-02061-CCW |
|      Plaintiffs, | Judge Christy Criswell Wiegand |
| v. | |
| WEST PENN MULTI-LIST, INC; EVEREST CONSULTING GROUP LP (d/b/a Berkshire Hathaway HomeServices The Preferred Realty); HOWARD HANNA COMPANY (d/b/a Howard Hanna); REEDSTONE, INC. (f/k/a Pirain Enterprises, Inc.) (d/b/a NextHome PPM Realty); MHDM LLC (d/b/a Realty ONE Group Gold Standard); SF, LLC (d/b/a Realty ONE Group Platinum); REALTY ONE GROUP HORIZON, LLC, RIVER POINT REALTY, LLC; BOVARD-ANDERSON CO.; PRIORITY REALTY, LLC; RUBINOFF REALTY SERVICES, LLC (d/b/a Rubinoff Realty); and FOUND IT PA, LLC, | **JURY TRIAL DEMANDED** |
|      Defendants. | |

## AMENDED CLASS ACTION COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15(a), Plaintiffs, Danielle and Jessie Kay and John and Nancy Moratis, through undersigned counsel, file this Amended Class Action Complaint on behalf of themselves and all similarly situated individuals and state as follows:

## NATURE OF THE ACTION

1. Defendants are West Penn Multi-List, Inc. ("West Penn MLS") and several real estate brokerages operating in western Pennsylvania, namely: Everest Consulting Group LP (d/b/a Berkshire Hathaway HomeServices The Preferred Realty); Howard Hanna Company (d/b/a Howard Hanna); Reedstone, Inc. (f/k/a Pirain Enterprises, Inc.) (d/b/a NextHome PPM Realty); NextHome Dynamic, Inc.; MHDM LLC (d/b/a Realty One Group Gold Standard); SF LLC (d/b/a

1

Realty One Group Platinum); Realty One Group Horizon, LLC; River Point Realty, LLC; Bovard-Anderson Co.; Priority Realty, LLC; Rubinoff Realty Services, LLC; and FOUND IT PA, LLC (collectively, the "Broker Defendants").

2.      Plaintiffs, individuals who sold residential real estate that was listed on West Penn Multi-List, Inc.'s ("West Penn MLS") multiple listing service ("MLS") during the past four years, bring this action against Defendants for agreeing, combining, and conspiring to impose and enforce rules and practices in the western Pennsylvania residential real estate market that force home sellers to pay artificially inflated commissions on the sale of their homes, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("CPL"), 73 P.S. §§ 201-1, *et seq*.

3.      Although these rules and practices trace their inspiration to rules and practices promulgated by the National Association of REALTORS ("NAR") for multiple listing services—which have been found to violate federal antitrust law—NAR's rules are only mandatory for MLSs owned and/or controlled by state or local REALTOR associations.

4.      Thus, while many (if not all) of West Penn MLS's officers and directors have some association with NAR, West Penn MLS itself is not owned or controlled by any state or local REALTOR association.  West Penn MLS and its subscribers/members, therefore, were not required to implement the rules and practices at issue in this action.

5.      Defendants have nevertheless adopted, participated in, and enforced their own version of the Buyer Broker Commission Rule. Together with the rules and practices that support its implementation and enforcement, the Rule amounts to a scheme to fix the price for buyer broker services at a supra-competitive level.

6.      This state of affairs is manifestly anticompetitive because, among other things, it effectively compels the seller to compensate the broker representing the purchaser even though that broker should be working for the purchaser, not the seller; it mandates a "blanket offer," meaning that the same compensation must be offered to every buyer's broker, regardless of skill, experience, or the services provided; and it has the effect of encouraging "steering" by buyer-brokers, because it incentivizes them to direct their clients to properties with higher commission offers.

7.      As a result, home sellers generally pay between 5-6% of the total sale price of their home in broker commissions—although total commissions in western Pennsylvania range as high as 7%—with the seller's broker (the "Listing Broker") and the purchaser's broker (the "Buyer Broker") typically splitting the commission.

8.      In developed markets outside the United States, purchasers compensate their own brokers (if they use one at all), typically paying less than half the rate paid to buyer brokers in the U.S.  For example, according to the Executive Director of the Consumer Federation of America, total commission rates in "a number of developed countries" range "between 1% and 4%" yet commissions in the U.S. remain fixed between 5% and 6%, which is "no lower than it was in 2001."[1]

9.      Indeed, a 2015 report, commissioned by NAR to study negative emerging trends in the real estate industry, highlighted concerns that total commissions in the United States are inflated compared to international markets, such as the United Kingdom, Singapore, the

---

[1]   FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_ segment_3.pdf.

Netherlands, Australia, and Belgium. According to this report, in those countries the average total commissions ranges between 1% and 3%.[2]

10.     Furthermore, these inflated commissions have persisted despite technological advances—principally the development of readily accessible, public-facing websites that make it easier for home buyers to find properties, thereby significantly reducing the traditional utility of a Buyer Broker—that would reasonably have been expected to lower costs.

11.     As noted above, Defendants' anticompetitive practices are not unique--as they represent western Pennsylvania's local version of collusive practices that are widespread within the residential real estate industry. Recently, a federal jury in *Burnett, et al. v. The National Association of Realtors, et al.*, 4:19-cv-00332-SRB (Western District of Missouri), found that rules, policies, and practices similar in both design and effect to those at issue here violated federal antitrust law. The jury in *Burnett* imposed a historic ten-figure judgment on the defendants.

12.     Like the defendants in *Burnett*, Defendants' conduct unlawfully restrains trade and competition, harms home sellers in the form of inflating the cost of selling a house (therefore eating into the equity a seller may have accrued in his or her property), and is, therefore, violative of federal antitrust law.

13.     For these violations, Plaintiffs seek treble damages under federal antitrust law, Pennsylvania's CPL, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees. Plaintiffs demand a trial by jury on all issues so triable.

---

[2] Swanepoel Group, D.A.N.G.E.R Report, at 22 (definitive analysis of negative game changers emerging in real estate) (2015). The report also suggests that total commissions in Germany range between 3% and 6%.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over Plaintiffs' antitrust claim pursuant to 28 U.S.C. § 1331 because Plaintiffs' claim arises under the laws of the United States, specifically the Sherman Antitrust Act, 15 U.S.C. § 1.

15.     The Court also has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d) because the proposed class comprises more than 100 persons, the total amount in controversy exceeds $5 million, and at least one member of the class is a citizen of a state different from Defendants.

16.     The Court also has subject matter jurisdiction over Plaintiffs' state-law CPL claims under 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' antitrust claims, over which the Court has original jurisdiction, as to form part of the same case or controversy under Article III of the U.S. Constitution.

17.     This Court has personal jurisdiction over Defendants, each of which maintains offices in Pennsylvania and conducts significant business within the Commonwealth and this District.

18.     Venue is appropriate in this District because Defendants maintain offices and places of business in western Pennsylvania, which includes this District; all of the real estate transactions that form the basis for this Complaint occurred in this District; and most of the class members reside in this District.

## PARTIES

**Plaintiffs**

19.     Plaintiffs Danielle and Jessie Kay are residents and citizens of Pennsylvania. They sold a house located in Baden, Pennsylvania, on or about December 14, 2021. The Kays used Realty ONE Group Gold Standard as their listing broker. The Kays' listing agreement, as amended,

5

provided for a total commission of 5% on the sale of their home, with 3% earmarked to compensate a broker representing the purchaser.

20.     Plaintiffs John and Nancy Moratis are residents and citizens of Pennsylvania. They sold a house located in Rockwood, Pennsylvania, on or about December 3, 2021. The Moratis's used Berkshire Hathaway HomeServices The Preferred Realty as their listing broker. The Moratis's listing agreement provided for a total commission of 7% on the sale of their home, with 3.5% earmarked to compensate a broker representing the purchaser.

**Defendants**

21.     Defendant West Penn Multi-List, Inc. ("West Penn MLS") is a Pennsylvania membership corporation with its principal place of business at 8980 Perry Highway, Pittsburgh, Pennsylvania 15237. West Penn MLS is a corporation comprising thousands of real estate professionals based in the Pittsburgh metropolitan area and surrounding counties, including Allegheny, Armstrong, Beaver, Butler, Washington, Westmoreland, Clarion, Crawford, Fayette, Greene, Indiana, Lawrence, Mercer, Somerset, Venango and Erie (the "Service Area").

22.     Defendant Everest Consulting Group LP (d/b/a Berkshire Hathaway HomeServices The Preferred Realty) is a Pennsylvania limited partnership and licensed real estate brokerage operating within the western Pennsylvania region. Everest (under its d/b/a) and/or the brokers and agents it employs in the region are members of and/or participants in the West Penn MLS. Everest Consulting Group LP's principal office is located at 9840 Old Perry Highway, Wexford, PA 15090.

23.     Defendant Howard Hanna Company (d/b/a Howard Hanna) is a Pennsylvania corporation and licensed real estate brokerage operating within the western Pennsylvania region. Howard Hanna and/or the brokers and agents it employs in the region are members of and/or

participants in the West Penn MLS. Howard Hanna maintains a registered office at 1090 Freeport Road, Pittsburgh, PA 15238.

24.     Reedstone, Inc. (f/k/a Pirain Enterprises Inc.) (d/b/a NextHome PPM Realty) is a Pennsylvania corporation and licensed real estate brokerage operating within the western Pennsylvania region. Reedstone, Inc. (under its d/b/a) and/or the brokers and agents it employs in the region are members of and/or participants in the West Penn MLS. NextHome PPM Realty principal office is located at 1308 Peermont Avenue, Pittsburgh, PA 15216. Reedstone, Inc. maintains a registered office at 333 Old Lesnett Road, Pittsburgh, PA 15241.

25.     MHDM LLC (d/b/a Realty ONE Group Gold Standard) is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. MHDM LLC, along with the brokers and agents it employs in the region, are members of and/or participants in the West Penn MLS. MHDM LLC maintains an office at 11171 Perry Highway, Wexford PA, 15090.

26.     SF, LLC (d/b/a Realty ONE Group Platinum) is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. SF, LLC, along with the brokers and agents it employs in the region, are members of and/or participants in the West Penn MLS. SF, LLC maintains an office at 427 Cochran Road, Pittsburgh, PA 15228.

27.     Realty ONE Group Horizon, LLC is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. Realty ONE Group Horizon, LLC, along with the brokers and agents it employs in the region, are members of and/or participants in the West Penn MLS. Realty ONE Group Horizon, LLC, maintains an office at 3731 William Penn Highway, Murrysville, PA 15668.

28.     River Point Realty, LLC is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. River Point Realty, LLC, along with the brokers and agents it employs in the region, are members of and/or participants in the West Penn MLS. River Point Realty, LLC, maintains a principal office at 7112 Church Avenue, Pittsburgh, PA 15202.

29.     Bovard-Anderson Co. is a Pennsylvania corporation and licensed real estate brokerage operating within the western Pennsylvania region. Bovard-Anderson Co., along with the brokers and agents it employs in the region, are members of and/or participants in the West Penn MLS. Bovard-Anderson Co. maintains a principal office at 617 Third Street, Beaver, PA 15009.

30.     Priority Realty, LLC is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. Priority Realty LLC, along with the brokers and agents it employs in the region, are members of and/or participants in the West Penn MLS. Priority Realty, LLC, maintains a principal office at 2940 South Park Road, Bethel Park, PA 15102.

31.     Rubinoff Realty Services, LLC (d/b/a Rubinoff Realty) is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. Rubinoff Realty Services, LLC along with the brokers and agents it employs in the region, are members of and/or participants in the West Penn MLS. Rubinoff Realty Services, LLC maintains a principal office at 925 Liberty Avenue, Pittsburgh, PA 15222.

32.     Fount It PA, LLC, is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. Fount It PA, LLC along with the brokers and agents it employs in the region are members of and/or participants in the West

Penn MLS. Found It PA, LLC maintains a principal office at 5362 Steubenville Pike, McKees Rocks, PA 15136. CT Corporation System is Found It PA, LLC's registered agent, and maintains an office at 600 N. 2nd Street, Suite 401, Harrisburg, PA 17101.

33.     Each of the named Defendants is a subscriber to West Penn MLS and does a significant amount of business in this District.

**Co-Conspirators**

34.     In addition to the named Defendants, realtor associations in the western Pennsylvania region (including, among others, the Pennsylvania Association of Realtors and the Realtors Association of Metropolitan Pittsburgh) and other brokerages operating within that geographic area, among others, participated as co-conspirators in the violations alleged in this Complaint.

35.     These co-conspirators participated in the violations by, for example, agreeing to, complying with, and enforcing the Buyer Broker Commission Rule.

36.     Defendants are jointly and severally liable for the acts of their co-conspirators whether or not those co-conspirators are named as defendants in this Complaint.

## FACTUAL ALLEGATIONS

**Real Estate Industry Background**

37.     Real estate brokers play an important role in the residential real estate market, facilitating transactions by marketing properties listed for sale, helping buyers find properties, assisting with negotiations, and the like.

38.     Most brokers and their individual realtors or agents do not work exclusively with buyers or sellers; that is, a broker/agent may act as the seller broker in some sales and act as the buyer broker in others.

39.     According to a survey published by the National Association of Realtors ("NAR") in 2022, about 90% of sellers used a real estate broker when selling their home, while 87% of home buyers engaged a broker to assist in the buying process.[3]

40.     In typical residential real estate transactions, real estate brokers and agents receive compensation through commissions that are calculated as a percentage of a home's sale price, and the commissions are paid when the home sells.

41.     The seller broker's compensation is set forth in the listing agreement, which is a contract between the seller and his/her/their broker that includes the terms of the listing—for example, how long the broker retains the exclusive right to market the property, the listing price, etc.

42.     Due to the Buyer Broker Commission Rule, in addition to setting forth the total commission to be paid on the sale of the property, the listing agreement will also authorize the listing broker to "cooperate" with other brokers, in relevant part by making a blanket, unilateral offer of compensation to a broker who (a) represents the buyer and (b) is a member of a multiple listing service.

43.     If a buyer retains a broker, the buyer also enters into a contract with that broker. The contract typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker. In fact, until only very recently, a standard of conduct in NAR's Code of Ethics long permitted buyer brokers to inform their clients that their services were being provided free of charge—an obviously false statement, both because the seller pays the buyer broker's commission and because, by inflating total commissions, the Buyer Broker Commission Rule also exerts upward pressure on overall home prices.

---

[3] *See* https://www.nar.realtor/sites/default/files/documents/2022-home-buyers-and-sellers-generational-trends-03-23-2022.pdf

44. If the buyer has a broker, the listing broker will pay the buyer broker a share of the total commission as set forth in the listing agreement.

45. That said, because the total commission comes from the sale price of the home, this commission structure effectively results in the seller paying the broker representing the buyer.

46. Furthermore, the Buyer Broker Commission Rule encourages buyers to use the services of a broker regardless of whether they feel that they need one, as there is no financial benefit to the buyer to not using a broker.

47. As a result, the buyer brokers—who are supposed to assist their clients in negotiating against the seller—receive their compensation from the total commission paid by the seller, not from the buyer they represent.

48. Without the Buyer Broker Commission Rule, sellers would have no incentive to pay a commission to a buyer broker (who, after all, does not represent the seller's interests), and instead the buyer would pay his/her/their broker. Accordingly, the seller would only pay a commission to his/her/their own broker.

49. The seller's total broker commission would thus be approximately half (or less) than the amount that sellers have been forced to pay as total commission to compensate both brokers in the transaction.

**West Penn MLS**

50. Multiple listing services are cooperative ventures through which real estate brokers serving a common geographical area submit listings to a central hub which, in turn, distributes the information to every other member or subscriber of the service.

51. West Penn MLS is such an entity. Furthermore, all of the Broker Defendants and their co-conspirator brokerages are West Penn MLS subscribers.

11

52. However, unlike many local and regional MLSs across the United States, West Penn MLS is not owned or operated by a state or local association of REALTORS.

53. West Penn MLS is virtually the only MLS operating in the Service Area and is the only MLS servicing the Pittsburgh metropolitan region.

54. West Penn MLS is controlled by its subscribers (which include the Broker Defendants and their co-conspirator brokers and agents), whose officers and/or employees comprise its board of directors.

55. In exchange for the payment of dues, West Penn MLS provides the Broker Defendants and its other broker subscribers with access to an electronic database of supply, pricing, and property-characteristics information relating to past and current real-estate listings in the Service Area.

56. Importantly, included in the information disseminated to and shared among West Penn MLS's subscribers is the amount of commission offered to brokers representing potential buyers of listed properties.

57. To build and maintain this database, West Penn MLS's rules require its subscribers to list all residential properties placed with them within the West Penn MLS Service Area:

> "All properties/rentals listed with the [West Penn MLS] are Exclusive to [West Penn MLS]. Every Subscriber shall place for listing with [West Penn MLS] ALL of the following types or categories of listings obtained or received by said Subscriber with[in] the MLS coverage area. No listing may be placed with [West Penn MLS] by anyone other than a Subscriber of [West Penn MLS]."

58. Non-subscribers cannot list properties with West Penn MLS and, furthermore, non-subscribers do not have access to the West Penn MLS database.

59. West Penn MLS's Rules provide that West Penn MLS may terminate its services "to any Broker, Associate Broker, Sales Associate, Certified Appraiser, or Sales Associate

12

Director who, in the opinion of [West Penn MLS], does not conform to the professional standards established by the National Association of REALTORS and the Rules and Regulations of" West Penn MLS.

60. West Penn MLS's Rules require the listing broker to "include and designate…the compensation being offered by the Listing Broker to the Seller [i.e. buyer] Broker. This section of the form is mandatory and must be completed. For those listings which do not offer compensation to the Buyer's Agent, this section of the form should not be left blank. Rather, the form should completed by indicating $0.00 if no compensation is being offered."

61. And, while West Penn MLS's Rules and Listing Agreement indicate that broker commissions are subject to negotiation between the seller and the listing broker, the reality is that many agents represent to sellers that a 2.5-3.0% buyer broker commission is "standard" and further discourage negotiation to lower the commission offered.

62. Furthermore, West Penn MLS's Rules provide that "[f]ines will be imposed to the Listing Agent for incomplete listing data in the West Penn system" for certain "missing or incorrect features," including failing to list the amount of commission (including zero) that the buyer's agent will receive from the sale of the listed property.

63. West Penn MLS's "Standard Exclusive Listing Contract" during the relevant period includes a term stating "Owner further authorizes Listing Broker to offer compensation to subagents, Buyer-Agents and Transactional Licensees including the sharing of part of Listing Broker's Commission."

64. West Penn MLS's standard listing agreement goes on to provide that,

COOPERATION WITH OTHER BROKERS – Licensee(s) has explained Broker's company policies about cooperating with other brokers. Broker and Seller agree that Broker will pay from Broker's fee a fee to another Broker who procures the Buyer, is a member of a Multiple Listing Service (MLS), and who:

13

… (B) Represents the Buyer (BUYER'S AGENT). Broker will pay _____ of/from the sale price. A Buyer's Agent, even if compensated by Broker for Seller, will represent the interests of the Buyer.

65.     The Pennsylvania Association of Realtors (a state-level affiliate of NAR) also publishes a standard listing agreement—which just happens to be the only other form of listing agreement approved by West Penn MLS for use by its subscribers—that includes identical terms to those described in paragraphs 71-72.

66.     West Penn MLS has a history of implementing rules that have anticompetitive effects. For example, in 2009, West Penn MLS settled charges—via consent order—brought against it by the Federal Trade Commission for rules that effectively barred brokers who offered "unbundled," flat-rate, or otherwise innovative discount service packages from subscribing to the service.

67.     In other words, Defendants have a track record of engaging in practices designed to inhibit price competition among real estate brokers operating within the Service Area.

**Buyer Broker Commission Rule**

68.     The rules and standard listing agreement terms detailed above and adopted and implemented by West Penn MLS, the Broker Defendants, and their co-conspirators, are clearly inspired by rules and policies promulgated by NAR.

69.     NAR's Handbook on Multiple Listing Policy mandates that "[i]n filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants."[4]

---

[4] *See* Section G.1, https://www.nar.realtor/sites/default/files/documents/2019-HMLP.pdf

70.     The Handbook further states that "[m]ultiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."

71.     The Buyer Broker Commission Rule therefore shifts a cost to the seller that would otherwise be paid by the buyer in a competitive market. As *The Wall Street Journal* opined, the result is that home sellers are effectively required to hire a buyer broker if they wish to list their home on an MLS, which requires the services of a seller broker, and that this system is a violation of "the Sherman Anti-Trust Act that keeps buying agents paid though they offer almost no useful services."[5]

72.     The rules and required standard listing agreement provisions promulgated by West Penn MLS, and accepted, adopted, and implemented by the Broker Defendants and their co-conspirators, are modeled on NAR's rules and policies.

73.     In adopting these rules, West Penn MLS and the Broker Defendants have invited each and every residential real estate broker and agent operating in the Service Area to participate in the following agreement, combination, and conspiracy: They can participate in the MLS, and gain the benefits provided by it, but only upon the condition that they agree to adhere to and enforce anticompetitive restraints on price competition among brokers.

74.     Thus, to the extent any Defendant argues that it was not involved in the initial drafting or adoption of West Penn MLS's rules, that argument lacks legal significance because each

---

[5] Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J. (Mar. 3, 2019), https://www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734.

Defendant has joined the conspiracy and agreed to abide by, implement, and enforce the Buyer Broker Commission Rule within the West Penn MLS Service Area.

75.     Similarly, although access to an MLS is of great significance to a broker in maintaining its business—without such access, a broker would face enormous disadvantages in marketing properties its clients are trying to sell or finding properties its clients would be interested in buying—any argument that Defendants had no choice but to adopt West Penn MLS's rules is likewise legally insignificant.

76.     As noted above, West Penn MLS is directed and controlled by a board of directors comprised of the principals, officers, and/or employees of the Broker Defendants and their co-conspirators. Furthermore, as noted above, virtually all of the real estate brokers in the western Pennsylvania region are members of West Penn MLS—thereby giving West Penn MLS a virtual monopoly in that geographic region.

77.     Thus, Defendants could, at any time, have chosen to shed the anticompetitive Buyer Broker Commission Rule without any meaningful threat to their position in the market.

78.     Instead, Defendants have maintained the Buyer Broker Commissions Rule (and related rules and policies) in order to stabilize commissions at an inflated level and to prevent competition—in the form of different (and lower) commission structures and service models—from driving down commission levels.

**Effects of the Buyer Broker Commission Rule**

79.     Defendants' conspiracy has had the following anticompetitive effects throughout the Service Area:

a. Home sellers have been forced to pay commissions to a buyer broker—who represent their adversaries in negotiations to sell their homes—thereby substantially inflating the cost of selling their homes.

b. Home sellers have been compelled to set a high buyer broker commission to induce buyer brokers to show their homes to the buyer brokers' clients.

c. Home sellers have paid inflated buyer broker commissions and inflated total commissions.

d. The retention of a buyer broker has been severed from the setting of the broker's commission; the home buyer retains the buyer broker, while the home seller's agent actually sets the buyer broker's compensation.

e. Price competition among brokers to be retained by home buyers has been restrained, as has price competition among brokers seeking to be retained to sell homes.

f. Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer broker commission.

g. The Broker Defendants have increased their profits substantially by receiving inflated buyer broker commissions and inflated total commissions.

80. There are no pro-competitive effects of Defendants' conspiracy, which is plainly anticompetitive and injurious to competition.

17

81.     Even if any alleged pro-competitive effects exist, they are substantially outweighed by the conspiracy's anticompetitive effects.

82.     Substantial economic evidence supports the view that Defendants' conspiracy has resulted in inflated total commissions and inflated buyer broker commissions paid by home sellers, at levels far above what a competitive market would produce.

83.     Compared to other countries with competitive markets for residential real estate brokerage services, the commissions in the United States are substantially higher. Economists Natalya Delcoure and Norm Miller compared international real estate commissions with those in the United States.[6] They found:

> Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand . . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%.[7]

84.     Delcoure and Miller also found variation within countries. For example, in the UK, they found that "1%-2% is typical" for total broker commissions, but that in "very competitive areas" the total rates ranged between "0.5-0.75%" whereas in lower priced areas the range was "as high as 3.5%."[8] Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."[9]

85.     In comparison, the total broker commissions (*i.e.*, the aggregate commission paid to the seller broker and buyer broker) in most areas of the United States average between 5% and

---

[6] *See* Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 Int'l Real Estate Review 12 (2002).
[7] *Id*. at 14.
[8] *Id.* at 17
[9] *Id.* at 13

18

6%, with buyer broker commissions by themselves holding steady in a range between 2.5% and 3%. These numbers have remained stable despite both rising home prices (which leads to larger commission amounts) and the decreasing role of the buyer broker in an age when many prospective home buyers have already scoured the market using Zillow or other websites.

86.     Other economists have reached similar conclusions. A Professor of Economics from Cornell University has described the Buyer Broker Commission Rule — that is, the NAR requirement (adopted by West Penn MLS and the Broker Defendants) of having "the seller pay[] for the commission of both the listing [selling] agent and the cooperative [buyer's] agent" — as a "structural hurdle" that has prevented innovation and price competition in the real estate market.[10] This "hurdle" exists only because of Defendants' anticompetitive conspiracy and does not stem from any actual or unique structural aspect of real estate markets.

87.     Commissions paid in the western Pennsylvania region follow this national trend, with the typical commission paid by home sellers within the service area ranging anywhere from 5% to as high as 7%, with an average total commission of 5.53%.[11]

88.     In addition, the Buyer Broker Commission Rule encourages and facilitates anticompetitive steering away from brokers who deviate from the "standard" commission practices and rates. The Buyer Broker Commission Rule enables buyer brokers to identify and compare the

---

[10] See FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, available at

https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf

[11] See https://listwithclever.com/average-real-estate-commission-rate/pennsylvania/.

buyer broker compensation offered by every seller and then steer their clients toward homes offering higher commissions.

89.     This practice of steering, confirmed by economic literature, has manifest anticompetitive effects. Steering deters reductions from the "standard" commission and enables brokers to avoid doing business with, or to retaliate against, buyer brokers who try to compete by offering significant discounts.

90.     Indeed, although West Penn MLS's rules permit listing brokers to indicate zero dollars as the amount of commission to be paid to the buyer broker, the reality is that the steering effects of the Buyer Broker Commission Rule ensures that virtually no seller or listing broker will provide for a buyer broker commission that is significantly out of line with what is "typical" or "customary."

91.     This is because by requiring sellers to make a blanket, unilateral offer of compensation, the Buyer Broker Commission Rule enables brokers and agents (who all, as noted above, variously represent buyers and sellers) to discipline listing brokers who might stray from the norm by refusing to show their properties to prospective buyers or only showing them after showing properties advertising the expected commission.

92.     Thus, the option to list zero dollars as the buyer broker's commission is little more than a smokescreen, giving the appearance that actors in the market are free to negotiate and compete on price, when in fact they are not.

93.     The economic evidence is plain that the Buyer Broker Commission Rule works to restrain competition in several respects in real estate markets with the result being that home sellers pay far more than they would in a market not fettered by the Buyer Broker Commission Rule.

94. Defendants' conspiracy and the Buyer Broker Commission Rule was designed to keep real estate commissions at elevated, supra-competitive levels, and Defendants have managed to keep the standard commission at right around 6 percent for many years, despite significant changes in technology that should have substantially reduced commission charges.

## RELEVANT MARKET AND DEFENDANTS' MARKET POWER

95. The relevant market for the claims asserted herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with MLS access. Defendants' control of the MLS and the rule that all brokers must use MLS allows Defendants to impose the Buyer Broker Commission Rule and other anticompetitive rules on a class-wide basis. Access to the West Penn MLS is critical for brokers to compete and to assist home buyers and sellers in the West Penn MLS Service Area.

96. The relevant geographic market for the claims asserted herein are no broader than the geographic area covered by the West Penn MLS. The residential real estate business is inherently local. Most sellers prefer to work with brokers that are familiar with the local market conditions and have experience selling homes in the local market. Similarly, most buyers prefer to work with brokers who have knowledge of the area in which they have an interest.

97. The Federal Trade Commission and Department of Justice have similarly defined the market for residential real estate brokerage services within the United States based on the geographic area covered by each local MLS.

98. MLSs also define themselves in regional/local terms. The West Penn MLS has adopted a geographically defined service area that is regional in scope.

99.     Defendants consisting of other conspiring brokers in the West Penn MLS coverage area, collectively provide a significant portion of the residential real estate broker services in these areas.

100.     According to data provided by West Penn MLS, there were approximately 26,000 homes sold in the Service Area in 2023, down from about 29,600 homes sold in 2022.[12]

101.     The average sale price for homes listed on the West Penn MLS was $288,000 in 2023, which represented an approximately $15,000 increase from 2022.[13]

102.     Based on the average number of sales and average sale price, West Penn MLS's Service Area constitutes an approximately $8 billion per year residential real estate market for home sales.

103.     Based on self-reported data provided to the Pittsburgh Business Times (PBT) for its annual survey of Pittsburgh-area residential real estate firms, the Broker Defendants include about half of the top 10, and one-third of the top 28, residential real estate brokerages operating in the Service Area.

104.     Furthermore, Defendants' un-named co-conspirators, which include subsidiaries and/or affiliates of Re/Max and Anywhere Real Estate, make up almost the entire remainder of the firms listed as comprising PBT's survey.[14]

---

[12] *See* https://triblive.com/local/westmoreland/realtors-see-rebound-for-housing-market-in-2024-spurred-by-lower-interest-rates/

[13] *Id.*

[14] Re/Max and Anywhere Real Estate have entered into prospective nation-wide settlement agreements with plaintiffs in the *Burnett/Sitzer* and *Moehrl* cases. Those settlements purport to release any and all buyer-broker commission fee related claims that could have been brought against Re/Max, Anywhere, or any of their subsidiaries, franchisees, or affiliates. The proposed settlements have not yet obtained final court approval. In the event the settlements are not approved, Plaintiffs intend to move to join the Re/Max and Anywhere affiliates operating within the western Pennsylvania region.

105.    Any buyer-brokers in the West Penn MLS coverage area who wished to compete outside of Defendants' conspiracy would face insurmountable barriers. Defendants' control of the West Penn MLS means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service. A seller-broker attempting to sell a home without a listing service would not have access to the majority of potential buyers and a buyer-broker representing a buyer without a listing service would not have access to the large majority of sellers. Simply put, brokers cannot compete without access to a listing service.

106.    For an alternative listing service to compete effectively with an MLS, the alternative would need to have listings as comprehensive or at least nearly as comprehensive as an MLS. But there is no incentive for brokers and their individual realtors or agents who currently profit from inflated buyer-broker commissions and total commissions to create and/or participate in an alternative listing service that would generate lower total commissions and lower buyer-broker commissions and seller-broker commissions.

107.    Home buyers would be reluctant to retain a buyer-broker operating on an alternative listing service that required them to pay the buyer-broker commission, when other buyer-brokers operating on an MLS- are entirely compensated by home sellers. Accordingly, seller-brokers on an alternative listing service would struggle to attract buyer-brokers and their buyer clients.

108.    Moreover, many home sellers would not retain brokers using a new, unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient buyers and buyer-brokers. Any listing service attempting to compete with an MLS would likely fail to attract enough property listings to operate profitably and be a competitive constraint on the

23

incumbent MLS. Hence, the absence of listing services that compete with West Penn MLS reflects the very substantial barriers to entry.

## CLASS ACTION ALLEGATIONS

109.    Plaintiffs bring this action on behalf of themselves and on behalf of the members of a Class, pursuant to Federal Rule of Civil Procedure 23, defined as follows for the purposes of Plaintiffs' claims under 15 U.S.C. § 1 (the "Antitrust Class"):

> All persons or entities who, from December 4, 2019, through the present used a listing agent or broker affiliated with or employed by one of the Broker Defendants in the sale of a home listed on the West Penn MLS, and who paid a commission to the buyer's broker in connection with the sale of the home.

110.    Plaintiffs also bring this action on behalf of themselves and on behalf of the members of a class, pursuant to Federal Rule of Civil Procedure 23, defined as follows for the purposes of Plaintiffs' claims under 73 P.S. §§ 201-1, *et sq.* (the "PA CPL Class):

> All individuals who, from December 4, 2019, through the present used a listing agent or broker affiliated with or employed by one of the Broker Defendants in the sale of a home listed on the West Penn MLS, and who paid a commission to the buyer's broker in connection with the sale of the home.

111.    Excluded from the Classes are Defendants, their officers, directors, and employees; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firm.

112.    The members of both Classes are ascertainable as Defendants possess records relating to the residential real estate transactions at issue in this litigation.

24

113.    Data publicized by West Penn MLS indicates that nearly 2,000 units of residential real estate were sold in the Service Area in January 2020 alone.[15] Similarly, as noted above, annual data from West Penn MLS for 2022 and 2023 suggests that well over 25,000 homes are sold in the Service Area each year. As such, Plaintiffs reasonably believe that the Classes are so numerous as to make individual joinder of all Class members impracticable.

114.    Common questions of law and fact exist as to all members of the Classes and predominate over questions that affect only individual Class members. These common questions of law and/or fact, include but are not limited to:

a.      Whether Defendants engaged in the alleged conspiracy;

b.      Whether the conduct of Defendants' and their co-conspirators caused injury to the business or property of Plaintiffs and the Class members.

c.      Whether Defendants' conspiracy caused the amount of total commissions and buyer broker commissions paid in the Service Area to be inflated;

d.      Whether the competitive harm caused by the conspiracy substantially outweighs any competitive benefit;

e.      Whether Plaintiffs and the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief;

f.      Whether Defendants' conduct was deceptive within the meaning of Pennsylvania's CPL, such that it created a likelihood of confusion or of misunderstanding;

---

[15] *See* https://www.prnewswire.com/news-releases/residential-real-estate-begins-new-year-with-a-bang-301026645.html

      g.     Whether Defendants' conduct is unlawful; and

      h.     The appropriate class-wide measure of damages.

115.    Plaintiffs' claims are typical of the claims of the Classes, as Plaintiffs' claims arise from the same course of conduct.

116.    Plaintiffs have retained counsel with experience in antitrust litigation and the prosecution of class and/or collective actions. Together, Plaintiffs and their counsel will zealously prosecute this action for the benefit of the Classes and will fairly and adequately protect the interests of the Classes.

117.    A class action is superior to other available methods for the fair and efficient adjudication of the claims in this action. The prosecution of separate actions by numerous individual members of the classes would impose undue burdens on Defendants and the judicial system and would create a risk of inconsistent adjudications of the questions of law and fact common to the Classes. The class action mechanism, on the other hand, can generate significant efficiencies of both time and expense and would ensure consistency.

## **ANTITRUST INJURY**

118.    Defendants' anticompetitive agreements and conduct have had the following effects, among others:

      a.     Sellers of residential property have been made to pay inflated costs to sell their homes because Defendants' rules and practices require them to pay commissions to buyer brokers;

      b.     Home sellers have been forced to set buyer broker commissions to induce buyer brokers to show the sellers' homes to prospective buyers;

      c.     Price competition has been restrained, both among buyers' brokers and among sellers' brokers; and

      d.    the Broker Defendants have inflated their profits through artificially increased total commissions and increased buyer broker commissions.

119.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their business or property, have paid higher total commissions than they would have paid in the absences of Defendants' anticompetitive conspiracy, and have suffered damages as a result.

120.    There are no pro-competitive effects of Defendants' conspiracy that are not substantially outweighed by the conspiracy's anticompetitive effects.

121.    Significant economic evidence supports concluding that Defendants' conspiracy has resulted in Plaintiffs and the Class paying buyer broker commissions and total commissions that have been inflated to a supra-competitive level.

122.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## INTERSTATE TRADE AND COMMERCE

123.    Defendants' conduct as described in this Complaint was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

124.    The price-fixing combination or conspiracy in which Defendants participated with their co-conspirators had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## COUNT I – VIOLATION OF 15 U.S.C. § 1
## (All Plaintiffs; All Defendants)

125.    Plaintiffs incorporate by reference each of the foregoing paragraphs as though set forth at length herein.

27

126.    Beginning more than four years before the filing of this Complaint, and continuing into the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

127.    The conspiracy alleged herein consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make inflated payments to the broker representing the purchaser of the seller's home.

128.    In furtherance of this contract, combination, or conspiracy West Penn MLS and the Broker Defendants, along with their co-conspirators, have committed one or more of the following overt acts:

    a.    Participating in the implementation, maintenance, and enforcement of the Buyer Broker Commission Rule and other anticompetitive rules by and among West Penn MLS subscribers and within the West Penn MLS Service Area; and

    b.    the Buyer Broker Defendants requiring and encouraging the individual brokers and agents they employ to implement the Buyer Broker Commission Rule and related anticompetitive policies.

129.    Defendants' conspiracy has required sellers to pay buyer brokers, to pay an inflated buyer broker commission and an inflated total commission, and it has restrained price competition among buyer brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

130.    Defendants' conspiracy has caused buyer broker commissions and total commissions to be inflated. Plaintiffs and the other Class members paid these inflated commissions

during (and before) the last four years in connection with the sale of residential real estate. Absent Defendants' conspiracy, Plaintiffs and the other Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer.

131.     Defendants' conspiracy is a *per se* violation of the Sherman Act, 15 U.S.C. § 1.

132.     Alternatively, Defendants' conspiracy violates 15 U.S.C. §1 under a rule-of-reason analysis.

133.     As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S. C. § 1, Plaintiffs and the other members of the Class have been injured in their business and property and suffered damages in an amount to be proven at trial.

## COUNT II – VIOLATION OF 73 P.S. §§ 201-1, *et sq.*

### (All Plaintiffs; All Defendants)

134.     Plaintiffs incorporate the foregoing paragraphs 1-133 as though set forth at length herein.

135.     The CPL creates a private right of action for consumers of goods or services who (1) purchased or leased good or services primarily for a personal, family, or household purpose; (2) suffered an ascertainable loss of money or property; (3) that loss resulted from the use or employment by a vendor of a method or act made unlawful by the CPL; and (4) the consumer justifiably relied upon the unfair or deceptive business practice.

136.     In relevant part, the CPL defines "unfair or deceptive acts or practices" to mean, "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi).

29

137.    Plaintiffs retained the services of real estate brokers for personal or household purposes, namely the sale of their homes.

138.    These Plaintiffs suffered an ascertainable loss of money in the form of paying inflated broker commissions on the sale of their homes.

139.    The Buyer Broker Commission Rule is deceptive and creates a likelihood of confusion or of misunderstanding because the average home seller will not know that the "standard" or "typical" commission rate urged by their listing broker is the result of anticompetitive collusion among brokers.

140.    These Plaintiffs justifiably relied on their listing brokers as their agents for the sale of their homes and as experts in the field of residential real estate sales.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, requests that the Court grant judgment in their favor and against Defendants and awards them relief as follows:

a.    An order certifying the Classes described above under Federal Rule of Civil Procedure 23 and appointing Plaintiffs and their counsel to represent the classes;

b.    A declaration that Defendants' conduct, as set forth above, is unlawful;

c.    A permanent injunction under Section 16 of the Clayton Act enjoining Defendants from (1) including in listing agreements any mandatory field requiring home sellers to make any blanket offer of compensation (even $0) to buyer's agents; and (2) continuing to restrict competition among residential real estate brokers in the manner set forth above;

30

d. An award of treble damages and/or restitution to Plaintiffs and the Class in an amount to be determined at trial for violations of federal antitrust law;

e. An award of treble damages for violations of the Pennsylvania CPL, as permitted under 73 P.S. § 201-9.2;

f. An award of pre- and post-judgment interest to Plaintiffs;

g. An award to Plaintiffs of the costs of this lawsuit, including reasonable attorneys' fees and expenses; and

h. Any other relief the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury on all issues so triable.

Dated: <u>January 26, 2024</u>                    Respectfully Submitted,

<u>/s/ *Bruce C. Fox*</u>
Bruce C. Fox (PA 42576)
Hugh T. McKeegan (PA 325673)
OBERMAYER REBMANN
MAXWELL & HIPPEL LLP
525 William Penn Place, Suite 1710
Pittsburgh, PA 15219
(412) 566-1500 (Phone)
(412) 281-1530 (Fax)
bruce.fox@obermayer.com
hugh.mckeegan@obermayer.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SPRING WAY CENTER, LLC;DANIELLE and JESSIE KAY; and JOHN and NANCY MORATIS; and NANCY WEHRHEIM,

       Plaintiffs,

v.

WEST PENN MULTI-LIST, INC; EVEREST CONSULTING GROUP LP (d/b/a Berkshire Hathaway HomeServices The Preferred Realty); NRT PHILADELPHIA LLC (d/b/a Coldwell Banker Realty); PPSIR, LLC (d/b/a Piatt Sotheby's International Realty); PIRAIN ENTERPRISES, INC. (d/b/HOWARD HANNA COMPANY (d/b/a Howard Hanna); REEDSTONE, INC. (f/k/a Pirain Enterprises, Inc.) (d/b/a NextHome PPM Realty); MHDM LLC (d/b/a Realty ONE Group Gold Standard); SF, LLC (d/b/a Realty ONE Group Platinum); and REALTY ONE GROUP HORIZON, LLC, RIVER POINT REALTY, LLC; BOVARD-ANDERSON CO.; PRIORITY REALTY, LLC; RUBINOFF REALTY SERVICES, LLC (d/b/a Rubinoff Realty); and FOUND IT PA, LLC,

       Defendants.

Civil Action No. ——————2:23-cv-02061-CCW

Judge Christy Criswell Wiegand

**JURY TRIAL DEMANDED**

## AMENDED CLASS ACTION COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15(a), Plaintiffs, Spring Way Center, LLC;Danielle and Jessie Kay and John and Nancy Moratis, and Nancy Wehrheim, through undersigned counsel, bring this actionfile this Amended Class Action Complaint on behalf of themselves and all similarly situated individuals and state as follows:

## NATURE OF THE ACTION

1. Plaintiffs, individuals who sold residential real estate that was listed on West Penn Multi-List, Inc.'s multiple listing service ("MLS") during the past four years, bring this action against

1

~~Defendants for agreeing, combining, and conspiring to impose and enforce rules and practices in the western Pennsylvania residential real estate market that force home sellers to pay artificially inflated commissions on the sale of their homes, in violation of federal antitrust law.~~

1. ~~2.~~ Defendants are West Penn Multi-List, Inc. ("West Penn MLS") and several real estate brokerages operating in western Pennsylvania, namely: Everest Consulting Group LP (d/b/a Berkshire Hathaway HomeServices The Preferred Realty); ~~NRT Philadelphia LLC (d/b/a Coldwell Banker Realty); PPSIR, LLC (d/b/a Piatt Sotheby's International Realty);~~ Howard Hanna Company (d/b/a Howard Hanna); Reedstone, Inc. (f/k/a Pirain Enterprises, Inc.) (d/b/a NextHome PPM Realty); NextHome Dynamic, Inc.; MHDM LLC (d/b/a Realty One Group Gold Standard); SF LLC (d/b/a Realty One Group Platinum); ~~and~~ Realty One Group Horizon, LLC; River Point Realty, LLC; Bovard-Anderson Co.; Priority Realty, LLC; Rubinoff Realty Services, LLC; and FOUND IT PA, LLC (collectively, the "Broker Defendants").

2. Plaintiffs, individuals who sold residential real estate that was listed on West Penn Multi-List, Inc.'s ("West Penn MLS") multiple listing service ("MLS") during the past four years, bring this action against Defendants for agreeing, combining, and conspiring to impose and enforce rules and practices in the western Pennsylvania residential real estate market that force home sellers to pay artificially inflated commissions on the sale of their homes, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("CPL"), 73 P.S. §§ 201-1, *et seq.*

3. Although these rules and practices trace their inspiration to rules and practices promulgated by the National Association of REALTORS ("NAR") for multiple listing services— which have been found to violate federal antitrust law—NAR's rules are only mandatory for MLSs owned and/or controlled by state or local REALTOR associations.

2

4.      Thus, while many (if not all) of West Penn MLS's officers and directors have some association with NAR, West Penn MLS itself is not owned or controlled by any state or local REALTOR association.  West Penn MLS and its subscribers/members, therefore, were not required to implement the rules and practices at issue in this action.

5.      3. In short, Defendants have nevertheless adopted, participated in, and enforced their own version of the so-called "Buyer Broker Commission Rule." According to this rule—first promulgated by the National Association of Realtors ("NAR") and then agreed to and implemented by Defendants in western Pennsylvania—every seller's broker, when listing a property on West Penn MLS's multiple listing service, must make a blanket, unilateral offer of compensation to any other West Penn MLS subscriber broker who procures a buyer for the home. Together with the rules and practices that support its implementation and enforcement, the Rule amounts to a scheme to fix the price for buyer broker services at a supra-competitive level.

6.      4.    The Buyer Broker Commission RuleThis state of affairs is manifestly anticompetitive because, among other ill-effectsthings, it effectively compels the seller to compensate the broker representing the purchaser even though that broker should be working for the purchaser, not the seller; it mandates a "blanket offer," meaning that the same compensation must be offered to every buyer's broker, regardless of skill, experience, or the services provided; and it has the effect of encouraging "steering" by buyer-brokers, because it incentivizes them to direct their clients to properties with higher commission offers.

7.      5. As a result, home sellers generally pay between 5-6% of the total sale price of their home in broker commissions—although total commissions in western Pennsylvania range as high as 7%—with the seller's broker (the "Listing Broker") and the purchaser's broker (the "Buyer Broker") typically splitting the commission.

3

8. 6. In developed markets outside the United States, purchasers compensate their own brokers (if they use one at all), typically paying less than half the rate paid to buyer brokers in the U.S. For example, according to the Executive Director of the Consumer Federation of America, total commission rates in "a number of developed countries" range "between 1% and 4%" yet commissions in the U.S. remain fixed between 5% and 6%, which is "no lower than it was in 2001."[1]

9. 7. Indeed, a 2015 report, commissioned by NAR to study negative emerging trends in the real estate industry, highlighted concerns that total commissions in the United States are inflated compared to international markets, such as the United Kingdom, Singapore, the Netherlands, Australia, and Belgium. According to this report, in those countries the average total commissions ranges between 1% and 3%.[2]

10. 8. Furthermore, these inflated commissions have persisted despite technological advances—principally the development of easily readily accessible, public-facing websites that make it easier for home buyers to find properties, thereby significantly reducing the traditional utility of a Buyer Broker—that would reasonably have been expected to lower costs.

11. 9. As noted above, Defendants' anticompetitive practices are not unique; rather, they are part and parcel of nation-wide collusion--as they represent western Pennsylvania's local version of collusive practices that are widespread within the residential real estate industry—to

---

[1] FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_ https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_ segment_3.pdf.

[2] Swanepoel Group, D.A.N.G.E.R Report, at 22 (definitive analysis of negative game changers emerging in real estate) (2015). The report also suggests that total commissions in Germany range between 3% and 6%.

4

~~maintain inflated commissions~~. Recently, a federal jury in *Burnett, et al. v. The National Association of Realtors, et al.*, 4:19-cv-00332-SRB~~, in the~~ (Western District of Missouri), found that ~~the same~~ rules, policies, and practices ~~as those alleged in this Complaint~~ similar in both design and effect to those at issue here violated federal antitrust law. ~~That~~ The jury in *Burnett* imposed a historic ten-figure judgment on the defendants.

12. ~~10.~~ Like the defendants in *Burnett*, Defendants' conduct unlawfully restrains trade and competition, harms home sellers in the form of inflating the cost of selling a house (therefore eating into the equity a seller may have accrued in his or her property), and is, therefore, violative of federal antitrust law.

13. For these violations, Plaintiffs seek treble damages under federal antitrust law, Pennsylvania's CPL, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees. Plaintiffs demand a trial by jury on all issues so triable.


## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over Plaintiffs' antitrust claim pursuant to 28 U.S.C. § 1331 because Plaintiffs' claim arises under the laws of the United States, specifically the Sherman Antitrust Act, 15 U.S.C. § 1.

15. The Court also has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d) because the proposed class comprises more than 100 persons, the total amount in controversy exceeds $5 million, and at least one member of the class is a citizen of a state different from Defendants.

16. The Court also has subject matter jurisdiction over Plaintiffs' state-law CPL claims under 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' antitrust claims, over

5

which the Court has original jurisdiction, as to form part of the same case or controversy under Article III of the U.S. Constitution.

17.     This Court has personal jurisdiction over Defendants, each of which maintains offices in Pennsylvania and conducts significant business within the Commonwealth and this District.

18.     Venue is appropriate in this District because Defendants maintain offices and places of business in western Pennsylvania, which includes this District; all of the real estate transactions that form the basis for this Complaint occurred in this District; and most of the class members reside in this District.

## PARTIES

**Plaintiffs**

11. Plaintiff Spring Way Center LLC ("Spring Way") is a Pennsylvania limited liability company. Spring Way sold a house located in Freedom, Pennsylvania, on or about September 8, 2023. Spring Way used Coldwell Banker Realty as its listing broker. Spring Way paid a total commission of 5% for the sale of the property.

19.     Plaintiffs Danielle and Jessie Kay are residents and citizens of Pennsylvania. They sold a house located in Baden, Pennsylvania, on or about December 14, 2021. The Kays used Realty ONE Group Gold Standard as their listing broker. The Kays' listing agreement, as amended, provided for a total commission of 5% on the sale of their home, with 3% earmarked to compensate a broker representing the purchaser.

20.     12. Plaintiffs John and Nancy Moratis are residents and citizens of Pennsylvania. They sold a house located in Rockwood, Pennsylvania, on or about December 3, 2021. The Moratis's used Berkshire Hathaway HomeServices The Preferred Realty as their listing broker.

6

The Moratis's listing agreement provided for a total commission of 7% on the sale of their home, with 3.5% earmarked to compensate a broker representing the purchaser.

13. Plaintiff Nancy Wehrheim is a resident and citizen of Pittsburgh, Pennsylvania. Wehrheim sold a property in the Pittsburgh region on or about July 2021. Wehrheim used Coldwell Banker Realty as her listing broker.

**Defendants**

21. 14. Defendant West Penn Multi-List, Inc. ("West Penn MLS") is a Pennsylvania membership corporation with its principal place of business at 8980 Perry Highway, Pittsburgh, Pennsylvania 15237. West Penn MLS is a corporation comprising thousands of real estate professionals based in the Pittsburgh metropolitan area and surrounding counties, including Allegheny, Armstrong, Beaver, Butler, Washington, Westmoreland, Clarion, Crawford, Fayette, Greene, Indiana, Lawrence, Mercer, Somerset, Venango and Erie (the "Service Area").

22. 15. Defendant Everest Consulting Group LP (d/b/a Berkshire Hathaway HomeServices The Preferred Realty) is a Pennsylvania limited partnership and licensed real estate brokerage operating within the western Pennsylvania region. Everest (under its d/b/a) and/or the brokers and agents it employs in the region are members of and/or participants in the West Penn MLS. Everest Consulting Group LP's principal office is located at 9840 Old Perry Highway, Wexford, PA 15090.

16. NRT Philadelphia LLC (d/b/a Coldwell Banker Realty) is a Delaware limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. NRT Philadelphia's western Pennsylvania offices (under its d/b/a) and/or the brokers and agents it employs in the region are members of the West Penn MLS. NRT Philadelphia's principal office

7

is located at 390 Waterloo Boulevard, Exton, PA 19341. NRT Philadelphia maintains offices throughout the Service Area.

23. 17. PPSIR, LLC (d/b/a Piatt Sotheby's International Realty Defendant Howard Hanna Company (d/b/a Howard Hanna) is a Pennsylvania limited liability company corporation and licensed real estate brokerage operating within the western Pennsylvania region. PPSIR, LLC (under its d/b/a) Howard Hanna and/or the brokers and agents it employs in the region are members of and/or participants in the West Penn MLS. PPSIR, LLC's principal office is located at 260 Forbes Avenue, Suite 1525 Howard Hanna maintains a registered office at 1090 Freeport Road, Pittsburgh, PA 15222 15238.

24. 18. Reedstone, Inc. (f/k/a Pirain Enterprises Inc.) (d/b/a NextHome PPM Realty) is a Pennsylvania corporation and licensed real estate brokerage operating within the western Pennsylvania region. Pirain Enterprises Reedstone, Inc. (under its d/b/a) and/or the brokers and agents it employs in the region are members of and/or participants in the West Penn MLS. Pirain Enterprises' NextHome PPM Realty principal office is located at 1308 Peermont Avenue, Pittsburgh, PA 15216. Reedstone, Inc. maintains a registered office at 333 Old Lesnett Road, Pittsburgh, PA 15241.

25. 19. MHDM LLC (d/b/a Realty ONE Group Gold Standard) is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. MHDM LLC, along with the brokers and agents it employs in the region, are members of and/or participants in the West Penn MLS. MHDM LLC maintains an office at 11171 Perry Highway, Wexford PA, 15090.

26. 20. SF, LLC (d/b/a Realty ONE Group Platinum) is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. SF,

8

LLC, along with the brokers and agents it employs in the region, are members of and/or participants in the West Penn MLS. SF, LLC maintains an office at 427 Cochran Road, Pittsburgh, PA 15228.

27. 21. Realty ONE Group Horizon, LLC is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. Realty ONE Group Horizon, LLC, along with the brokers and agents itsit employs in the region, are members of and/or participants in the West Penn MLS. Realty ONE Group Horizon, LLC, maintains an office at 3731 William Penn Highway, Murrysville, PA 15668.

28. River Point Realty, LLC is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. River Point Realty, LLC, along with the brokers and agents it employs in the region, are members of and/or participants in the West Penn MLS. River Point Realty, LLC, maintains a principal office at 7112 Church Avenue, Pittsburgh, PA 15202.

29. Bovard-Anderson Co. is a Pennsylvania corporation and licensed real estate brokerage operating within the western Pennsylvania region. Bovard-Anderson Co., along with the brokers and agents it employs in the region, are members of and/or participants in the West Penn MLS. Bovard-Anderson Co. maintains a principal office at 617 Third Street, Beaver, PA 15009.

30. Priority Realty, LLC is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. Priority Realty LLC, along with the brokers and agents it employs in the region, are members of and/or participants in the West Penn MLS. Priority Realty, LLC, maintains a principal office at 2940 South Park Road, Bethel Park, PA 15102.

31. Rubinoff Realty Services, LLC (d/b/a Rubinoff Realty) is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. Rubinoff Realty Services, LLC along with the brokers and agents it employs in the region, are members of and/or participants in the West Penn MLS. Rubinoff Realty Services, LLC maintains a principal office at 925 Liberty Avenue, Pittsburgh, PA 15222.

32. Fount It PA, LLC, is a Pennsylvania limited liability company and licensed real estate brokerage operating within the western Pennsylvania region. Fount It PA, LLC along with the brokers and agents it employs in the region are members of and/or participants in the West Penn MLS. Found It PA, LLC maintains a principal office at 5362 Steubenville Pike, McKees Rocks, PA 15136. CT Corporation System is Found It PA, LLC's registered agent, and maintains an office at 600 N. 2nd Street, Suite 401, Harrisburg, PA 17101.

33. ~~22.~~ Each of the named Defendants is a subscriber to West Penn MLS and does a significant amount of business in this District.

**Co-Conspirators**

34. ~~23.~~ In addition to the named Defendants, realtor associations in the western Pennsylvania region (including, among others, the Pennsylvania Association of Realtors and the Realtors Association of Metropolitan Pittsburgh) and other brokerages operating within that geographic area, among others, participated as co-conspirators in the violations alleged in this Complaint.

35. ~~24.~~ These co-conspirators participated in the violations by, for example, agreeing to, complying with, and enforcing the Buyer Broker Commission Rule.

36. ~~25.~~ Defendants are jointly and severally liable for the acts of their co-conspirators whether or not those co-conspirators are named as defendants in this Complaint.

**~~JURISDICTION AND VENUE~~**

10

26. This Court has subject matter jurisdiction over Plaintiffs' antitrust claim pursuant to 28 U.S.C. § 1331 because Plaintiffs' claim arises under the laws of the United States, specifically the Sherman Antitrust Act, 15 U.S.C. § 1.

27. The Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because the proposed class comprises more than 100 persons, the total amount in controversy exceeds $5 million, and at least one member of the class is a citizen of a state different from Defendants.

28. This Court has personal jurisdiction over Defendants, each of which maintains offices in Pennsylvania and conducts significant business within the Commonwealth and this District.

29. Venue is appropriate in this District because Defendants maintain offices and places of business in western Pennsylvania, which includes this District; all of the real estate transactions that form the basis for this Complaint occurred in this District; and most of the class members reside in this District.

## **FACTUAL ALLEGATIONS**

**Real Estate Industry Background**

37. 30. Real estate brokers play an important role in the residential real estate market, facilitating transactions by marketing properties listed for sale, helping buyers find properties, assisting with negotiations, and the like.

38. 31. Most brokers and their individual realtors or agents do not work exclusively with buyers or sellers; that is, a broker/agent may act as the seller broker in some sales and act as the buyer broker in others.

11

39. ~~32.~~ According to a survey published by the National Association of Realtors ("NAR") in 2022, about 90% of sellers used a real estate broker when selling their home, while 87% of home buyers engaged a broker to assist in the buying process.[3]

40. ~~33.~~ In typical residential real estate transactions, real estate brokers and agents receive compensation through commissions that are calculated as a percentage of a home's sale price, and the commissions are paid when the home sells.

41. ~~34.~~ The seller broker's compensation is set forth in the listing agreement, which is a contract between the seller and his/her/their broker ~~and~~ that includes the terms of the listing—for example, how long the broker retains the exclusive right to market the property, the listing price, etc.

42. ~~35.~~ Due to the Buyer Broker Commission Rule, ~~the listing agreement will also specify~~ in addition to setting forth the total commission to be paid ~~to the seller broker and also details the amount to be paid to the buyer broker.~~ on the sale of the property, the listing agreement will also authorize the listing broker to "cooperate" with other brokers, in relevant part by making a blanket, unilateral offer of compensation to a broker who (a) represents the buyer and (b) is a member of a multiple listing service.

~~36. Notably, until sometime in 2021, West Penn MLS's standard exclusive listing contract—the type of agreement used in most listings submitted to West Penn MLS—did not inform the seller of the amount to be paid to the buyer's broker, only the total commission in the event of a sale.~~

---

[3] *See* https://www.nar.realtor/sites/default/files/documents/2022-home-buyers-and-sellers-generational-trends-03-23-2022.pdf

4879-6049-2181 v3

43. 37. When~~If~~ a buyer retains a broker, the buyer ~~often~~also enters into a contract with that broker. The contract typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker.

~~38. If the buyer has a broker, the seller pays the buyer broker a commission.~~ In fact, until only very recently, a standard of conduct in NAR's Code of Ethics long permitted ~~and encouraged~~ buyer brokers to inform their clients that their services were being provided free of charge—an obviously false statement, both because the seller pays the buyer broker's commission and because, by inflating total commissions, the Buyer Broker Commission Rule also exerts upward pressure on overall home prices.

44. If the buyer has a broker, the listing broker will pay the buyer broker a share of the total commission as set forth in the listing agreement.

45. That said, because the total commission comes from the sale price of the home, this commission structure effectively results in the seller paying the broker representing the buyer.

46. 39. In any event~~Furthermore~~, the Buyer Broker Commission Rule encourages buyers to use the services of a broker regardless of whether they feel that they need one, as there is no financial benefit to the buyer to not using a broker.

47. 40. The~~As a~~ result ~~of these agreements and the Buyer Broker Commission Rule is that~~, the buyer brokers—who are supposed to assist their clients in negotiating against the seller—receive their compensation from the total commission paid by the seller, not from the buyer they represent.

48. 41. Without the Buyer Broker Commission Rule, sellers would have no incentive to pay a commission to a buyer broker (who, after all, does not represent the seller's interests), and

4879-6049-2181 v3

instead the buyer would pay his/her/their broker. Accordingly, the seller would only pay a commission to his/her/their own broker.

49. 42. The seller's total broker commission would thus be approximately half (or less) than the amount that sellers have been forced to pay as total commission to compensate both brokers in the transaction.

**West Penn MLS**

50. 43. Multiple listing services are cooperative ventures through which real estate brokers serving a common geographical area submit listings to a central hub which, in turn, distributes the information to every other member or subscriber of the service.

51. 44. West Penn MLS is such an entity. Furthermore, all of the Broker Defendants and their co-conspirator brokerages are West Penn MLS subscribers.

52. However, unlike many local and regional MLSs across the United States, West Penn MLS is not owned or operated by a state or local association of REALTORS.

53. 45. West Penn MLS is virtually the only MLS operating in the Service Area in general and is the only MLS servicing the Pittsburgh metropolitan region.

54. 46. West Penn MLS is controlled by its subscribers (which include the Broker Defendants and their co-conspirator brokers and agents), whose officers and/or employees comprise its board of directors.

55. 47. In exchange for the payment of dues, West Penn MLS provides the Broker Defendants and its other broker subscribers with access to an electronic database of supply, pricing, and property-characteristics information relating to past and current real-estate listings in the Service Area.

4879-6049-2181 v3

56. 48. Importantly, included in the information disseminated to and shared among West Penn MLS's subscribers is the amount of commission offered to brokers representing potential buyers of listed properties.

57. 49. To build and maintain this database, West Penn MLS's rules require its subscribers to list all residential properties placed with them within the West Penn MLS Service Area:

> "All properties/rentals listed with the [West Penn MLS] are Exclusive to [West Penn MLS]. Every Subscriber shall place for listing with [West Penn MLS] ALL of the following types or categories of listings obtained or received by said Subscriber with[in] the MLS coverage area. No listing may be placed with [West Penn MLS] by anyone other than a Subscriber of [West Penn MLS]."

58. 50. Non-subscribers cannot list properties with West Penn MLS and, furthermore, non-subscribers do not have access to the West Penn MLS database.

59. 51. West Penn MLS's Rules provide that West Penn MLS may terminate its services "to any Broker, Associate Broker, Sales Associate, Certified Appraiser, or Sales Associate Director who, in the opinion of [West Penn MLS], does not conform to the professional standards established by the National Association of REALTORS and the Rules and Regulations of" West Penn MLS.

60. West Penn MLS's Rules require the listing broker to "include and designate…the compensation being offered by the Listing Broker to the Seller [i.e. buyer] Broker. This section of the form is mandatory and must be completed. For those listings which do not offer compensation to the Buyer's Agent, this section of the form should not be left blank. Rather, the form should completed by indicating $0.00 if no compensation is being offered."

61. And, while West Penn MLS's Rules and Listing Agreement indicate that broker commissions are subject to negotiation between the seller and the listing broker, the reality is that

15

4879-6049-2181 v3

many agents represent to sellers that a 2.5-3.0% buyer broker commission is "standard" and further discourage negotiation to lower the commission offered.

62. 52. Furthermore, West Penn MLS's Rules provide that "[f]ines will be imposed to the Listing Agent for incomplete listing data in the West Penn system" for certain "missing or incorrect features," including failing to list the amount of commission (including zero) that the buyer's agent will receive from the sale of the listed property.

63. 53. West Penn MLS's "Standard Exclusive Listing Contract" during the relevant period includes a term stating "Owner further authorizes Listing Broker to offer compensation to subagents, Buyer-Agents and Transactional Licensees including the sharing of part of Listing Broker's Commission."

64. 54. West Penn MLS's standard listing agreement goes on to provide that,

COOPERATION WITH OTHER BROKERS – Licensee(s) has explained Broker's company policies about cooperating with other brokers. Broker and Seller agree that Broker will pay from Broker's fee a fee to another Broker who procures the Buyer, is a member of a Multiple Listing Service (MLS), and who: … (B) Represents the Buyer (BUYER'S AGENT). Broker will pay _____ of/from the sale price. A Buyer's Agent, even if compensated by Broker for Seller, will represent the interests of the Buyer.

65. 55. The Pennsylvania Association of Realtors (a state-level affiliate of NAR) also publishes a standard listing agreement—which just happens to be the only other form of listing agreement approved by West Penn MLS for use by its subscribers—that includes identical terms to those described in paragraphs 50-51 71-72.

66. 56. West Penn MLS has a history of implementing rules that have anticompetitive effects. For example, in 2009, West Penn MLS settled charges—via consent order—brought against it by the Federal Trade Commission for rules that effectively barred brokers who offered

16

"unbundled," flat-rate, or otherwise innovative discount service packages from becoming subscriberssubscribing to the service.

67.    In other words, Defendants have a track record of engaging in practices designed to inhibit price competition among real estate brokers operating within the Service Area.

**Buyer Broker Commission Rule**

68.    57. The rules and standard listing agreement terms detailed above and adopted and implemented by West Penn MLS, the Broker Defendants, and their co-conspirators, flow directly fromare clearly inspired by rules and policies promulgated by NAR.

58. As noted above, NAR's rules and policies have already been found to violate the federal antitrust laws.

69.    59. NAR's Handbook on Multiple Listing Policy mandates that "[i]n filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants."[4]

70.    60. The Handbook further states that "[m]ultiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."

71.    61. The Buyer Broker Commission Rule therefore shifts a cost to the seller that would otherwise be paid by the buyer in a competitive market. As *The Wall Street Journal* opined, the result is that home sellers are effectively required to hire a buyer broker if they wish to list their home on an MLS, which requires the services of a seller broker, and that this system is a violation

---

[4] *See* Section G.1, https://www.nar.realtor/sites/default/files/documents/2019-HMLP.pdfhttps://www.nar.realtor/sites/default/files/documents/2019-HMLP.pdf

4879-6049-2181 v3

of "the Sherman Anti-Trust Act that keeps buying agents paid though they offer almost no useful services."[5]

~~62. All policies that are retained unchanged, and all modified or revised or new policies, are then set forth by NAR in new editions of the Handbook that tend to be issued annually.~~

72. ~~63.~~ The rules and required standard listing agreement provisions promulgated by West Penn MLS, and accepted, adopted, and implemented by the Broker Defendants and their co-conspirators, are ~~directly~~ modeled on NAR's rules and policies.

73. ~~64.~~ In ~~revising and re-issuing the Handbook, NAR has~~ adopting these rules, West Penn MLS and the Broker Defendants have invited each ~~Defendant and other co-conspirators~~ and every residential real estate broker and agent operating in the Service Area to participate in the following agreement, combination, and conspiracy: They can participate in the MLS, and gain the benefits provided by ~~NAR and the MLS~~ it, but only upon the condition that they agree to adhere to and enforce ~~the~~ anticompetitive restraints ~~set forth in the Handbook~~ on price competition among brokers.

~~65. West Penn MLS and the Broker Defendants, along with their co-conspirators in the western Pennsylvania region, have furthered and participated in this agreement, combination, and conspiracy by adopting, implementing, and enforcing rules and policies modeled on those issued by NAR.~~

74. ~~66.~~ Thus, to the extent any Defendant argues that it was not involved in the initial drafting or adoption of ~~NAR's Buyer Broker Commission Rule~~ West Penn MLS's rules, that

---

[5] Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J. (Mar. 3, 2019), ~~https://www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734~~ https://www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734.

4879-6049-2181 v3

argument lacks legal significance because each Defendant has joined the conspiracy and agreed to abide by, implement, and enforce the Buyer Broker Commission Rule within the West Penn MLS Service Area.

75. 67. Similarly, although access to an MLS is of great significance to a broker in maintaining its business—without such access, a broker would face enormous disadvantages in marketing properties its clients are trying to sell or finding properties its clients would be interested in buying—any argument that Defendants had no choice but to adopt NAR'sWest Penn MLS's rules is likewise legally insignificant.

76. 68. As noted above, West Penn MLS is directed and controlled by a board of directors comprised of the principals, officers, and/or employees of the Broker Defendants and their co-conspirators. Furthermore, as noted above, virtually all of the real estate brokers in the western Pennsylvania region are members of West Penn MLS—thereby giving West Penn MLS a virtual monopoly in that geographic region.

77. 69. Thus, Defendants could, at any time, have chosen to shed the anticompetitive Buyer Broker Commission Rule without any meaningful threat to their position in the market.

78. 70. Instead, Defendants have maintained the Buyer Broker Commissions Rule (and related rules and policies) in order to stabilize commissions at an inflated level and to prevent competition—in the form of different (and lower) commission structures and service models—from driving down commission levels.

**Effects of the Buyer Broker Commission Rule**

79. 71. Defendants' conspiracy has had the following anticompetitive effects throughout the Service Area:

4879-6049-2181 v3

a. Home sellers have been forced to pay commissions to a buyer broker—who represent their adversaries in negotiations to sell their homes—thereby substantially inflating the cost of selling their homes.

b. Home sellers have been compelled to set a high buyer broker commission to induce buyer brokers to show their homes to the buyer brokers' clients.

c. Home sellers have paid inflated buyer broker commissions and inflated total commissions.

d. The retention of a buyer broker has been severed from the setting of the broker's commission; the home buyer retains the buyer broker, while the home seller's agent actually sets the buyer broker's compensation.

e. Price competition among brokers to be retained by home buyers has been restrained, as has price competition among brokers seeking to be retained to sell homes.

f. Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer broker commission.

g. The Broker Defendants have increased their profits substantially by receiving inflated buyer broker commissions and inflated total commissions.

80. 72. There are no pro-competitive effects of Defendants' conspiracy, which is plainly anticompetitive and injurious to competition.

20

81. ~~73.~~ Even if any alleged pro-competitive effects exist, they are substantially outweighed by the conspiracy's anticompetitive effects.

82. ~~74.~~ Substantial economic evidence supports the view that Defendants' conspiracy has resulted in inflated total commissions and inflated buyer broker commissions paid by home sellers, at levels far above what a competitive market would produce.

83. ~~75.~~ Compared to other countries with competitive markets for residential real estate brokerage services, the commissions in the United States are substantially higher. Economists Natalya Delcoure and Norm Miller compared international real estate commissions with those in the United States.[6] They found:

> Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand . . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%.[7]

84. ~~76.~~ Delcoure and Miller also found variation within countries. For example, in the UK, they found that "1%-2% is typical" for total broker commissions, but that in "very competitive areas" the total rates ranged between "0.5-0.75%" whereas in lower priced areas the range was "as high as 3.5%."[8] Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."[9]

85. ~~77.~~ In comparison, the total broker commissions (*i.e.*, the aggregate commission paid to the seller broker and buyer broker) in most areas of the United States average between 5%

---

[6] *See* Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 Int'l Real Estate Review 12 (2002).
[7] *Id*. at 14.
[8] *Id.* at 17
[9] *Id.* at 13

4879-6049-2181 v3

and 6%, with buyer broker commissions by themselves holding steady in a range between 2.5% and 3%. These numbers have remained stable despite both rising home prices (which leads to larger commission amounts) and the decreasing role of the buyer broker in an age when many prospective home buyers have already scoured the market using Zillow or other websites.

86. 78. Other economists have reached similar conclusions. A Professor of Economics from Cornell University has described the Buyer Broker Commission Rule — that is, the NAR requirement (adopted by West Penn MLS and the Broker Defendants) of having "the seller pay[] for the commission of both the listing [selling] agent and the cooperative [buyer's] agent" — as a "structural hurdle" that has prevented innovation and price competition in the real estate market.[10] This "hurdle" exists only because of Defendants' anticompetitive conspiracy and does not stem from any actual or unique structural aspect of real estate markets.

87. 79. Commissions paid in the western Pennsylvania region follow this national trend, with the typical commission paid by home sellers within the service area ranging anywhere from 5% to as high as 7%, with an average total commission of 5.53%.[11]

88. 80. In addition, the Buyer Broker Commission Rule encourages and facilitates anticompetitive steering away from brokers who deviate from the "standard" commission practices and rates. The Buyer Broker Commission Rule enables buyer brokers to identify and compare the

---

[10] *See* FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at*
https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf
https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf

[11] *See* https://listwithclever.com/average-real-estate-commission-rate/pennsylvania/.

4879-6049-2181 v3

buyer broker compensation offered by every seller and then steer their clients toward homes offering higher commissions.

89. ~~81.~~ This practice of steering, confirmed by economic literature, has manifest anticompetitive effects. Steering deters reductions from the "standard" commission and enables brokers to avoid doing business with, or to retaliate against, buyer brokers who try to compete by offering significant discounts.

90. ~~82.~~ Indeed, although West Penn MLS's rules permit listing brokers to indicate zero dollars as the amount of commission to be paid to the buyer broker, the reality is that the steering effects of the Buyer Broker Commission Rule ensures that virtually no seller or listing broker will provide for a buyer broker commission that is significantly out of line with what is "typical" or "customary."

91. ~~83.~~ This is because by requiring sellers to make a blanket, unilateral offer of compensation ~~in advance of any offer being made on a listed property~~, the Buyer Broker Commission Rule enables brokers and agents (who all, as noted above, variously represent buyers and sellers) to discipline listing brokers who might stray from the norm by refusing to show their properties to prospective buyers or only showing them after showing properties advertising the expected commission.

92. ~~84.~~ Thus, the option to list zero dollars as the buyer broker's commission is little more than a smokescreen, giving the appearance that actors in the market are free to negotiate and compete on price, when in fact they are not.

93. ~~85.~~ The economic evidence is plain that the Buyer Broker Commission Rule works to restrain competition in several respects in real estate markets with the result being that home

23

sellers pay far more than they would in a market not fettered by the Buyer Broker Commission Rule.

94. ~~86.~~ Defendants' conspiracy and the Buyer Broker Commission Rule was designed to keep real estate commissions at elevated, supra-competitive levels, and Defendants have managed to keep the standard commission at right around 6 percent for many years, despite significant changes in technology that should have substantially reduced commission charges.

## **RELEVANT MARKET AND DEFENDANTS' MARKET POWER**

95. The relevant market for the claims asserted herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with MLS access. Defendants' control of the MLS and the rule that all brokers must use MLS allows Defendants to impose the Buyer Broker Commission Rule and other anticompetitive rules on a class-wide basis. Access to the West Penn MLS is critical for brokers to compete and to assist home buyers and sellers in the West Penn MLS Service Area.

96. The relevant geographic market for the claims asserted herein are no broader than the geographic area covered by the West Penn MLS. The residential real estate business is inherently local. Most sellers prefer to work with brokers that are familiar with the local market conditions and have experience selling homes in the local market. Similarly, most buyers prefer to work with brokers who have knowledge of the area in which they have an interest.

97. The Federal Trade Commission and Department of Justice have similarly defined the market for residential real estate brokerage services within the United States based on the geographic area covered by each local MLS.

98. MLSs also define themselves in regional/local terms. The West Penn MLS has adopted a geographically defined service area that is regional in scope.

4879-6049-2181 v3

99.     Defendants consisting of other conspiring brokers in the West Penn MLS coverage area, collectively provide a significant portion of the residential real estate broker services in these areas.

100.     According to data provided by West Penn MLS, there were approximately 26,000 homes sold in the Service Area in 2023, down from about 29,600 homes sold in 2022.[12]

101.     The average sale price for homes listed on the West Penn MLS was $288,000 in 2023, which represented an approximately $15,000 increase from 2022.[13]

102.     Based on the average number of sales and average sale price, West Penn MLS's Service Area constitutes an approximately $8 billion per year residential real estate market for home sales.

103.     Based on self-reported data provided to the Pittsburgh Business Times (PBT) for its annual survey of Pittsburgh-area residential real estate firms, the Broker Defendants include about half of the top 10, and one-third of the top 28, residential real estate brokerages operating in the Service Area.

104.     Furthermore, Defendants' un-named co-conspirators, which include subsidiaries and/or affiliates of Re/Max and Anywhere Real Estate, make up almost the entire remainder of the firms listed as comprising PBT's survey.[14]

---

[12] *See* https://triblive.com/local/westmoreland/realtors-see-rebound-for-housing-market-in-2024-spurred-by-lower-interest-rates/
[13] *Id.*
[14] Re/Max and Anywhere Real Estate have entered into prospective nation-wide settlement agreements with plaintiffs in the *Burnett/Sitzer* and *Moehrl* cases. Those settlements purport to release any and all buyer-broker commission fee related claims that could have been brought against Re/Max, Anywhere, or any of their subsidiaries, franchisees, or affiliates. The proposed settlements have not yet obtained final court approval. In the event the settlements are not approved, Plaintiffs intend to move to join the Re/Max and Anywhere affiliates operating within the western Pennsylvania region.

4879-6049-2181 v3

105.　Any buyer-brokers in the West Penn MLS coverage area who wished to compete outside of Defendants' conspiracy would face insurmountable barriers. Defendants' control of the West Penn MLS means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service. A seller-broker attempting to sell a home without a listing service would not have access to the majority of potential buyers and a buyer-broker representing a buyer without a listing service would not have access to the large majority of sellers. Simply put, brokers cannot compete without access to a listing service.

106.　For an alternative listing service to compete effectively with an MLS, the alternative would need to have listings as comprehensive or at least nearly as comprehensive as an MLS. But there is no incentive for brokers and their individual realtors or agents who currently profit from inflated buyer-broker commissions and total commissions to create and/or participate in an alternative listing service that would generate lower total commissions and lower buyer-broker commissions and seller-broker commissions.

107.　Home buyers would be reluctant to retain a buyer-broker operating on an alternative listing service that required them to pay the buyer-broker commission, when other buyer-brokers operating on an MLS- are entirely compensated by home sellers. Accordingly, seller-brokers on an alternative listing service would struggle to attract buyer-brokers and their buyer clients.

108.　Moreover, many home sellers would not retain brokers using a new, unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient buyers and buyer-brokers. Any listing service attempting to compete with an MLS would likely fail to attract enough property listings to operate profitably and be a competitive constraint on the

26

incumbent MLS. Hence, the absence of listing services that compete with West Penn MLS reflects the very substantial barriers to entry.

## **CLASS ACTION ALLEGATIONS**

109. ~~87.~~ Plaintiffs bring this action on behalf of themselves and on behalf of the members of a Class, pursuant to Federal Rule of Civil Procedure 23, defined as follows for the purposes of Plaintiffs' claims under 15 U.S.C. § 1 (the "Antitrust Class"):

> All persons or entities who, from December 4, 2019, through the present used a listing agent or broker affiliated with or employed by one of the Broker Defendants in the sale of a home listed on the West Penn MLS, and who paid a commission to the buyer's broker in connection with the sale of the home.

110. Plaintiffs also bring this action on behalf of themselves and on behalf of the members of a class, pursuant to Federal Rule of Civil Procedure 23, defined as follows for the purposes of Plaintiffs' claims under 73 P.S. §§ 201-1, *et sq.* (the "PA CPL Class"):

> All individuals who, from December 4, 2019, through the present used a listing agent or broker affiliated with or employed by one of the Broker Defendants in the sale of a home listed on the West Penn MLS, and who paid a commission to the buyer's broker in connection with the sale of the home.

111. ~~88.~~ Excluded from the ~~Class~~ Classes are Defendants, their officers, directors, and employees; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firm.

112. ~~89.~~ The ~~Class~~ members of both Classes are ascertainable as Defendants possess records relating to the residential real estate transactions at issue in this litigation.

113. 90. Data publicized by West Penn MLS indicates that nearly 2,000 units of residential real estate were sold in the Service Area in January 2020 alone.[12][15] Similarly, as noted above, annual data from West Penn MLS for 2022 and 2023 suggests that well over 25,000 homes are sold in the Service Area each year. As such, Plaintiffs reasonably believe that the Class is comprised of many thousands of individuals and is thereforeClasses are so numerous as to make individual joinder of all Class members impracticable.

114. 91. Common questions of law and fact exist as to all members of the ClassClasses and predominate over questions that affect only individual Class members. These common questions of law and/or fact, include but are not limited to:

    a.    Whether Defendants engaged in the alleged conspiracy;

    b.    Whether the conduct of Defendants' and their co-conspirators caused injury to the business or property of Plaintiffs and the Class members.

    c.    Whether Defendants' conspiracy caused the amount of total commissions and buyer broker commissions paid in the Service Area to be inflated;

    d.    Whether the competitive harm caused by the conspiracy substantially outweighs any competitive benefit;

    e.    Whether Plaintiffs and the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief;

---

[12][15] *See* https://www.prnewswire.com/news-releases/residential-real-estate-begins-new-year-with-a-bang-301026645.html

28

f.     Whether Defendants' conduct was deceptive within the meaning of Pennsylvania's CPL, such that it created a likelihood of confusion or of misunderstanding;

g.     ~~f.~~ Whether Defendants' conduct is unlawful; and

h.     ~~g.~~ The appropriate class-wide measure of damages.

115.   ~~92.~~ Plaintiffs' claims are typical of the claims of the ~~Class~~Classes, as Plaintiffs' claims arise from the same course of conduct.

116.   ~~93.~~ Plaintiffs have retained counsel with experience in antitrust litigation and the prosecution of class and/or collective actions. Together, Plaintiffs and their counsel will zealously prosecute this action for the benefit of the ~~Class~~Classes and will fairly and adequately protect the interests of the ~~Class~~Classes.

117.   ~~94.~~ A class action is superior to other available methods for the fair and efficient adjudication of the claims in this ~~controversy~~action. The prosecution of separate actions by numerous individual members of the classes would impose undue burdens on Defendants and the judicial system and would create a risk of inconsistent adjudications of the questions of law and fact common to the ~~Class~~Classes. The class action mechanism, on the other hand, can generate significant efficiencies of both time and expense and would ensure consistency.

**ANTITRUST INJURY**

118.   ~~95.~~ Defendants' anticompetitive agreements and conduct have had the following effects, among others:

a.     ~~h.~~ Sellers of residential property have been made to pay inflated costs to sell their homes because Defendants' rules and practices require them to pay commissions to buyer brokers;

29

b.    ~~i.~~ Home sellers have been forced to set buyer broker commissions to induce buyer brokers to show the sellers' homes to prospective buyers;

c.    ~~j.~~ Price competition has been restrained, both among buyers' brokers and among sellers' brokers; and

d.    ~~k.~~ the Broker Defendants have inflated their profits through artificially increased total commissions and increased buyer broker commissions.

119.    ~~96.~~ By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their business or property, have paid higher total commissions than they would have paid in the absences of Defendants' anticompetitive conspiracy, and have suffered damages as a result.

120.    ~~97.~~ There are no pro-competitive effects of Defendants' conspiracy that are not substantially outweighed by the conspiracy's anticompetitive effects.

121.    ~~98.~~ Significant economic evidence supports concluding that Defendants' conspiracy has resulted in Plaintiffs and the Class paying buyer broker commissions and total commissions that have been inflated to a supra-competitive level.

122.    ~~99.~~ This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**INTERSTATE TRADE AND COMMERCE**

123.    Defendants' conduct as described in this Complaint was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

30

124.     The price-fixing combination or conspiracy in which Defendants participated with their co-conspirators had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## COUNT I – VIOLATION OF 15 U.S.C. § 1

### (All Plaintiffs; All Defendants)

125.     ~~100.~~ Plaintiffs incorporate by reference each of the foregoing paragraphs as though set forth at length herein.

126.     ~~101.~~ Beginning more than four years before the filing of this Complaint, and continuing into the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

127.     ~~102.~~ The conspiracy alleged herein consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make inflated payments to the broker representing the purchaser of the seller's home.

128.     ~~103.~~ In furtherance of this contract, combination, or conspiracy West Penn MLS and the Broker Defendants, along with their co-conspirators, have committed one or more of the following overt acts:

> a.     ~~l.~~ Participating in the implementation, maintenance, and enforcement of the Buyer Broker Commission Rule and other anticompetitive rules by and among West Penn MLS subscribers and within the West Penn MLS Service Area; and
>
> b.     ~~m.~~ the Buyer Broker Defendants requiring and encouraging the individual brokers and agents they employ to implement the Buyer Broker Commission Rule and related anticompetitive policies.

31

129. ~~104.~~ Defendants' conspiracy has required sellers to pay buyer brokers, to pay an inflated buyer broker commission and an inflated total commission, and it has restrained price competition among buyer brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

130. ~~105.~~ Defendants' conspiracy has caused buyer broker commissions and total commissions to be inflated. Plaintiffs and the other Class members paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate. Absent Defendants' conspiracy, Plaintiffs and the other Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer.

131. ~~106.~~ Defendants' conspiracy is a *per se* violation of the Sherman Act, 15 U.S.C. § 1.

132. ~~107.~~ Alternatively, Defendants' conspiracy violates 15 U.S.C. §1 under a rule-of-reason analysis.

133. ~~108.~~ As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S. C. § 1, Plaintiffs and the other members of the Class have been injured in their business and property and suffered damages in an amount to be proven at trial.

## COUNT II – VIOLATION OF 73 P.S. §§ 201-1, *et sq.*

### (All Plaintiffs; All Defendants)

134. Plaintiffs incorporate the foregoing paragraphs 1-133 as though set forth at length herein.

4879-6049-2181 v3

135. The CPL creates a private right of action for consumers of goods or services who (1) purchased or leased good or services primarily for a personal, family, or household purpose; (2) suffered an ascertainable loss of money or property; (3) that loss resulted from the use or employment by a vendor of a method or act made unlawful by the CPL; and (4) the consumer justifiably relied upon the unfair or deceptive business practice.

136. In relevant part, the CPL defines "unfair or deceptive acts or practices" to mean, "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi).

137. Plaintiffs retained the services of real estate brokers for personal or household purposes, namely the sale of their homes.

138. These Plaintiffs suffered an ascertainable loss of money in the form of paying inflated broker commissions on the sale of their homes.

139. The Buyer Broker Commission Rule is deceptive and creates a likelihood of confusion or of misunderstanding because the average home seller will not know that the "standard" or "typical" commission rate urged by their listing broker is the result of anticompetitive collusion among brokers.

140. These Plaintiffs justifiably relied on their listing brokers as their agents for the sale of their homes and as experts in the field of residential real estate sales.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, requests that the Court grant judgment in their favor and against Defendants and awards them relief as follows:

4879-6049-2181 v3

a. An order certifying ~~a Class~~the Classes described above under Federal Rule of Civil Procedure 23 and appointing Plaintiffs and their counsel to represent the ~~class~~classes;

b. A declaration that Defendants' conduct, as set forth above, is unlawful;

c. A permanent injunction under Section 16 of the Clayton Act enjoining Defendants from (1) including in listing agreements any mandatory field requiring ~~that~~home sellers ~~pay the buyer broker~~to make any blanket offer of compensation (even $0) to buyer's agents; and (2) continuing to restrict competition among residential real estate brokers in the manner set forth above;

d. An award of treble damages and/or restitution to Plaintiffs and the Class in an amount to be determined at trial for violations of federal antitrust law;

e. An award of treble damages for violations of the Pennsylvania CPL, as permitted under 73 P.S. § 201-9.2;

f. ~~e.~~An award of pre- and post-judgment interest to Plaintiffs;

g. ~~f.~~An award to Plaintiffs of the costs of this lawsuit, including reasonable attorneys' fees and expenses; and

h. ~~g.~~Any other relief the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury on all issues so triable.

Dated: ~~December 4~~January 26, ~~2023~~2024

Respectfully Submitted,

/s/ *Bruce C. Fox*
Bruce C. Fox (PA 42576)
Hugh T. McKeegan (PA 325673)
OBERMAYER REBMANN
MAXWELL & HIPPEL LLP
525 William Penn Place, Suite 1710

4879-6049-2181 v3

Pittsburgh, PA 15219
(412) 566-1500 (Phone)
(412) 281-1530 (Fax)
bruce.fox@obermayer.com
hugh.mckeegan@obermayer.com

| Summary report: Litera Compare for Word 11.3.1.3 Document comparison done on 1/26/2024 8:39:57 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** nd://4893-3952-1184/1/Realtor Antitrust Class Action Complaint 3 4879-6049-2181.docx | |
| **Modified DMS:** nd://4871-2571-2544/2/Realtor Antitrust Class Action Complaint (clean final).docx | |
| **Changes:** | |
| Add | 319 |
| Delete | 213 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 532 |

Exhibit B

**Subject: Activity in Case 2:23-cv-02061 SPRING WAY CENTER, LLC et al v. WEST PENN MULTI-LIST, INC. et al Order of Recusal**

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Western District of Pennsylvania

**Notice of Electronic Filing**

The following transaction was entered on 1/29/2024 at 10:01 AM EST and filed on 1/29/2024

| | |
|---|---|
| **Case Name:** | SPRING WAY CENTER, LLC et al v. WEST PENN MULTI-LIST, INC. et al |
| **Case Number:** | 2:23-cv-02061 |
| **Filer:** | |
| **Document Number:** | 31(No document attached) |

**Docket Text:**

**ORDER OF RECUSAL. Judge Christy Criswell Wiegand recused per 28 U.S.C. § 455. Signed by Judge Christy Criswell Wiegand on 1/29/2024. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (bjw)**

**2:23-cv-02061 Notice has been electronically mailed to:**

Andrew J. Horowitz     andrew.horowitz@obermayer.com, amie.regan@obermayer.com, hugh.mckeegan@obermayer.com, maureen.boyd@obermayer.com, salena.moran@obermayer.com

Joseph Aaron Carroll     jac@muslaw.com, muslawpitt@yahoo.com, rae@muslaw.com

Wendelynne J. Newton     wendelynne.newton@bipc.com, eservice@bipc.com, nannette.quillen@bipc.com

Gretchen L. Jankowski     gretchen.jankowski@bipc.com, eservice@bipc.com, william.vankirk@bipc.com

Bruce C. Fox     bruce.fox@obermayer.com, amie.regan@obermayer.com, andrew.horowitz@obermayer.com, hugh.mckeegan@obermayer.com, maureen.boyd@obermayer.com, salena.moran@obermayer.com

Chad I. Michaelson     cim@muslaw.com, mjs@muslaw.com, muslawpitt@yahoo.com

Jason M. Yarbrough     jmy@muslaw.com, aah@muslaw.com, muslawpitt@yahoo.com

**2:23-cv-02061 Filer must deliver notice by other means to:**

DANIELLE KAY

JESSIE KAY