**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **In re: Real Estate Commission Litigation** | **MDL-3100** |

**MOVANTS' CONSOLIDATED REPLY IN SUPPORT OF MOTION FOR TRANSFER
OF ACTIONS TO THE WESTERN DISTRICT OF MISSOURI PURSUANT TO 28
U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL
PROCEEDINGS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................3

    I.    The Panel Should Consolidate the Actions Requested by the Umpa and Gibson Plaintiffs. ......................................................................................3

    II.    The Umpa and Gibson Plaintiffs Take No Position on Consolidation of the Nosalek, and Home-Buyer Actions, but Moehrl Should Not Be Consolidated Given Its Advanced Stage................................................12

    III.    The Western District of Missouri is the Ideal Forum for Consolidation. ..............14

CONCLUSION..................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Burnett v. Nat'l Ass'n of Realtors*,
 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022) ............................................................. *passim*

*Burnett v. Nat'l Ass'n of Realtors*,
 No. 19-cv-00332-SRB (W.D. Mo.) ...........................................................................15

*Gibson v. Nat'l Ass'n of Realtors*,
 No. 23-cv-788 (W.D. Mo.) ................................................................................ *passim*

*In re Activated Carbon-Based Hunting Clothing Mktg. & Sales Practices Litig.*,
 626 F. Supp. 2d 1358 (J.P.M.L 2009).........................................................................16

*In re Armodafinil Patent Litig.*,
 755 F. Supp. 2d 1359 (J.P.M.L. 2010)........................................................................16

*In re Auto Body Shop Antitrust Litig.*,
 37 F. Supp. 3d 1388 (J.P.M.L. 2014)...........................................................................7

*In re Broiler Chicken Grower Antitrust Litig.*,
 509 F. Supp. 3d 1359 (J.P.M.L. 2020)........................................................................16

*In re Cook Medical, Inc., Pelvic Repair System Products Liability Litig.*,
 949 F. Supp. 2d 1373 (2013) ...................................................................................6

*In re Corn Derivative Antitrust Litig.*,
 486 F. Supp. 929 (J.P.M.L. 1980)..............................................................................17

*In re Deere & Company Repair Services Antitrust Litig.*,
 607 F. Supp. 3d 1350 (J.P.M.L. 2022)....................................................................9, 13

*In re Future Motion, Inc. Products Liability Litig.*,
 2023 WL 8539210 (J.P.M.L. Dec. 8, 2023) ................................................................13

*In re Gator Corp. Software Trademark & Copyright Litig.*,
 259 F. Supp. 2d 1378 (J.P.M.L. 2003).......................................................................17

*In re Helicopter Crash Near Wendle Creek, British Columbia, on August 8, 2002*,
 542 F. Supp. 2d 1362 (J.P.M.L. 2008).......................................................................14

*In re Inclusive Access Course Materials Antitrust Litig.*,
 482 F.Supp.3d 1358 (J.P.M.L. 2020).........................................................................13

*In re Insulin Pricing Litig.*,
2023 WL 5065090 (J.P.M.L. Aug. 3, 2023)....................................................13, 14, 15

*In re McKinsey & Company, Inc., National Prescription Opiate Consultant Litig.*,
543 F. Supp. 3d 1377 (J.P.M.L. 2021).....................................................................14

*In re Santa Fe Natural Tobacco Co. Marketing & Sales Practices Litig.*,
178 F. Supp. 3d 1377 (J.P.M.L. 2016).......................................................................8

*In re Smitty's/CAM2 303 Tractor Hydraulic Fluid Marketing, Sales Practices & Products Liability Litig.*,
466 F. Supp. 3d 1380 (J.P.M.L. 2020).....................................................................18

*March v. REBNY*,
No. 23-cv-09995-JGLC-RWL (S.D.N.Y.), ECF No. 1 .........................................11

*Moehrl v. Nat'l Ass'n of Realtors* (*Moehrl II*),
2023 WL 2683199 (N.D. Ill. Mar. 29, 2023)........................................................2, 4

*Moehrl v. Nat'l Ass'n of Realtors*,
Case No. 1:19-cv-01610-ARW (N.D. Ill.)....................................................... *passim*

*Umpa v. Nat'l Ass'n of Realtors*,
No. 23-cv-00945-SRB (W.D. Mo.) ................................................................. *passim*

**Statutes**

28 U.S.C. § 1407....................................................................................1, 3, 12, 20

**Other Authorities**

*MDL Statistics Reports - Distribution of Pending MDL Dockets by District*, Jud.
Panel on Multidistrict Litig. (January 2, 2024).......................................................17

RLS Universal Co-Brokerage Agreement Rules and Regulations ...........................11, 12

U.S. District Courts-Combined Civil and Criminal Federal Court Management
Statistics (September 30, 2023) ...............................................................................18

## INTRODUCTION

The actions at issue involve industrywide rules governing the conduct of real estate agents and brokers promulgated by the National Association of Realtors. Several of these rules apply nationwide to all NAR members (i.e. "REALTORS®"), regardless of whether they participate in the vast majority of Multiple Listing Services that are under NAR's exclusive control, or the minority that are not. Other rules at issue have been adopted nationwide without variation by NAR-controlled Multiple Listing Services and with no or only slight variations by other MLSs.

These rules are followed and implemented by the same kind of industry participants named as defendants in all the actions: residential real estate brokerages and their owners and franchisors. (Indeed, many of these participants have a national presence and have been named as defendants in multiple suits.) And—regardless of the alleged "localized" nature of real estate markets—the legality of the challenged rules present questions common to all of the cases and have resulted in the same anticompetitive effects and impact nationwide: inflated commissions paid by home sellers to brokers representing homebuyers. Given the significant common questions of fact and law, centralization would promote the convenient, just, and efficient conduct of these actions. *See* 28 U.S.C. § 1407. A substantial number of plaintiffs and defendants, including key defendants named in multiple suits such as NAR, agree. *See, e.g.*, ECF No. 196 (NAR); ECF No. 259 (Ansley Atlanta, LLC et al.); ECF No. 261 (Marin Ass'n of Realtors et al.); ECF No. 267 (Georgia Plaintiffs); ECF No. 271 (Weichert Realtors et al.); ECF No. 280 (United Real Estate); ECF No. 286 (Arizona Plaintiff); ECF No. 292 (Hanna Holdings, Inc.); ECF No. 294 (Redfin Corporation).

While opponents of transfer point to some defendant-specific inquiries that will arise— namely, whether a particular named defendant joined the challenged conspiracy—they fail to engage with the counterfactual. In comparison to each of these actions being handled separately in

their individual districts, centralization is by far the more convenient, just, and efficient outcome because of the overlapping issues they raise concerning the operation of the challenged rules and their effects. It does not make sense to have multiple courts repeatedly addressing the same issues using overlapping discovery simply because there may be some individualized issues in some cases.

Further, while opponents emphasize the allegedly localized nature of the real estate market in the United States, they focus on irrelevant differences and ignore the fundamental conduct at the core of each of the actions. The challenged rules are national in scope. And their anticompetitive effects—inflated commissions—have impacted home sellers across the country. Amply highlighting this, two pending class actions brought on behalf of home sellers across many regions of the country have been certified where the court rejected similar arguments opponents now make about the allegedly localized nature of the market. *See Burnett v. Nat'l Ass'n of Realtors*, 2022 WL 1203100, at *7 (W.D. Mo. Apr. 22, 2022); *Moehrl v. Nat'l Ass'n of Realtors* (*Moehrl II*), 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023).

Accordingly, the Panel should centralize these actions in one court. And we respectfully submit it should assign the MDL to the Hon. Stephen R. Bough in the Western District of Missouri. Judge Bough has already shepherded one case challenging the same conduct all the way through trial, giving him invaluable experience and insights into the issues at the heart of the cases and demonstrating that he can and will advance an MDL efficiently. Moreover, his docket is less congested than those of the other judges and courts proposed, and his court's location in Kansas City, Missouri, is equally if not more convenient than the other venues proposed. Finally, he is already overseeing multiple settlements involving key common defendants (RE/MAX, Anywhere, and Keller Williams) that largely cover claims asserted against those same Defendants in the

newly-filed cases. Centralization before Judge Bough is particularly appropriate to ensure the efficient administration of those settlements. Alternatively, the MDL should be assigned to the Hon. Andrea R. Wood in the Northern District of Illinois, who has also ably and effectively managed the *Moehrl* case through the close of fact discovery and is also familiar with the key issues of this litigation.

## ARGUMENT

**I.      The Panel Should Consolidate the Actions Requested by the *Umpa* and *Gibson* Plaintiffs.**

Centralization of the actions proposed by the *Umpa* and *Gibson* Plaintiffs (*see* ECF No. 1) is appropriate here because these actions involve numerous "common questions of fact," transfer would be convenient for parties and witnesses, and transfer would promote the "just and efficient conduct" of the actions. *See* 28 U.S.C. § 1407. At their core, each of the actions challenge mandatory, industrywide rules promulgated by NAR. Several of these challenged rules apply nationwide to **all** NAR members (i.e. "REALTORS®")—regardless of whether they participate in the vast majority of Multiple Listing Services, which are NAR-controlled, or the minority that are not. The remaining rules at issue have been adopted nationwide without variation by NAR-affiliated Multiple Listing Services and with no or only slight variations by other MLSs. Accordingly, questions concerning the drafting, enactment, amendment, interpretation, and enforcement of these rules by NAR are common among all the actions. Further, because the rules are uniform or, at most, have slight variations, the anticompetitive effects are necessarily common as well.

Indeed, relying on extensive discovery and other evidence, two different courts (in *Moehrl* and *Burnett*) certified class actions involving a collective 24 different multiple listing services covering 21 different states and the District of Columbia. In doing so, both courts determined not

3

only that common questions of law and fact exist—but that these common questions predominate over the same types of individual considerations that the opponents to consolidation raise here. *See Burnett v. Nat'l Ass'n of Realtors*, 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022); *Moehrl v. Nat'l Ass'n of Realtors* (*Moehrl II*), 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023).

The several briefs in opposition to consolidation do not undermine these core conclusions. Instead, they obscure the Panel's inquiry by pointing to perceived difficulties that a judge supervising an MDL might face. But these supposed challenges would persist even if these actions were handled individually. The key inquiry for the Panel is whether transfer and centralization would make the conduct of these actions *more* convenient, just, and efficient than they otherwise would be as individual actions. Here, the answer to that question is clearly "yes."

Start with common questions of fact. Opponents of centralization maintain that the real estate industry is "localized" and that individualized fact questions would "predominate" in a multidistrict litigation. *See, e.g.*, ECF No. 268, at 12 (Texas Defendants); ECF No. 296, at 4 (Realty Austin, LLC et al.). That is inaccurate. While it is true that a multidistrict litigation would involve some localized evidence, the key questions of fact necessary to a finding of liability in these cases are common. Take two important (though certainly not exhaustive) examples: (1) the question whether a nationwide and industrywide "agreement" exists by virtue of the buyer-broker commission rules; and (2) the question whether buyer-broker commission rules are an unlawful restraint on trade.

On the question of agreement, the facts are essentially identical across the actions. Each involves rules enacted and promulgated by NAR—a nationwide trade association that owns the REALTOR® trademark—that have been adopted without variation in most of the country, and with *slight* variations in a few locations. It is for this reason that plaintiffs in several of these cases

allege a *nationwide* conspiracy and seek relief on behalf of a *nationwide* class of plaintiffs. *See Gibson v. Nat'l Ass'n of Realtors*, No. 23-cv-788 (W.D. Mo.); *Umpa v. Nat'l Ass'n of Realtors*, No. 23-cv-945 (W.D. Mo.). Minimal differences between local residential real estate markets have no bearing on questions concerning these nationwide rules. *Cf.* ECF No. 268, at 4–5. Nor do minor differences between buyer-broker commission rules—such as those alleged between the NAR rule and the REBNY rule. *Cf.* ECF No. 266, at 6 (REBNY).

The facts are likewise essentially identical with respect to whether the buyer-broker commission rules are an unlawful restraint on trade. The various defendants adopt the *same* buyer-broker commission rule: they require seller-brokers to offer buyer-brokers a commission as a prerequisite to access networks that are essential to do business. In doing so, the defendants are inflicting the same kind of anticompetitive harms nationwide. The rules incentivize brokers to steer buyers to homes offering higher commissions and disincentivize buyers from negotiating commissions (because they are not directly paying them)—both of which are common incentives that inflate commissions nationwide. Further, while Plaintiffs disagree that the rules have any procompetitive justifications, assuming, *arguendo*, that a rule of reason analysis would apply, those issues too will necessarily be common because of the uniform nature of the challenged rules.

Centralization on the question whether the challenged restraints are lawful under the antitrust laws is particularly important. This analysis may require detailed expert testimony. As such, discovery battles over expert witnesses will be crucial to the conduct of these actions. Given that several of these actions are on behalf of a nationwide class of plaintiffs, conflicting rulings on the admissibility or relevance of expert testimony could be detrimental to an efficient outcome of the actions. By contrast, centralization would allow expert discovery to proceed in a uniform fashion. It would also avoid the same efforts being duplicated across multiple actions.

Opponents of centralization ignore these common factual and legal questions and instead point to various "individualized" aspects of the real estate industry. Time and time again, respondents repeat their allegations that these actions involve "different" markets and "region specific" discovery. But they never explain how the alleged differences will actually result in fractured questions of fact or law. *See, e.g.*, ECF No. 257, at 10; ECF No. 296, at 4–5. Whether a defendant is located in California or Kansas, the question is whether they participated in a nationwide anticompetitive conspiracy.

Indeed, prior cases demonstrate that variations across local real estate markets will not result in the individualized factual inquiries suggested. Take, for example, the limited variation in buyer-broker commission rates across different real estate markets. Despite a modest variation in rates, the Plaintiffs in *Moehrl* proposed impact and damages models that accounted for the variation across twenty MLSs located around the country. *Moehrl v. Nat'l Ass'n of Realtors*, Case No. 1:19-cv-01610-ARW (N.D. Ill.), ECF No. 403, at 17–18. Part of the evidence of the conspiracy, and its effect, was that commission rates in each of the 20-plus geographic regions at issue in *Moehrl* are quite similar and substantially elevated over what would be expected in a competitive market. *See id.* at 17, 39 (finding expert methodology "capable of measuring classwide impact" despite individual differences in real estate markets).

To the extent that there are some individualized considerations in these actions, the mere presence of such considerations does not preclude centralization. *See In re Cook Medical, Inc., Pelvic Repair System Products Liability Litig.*, 949 F. Supp. 2d 1373, 1375 (2013) ("Though these actions present some individual issues of fact, . . . We find the unique facts presented by individual plaintiffs to be less significant than the fact that these actions share core issues of fact"). The question is whether centralization would be more convenient, just, and efficient than the

alternative. If these actions are not centralized, the district judges overseeing them will still be challenged by all the purportedly individual considerations opponents identify. The important benefit of centralization is that the multiple significant common questions of fact and law that do exist can be handled by one court. That would mitigate duplicative efforts and prevent contradictory outcomes for these nationwide actions.

Consider next the convenience of parties and witnesses. Again, the opponents of centralization point out imperfections that might result from a multidistrict litigation and obscure the relevant inquiry, which is whether centralization would be *more* convenient than the alternative. As movants have explained, centralization would reduce the risk of witnesses being subjected to duplicative discovery demands and would prevent contradictory pretrial decisions from confusing a nationwide litigation. *See* ECF No. 1, at 8–9 (initial motion); *In re Auto Body Shop Antitrust Litig.*, 37 F. Supp. 3d 1388, 1390 (J.P.M.L. 2014) (noting the "benefit of placing all related actions before a single judge who can structure pretrial proceedings to accommodate all parties' legitimate discovery needs.").

For the most part, opponents do not dispute this. Instead, they claim that the convenience of a multidistrict litigation could be achieved by agreements to rely on discovery that has already occurred in *Burnett* and *Moehrl* and by "informal coordination." *See, e.g.*, ECF No. 251, at 14 (HomeServices Defendants); ECF No. 268, at 9. These claims far underestimate the difficulty of coordinating through agreement where there are multiple highly complex cases, proceeding on different case schedules before multiple different judges, and involving extensive discovery of overlapping (but not identical) groups of defendants. The experience of *Moehrl* and *Burnett* is instructive, though not in the way that coordination opponents suggest. Although *Moehrl* and *Burnett* involved claims against identical defendant groups proceeding in only two courts, the

7

judges overseeing those cases were repeatedly called on to resolve attorney disputes over the appropriate extent and manner of coordination on discovery and other issues. And, while the limited informal coordination in *Moehrl* and *Burnett* alone was challenging, coordinating the *nine* different actions that movants originally sought to consolidate, the additional actions that NAR seeks to coordinate, and any future actions that may be filed, would be wholly impractical. *See In re Santa Fe Natural Tobacco Co. Marketing & Sales Practices Litig.*, 178 F. Supp. 3d 1377, 1378–79 (J.P.M.L. 2016) (centralizing "nine putative nationwide" class-actions with "minimal overlap in plaintiffs' counsel" was proper because "informal coordination" would be "difficult."). Furthermore, while opponents profess openness to informal coordination in their advocacy before the Panel now, that is no guarantee that they would permit the coordination and sharing of discovery materials as these actions progress. The fact that counsel for *Burnett* and *Moehrl* went through exceptional efforts to share discovery is hardly proof that coordination would be as convenient as centralization.

The difficulties of "informal coordination" are illustrated by recent conduct in the *Gibson* and *Umpa* actions. Movants and the defendants across those two actions were able—after multiple conferences and extended written correspondence—to agree upon a joint schedule for motion to dismiss briefing, a Rule 26(f) conference, and initial discovery. Yet one group of defendants—the HomeServices Defendants—refused to join in this coordination. *See Gibson*, 4:23-cv-788-SRB, ECF No. 84, at 2. That same group of Defendants now claims that informal coordination could provide the same benefits as centralization. ECF No. 251, at 14–15. But their own response later contradicts that claim, as they admit that they "have no interest in attending joint hearings" and "have no interest in attempting to coordinate motion practice or briefing." *Id.* at 17. If a defendant

who is a party to multiple of these cases has no interest in coordination, how can the parties reasonably be expected to informally coordinate amongst themselves?

And by highlighting the extent to which discovery *can* be shared in these actions, opponents demonstrate the predominance of common questions. As the HomeServices Defendants point out, the plaintiffs in *Nosalek* were able to rely mostly on documents and depositions from *Burnett* and *Moehrl* and have taken "only a single *Nosalek*-specific deposition to date." ECF No. 251, at 15. Even though *Nosalek* concerns a different region with "localized" real estate markets, the plaintiffs were able to rely primarily on discovery from *Moehrl* and *Burnett* because the key questions of fact were common. The same is true in the actions movants seek to centralize.

However, the fact that actions can potentially rely on some already-existing discovery does not weigh against centralization, as some opponents suggest. ECF No. 251 at 15 (arguing "plaintiffs in the new cases" could "proceed just as efficiently" without centralization because of common discovery). First, the current actions involve different time periods than the actions where discovery has already been completed, meaning that discovery in them will not simply amount to recycling what came before. Second, avoiding duplicative discovery is not the only goal of centralization. Centralization also seeks to "prevent inconsistent pretrial rulings" and "conserve the resources of the parties, their counsel, and the judiciary." *See In re Deere & Company Repair Services Antitrust Litig.*, 607 F. Supp. 3d 1350, 1351 (J.P.M.L. 2022). Even if these actions could rely substantially on discovery from former cases, centralization would still be necessary to achieve those other goals. The fact that the *Nosalek* plaintiffs do not oppose centralization shows this. *See* ECF No. 347. The conduct of these actions would be more just and efficient if discovery issues were handled by one judge who could issue uniform rulings.

The primary inconvenience of centralization raised by opponents concerns location. Several opponents point to the location of documents and witnesses as a reason against consolidation. *See, e.g.*, ECF No. 276, at 4; ECF No. 302, at 9–10. They ignore, however, how discovery will actually be conducted. In this day and age, documents are produced electronically so their physical location is irrelevant. As for the location of witnesses, they will likely be deposed where they reside regardless of whether the cases are consolidated or not.

Several opponents also complain about the proposed locations for consolidation, observing that they will be required to appear and argue in a more distant court. *See, e.g.*, ECF No. 302, at 11–12. Some parties also complain about coordinating in larger groups. *See, e.g.*, ECF No. 251, at 17. But those inconveniences are always present when the Panel centralizes actions, and they must be weighed against the conveniences that will result from centralization. Here, centralization will be vastly more convenient by creating a single discovery schedule process, and by coordinating briefing on discovery, class certification, summary judgment, and expert issues. For many parties, centralization will also allow the pursuit and defense of these actions in one district instead of several. Those conveniences, among others, outweigh the inconveniences to some parties that will result from litigation occurring in a more distant district.

Finally, parties to certain actions involving non-NAR MLSs argue that their actions should not be consolidated because they do not challenge the NAR rules challenged in other actions. *See, e.g.*, ECF No. 266, at 6 (REBNY); ECF No. 302, at 8 (Plaintiff Monty March); ECF No. 293, at 4 (West Penn Multi-List). But these parties ignore that the supposed non-NAR MLSs at issue in their cases are, in fact, "typically controlled by REALTOR® associations and/or NAR-aligned brokerages and are not fully independent from NAR," often explicitly adopt NAR's rules, and are controlled by many of the same brokerages companies that are responsible for adopting and

implementing the NAR rules being challenged. *See, e.g.*, *Umpa v. Nat'l Ass'n of Realtors*, No. 23-cv-00945-SRB (W.D. Mo.), ECF No. 1, at ¶ 110 (describing in detail NAR's control over and influence on these supposed non-NAR MLSs).[1]

For example, the New York opponents claim their actions should not be centralized because they do not involve the NAR rule. *See* ECF No. 266, at 6; ECF No. 302, at 8. But the New York opponents misrepresent the differences between the REBNY and NAR rules. For example, one opponent alleges that the REBNY rules do not require "blanket" offers and allow for "negotiation" of buyer-broker rates. *See* ECF No. 257, at 5–6 (Brown Harris Stevens). Yet, despite opposing centralization, plaintiff March alleges in his complaint that "***NAR regulations include***, in effect, ***the same rule as REBNY*** that mandates the payment of commission by a Seller Broker to a Buyer Broker" *March v. REBNY*, No. 23-cv-09995-JGLC-RWL (S.D.N.Y.), ECF No. 1, at ¶ 73; *see also id.* ¶¶ 81-100 (detailing NAR's anticompetitive rules, prior litigation challenging those rules, and the close relationship of both to REBNY's rules).

Indeed, even a cursory examination of the REBNY rule shows that it imposed functionally identical restraints as the NAR rule. Article I, § 6 of the REBNY rules states that "[a]ny change" in a so-called "Exclusive Listing" must be "entered into the [Residential Listing Service]." That means any negotiated change requires an adjustment to the public, blanket offer—just like the NAR rule. *See* RLS Universal Co-Brokerage Agreement Rules and Regulations, Art. I, § 6.

---

[1] *See also* Redacted Corrected Elhauge Class Report, *Moehrl v. Nat'l Ass'n of Realtors*, No. 19-cv-01610-ARW (N.D.Ill.), ECF. No. 324-6, at 233 (stating that "while MLSs that are not exclusively owned by Realtor associations are sometimes labelled 'independent MLSs,' many had features suggesting that they were in fact not fully independent from NAR. These features include: (i) partial MLS ownership by Realtor associations; (ii) MLS rules restricting ownership to brokers that are NAR members (i.e., Realtors); (iii) MLS rules limiting membership to NAR members (i.e., Realtors); (iv) MLS executive participation on NAR's MLS rulemaking bodies; and/or (v) MLS rules expressly adopting or incorporating NAR's Code of Ethics, NAR's MLS Handbook, and other NAR policies.").

Additionally, the REBNY rule discourages commission negotiation just as the NAR rule does: if a seller-broker negotiates a reduced commission with the property owner, the seller-broker "must absorb the full amount of the commission reduction." *Id.*, Art. IV, § 2. The REBNY rule and the NAR rule operate in functionally the same manner; the factual questions underlying whether either rule is an unlawful restraint on trade under the antitrust laws will be essentially identical.

*   *   *

In summary, these cases allege a nationwide conspiracy with nationwide effects, they raise numerous common questions of fact, and centralization would promote the convenient, just, and efficient conduct of these actions. Unsurprisingly, plaintiffs and defendants from across the actions agree and have supported our motion. The Panel should centralize.

## II.   The *Umpa* and *Gibson* Plaintiffs Take No Position on Consolidation of the *Nosalek*, and Home-Buyer Actions, but *Moehrl* Should Not Be Consolidated Given Its Advanced Stage.

NAR and other respondents support centralization but ask the Panel to consolidate additional actions not included in movants' original schedule of actions. *See, e.g.*, ECF No. 196, at 9–15; ECF No. 271. Movants did not include these cases in their motion because they are advanced or differ in other respects from the actions Movants seek to consolidate. That said, with the exception of *Moehrl*, movants do not object to the centralization of those additional actions. *Moehrl*, however, should not be centralized because doing so would not promote the just and efficient conduct of any action. *See* 28 U.S.C. § 1407. In fact, it would do the opposite. Several of the defendants agree. *See, e.g.*, ECF No. 251, at 15 n.12; ECF No. 268, at 17–18.

Pretrial proceedings in *Moehrl* are essentially complete. Merits and expert discovery are closed.  The parties are about to complete summary judgment briefing. *Moehrl v. Nat'l Assoc. of Realtors*, Case No. 1:19-cv-01610-ARW (N.D. Ill.), ECF No. 438 (minute order on briefing

12

schedule). And the court is in the process of setting a trial schedule. Thus, the pretrial rulings of a transferee judge could have no positive impact on *Moehrl*.

Nor is centralizing the *Moehrl* action itself necessary for the efficient conduct of the other actions. Since *Moehrl* is about to head to trial, consolidating it would offer none of the benefits of centralization that the Panel typically considers. There is no risk of *Moehrl* spawning inconsistent pretrial rulings, as the pretrial process is nearly over. *See In re Deere*, 607 F. Supp. 3d at 1351. There is no risk of *Moehrl* imposing duplicative discovery demands, as discovery is complete. *See id.* The only result of centralizing *Moehrl* would be to risk causing it to "stop in [its] tracks" while other cases catch up, over what is "likely to be a years long process." *See* ECF No. 269, at 12 (Plaintiff Shauntell Burton). That is the opposite of efficiency.

Respondents who advocate for the centralization of *Moehrl* misstate Panel precedent on the question of consolidating advanced actions. NAR, for example, argues that the Panel has consolidated actions after the close of discovery, and points to *In re Future Motion, Inc. Products Liability Litig.*, 2023 WL 8539210 (J.P.M.L. Dec. 8, 2023). But NAR omits the unique facts that justified centralization of the post-discovery actions in *Future Motion*. Namely, "all parties" in those post-discovery actions "support[ed] centralization." *Id.* at *2. And it was already known that the other centralized actions would use the same experts as the post-discovery actions. *Id.* Such factors are not at play here.

Other Panel precedents cited by NAR merely stand for the proposition that a more advanced action *can* be centralized with a less advanced action. *See In re Insulin Pricing Litig.*, 2023 WL 5065090, at *3 (J.P.M.L. Aug. 3, 2023) (assigning MDL to judge who "presides over the three most advanced actions."); *In re Inclusive Access Course Materials Antitrust Litig.*, 482 F.Supp.3d 1358, 1359 (J.P.M.L. 2020) ("[i]t is frequently the case . . . that actions transferred to

an MDL are in somewhat varying procedural postures."). Movants do not dispute that. The Panel certainly centralizes cases in different stages of pretrial proceedings. The issue with centralizing *Moehrl* is not simply that it is "more advanced." Rather, it is that discovery has closed and trial is imminent. In that context, centralization offers no benefit and could, in fact, jeopardize further progress in *Moehrl*.

## III.   The Western District of Missouri is the Ideal Forum for Consolidation.

The Western District of Missouri is an ideal forum for centralization, and Judge Stephen R. Bough is an ideal transferee judge. While several responses argue that these actions should be centralized in a different court, such as the Northern District of Illinois, Eastern District of Texas, or Western District of Pennsylvania,[2] the factors that the Panel typically considers all firmly point to the Western District of Missouri as the most appropriate forum.

To start, Judge Bough has the most experience with cases like these, having shepherded the similar *Burnett* action from complaint to verdict in less than five years. The Panel often looks to the familiarity of a judge with the underlying subject matter when making transfer decisions. *In re Insulin Pricing Litig.*, 2023 WL 5065090, at *3 (J.P.M.L. Aug. 3, 2023) (assigning MDL to judge whose "familiarity with the issues in this litigation will serve to maximize the efficient conduct of pretrial proceedings."); *In re Helicopter Crash Near Wendle Creek, British Columbia, on August 8, 2002*, 542 F. Supp. 2d 1362, 1363 (J.P.M.L. 2008) ("the transferee judge has developed a familiarity with the allegations, issues, parties and counsel involved in this docket, which will further the expeditious resolution of the litigation taken as a whole."); *In re McKinsey*

---

[2] *See, e.g.*, ECF No. 196, at 1 (suggesting N.D. Ill. or E.D. Tex.); ECF No. 251, at 12 (suggesting E.D. Tex.); ECF No. 292, at 1 (suggesting W.D. Pa.).

14

*& Company, Inc., National Prescription Opiate Consultant Litig.*, 543 F. Supp. 3d 1377, 1378 (J.P.M.L. 2021) (selecting a judge "who is already familiar with the contours" of the MDL).

In handling *Burnett* from complaint to verdict, Judge Bough has ruled on motions to dismiss, a motion for class certification, motions for summary judgment, *Daubert* motions, discovery motions, and pretrial motions. *See Burnett v. Nat'l Ass'n of Realtors*, No. 19-cv-00332-SRB (W.D. Mo.); *see also* ECF No. 267, at 12 (stating the same). In doing so—not to mention trying the case to verdict—he has become intimately familiar with the facts and pretrial issues that will arise in the centralized actions and is well-equipped to deal with them quickly and efficiently, as he did repeatedly in *Burnett*. As defendant Howard Hanna notes, "these are not run-of-the-mill cases and are not even run-of-the-mill antitrust cases"—making it all the more important to place the MDL in the hands of a judge already steeped in the intricacies of the cases. ECF No. 292, at 8. And even though the previous *Burnett* action involved Missouri MLSs, the rules at issue in that case were the same rules that apply nationwide, with the same nationwide effects, and will be at the heart of the MDL.

Furthermore, Judge Bough is presiding over the pending national settlements with RE/MAX, Anywhere (formerly Realogy), and Keller Williams that will resolve the claims asserted in *Moehrl* and *Burnett* against those defendants.[3] These defendants and their subsidiaries and other affiliates have been named in several of the other actions. Effectively and efficiently managing these nationwide settlements would require the actions to be centralized in front of Judge Bough. *See, e.g.*, *In re Insulin Pricing Litig.*, 2023 WL 5065090, at *3 (J.P.M.L. Aug. 3, 2023) (transfer

---

[3] NAR's claim that these same settlements were "filed" in *Moehrl* is misleading. ECF No. 196, at 3. Although *notices* of these settlements were filed in *Moehrl*, and Judge Wood has been kept apprised of them as they develop, the settlement approval process is occurring exclusively in the Western District of Missouri before Judge Bough. Judge Bough has preliminarily approved the settlements and will be the one deciding whether to grant final approval.

to judge was warranted "particularly . . . considering that he presides over a proposed nationwide settlement with one of the defendants that allegedly will impact plaintiffs' claims in this MDL").

Judge Bough has also made progress in advancing the two newer-filed cases in front of him, *Gibson* and *Umpa*. He ruled on the defendants' request to stay *Gibson*. *See Gibson*, ECF No. 78. And he entered a joint scheduling order across *Gibson* and *Umpa* setting a single briefing schedule for motions to dismiss and directing the parties to hold their Rule 26(f) conference no later than February 16, 2024. *See Gibson*, ECF No. 85.

Several Respondents point to the Panel's reliance on the "first-filed" action in its decisions to consolidate. *See, e.g.*, ECF No. 196, at 14; ECF No. 294, at 7. But the Panel's reliance on the "first-filed" action is usually a proxy for identifying the jurist who is most familiar with the underlying subject matter. *See In re Broiler Chicken Grower Antitrust Litig.*, 509 F. Supp. 3d 1359, 1362 (J.P.M.L. 2020) (noting that judge in "first-filed" action "has the most familiarity with the subject matter of this litigation, having already ruled on multiple dismissal motions"); *In re Armodafinil Patent Litig.*, 755 F. Supp. 2d 1359, 1360 (J.P.M.L. 2010) (judge in "first-filed" district "has particular experience with MDL patent litigation arising in the Hatch-Waxman context"); *In re Activated Carbon-Based Hunting Clothing Marketing & Sales Practices Litig.*, 626 F. Supp. 2d 1358 (J.P.M.L 2009) (judge in "first-filed" district "has become familiar with this litigation").

As discussed, Judge Bough is fully familiar with the litigation based on his experience with the *Burnett* action.  Thus, one of the core justifications for the "first-filed" rule weighs in favor of the Western District of Missouri and Judge Bough. Judge Bough has also demonstrated an ability to handle complex litigation ably and efficiently. *Burnett* proceeded from complaint to verdict in just four and a half years. Were these cases to be consolidated in an MDL, Judge Bough would be

faced with many of the same disputes and issues he deftly and promptly addressed in *Burnett*. Judge Bough would thus be especially prepared to handle the MDL in an experienced and efficient manner.[4]

For these reasons, the Panel should consolidate the actions in front of Judge Bough. In the alternative, but for many of the same reasons, Movants also would support transfer to Judge Wood in the Northern District of Illinois, who has ably presided over the *Moehrl* action since its filing in 2019. Judge Wood is an excellent and experienced jurist, who is likewise familiar with the issues, having ruled on motions to dismiss, class certification, and *Daubert* motions, in addition to many discovery motions.

Movants nonetheless seek consolidation in the Western District of Missouri before Judge Bough over the Northern District of Illinois in light of the respective dockets of the two courts. As some opponents point out, the Panel often considers the number of MDLs already pending in a district when making a transfer decision. That is because the Panel prefers to avoid transferring to a district that is "overtaxed with other multidistrict dockets." *In re Gator Corp. Software Trademark & Copyright Litig.*, 259 F. Supp. 2d 1378, 1380 (J.P.M.L. 2003); *see also In re Corn Derivative Antitrust Litig.*, 486 F. Supp. 929, 932 (J.P.M.L. 1980) (selecting district with "drastically fewer multidistrict litigations" than other options). The Northern District of Illinois is currently assigned to *sixteen* multidistrict litigations. *See MDL Statistics Reports – Distribution of Pending MDL Dockets by District*, Jud. Panel on Multidistrict Litig. (January 2, 2024). That is the second-most in the country. *See id.* On top of that, the Northern District of Illinois is one of the

---

[4] NAR implies without explanation that because Movants did not include *Batton I* and *Batton II* as tagalong actions in their centralization motion, this must mean that those actions could not be centralized absent transfer to the Northern District of Illinois. *See* ECF No. 196, at 2. This is false. *Batton II* is a new case and, although *Batton I* was filed several years ago, both actions are in their infancy and have not commenced discovery.

busiest courts in the country, having received over 17,000 filings between September 2022 and 2023. *See* U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics (September 30, 2023). The Western District of Missouri received just 3,020 filings in that same timeframe. *Id.*

That puts the Western District of Missouri in a better position to oversee the efficient conduct of an MDL. Judge Bough in particular has proven his ability to handle MDL litigation with efficiency. As many respondents point out, Judge Bough has already been assigned to one MDL. *See In re Smitty's/CAM2 303 Tractor Hydraulic Fluid Marketing, Sales Practices & Products Liability Litig.*, 466 F. Supp. 3d 1380, 1382 (J.P.M.L. 2020) ("The Honorable Stephen R. Bough . . . is an experienced jurist with the ability and willingness to manage this litigation efficiently."). And despite being assigned to that MDL in 2020, Judge Bough simultaneously handled the complex *Burnett* litigation from 2020 through 2023 with utmost efficiency. He is clearly more than capable of managing another MDL.

Both the Western District of Missouri and the Northern District of Illinois are better choices than the other forums suggested by various respondents: the Eastern District of Texas and Western District of Pennsylvania. *See, e.g.*, ECF No. 293, at 11–13 (West Penn. Multi-List); ECF No. 268, at 12–13. Two of the actions that movants seek to consolidate were filed in the Eastern District of Texas (both by the same firms) and one was filed in the Western District of Pennsylvania. *See* ECF No. 1-2, at 4–5 (Schedule of Actions). Other than that, there is no compelling, specific reason to consider either forum as a potential transferee district. Proponents of the districts claim that they have the bandwidth to handle the cases and are comprised of intelligent, capable jurists. *See, e.g.*, ECF No. 293, at 9; ECF No. 292, at 6–7; ECF No. 268, at 13–15. Or they claim that the districts

are located in convenient cities with sufficient accommodations. *See, e.g.*, ECF No. 293, at 11–12; ECF No. 268, at 14.

All of that is generally true of many district courts throughout the country. By contrast, there are ample *specific* reasons for the Panel to transfer these cases to the Western District of Missouri or the Northern District of the Illinois. In particular, Judge Bough on the Western District of Missouri and Judge Wood on the Northern District of Illinois are both familiar with the underlying subject matter of these actions. It would conserve judicial resources and be more efficient to consolidate these cases in front of jurists who are already highly knowledgeable about the issues presented.

Respondents' specific reasons for requesting the Eastern District of Texas or Western District of Pennsylvania are comparatively sparse. Defendants in the Texas actions claim that Texas is home to the largest number of defendants, including some repeat defendants such as Keller Williams Realty, Inc. *See* ECF No. 268, at 14. But being home to a large number of small defendants—named in only one case—does not weigh in favor of transfer to Texas. Texas is home to many defendants because the Texas actions name a proportionally large number of local REALTOR® associations as defendants. *See* ECF No. 1-2, at 5–6 (Schedule of Actions). Given that the allegations against many of those organizations are simply that they incorporate and enforce the NAR rules, there is no reason to believe that a disproportionate amount of fact discovery in Texas will be required. Instead, the focus of discovery will be the industrywide NAR rules. Furthermore, the suggestion that transfer decisions should be made simply by counting parties would create perverse incentives to "stuff the ballot box" by adding as many small parties as possible to cases, which benefits no one. Finally, the one significant defendant named in multiple actions and also in Texas—Keller Williams Realty—now has a preliminarily approved

19

settlement pending before Judge Bough in the Western District of Missouri.  Accordingly, Keller Williams has withdrawn both its opposition to centralization and its alternative request for transfer to the Eastern District of Texas. *See* ECF No. 333.

The specific arguments in favor of the Western District of Pennsylvania are even more flimsy. Respondents in favor of Pennsylvania assert that a handful of parties are in Pennsylvania or in states nearby. *See, e.g.*, ECF No. 292, at 7. But more parties, and more important parties for discovery purposes, are closer to the other proposed forums. And the more geographically central forums—the Western District of Missouri and Northern District of Illinois—are much more convenient for parties and counsel on the West coast than the Western District of Pennsylvania. Respondents also point out the specifically manageable workload on the Western District of Pennsylvania. *See, e.g.*, ECF No. 292, at 2; ECF No. 293, at 9. But—as has already been noted—the Western District of Missouri has a similarly balanced workload, in addition to the panoply of other reasons in favor of transferring there.

The Western District of Missouri before Judge Bough and the Northern District of Illinois before Judge Wood are clearly the best candidates for transfer. However, given the heavy workload on the Northern District of Illinois, and the settlements already pending before Judge Stephen R. Bough, the Western District of Missouri is the best choice for transfer should centralization occur.

## CONCLUSION

When considered against the alternative of allowing these important cases to proceed in their individual districts, centralization offers a more convenient, just, and efficient outcome. *See* 28 U.S.C. § 1407. The Panel should centralize these actions and transfer them to the Hon. Stephen R. Bough in the Western District of Missouri.

Dated: February 2, 2024

By: /s/ *Marc M. Seltzer*
Marc M. Seltzer
Steven G. Sklaver
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Beatrice C. Franklin
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330
bfranklin@susmangodfrey.com

Matthew R. Berry
Floyd G. Short
Alexander W. Aiken
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, Washington 98101
Telephone: (206) 516-3880
mberry@susmangodfrey.com
fshort@susmangodfrey.com
aaiken@susmangodfrey.com

Benjamin D. Brown
Robert A. Braun
Daniel Silverman
Brian E. Johnson
COHEN MILSTEIN SELLERS & TOLL
PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
dsilverman@cohenmilstein.com
BEJohnson@cohenmilstein.com

By: /s/ *Eric L. Dirks*
Eric L. Dirks
Matthew Lee Dameron
WILLIAMS DIRKS DAMERON LLC
1100 Main Street, Suite 2600
Kansas City, MO 64105
Telephone: (816) 945-7110
dirks@williamsdirks.com
matt@williamsdirks.com

Brandon J.B. Boulware
Erin D Lawrence
Jeremy M. Suhr
BOULWARE LAW LLC
1600 Genessee Street, Suite 416
Kansas City, MO 64102
Telephone: 816-492-2826
brandon@boulware-law.com
erin@boulware-law.com
jeremy@boulware-law.com

Michael S. Ketchmark
Scott A McCreight
KETCHMARK & MCCREIGHT PC
Two Hallbrook Place
11161 Overbrook Road, Suite 210
Leawood, KS 66211
Telephone: (913) 266-4500
mike@ketchmclaw.com
smccreight@ketchmclaw.com

*Attorneys for Plaintiffs Don Gibson, Lauren
Criss, John Meiners*

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Rio S. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
riop@hbsslaw.com

Nathan Emmons
Jeannie Evans
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
nathane@hbsslaw.com
jeannie@hbsslaw.com

*Attorneys for Plaintiff Daniel Umpa*