**BEFORE THE**

**UNITED STATES JUDICIAL PANEL**

**ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE: REAL ESTATE COMMISSION ANTITRUST LITIGATION** | MDL No. 3100 |

**INTERESTED PARTY PLAINTIFF ROBERT FRIEDMAN'S
RESPONSE IN OPPOSITION TO MOTION FOR TRANSFER OF
*FRIEDMAN V. THE REAL ESTATE BOARD OF NEW YORK, INC., ET AL.*,
NO. 1:24-CV-00405 (S.D.N.Y.), PURSUANT TO 28 U.S.C. § 1407**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 2

II.   BACKGROUND .................................................................................................. 3

    A.    The *Umpa* and *Gibson* Cases allege a nationwide conspiracy by NAR-member firms to inflate buyer broker commissions on MLSs pursuant to NAR Rules. .................................................................................................... 3

    B.    The *REBNY* Cases allege a conspiracy by REBNY-member firms to inflate buyer broker commissions in New York City on the RLS pursuant to REBNY Rules. ..................................................................................................... 4

    C.    REBNY rules are substantively different from NAR rules. ................................... 5

    D.    There is no overlap between the putative classes in the NAR actions and the *REBNY* Cases. ...................................................................................................... 6

    E.    After more than four years of litigation in separate cases concerning NAR rules, Movants seek to centralize and consolidate all buyer broker commission-related antitrust litigation, no matter the facts. .................................. 7

    F.    NAR seeks to centralize the *REBNY* Cases in the Northern District of Illinois, despite having admitted that REBNY has nothing to do with NAR. ........ 8

III.  ARGUMENT ....................................................................................................... 8

    A.    There are no common questions of fact between the cases involving NAR rules and the *REBNY* Cases ................................................................................. 9

    B.    Convenience of Parties and Witnesses Weighs Heavily Against Transfer ........... 13

    C.    Centralizing the *REBNY* Cases with the NAR actions would not be just or efficient. .............................................................................................................. 15

        1.    The plaintiffs in the *REBNY* Cases are Not Members of Any Current Settlement Class That Might Favor Consolidation. .................................. 15

IV.   CONCLUSION ................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*In re Baby Food Mktg., Sales Pracs. & Prod. Liab. Litig.*,
544 F. Supp. 3d 1375 (J.P.M.L. 2021) ...................................................... 9

*In re Credit Union Checking Acct. Overdraft Litig.*,
158 F. Supp. 3d 1363 (J.P.M.L. 2016)..................................................... 13

*In re CVS Caremark Corp. Wage & Hour Emp. Pracs. Litig.*,
684 F. Supp. 2d 1377 (J.P.M.L. 2010)..................................................... 12

*In re Deere & Co. Repair Servs. Antitrust Litig.*,
607 F. Supp. 3d 1350 (J.P.M.L. 2022)..................................................... 15

*In re Fed. Hous. Fin. Agency, et al., Preferred Stock Purchase Agreements Third Amend.
Litig.*,
190 F. Supp. 3d 1356 (J.P.M.L. 2016) ..................................................... 10

*In re Hotel Industry Sex Trafficking Litig.*,
433 F. Supp. 3d 1353 (J.P.M.L. 2020) ..................................................... 13

*In re SFPP, LP, R.R. Prop. Rights Litig.*,
121 F. Supp. 3d 1360 (J.P.M.L. 2015) ..................................................... 10

*In re: Credit Card Payment Prot. Plan Mktg. & Sales Pracs. Litig.*,
753 F. Supp. 2d 1375 (J.P.M.L. 2010) ..................................................... 9

*In re: Credit Default Swaps Antitrust Litig.*,
978 F. Supp. 2d 1374 (J.P.M.L. 2013) ..................................................... 15

*In re: Facebook, Inc., Consumer Privacy User Profile Litig.*,
325 F. Supp. 3d 1362 (J.P.M.L. 2018) ..................................................... 13

*In re: Google Play Store Simulated Casino-Style Games Litig.*,
544 F. Supp. 3d 1364 (J.P.M.L. 2021) ..................................................... 13

*In re: Nat'l Ass'n for Advancement of Multijurisdictional Prac. Litig.*,
52 F. Supp. 3d 1377 (J.P.M.L. 2014) ..................................................... 10

*In re: Unilever Aerosol Prods. Mktg., Sales Practices, & Prod's Liab. Litig.*,
No. MDL 3068, 2023 WL 2875972 (J.P.M.L. Apr. 7, 2023) ................... 17

*In re: Yellow Brass Plumbing Component Prod. Liab. Litig.*,
844 F. Supp. 2d 1377 (J.P.M.L. 2012)......................................................11

*National Association of Realtors v. Champions Real Estate Services Inc., et al.*,
  No. 10 Civ. 00049, 2011 WL 4803013, at *1 (W.D. Wash. Aug. 29, 2011) .............................. 3

*Secondary Ticket Mkt. Refund Litig.*,
  481 F. Supp. 3d 1345 (J.P.M.L. 2020) ...................................................................................... 9

**Statutes**

28 U.S.C. § 1407 ..................................................................................................................... passim

28 U.S.C. § 1407(a) ................................................................................................................. 8, 13

**Rules**

J.P.M.L. Rule 6.2(d) ...................................................................................................................... 1

**Docketed**

*Bauman v. MLS Property Information Network, Inc.*,
  No. 20-cv-12244 (D. Mass.) ....................................................................................................... 7

*Burnett v. Nat'l Ass'n Realtors*,
  No. 19-cv-332 (W.D. Mo.) ............................................................................................. 7, 8, 15, 16

*Friedman v. The Real Estate Board of New York, Inc., et al.*,
  No. 1:24-cv-00405 (S.D.N.Y.) ............................................................................................. passim

*Gibson, et al. v. Nat'l Ass'n of Realtors, et al.*,
  No. 23-cv-0788 (W.D. Mo.) .................................................................................................. passim

*March v. Real Estate Board of New York, Inc., et al.*,
  No. 1:23-cv-09995 (S.D.N.Y.) ............................................................................................. passim

*Moehrl v. Nat'l Ass'n of Realtors*,
  No. 1:19-cv-01610 (N.D. Ill.) ............................................................................................... passim

*Umpa v. Nat'l Ass'n of Realtors, et al.*,
  No. 23-cv-0945 (W.D. Mo.) .................................................................................................. passim

Interested Party is Robert Friedman, plaintiff in the action *Friedman v. The Real Estate Board of New York, Inc., et al.*, No. 1:24-cv-00405 (S.D.N.Y.) ("*Friedman*"), pending in the United States District Court for the Southern District of New York and proceeding in coordination with the related action *March v. Real Estate Board of New York, Inc., et al.*, No. 1:23-cv-09995 (S.D.N.Y.) ("*March*," and together with *Friedman*, the "*REBNY* Cases").[1] Friedman respectfully submits this Interested Party Response in Opposition to the Motion for Transfer of Actions to the Western District of Missouri Pursuant to 28 U.S.C. § 1407 filed by plaintiffs in *Gibson, et al. v. Nat'l Ass'n of Realtors, et al.*, No. 23-cv-0788 (W.D. Mo., filed Oct. 31, 2003) and *Umpa v. Nat'l Ass'n of Realtors, et al.*, No. 23-cv-0945 (W.D. Mo., filed Dec. 27, 2023) (collectively, "Movants"), ECF No. 1-1 ("Movants' Br."), as well as the alternative proposal set forth in the Response of Defendant National Association of Realtors® in Support of Transfer of Actions to the Northern District of Illinois for Coordinated or Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407, ECF No. 295 ("NAR Br.").[2]

---

[1] *Friedman* was initially filed on December 29, 2023 in the Eastern District of New York. Upon reaching an agreement with counsel in *March* to coordinate the *REBNY* Cases for pretrial purposes, *Friedman* was voluntarily dismissed without prejudice and refiled in the Southern District of New York as a related action to *March*. Counsel are currently in the process of seeking formal coordination in the Southern District of New York.

[2] *Friedman* is not among the cases that the Movants seek to consolidate. *Friedman* was first identified as a potential tag-along action by the National Association of Realtors® ("NAR") which is not a defendant in *Friedman*—in NAR's opposition brief filed on January 23, 2024. *See* ECF Nos. 197, 204. Counsel for *Friedman* was first notified via Notices of Electronic Filing from the J.P.M.L. that *Friedman* had been identified as a potential tag-along action on January 26, 2024. Because NAR is not a defendant in *Friedman*, and NAR's counsel has not appeared in that action—and because *no defendant* in *Friedman* has identified *Friedman* as a potential tag along to cases identified by Movants—*Friedman* has not been properly identified as a potential tag along action in this proceeding. *See* J.P.M.L. Rule 6.2(d) (limiting who may designate an action as a potential tag along to a "party" that is named in the action or "in which that [party's] counsel appears").

## I.   __INTRODUCTION__

The Plaintiffs and every Defendant in the *REBNY* Cases agree on one thing: the Real Estate Board of New York, Inc. ("REBNY"), its rules, and REBNY's Residential Listing Service ("RLS") have *nothing* to do with NAR, NAR's rules, or NAR-owned or affiliated Multiple Listing Services ("MLSs").   The *REBNY* Cases involve a separate, alleged unlawful conspiracy between competitors than the conspiracy alleged in the NAR cases.   On their face, the putative classes in *Umpa* and *Gibson* do not overlap with those of the *REBNY* Cases.   Consequently, the *REBNY* Cases should remain in the Southern District of New York before the Hon. Jessica G. L. Clarke.

REBNY and the RLS have *zero* affiliation with NAR; neither Movants, NAR, nor any Defendant contends otherwise.   REBNY operates *only* in the five boroughs of New York City.   Listings on the RLS, which is not an MLS, are *only* for properties located in New York City— principally in Manhattan and the Brooklyn neighborhoods at issue in the *REBNY* Cases.

REBNY promulgates and enforces an *entirely separate* set of rules from the NAR rules in these areas of New York City that yield inflated buyer broker commission rates, as distinguished from *other* areas of New York City where a dominant NAR-affiliated MLS imposes NAR rules that yield *competitive* commission rates.   Indeed, real estate brokers are obliged to follow *only* REBNY's rules, *not* NAR's, when transacting through the RLS; REBNY and other named defendants in both the *REBNY* Cases and Movants' cases make this clear here.   Accordingly, there are no common questions of fact between the *REBNY* Cases and the Movants' cases against NAR: the alleged anticompetitive scheme, its effects, and resulting damages in each set of cases requires *separate proof*.

Nor is consolidation convenient for the parties or witnesses in the *REBNY* Cases, all of which are located in New York City or its metropolitan area—half a continent away from Movants' and NAR's proposed venues.   Movants provide no basis to find that consolidating the *REBNY*

Cases with NAR-related actions would be just or efficient. Judicial Panel on Multidistrict Litigation jurisprudence is clear that centralization is improper where alleged conspiracies are unrelated, even if they occur in the same industry and share facial similarities.

Regardless of whether this Panel agrees to form an MDL to consolidate NAR-related cases,[3] Plaintiff Friedman respectfully requests that this Panel deny transfer of the *REBNY* Cases outside the Southern District of New York.

## II.    **BACKGROUND**

### A.    The *Umpa* and *Gibson* Cases allege a nationwide conspiracy by NAR-member firms to inflate buyer broker commissions on MLSs pursuant to NAR Rules.

NAR is "one of the largest lobbying groups in the country, advocating for the interests of" its member real estate brokers. *Umpa* Class Action Compl. ("Compl.") ¶ 29. NAR members are referred to as "Realtors," a term that is trademarked by NAR and refers *only* to NAR members. *See* National Association of Realtors' Trial Brief, *National Association of Realtors v. Champions Real Estate Services Inc., et al*., No. 10 Civ. 00049, 2011 WL 4803013, at *1 (W.D. Wash. Aug. 29, 2011) ("The Association owns the federally-registered collective service trademarks REALTOR® and REALTORS®. The REALTOR® Marks are used to identify members of the Association who provide real estate-related services consistent with a strict Code of Ethics and the highest standards of professionalism.") (citations omitted).

NAR's "Realtors" list properties for sale on MLSs overseen and/or operated by NAR. An MLS, also a NAR trademark,[4] is a "database of properties listed for sale in a defined region that [is] accessible to real estate brokers and their individual realtors that agree to comply with the rules

---

[3] Plaintiff Robert Friedman takes no position on whether cases alleging a separate antitrust conspiracy through NAR and involving NAR's rules should be consolidated.

[4] *See, e.g.*, MLS Service Mark Logo, https://www.nar.realtor/logos-and-trademark-rules/mls-service-mark-logo (last accessed Jan. 22, 2024)

of the MLS." *Umpa* Compl. ¶ 57.  NAR promulgates its own rules that govern the conduct of its member Realtors when offering or accessing listings on an MLS.  *Umpa* Compl. ¶¶ 24, 66.

> **B.     The *REBNY* Cases allege a conspiracy by REBNY-member firms to inflate buyer broker commissions in New York City on the RLS pursuant to REBNY Rules.**

REBNY is a "not-for-profit real estate trade association . . . that operates only in the five boroughs of New York City."  REBNY and the REBNY RLS's Brief in Opposition to Plaintiffs' Motion for Transfer to the Western District of Missouri Pursuant to 28 U.S.C. § 1407 For Coordinated or Consolidated Pretrial Proceedings ("REBNY Br.") at 1, ECF No. 266.  REBNY maintains a dominant presence in Manhattan and certain more expensive neighborhoods of Brooklyn.  *Friedman* Class Action Compl. ("*Friedman* Compl.") ¶¶ 34-40.

REBNY has had no affiliation with NAR since 1994.  *Friedman* Compl. ¶ 51.[5]  As alleged in the *REBNY* Cases—and as acknowledged by REBNY, Compass, Inc., and Movants themselves—REBNY operates its own listing service, called RLS, which is *not* an MLS associated with NAR.[6]  *Id*. ¶ 49; REBNY Br. at 3 (the RLS is "not a traditional multiple listing service"); *Friedman* Compl. ¶ 49 (citing Compass antitrust complaint against REBNY alleging that the RLS is not an MLS and REBNY "thus operates the REBNY RLS independently from the National Association of Realtors."); *Umpa* Compl. ¶ 110 (acknowledging that RLS is not licensed or controlled by NAR and describing it as "MLS-like.").  As alleged in the *REBNY* Cases—and echoed by REBNY and other defendants in the *REBNY* Cases here—REBNY has its own set of

---

[5] *See also* REBNY Br. at 1 ("REBNY and RLS have no affiliation with [NAR], and do not use the NAR Rules, the NAR Handbook on Listing Policy (the 'NAR Handbook') or the NAR Code of Ethics").

[6] *See* NAR, MLS & Online Listings, https://www.nar.realtor/mls-online-listings (last accessed Feb. 12, 2024) (treating "MLS" as a proprietary term unique to NAR and explaining MLSs "use *a common set of rules* to enable a smooth exchange of information in their local communities" among "REALTORS®" (emphasis added)).

governing rules, to which member brokerage firms must agree in writing to list properties on the RLS. *Friedman* Compl. ¶ 51; REBNY Br. at 4 (REBNY and RLS maintain their own rules and "have no affiliation with NAR, and they have not adopted NAR's Rules, the NAR Handbook or NAR's Code of Ethics").[7]

### C.   REBNY rules are substantively different from NAR rules.

NAR rules explicitly require "every listing broker (*i.e.*, the broker representing the seller) when listing a property on a Multiple Listing Service, to make a 'blanket unilateral offer[] of compensation' to any broker who may work with a buyer in purchasing that property." *Umpa* Compl. ¶ 3.  By contrast, the REBNY rules imposed a mandatory default that the buyer and seller broker each "receive 'an equal share [*i.e.*, half] of the commission,' paid entirely by the Seller." *Friedman* Compl. ¶ 54.  To enforce this default rule, REBNY rules mandate that, to the extent a

---

[7] *See also* ECF No. 304, at 2 (Douglas Elliman: REBNY rules are "entirely different" from NAR's  and REBNY and RLS "have zero affiliation with NAR, and are both limited to New York City"); ECF No. 296, at 2, 5 (Compass: REBNY is "a trade association that is not affiliated with the National Association of Realtors and thus operates under a completely separate and unique set of rules" and "REBNY members would be subject to a completely different set of rules that have nothing to do with NAR"); ECF No. 257 ("BHS Br.") at 2 (Brown Harris Stevens: REBNY "has its own unique rules, constitution, and listing exchange [RLS]" and that REBNY members "are not party to rules promulgated by NAR that are the subject of the NAR Actions"); ECF No. 272, at 5-6 (Engel & Volkers New York Real Estate LLC: "neither *March* nor *Friedman* involve <u>either</u> 'rules adopted by' NAR <u>or</u> an MLS"); ECF No. 305, at 1 (Leslie J. Garfield is "subject to the specific and unique listing agreement promulgated by REBNY, and does not participate in any rules or fee arrangements promulgated by the National Association of Realtors, including with respect to broker commissions"); ECF No. 276, at 2 (CORE Group Marketing LLC: "REBNY does not have any affiliation with [NAR], and does not use the NAR Rules, the NAR Handbook on listing Policy . . . or the NAR Code of Ethics"); ECF No. 299 ("KWNYC Br."), at 1 (Keller Williams, NYC LLC has not adopted and is not subject to NAR's rules, handbooks, or code of ethics and the "the claims asserted against KWNYC in the *March* case do not predicate liability upon any NAR rule, but rather, upon liability for rules promulgated by [REBNY and RLS]"); ECF No. 270, at ¶¶ 5-7 (Level Group "has no affiliation with the National Association [of] Realtors" and "does not use, and has not adopted, the NAR Rules, the NAR Handbook on Listing Policy, or the NAR Code of Ethics" and the REBNY litigation "is premised on REBNY's and RLS's own rules and does not implicate NAR Rules").

seller negotiates to reduce the amount of commission he/she pays after a property is listed on the RLS, the seller's broker "'must absorb the full amount of the commission reduction.'" *Id*. ¶ 56.[8]

The presumptive 50/50 split of commissions between buyer and seller brokers under the REBNY rules is a clear break from the NAR Rules.[9]  NAR rules allow for different levels of compensation to a seller's broker and a buyer's broker based on the seller's assessment of the relative value of services to be provided by the brokers.  Sellers do not have that option under REBNY's default rule, which brokers in the *REBNY* Cases employ universally.  *Friedman* Compl. ¶¶ 66-71.  Indeed, independent studies have shown that the REBNY rules produce greater overcharges than the NAR rules in New York City.  Buyer broker commissions in REBNY dominated areas are nearly universally 2.5% - 3%, *id.* ¶¶ 36, 71, 114, whereas buyer broker commissions in areas of Brooklyn and Queens outside of REBNY's dominance—*that are instead influenced by a NAR MLS (OneKeyMLS)—are significantly less, averaging 1.5%, id.* ¶ 83 n.24.

### D.    There is no overlap between the putative classes in the NAR actions and the *REBNY* Cases.

The Movants seek to represent sellers of homes that were "listed on an MLS," which necessarily is limited to listings and sales made pursuant to NAR's rules.  *See Umpa* Compl. ¶ 161; *Gibson* Class Action Compl. ("*Gibson* Compl.") ¶ 151.  The *REBNY* Cases, by contrast, concern sellers of homes that were listed on the RLS and sold pursuant to REBNY rules.  *See March* Class

---

[8] Although NAR rules forbid sellers from unilaterally reducing an offered commission after receiving an offer, NAR lacks this punitive enforcement mechanism that disincentivizes seller brokers from reducing the commission at any time. *See Umpa* Compl. ¶ 6.

[9] Moreover, submissions by certain defendants in the *REBNY* Cases here preview factual issues and defenses pertaining *only* to the *REBNY* Cases.  *See*, *e.g.*, REBNY Br. at 3-4, 8 (pointing to factual differences concerning the market for cooperatives and condominium apartments that are more prevalent in New York City); BHS Br. at 5 (noting that unlike NAR, "REBNY allows each brokerage firm to create its own form governing exclusive listings of residential property in Manhattan"); KWNYC Br. at 6-7 (previewing likely defense regarding language in the REBNY Rules addressing the default 50-50 split of commissions that is not present in the NAR rules).

Action Compl. ("*March* Compl.") ¶ 112 (defining class to include only sellers "that sold Manhattan residential real estate . . . in accordance with [REBNY's] Rules"); *Friedman* Compl. ¶ 132 (defining class as sellers "that sold residential real estate in REBNY Brooklyn . . . and paid a Buyer Broker commission in accordance with the REBNY Rules").  Transactions on the RLS are subject *only* to REBNY rules, *not* NAR rules.  *See Friedman* Compl. Ex. A ("Use of the RLS is conditioned on agreement and compliance with these Rules and Regulations"), ¶ 83 n.24.  Accordingly, on their face, *none* of the home sales at issue in the *REBNY* Cases are covered by the putative classes in *Umpa* and *Gibson*.

### E.   After more than four years of litigation in separate cases concerning NAR rules, Movants seek to centralize and consolidate all buyer broker commission-related antitrust litigation, no matter the facts.

More than four years ago, Movants' counsel filed the first antitrust class action against NAR and certain brokerage firms, challenging NAR's commission rule in several of NAR's MLSs in select regions around the country. Class Action Compl., *Moehrl v. Nat'l Ass'n of Realtors*, No. 1:19-cv-01610 (N.D. Ill. Mar. 6, 2019) ("*Moehrl* Compl."), ¶ 12.   Other complaints challenging the same NAR-specific rules in other regions followed.[10]

Upon receiving a favorable jury verdict in *Burnett*, Movants filed a nationwide class action in the Western District of Missouri against NAR and major real estate brokerage firms on behalf of anyone in the United States who sold a home "listed on an MLS, and who paid a commission to the buyer's broker[.]" *Gibson* Compl. ¶ 151. The *Gibson* Compl. does not mention REBNY.

---

[10] *See, e.g.*, Class Action Compl. ¶ 22, *Burnett v. Nat'l Ass'n Realtors*, No. 19-cv-332 (W.D. Mo., filed Apr. 29, 2019), ECF No. 1 ("*Sitzer* Compl.") (addressing four MLSs in the Midwest); Compl. ¶ 1, *Bauman v. MLS Property Information Network, Inc.*, No. 20-cv-12244 (D. Mass., filed Dec. 17, 2020), ECF No. 1 (addressing a single MLS operating in Massachusetts).

Two months later, Movants filed a second nationwide class action in the Western District of Missouri against NAR and major real estate brokerage firms with the exact same class definition. *Umpa* Compl. ¶ 161. The *Umpa* complaint devotes a single bullet point to REBNY, fails to name REBNY as a defendant, and concedes that REBNY's RLS is not an MLS (but instead "MLS-like") and was not controlled by or affiliated with NAR. *Id*. ¶ 110.

That same day, Movants moved to centralize certain buyer broker commission litigation before the *Burnett* court, including one of the *REBNY* Cases (*March*). *See* ECF No. 1.

**F.     NAR seeks to centralize the *REBNY* Cases in the Northern District of Illinois, despite having admitted that REBNY has nothing to do with NAR.**

On January 26, 2024, NAR filed a response to Movants' motion, opposing centralization in the Western District of Missouri, and moving to centralize all buyer broker-related antitrust litigation in the Northern District of Illinois, including the *REBNY* Cases. ECF No. 295. None of the pending actions in the Northern District of Illinois even *mentions* REBNY, much less names it as a defendant. In fact, in *Moehrl*, NAR correctly stated that REBNY and the RLS are "unaffiliated with NAR,"[11] and that the RLS is "*not governed by the rules at issue in this case*."[12]

### III.    <u>ARGUMENT</u>

The MDL transfer statute, 28 U.S.C. § 1407, states that transfer is only appropriate where: (1) "common questions of fact" exist between the actions; (2) transfer "will be for the convenience of parties and witnesses"; *and* (3) transfer "will promote … just and efficient conduct." 28 U.S.C. § 1407(a). Applying these factors here weighs strongly in favor of rejecting both Movants' request to centralize the *REBNY* Cases in the Western District of Missouri and NAR's request to centralize the *REBNY* Cases in the Northern District of Illinois.

---

[11] *Moehrl*, ECF No. 325 at 16.

[12] *Moehrl*, ECF No. 325-2 at ¶ 68 (emphasis added).

**A.     There are no common questions of fact between the cases involving NAR rules and the *REBNY* Cases.**

Judicial Panel on Multidistrict Litigation authority is crystal clear that actions requiring substantially distinct discovery do not share common questions of fact. *See, e.g.*, *In re Baby Food Mktg., Sales Pracs. & Prod. Liab. Litig.*, 544 F. Supp. 3d 1375, 1376 (J.P.M.L. 2021); *Secondary Ticket Mkt. Refund Litig.*, 481 F. Supp. 3d 1345, 1346 (J.P.M.L. 2020); *In re: Credit Card Payment Prot. Plan Mktg. & Sales Pracs. Litig.*, 753 F. Supp. 2d 1375 (J.P.M.L. 2010).   That is precisely the case here: the *REBNY* Cases require fundamentally different proof than the *Umpa*, *Gibson*, and *Moehrl* actions.

*Umpa*, *Gibson*, and *Moehrl* require proof that (i) the defendants participated in the alleged conspiracies by promulgating broker policies and/or other conduct enforcing NAR rules on MLSs that *by definition do not apply to the RLS*; and (ii) the effects of NAR rules on MLSs were anticompetitive.   *Umpa* Compl. ¶¶ 92, 112, 122-138, 140; *Gibson Compl.* ¶¶ 1-3, 7, 87, 97-102, 117, 150; *Moehrl* Compl. ¶¶ 3-4, 7, 18, 94-122.   In contrast, the *REBNY* Cases require proof that (i) the defendants participated in the alleged conspiracy by agreeing to adhere to the REBNY rules as a condition of transacting on the RLS—a condition imposed by REBNY, not any broker policies; and (ii) the effects of REBNY rules on the RLS in specific areas of New York City were anticompetitive.   *See March* Compl. ¶¶ 6, 7, 9, 14, 60, 71, 102-107, 110; *Friedman* Compl. ¶¶ 1, 34-40, 53, 101-112, 125 & n.24.

Although Movants and NAR tout superficial overlap between *Umpa*, *Gibson*, *Moehrl*, and the *REBNY* Cases, in that they all involve alleged antitrust conspiracies to inflate buyer broker commissions, that is far from sufficient to warrant centralization. *Baby Food*, 544 F. Supp. 3d at 1376; *Secondary Ticket*, 481 F. Supp. 3d at 1346; *Credit Card Payment*, 753 F. Supp. 2d at 1375.

Movants and NAR assert various purported common factual questions, including whether the defendants "entered into an agreement or conspiracy," "possess market power," "engage in or promote steering," "inflat[ed] total commissions and buyer broker commissions," and whether "the competitive harm from the conspiracy outweighs any competitive benefits."  *See* Movants' Br. at 7-8.  Not only are these purported common questions overly broad and fail to account for the critical differences in proof detailed above, they are *legal* questions, not factual ones, that provide no support for centralization.  *See, e.g.*, *In re SFPP, LP, R.R. Prop. Rights Litig.*, 121 F. Supp. 3d 1360, 1361 (J.P.M.L. 2015); *In re Fed. Hous. Fin. Agency, et al., Preferred Stock Purchase Agreements Third Amend. Litig.*, 190 F. Supp. 3d 1356, 1357 (J.P.M.L. 2016) ("common legal, rather than factual, questions" do not support centralization); *In re: Nat'l Ass'n for Advancement of Multijurisdictional Prac. Litig.*, 52 F. Supp. 3d 1377, 1378 (J.P.M.L. 2014) (denying a motion for centralization and finding that "[w]hile each action focuses on the constitutionality of restrictions on attorney admission contained in each court's local rules, these common legal questions are insufficient to satisfy Section 1407's requirement of common factual questions").  Indeed, these questions would be common across any alleged antitrust conspiracy involving buyer broker commissions, irrespective of the facts.

Moreover, Movants' assertion that defendants in the *REBNY* Cases who are members of both REBNY and NAR are somehow influenced by NAR and its rules even when transacting on the RLS is wholly unsupported.  Movants' Consolidated Reply in Supp. of Mot. for Transfer of Actions to the Western District of Missouri Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings, ECF No. 350 at 10-11; *Umpa* Compl. ¶ 110. The *REBNY* Cases make clear—through well-pled allegations that were the result of an extensive pre-filing investigation—that the REBNY rules *exclusively* govern RLS transactions, and defendants who

10

are members of *both* NAR and REBNY unequivocally agree.  *Supra* at 4-7.  Movants' citation to the plaintiffs' expert report in *Moehrl*—finding that certain MLSs not fully controlled by NAR were nonetheless influenced by NAR and its rules—does not move the needle because ***those listed MLSs did not include REBNY or RLS***.  *Compare* ECF No. 350 at 11 n.1 *with Moehrl*, ECF. No. 324-6, at ¶¶ 398–420.[13]  Indeed, NAR itself stated in *Moehrl* that REBNY and the RLS are "unaffiliated with NAR," *supra* at 8, and that RLS transaction are "not governed" by NAR rules.  *Moehrl*, ECF No. 325-2 at ¶ 68.  It is truly perplexing that NAR now deems the *REBNY* Cases related.

Movants also assert that there is factual overlap because the REBNY rules are functionally similar to the NAR rules and therefore have similar anticompetitive effects.  ECF No. 350 at 11-12.  This is exactly the type of superficial similarity that fails to merit centralization.  Functionally similar rules and anticompetitive effects are not the same rules and anticompetitive effects; as detailed above, each set requires *different proof*.  *See In re: Yellow Brass Plumbing Component Prod. Liab. Litig*., 844 F. Supp. 2d 1377, 1379 (J.P.M.L. 2012) ("significant localized intervening causation issues" defeat centralization).

Movants fail to acknowledge the REBNY rule imposing a mandatory 50/50 default commission allocation between the buyer and seller broker, which has no analogue under NAR rules, and yields far greater anticompetitive effects.  *Supra* at 5-6.  Movants also cite to a REBNY rule discouraging commission negotiation between a seller and her broker because the broker "must absorb the full amount of the commission reduction," but fail to acknowledge that the

---

[13] On rebuttal, he admitted that had "not found any data on the extent to which RLS members were REALTORS®," and therefore had no ability to analyze NAR's influence on REBNY beyond a single corporate defendant cited by NAR's expert "who required all its brokers and agents to comply with" NAR Rules, but does not transact on the RLS. *Compare Moehrl*, ECF No. 372 at ¶ 36 *with Moehrl*, ECF No. 325-2 at ¶¶67-68.

punitive measure in the REBNY rules requiring the seller's broker to absorb the reduction does not exist in NAR rules.  *See id*.  The effects of these two different sets of rules will therefore therefore require different proof.  *See In re CVS Caremark Corp. Wage & Hour Emp. Pracs. Litig.*, 684 F. Supp. 2d 1377, 1379 (J.P.M.L. 2010) (where "discovery in each action is likely to involve individualized, location-specific examination of things," the "potential for significant individual discovery tilts the balance against centralization").

Movants have acknowledged this difference in the past.  Their own expert in *Moehrl* performed a separate analysis of the REBNY rules—which NAR was then pressing as an "alternative benchmark" to defeat causation—and found that they had "enhanced the anticompetitive effects" relative to the NAR rules and "accentuated the linkage between seller-broker and buyer-broker commission levels."  *Moehrl*, ECF No. 372 at ¶ 68.  The REBNY rules' "enhanced" anticompetitive effects is confirmed by an independent study finding that buyer broker commissions are far more inflated in New York City when transacting under the REBNY rules, as opposed to the NAR rules.  *Friedman Compl*. ¶ 83 n.24.  Thus, not only will anticompetitive effects require different proof in the *REBNY* Cases, so will damages.

Finally, Movants point out that a REBNY rule requiring that any changes to buyer broker commissions be entered into the RLS "functionally" amounts to a blanket offer, while the plain language of the NAR rules expressly requires a blanket offer.  ECF No. 350 at 11.  But demonstrating that REBNY rules effectively require blanket offers is a distinct issue.  Indeed, Movants acknowledge that certain defendants in the *REBNY* Cases here dispute whether the REBNY rules effectively require blanket offers, in contrast to NAR rules that explicitly require them.  ECF No. 350 at 11; *see also* REBNY Br. at 6 (asserting that, unlike the NAR rules, the REBNY rules "expressly acknowledge[] that offers of compensation to buyer's brokers may be

negotiated amongst the parties to an Exclusive Listing Agreement or in a separate written agreement between an owner of real estate and their Exclusive Broker."). While Plaintiff Friedman disagrees with REBNY's characterizations, these disputes are unique to the *REBNY* Cases.

In sum, asking this Panel to consolidate the *REBNY* Cases with the NAR actions is akin to seeking to consolidate price-fixing actions concerning beef, chicken, pork, and turkey simply because they involve similar price-fixing conspiracies among meat suppliers in the meat industry, or to consolidate all reverse payment actions because they involve reverse payments between drug companies in the pharmaceutical industry. There may be overlapping defendants and superficial similarity at a high level, but there is no common discovery. Cases alleging unrelated conspiracies cannot be centralized and consolidated simply because they involve facially similar conduct in the same industry. *See, e.g.*, *In re: Google Play Store Simulated Casino-Style Games Litig.*, 544 F. Supp. 3d 1364, 1365-66 (J.P.M.L. 2021) (centralizing cases involving casino style apps in the Google app store but not similar cases involving the Apple App Store); *In re Hotel Industry Sex Trafficking Litig.*, 433 F. Supp. 3d 1353, 1355 (J.P.M.L. 2020) (refusing to consolidate cases alleging separate conspiracies in the hotel industry across the country in different locations despite "broad similarities"); *In re Credit Union Checking Acct. Overdraft Litig.*, 158 F. Supp. 3d 1363, 1364 (J.P.M.L. 2016).

### B.    Convenience of Parties and Witnesses Weighs Heavily Against Transfer

Convenience of the parties and witnesses under 28 U.S.C. § 1407(a) looks to factors such as the location of likely witnesses and relevant evidence, including the location of the defendants' headquarters and where the alleged misconduct occurred. *See In re: Facebook, Inc., Consumer Privacy User Profile Litig.*, 325 F. Supp. 3d 1362, 1364 (J.P.M.L. 2018) (centralizing cases in N.D. Cal., "where Facebook is headquartered"). Centralization in either the Western District of

Missouri or Northern District of Illinois is plainly inconvenient for the parties and witnesses in the *REBNY* Cases.

**First**, *all 18 defendants in Friedman*, and 24 of the 28 defendants in *March*, are headquartered in or near New York City.[14] *Friedman* Compl. ¶¶ 9-26; *March* Compl. ¶¶ 19-44. REBNY, which is at the heart of the alleged conspiracy in the *REBNY* Cases, is headquartered in Manhattan.  And *none* of the named plaintiffs in *March* and *Friedman* reside in the Western District of Missouri or the Northern District of Illinois.

**Second**, the conduct at issue in the *REBNY* Cases occurred *only in New York City*. *Friedman* Compl. ¶¶ 2-6, 36-82, 101-27, 132, 137; *March* Compl. ¶¶ 14, 47, 51-71, 101-07, 110, 112.  REBNY unequivocally states that it "operates only in the five boroughs of New York City" and that RLS is a "non-traditional listing service operated by REBNY that covers only New York City." REBNY Br. at 1-2.

**Third**, a cornerstone of the *REBNY* Cases is the REBNY rules' and RLS's alleged dominance over specific areas of New York City (Manhattan and REBNY Brooklyn).  *Friedman* Compl. ¶¶ 101-11; *March* Compl. ¶¶ 101-07.  The alleged misconduct occurred only in New York City.

Accordingly, witnesses and document discovery relevant to the *REBNY* Cases will be overwhelmingly, if not exclusively, located in New York City.  Movants' concern about managing purportedly "common" or "duplicative" discovery (*see* Movants' Br. at 8-9) simply does not and cannot apply to the *REBNY* Cases.  Uprooting the *REBNY* Cases from their only logical venue—

---

[14] Defendant The Agency IP Holding Co. was misnamed, and the parties are in the process of substituting in a properly named New York-based defendant.  The small minority of defendants in *March* headquartered in other locations nonetheless maintain significant presences in New York City where they operate as REBNY members, agree to abide by the REBNY Rules, and list properties for sale on the RLS.  *March* Compl. ¶¶ 20-21, 27, 30, 36, 41.

the Southern District of New York—and forcing the parties to litigate halfway across the country is the opposite of convenient and squarely contravenes bedrock principles for transfer under Section 1407.[15]

**C.  Centralizing the *REBNY* Cases with the NAR actions would not be just or efficient.**

**1.  The plaintiffs in the *REBNY* Cases are Not Members of Any Current Settlement Class That Might Favor Consolidation.**

Movants and NAR erroneously contend that the need for oversight and administration of the settlements with two defendants in the *Burnett* and *Moehrl* litigation warrants transfer to the Western District of Missouri or the Northern District of Illinois.  *See* Movants' Br. at 2, 11-12; NAR Br. at 5-6, 19-20.[16]  Movants' and NAR's position is belied by the plain language of those settlements, which *does not apply* to the claims brought in *March* and *Friedman*.  Both settlements referenced by Movants define the "Settlement Class" in identical terms:

> 18. "Settlement Class" means the class of persons that will be certified by the Court for settlement purposes only, namely all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of a home in the following date ranges:
>
> a. Moehrl MLSs: March 6, 2015 to date of notice;
>
> b. Burnett MLSs: April 29, 2014 to date of notice;

---

[15] *Cf. In re Deere & Co. Repair Servs. Antitrust Litig.*, 607 F. Supp. 3d 1350, 1351 (J.P.M.L. 2022) (transferring to district "reasonably nearby" defendant headquarters, and thus relevant witnesses and documents); *In re: Credit Default Swaps Antitrust Litig.*, 978 F. Supp. 2d 1374, 1375 (J.P.M.L. 2013) (transferring case to district with "a strong connection" to the litigation where "most defendants are based," a "significant number" of class members resided, and material events occurred).

[16] One of those defendants, RE/MAX, LLC, is one of the 28 Defendants in *March*, and the other, Anywhere Real Estate, Inc. ("Anywhere"), is one of the 18 Defendants in *Friedman*. Anywhere also is a global franchiser and parent company of two Defendants in *March* and *Friedman*: Corcoran and Sotheby's.

c. MLS PIN: December 17, 2016 to date of notice;

d. All other MLSs: four years prior to (i) the date a new amended complaint (if any) is filed in the Actions reflecting any MLSs aside from the Moehrl MLSs, Burnett MLSs, and MLS PIN or (ii) the date of notice, whichever is earlier, up to the date of notice.

*Burnett*, ECF No. 1192-3 ("Anywhere Settlement Agreement") at ¶ 18; *Burnett*, ECF No. 1192-4 ("RE/MAX Settlement Agreement") at ¶ 18).[17]

Unlike the terms "Moehrl MLSs," "Burnett MLSs," and "MLS PIN," which are defined terms in the Settlement Agreements referring to specific MLSs that were at issue in each of those separate actions (*see* Anywhere Settlement Agreement and RE/MAX Settlement Agreements at ¶¶ 2, 10-11), the term "All other MLSs" is not defined in the Settlement Agreements.  But as explained above, the term "MLS" has a specific meaning that is tied to NAR control of a listing service through local NAR-affiliated associations and/or NAR members who are subject to NAR's rules—indeed, NAR's central role in certain MLSs is a key issue in the ongoing NAR litigation and in the context of the settled claims.  *See*, *e.g.*, *Umpa* Compl. ¶¶2-3, 9, 57, 60-67.

The *March* and *Friedman* Plaintiffs who sold their Manhattan and Brooklyn properties over the RLS are plainly not part of any proposed settlement class because they were not and could not have been damaged as a result of a NAR-controlled conspiracy involving NAR rules applied by NAR member "Realtors" who were obligated to follow those rules in a NAR-controlled MLS. It is therefore unsurprising that neither settlement makes any mention of REBNY or the RLS.

---

[17] The RE/MAX Settlement also adds, at the end of the definition, an additional sentence: "For avoidance of doubt, Plaintiffs and RE/MAX intend this Settlement Agreement to provide for a nationwide class with a nationwide settlement and release." RE/MAX Settlement Agreement at ¶ 18. This token and meaningless attempt to broadly expand the definition of "All other MLSs" does not and cannot sweep up the claims asserted in *March* (*Friedman* does not name RE/MAX as a defendant) involving REBNY and the RLS for the reasons described herein.

As detailed above, REBNY and RLS are *not* affiliated with NAR; the REBNY rules that bind REBNY members are distinct from the rules applicable to NAR members operating outside of New York City; and RLS is *not* an MLS. *See* supra at Sections II.B- D and III.A.  The plaintiffs in the *REBNY* Cases are therefore not subject to any proposed settlement that would necessitate transfer to the Western District of Missouri or the Northern District of Illinois.  *In re: Unilever Aerosol Prods. Mktg., Sales Practices, & Prod's Liab. Litig.*, No. MDL 3068, 2023 WL 2875972, at *1 (J.P.M.L. Apr. 7, 2023) (finding centralization inappropriate where "cases involve different putative classes of purchasers" and products that were "regulated in different ways").

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff in the *Friedman* action, respectfully requests that the Judicial Panel on Multidistrict Litigation deny Movants' motion with respect to centralization of the *Friedman* and *March* actions.

Dated February 13, 2024                 Respectfully submitted,

**BERMAN TABACCO**

By:   */s/ Todd A. Seaver*
        Todd A. Seaver

Carl Hammarskjold
425 California St, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
tseaver@bermantabacco.com
chammarskjold@bermantabacco.com

Steven J. Buttacavoli
Steven L. Groopman
Kristie A. LaSalle
Brooke E. Lowell
**BERMAN TABACCO**
One Liberty Square
Boston, Massachusetts 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
sbuttacavoli@bermantabacco.com
sgroopman@bermantabacco.com
klasalle@bermantabacco.com
blowell@bermantabacco.com

Daniel Goldman
**BIENERT KATZMAN**
**LITRELL WILLIAMS LLP**
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (973) 476-5485
dgoldman@bklwlaw.com

*Counsel for Plaintiff Robert Friedman and the
Proposed Class in Friedman v. The Real Estate
Board of New York, Inc., et al., No. 1:24-cv-00405
(S.D.N.Y.)*