**BEFORE THE UNITED STATES
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

|  |  |
|---|---|
| In re REAL ESTATE COMMISSION ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) )   MDL Case No. 3100 |

**RESPONSE OF ENGEL & VÖLKERS NEW YORK REAL ESTATE LLC IN OPPOSITION TO *GIBSON* AND *UMPA* PLAINTIFFS' MOTION FOR TRANSFER AND CENTRALIZATION PURSUANT TO 28 U.S.C. § 1407**

PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 Seventeenth Street, N.W.
Washington, D.C. 20036
t +1.202.663.8000

31 West 52nd Street
New York, NY 10019-6131
t +1.212.858.1000

*Counsel for Engel & Völkers New York Real Estate LLC*

# TABLE OF CONTENTS

|   |   |   | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | BACKGROUND OF THE REBNY CASES | | 3 |
| III. | ARGUMENT | | 4 |
| | A. | The REBNY Cases Do Not Share Common Questions of Fact with the Other Relevant Actions | 5 |
| | | 1. Whether defendants entered into an agreement or conspiracy based on the Buyer Broker Commission Rules. | 6 |
| | | 2. Whether defendants possess market power in the relevant markets. | 8 |
| | | 3. Whether defendants engage in or promote steering. | 9 |
| | | 4. Whether the agreement causes competitive harm that substantially outweighs any competitive benefits. | 9 |
| | B. | Centralization and Transfer Away from New York City Would Not Promote Judicial Economy or the Convenience of the Parties | 11 |
| | C. | The Western District of Missouri Is an Especially Poor Candidate for Transferee Court | 13 |
| | | 1. The Western District of Missouri Is Not a Convenient Venue. | 13 |
| | | 2. Transferring to the Western District of Missouri Would Reward Forum Shopping. | 14 |
| IV. | CONCLUSION | | 15 |

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re "Factor VIII or IX Concentrate Blood Products" Prod. Liab. Litig.*,
853 F. Supp. 454 (J.P.M.L. 1993) .................................................................................13

*In re Am. Bd. of Med. Specialties Maint. of Certification Antitrust Litig.*,
382 F. Supp. 3d 1353 (J.P.M.L. 2019) ............................................................................6

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) ....................................................................................................8

*In re CVS Caremark Corp.*,
684 F. Supp. 2d 1377 (J.P.M.L. 2010) ..........................................................................13

*In re Dental Supplies & Equip. Antitrust Litig.*,
289 F. Supp. 3d 1330 (J.P.M.L. 2018) ............................................................................6

*In re Dry Bean Revenue Prot. Crop Ins. Litig.*,
350 F. Supp. 3d 1381 (J.P.M.L. 2018) ..........................................................................11

*In re Equinox Fitness Wage & Hour Emp. Pracs. Litig.*,
764 F. Supp. 2d 1347 (J.P.M.L. 2011) ..........................................................................12

*In re Fresh Dairy Prod. Antitrust Litig.*,
856 F. Supp. 2d 1344 (J.P.M.L. 2012) ............................................................................6

*Friedman v. Real Estate Board of New York*,
Case No. 1:23-cv-09601 (E.D.N.Y. Dec. 29, 2023) ........................................................3

*Friedman v. Real Estate Board of New York, Inc.*,
Case No. 1:24-cv-00405 (S.D.N.Y.) ..................................................................... passim

*Gibson v. Nat'l Ass'n of Realtors*,
Case No. 4:23-cv-788-SRB (W.D. Mo. Oct. 31, 2023) ...............................................1, 9

*In re H&R Block Emp. Antitrust Litig.*,
355 F. Supp. 3d 1380 (J.P.M.L. 2019) ................................................................6, 11, 13

*Hooper v. The National Association of Realtors*,
Case No.1:23-cv-05392-SEG (N.D. Ga.) ........................................................................1

*In re IBM Antitrust Litig.*,
328 F. Supp. 509 (J.P.M.L. 1971) ...................................................................................6

*March v. Real Estate Board of New York*,
Case No. 1:23-cv-09995-JGLC (S.D.N.Y.) ........................................................... passim

*In re Medi-Cal Reimbursement Rate Reduction Litig.*,
652 F. Supp. 2d 1378 (J.P.M.L. 2009) ............................................................................5

*In re: Mortg. Lender Force-Placed Ins. Litig.*,
  895 F. Supp. 2d 1352 (J.P.M.L. 2012) .................................................................. 5, 7, 10

*Nosalek v. MLS Property Information Network Inc.*,
  Case No. 20-12244 (D. Mass.) ....................................................................................... 10

*In re Power Morcellator Prod. Liab. Litig.*,
  140 F. Supp. 3d 1351 (J.P.M.L. 2015) .......................................................................... 7, 10

*In re Senior Health Ins. Co. of Pa. Rehab. Plan Litig.*,
  607 F. Supp. 3d 1348 (J.P.M.L. 2022) ............................................................................... 5

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
  793 F. Supp. 1098 (J.P.M.L. 1992) ................................................................................. 14

*In re Thomas E. Noble Litig.*,
  223 F. Supp. 3d 1332 (J.P.M.L. 2016) ............................................................................ 14

*In re: Tyson Foods, Inc., Meat Processing Facilities Fair Lab. Standards Act (FLSA) Litig.*,
  581 F. Supp. 2d 1374 (J.P.M.L. 2008) ........................................................................... 5, 9

*In re Uber Techs., Inc., Data Sec. Breach Litig.*,
  304 F. Supp. 3d 1351 (J.P.M.L. 2018) ............................................................................ 12

*Umpa v. Nat'l Ass'n of Realtors*,
  Case No. 4:23-cv-945-SRB (W.D. Mo. Dec. 27, 2023) ..................................................... 1

*In re Unilever Aerosol Prod. Mktg., Sales Pracs., & Prod. Liab. Litig.*,
  No. MDL 3068, 2023 WL 2875972 (J.P.M.L. Apr. 7, 2023) ............................................ 5

*In re Varsity Spirit Athlete Abuse Litig.*,
  No. MDL 3077, 2023 WL 3828645 (J.P.M.L. June 5, 2023) .......................................... 12

*In re Watson Fentanyl Patch Prods. Liab. Litig.*,
  883 F. Supp. 2d 1350 (J.P.M.L. 2012) ............................................................................ 13

Statutes and Codes

United States Code
  Title 28, Section 1407 ................................................................................................. 4, 15
  Title 28, Section 1407(a) ......................................................................................... 4, 5, 11

Defendant Engel & Völkers New York Real Estate LLC ("E&V New York") respectfully submits this brief in opposition to the Motion of Plaintiffs for Transfer of Actions to the Western District of Missouri Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings (Dkt. 1); *see also* Dkt. 1-1 ("Motion"). E&V New York is involved in just two transfer candidates, both pending in the Southern District of New York: *March v. Real Estate Board of New York*, Case No. 1:23-cv-09995-JGLC[1] and *Friedman v. Real Estate Board of New York, Inc.*, Case No. 1:24-cv-00405 (collectively, the "REBNY cases").[2]

I. **INTRODUCTION**

On October 31, 2023, a jury verdict in the Western District of Missouri awarded nearly $1.8 billion against the National Association of Realtors ("NAR") and alleged co-conspirators for fixing the price of commissions on residential real estate transactions. *See* Motion at 4. Although the first to reach trial, that case was actually preceded by a larger class action against NAR that is still in pretrial proceedings in the Northern District of Illinois. *See id.* at 3.

On the very same day, and in the same venue, as the dramatic jury verdict, Movants filed their cases against NAR. *See id.* at 4-5. As with the earlier cases, Movants allege that NAR's rules regarding broker commissions form the basis of a price-fixing agreement between NAR, its member brokerages, the brokers working with them, and the Multiple Listing Services ("MLSs") they used to list properties. *See id.* at 1-5. Soon thereafter,

---

[1] The *March* plaintiffs mistakenly named as a defendant "Engel & Volkers LLC," which is unknown and unrelated to E&V New York; and they have indicated their intent to substitute E&V New York as a defendant in the *March* action—a substitution that E&V New York has agreed not to oppose.

[2] A different E&V business that serves only as a franchisor, and has no real estate brokerage license of its own, Engel & Völkers Americas, Inc. ("E&V Americas"), is named in a third transfer candidate, *Hooper v. The National Association of Realtors,* Case No.1:23-cv-05392-SEG (N.D. Ga.). E&V Americas supports the position here of E&V New York regarding the REBNY cases. In a separate brief, E&V Americas opposes the Motion but does not oppose centralization of *Hooper* with other suits in which NAR is a defendant in an alternative district, as more fully described therein.

1

Movants sought consolidation with seven other purportedly related and recently filed cases into that venue. *See id.* at 5.

In their transparent zeal to maximize the number of cases being heard in a perceived favorable forum—one that has already found liability and awarded substantial damages on similar theories—Movants have clearly swept in cases that are completely distinct on the facts, wholly unrelated to NAR, and only superficially similar in their legal theories. This describes the REBNY cases, in particular.

The REBNY cases are unique in that they allege conspiracies limited to two specific boroughs of New York City and to only those property transactions conducted there using the REBNY Listing Service, a service which serves only New York City. Critically, the REBNY cases do not allege a conspiracy with NAR or the use of NAR rules. To the contrary, the Plaintiffs in one of the two REBNY cases, *Friedman*, affirmatively allege that the NAR has "no effect" on the purported REBNY conspiracy.

In a misguided effort to nonetheless paint *March* as a related case, the Motion blatantly mischaracterizes that complaint, pointing only to the basic <u>legal</u> elements of an antitrust claim as commonalities between *March* and other cases identified in the Motion. It is undeniable, however, that the <u>factual</u> proof of those elements required in a REBNY-centered case will be entirely distinct from the proof needed to establish a NAR-centered conspiracy. Indeed, E&V New York is not a member of NAR, was not a party to *Burnett* or *Moehrl*, and does not operate in any of the real estate markets covered by those cases. *See Burnett v. Nat'l Ass'n of Realtors*, 4:19-cv-332-SRB (W.D. Mo.); *Moehrl v. Nat'l Ass'n of Realtors*, 1:19-cv-1610-ARW (N.D. Ill.).

Given the complete absence here of common factual issues—and, as detailed below, the severe prejudice and inefficiency that would result from transferring the REBNY cases out of the Southern District of New York—the Panel should deny the Motion as to *March* and *Friedman*. Moreover, the Panel should recognize that the Motion's request for transfer to the Western District of Missouri is inappropriate in light of the prior trial verdict there, and that any centralization should instead occur in a neutral forum.

## II.  BACKGROUND OF THE REBNY CASES

Within two months following the *Burnett* verdict, E&V New York was named as a defendant in two new cases alleging price fixing by real estate brokers: *March v. Real Estate Board of New York*, Case No. 1:23-cv-09995-JGLC (S.D.N.Y. Nov. 13, 2023), and *Friedman v. Real Estate Board of New York*, Case No. 1:23-cv-09601 (E.D.N.Y. Dec. 29, 2023).

*March* and *Friedman* are unique in focusing on the Real Estate Board of New York ("REBNY"), not NAR, and in limiting their claims to transactions conducted using the REBNY Listing Service, not a Multiple Listing Service ("MLS"), in two boroughs of New York City, Manhattan and Brooklyn. The REBNY Listing Service covers only New York City. The defendants in *March* and *Friedman* are real estate brokerages in New York City that are members of REBNY, and REBNY itself. *See March* Dkt. 1 ¶¶ 17–44; *Friedman* Dkt. 1 ¶¶ 9–28. Like many of the REBNY case defendants, E&V New York is headquartered in New York City and holds a real estate license only in New York.

The REBNY cases—unlike *Burnett, Moerhl,* or any of the other cases against NAR—allege a conspiracy based solely on the REBNY rules and their impact on transactions completed through the REBNY Listing Service. *See March* Dkt. 1 ¶¶ 1–14; *Friedman* Dkt. 1 ¶¶ 1–7. NAR is neither named as a defendant nor alleged to be an unnamed coconspirator in the REBNY cases. Nor could it be, since REBNY is specifically alleged to be an independent trade association separate from NAR: "REBNY used to be affiliated with NAR," "[b]ut in 1994, its members seceded to form their own, New York–only association." *Friedman* Dkt. 1 ¶ 51 (emphasis added). Because REBNY is independent from NAR, "neither REBNY itself nor REBNY members transacting through the [REBNY Listing Service] are subject to NAR rules like the NAR Code of Ethics and Standards of Practice or the Handbook on Multiple Listing Policy." *Id.* Accordingly, the "conspiracy (or conspiracies) not to compete over Buyer Broker commissions perpetuated

3

through NAR have no effect on the . . . conspiracy perpetuated through REBNY here." *Friedman* Dkt.1 ¶ 83 n. 24 (emphasis added).

Nevertheless, the Motion now seeks centralization of *March* on the (clearly erroneous) premise that it "allege[s] antitrust violations relating to rules adopted by [NAR] and [MLSs] that govern the conduct of residential real estate brokers and agents nationwide." Motion at 1. Additionally, *Friedman* has been identified as a related case, although without explanation for how it is related to any case but *March*. *See* Dkt. 197.

The REBNY cases have already both been assigned to the same District Judge and Magistrate Judge in the Southern District of New York, as related cases. *See March* Nov. 15, 2023 Dkt. entry; *Friedman* Jan. 22, 2024 Dkt. entry. Indeed, the plaintiffs in *Friedman* voluntarily withdrew their original complaint from the Eastern District of New York and refiled in the Southern District to facilitate coordination of the two cases.

## III. ARGUMENT

Centralization under Section 1407 is appropriate only where three conditions are met: (1) the actions are "pending in different districts," (2) the actions involve "one or more common questions of fact," and (3) transfer will be "for the convenience of parties and witnesses" and will "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a) (emphasis added). The REBNY cases fail two of the three factors. First, the REBNY cases do not share "common questions of fact" with any other cases, none of which allege a conspiracy involving REBNY or occurring in New York City. *See* Part III.A. Second, transferring the REBNY cases out of New York would create severe inconvenience and inefficiency for the parties and witnesses in these fundamentally NYC-based lawsuits. *See* Part III.B.

E&V New York therefore opposes the Motion as it relates to the REBNY cases.[3] Should the panel nevertheless decide to centralize the REBNY cases, E&V New York opposes centralization in the Western District of Missouri. *See* Part III.C.

### A. The REBNY Cases Do Not Share Common Questions of Fact with the Other Relevant Actions

The existence of "one or more common questions of fact" is an absolute prerequisite to centralization. 28 U.S.C. § 1407(a). And, even where actions "share facts, in a broad sense," denial is still appropriate if factual differences are more salient. *In re Unilever Aerosol Prod. Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. MDL 3068, 2023 WL 2875972, at *1 (J.P.M.L. Apr. 7, 2023); *see also, e.g., In re: Mortg. Lender Force-Placed Ins. Litig.*, 895 F. Supp. 2d 1352, 1353 (J.P.M.L. 2012) (denying centralization where "[c]ommon questions of fact . . . do not predominate"). Moreover, the common questions must be factual—overlapping legal issues are irrelevant to the analysis. *See In re Senior Health Ins. Co. of Pa. Rehab. Plan Litig.*, 607 F. Supp. 3d 1348, 1349 (J.P.M.L. 2022) ("Common legal questions generally are insufficient to satisfy Section 1407's requirement of common factual questions.") (citing *In re Medi-Cal Reimbursement Rate Reduction Litig.*, 652 F. Supp. 2d 1378, 1378 (J.P.M.L. 2009) ("Merely to avoid two federal courts having to decide the same issue is, by itself, usually not sufficient to justify Section 1407 centralization.")). The proponent of centralization bears the burden to show that common questions of fact "are sufficiently complex and/or numerous to justify Section 1407 transfer." *In re Tyson Foods, Inc., Meat Processing Facilities Fair Lab. Standards Act (FLSA) Litig.*, 581 F. Supp. 2d 1374, 1375 (J.P.M.L. 2008).

Here, the Motion purports to seek centralization of "antitrust violations relating to rules adopted by [NAR] and [MLSs] that govern the conduct of residential real estate brokers and agents nationwide." Motion at 1. But neither *March* nor *Friedman* involve

---

[3] As a New York City brokerage that is involved in only the two REBNY cases in the S.D.N.Y., E&V New York limits its position on centralization to those two cases. As noted, *supra*, E&V Americas is not opposed to centralization of cases against NAR in a neutral forum.

either "rules adopted by" NAR or an MLS. Instead, the REBNY cases allege that REBNY, using its own listing system, has conspired with New York City real estate brokers to distort the New York City residential real estate market and harm a New York City class of plaintiffs. *See supra* Part II. The REBNY cases are thus fundamentally distinct from the cases against NAR. The fact that they are all antitrust cases alleging similar legal theories is, as noted above, irrelevant.

While the Motion makes a general appeal to the idea that antitrust cases are often suitable for centralization, Motion at 8, the Panel plainly does not rubber stamp antitrust MDLs. Quite the contrary, the Panel has not hesitated to deny centralization in antitrust cases that, like this one, involved key factual differences between actions. *See e.g., In re Am. Bd. of Med. Specialties Maint. of Certification Antitrust Litig.*, 382 F. Supp. 3d 1353, 1353–54 (J.P.M.L. 2019) (denying centralization where different classes of physicians asserted antitrust claims against different medical certification boards). There, as here, the alleged conspiracies of each certification board were conceptually similar, but that failed to overcome the fact that the various defendants and plaintiff classes were not actually connected. *Id.*; *see also In re IBM Antitrust Litig.*, 328 F. Supp. 509, 510 (J.P.M.L. 1971) (refusing to centralize where actions alleged different monopolies by different defendants); *In re Dental Supplies & Equip. Antitrust Litig.*, 289 F. Supp. 3d 1330, 1330–31 (J.P.M.L. 2018) (denying centralization in antitrust case based on procedural dissimilarities); *In re H&R Block Emp. Antitrust Litig.*, 355 F. Supp. 3d 1380, 1381 (J.P.M.L. 2019) (denying centralization in antitrust case due to minimal risk of duplicative discovery).

While the Motion does attempt to identify purportedly common fact questions here, none of them withstand scrutiny when comparing the REBNY cases to any of the other relevant cases. *See* Motion at 7–8.

### 1. *Whether defendants entered into an agreement or conspiracy based on the Buyer Broker Commission Rules.*

Although true that an "agreement" is an element of all antitrust conspiracy claims, the REBNY cases allege a different agreement than any other action in the proposed

centralization. Indeed, there is plainly no overlap between the facts relevant to proving whether, "[b]y virtue of the REBNY Listing Service Buyer Broker Commission Rule, REBNY, Defendants, and their agents, have entered into an unlawful agreement and/or conspiracy to fix, raise, maintain, or stabilize Manhattan residential real estate commissions," *March* Dkt. 1 ¶ 12, and the facts relevant to alleged agreements in any other residential real estate market. *See also Friedman* Dkt. 1 ¶¶ 2–3. Notwithstanding alleged similarity between REBNY's rules and other associations' rules, the rules themselves are indisputably different; are subject to different interpretation, application, and enforcement decisions; and present factually unique histories and effects. *See infra* pp. 10–11. Moreover, even an industry-standard rule—which is not alleged here—would not suffice to create common fact questions. *See In re Mortg. Lender Force-Placed Ins. Litig.*, 895 F. Supp. 2d at 1353; *In re Power Morcellator Prod. Liab. Litig.*, 140 F. Supp. 3d 1351, 1353 (J.P.M.L. 2015).

  Tellingly, no other complaint in the proposed centralization alleges a conspiracy "pursuant to REBNY and the REBNY Listing Service Universal Co-Brokerage Agreement/Rules and Regulations" or asserts claims on behalf of a class "who sold residential real estate in Manhattan and were forced to pay a Buyer Broker's commission in accordance with the REBNY Listing Service rules." *March* Dkt. 1 ¶ 2; *see also Friedman* Dkt. 1 ¶¶ 1–3. Indeed, no other complaints allege agreements of any kind involving REBNY (or E&V New York). Thus, the facts relevant to the alleged agreement in the REBNY cases are entirely independent of the facts relevant to the agreement alleged in the other actions. The *Friedman* plaintiffs affirmatively acknowledge that the "conspiracy (or conspiracies) not to compete over Buyer Broker commissions perpetuated through NAR have <u>no effect</u> on the . . . conspiracy perpetuated through REBNY here." *Friedman* Dkt. 1 ¶ 83 n. 24 (emphasis added).

7

### *2. Whether defendants possess market power in the relevant markets.*

Again, the Motion mistakes a common legal issue for a common fact question. Whether defendants possess power in the relevant markets is plainly not the same question when it concerns entirely separate markets. Although each case may well confront questions of market dynamics, they will each require a "fact-specific assessment of market power and market structure." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (quotation omitted). Those factual inquiries will be entirely different in the REBNY cases than elsewhere, simply because the alleged markets are different. Indeed, there is no overlap whatsoever between the relevant markets alleged in the REBNY cases and those alleged in any other actions.

In both *March* and *Friedman*, the relevant product market is explicitly limited to transactions conducted on the REBNY Listing Service. *See March* Dkt. 1 ¶ 101; *Friedman* Dkt. 1 ¶ 101. Consequently, the allegations of market power in *March* and *Friedman* are specific to the defendants' use of the REBNY Listing Service. *See March* Dkt. 1 ¶ 103; *Friedman* Dkt. 1 ¶¶ 103–04. Further, both REBNY cases allege narrow relevant geographic markets. *March* is limited to claims regarding transactions in "Manhattan," *March* Dkt. 1 ¶ 102, on behalf of a class of "[a]ll persons or entities that sold Manhattan residential real estate," *id.* ¶ 112. The claims in *Friedman* are even narrower, limited to just those parts of Brooklyn covered by REBNY Listing Service ("REBNY Brooklyn"), *Friedman* Dkt. 1 ¶ 102, on behalf of a class including only "persons or entities that sold residential real estate in REBNY Brooklyn," *id.* ¶ 132.

Moreover, there is no allegation that NAR or any MLS is active in Manhattan or REBNY Brooklyn, let alone that they were part of the alleged conspiracies. Indeed, both complaints allege that it is essentially impossible for residential real estate transactions to occur in the relevant geographic markets without using the REBNY Listing Service. *See March* Dkt. 1 ¶ 104; *Friedman* Dkt. 1 ¶¶ 105–07. In contrast, no other actions in the proposed centralization allege a relevant market including transactions on the REBNY

8

Listing Service or allege that the defendants have market power in connection with the REBNY Listing Service or in New York City.

Given the combination of narrow product-market and narrow geographic-market allegations in the REBNY cases, there is, unsurprisingly, no overlap even with the cases that purport to raise claims on behalf of nationwide classes. Those cases consistently limit their relevant markets and class definitions to transactions on NAR-affiliated MLSs, which makes them mutually exclusive with the REBNY cases. *See, e.g.*, *Gibson* Dkt. 1 ¶ 151. The actions thus "do not involve overlapping classes" and will not present common issues of fact that could even potentially justify centralization. *In re: Tyson Foods, Inc.*, 581 F. Supp. 2d at 1375.

### *3. Whether defendants engage in or promote steering.*

As with the question of market power, the question of "steering" will not be common between two different actions alleging two different conspiracies. As if to prove this point, the Motion cites various allegations of steering in every case it identified for centralization, <u>except</u> *March*. *See* Motion at 8. Indeed, the *March* complaint makes no mention of steering. And, although there is an allegation of "steering" in *Friedman*, it is explicitly focused on the incentives allegedly created by REBNY's rules. *See Friedman* Dkt. 1 ¶ 115. No other actions allege that REBNY's rules promote steering. Thus, the question whether steering occurs under REBNY's rules will be unique to the REBNY cases. By the same token, neither *March* nor *Friedman* raise fact questions regarding steering arising from NAR's or another association's rules or occurring anywhere outside the REBNY Listing Service. Consequently, any facts relevant to steering in the other actions will be irrelevant to the REBNY cases.

### *4. Whether the agreement causes competitive harm that substantially outweighs any competitive benefits.*

As with "agreement" and "market power," the Motion simply takes the elements of a "rule of reason" antitrust claim requiring proof of antitrust injury and net-competitive effect, and it asserts that they are going to be common factual issues in each case. *See*

Motion at 8. But the Motion fails to acknowledge that the factual proof of these elements will vary between conspiracies.

Moreover, even if the various actions were alleging anticompetitive effects from a single industry standard (and, here, they do not), even that degree of similarity would be insufficient. Allegations of an "industry-wide practice" are not a substitute for common issues of fact. *In re: Mortg. Lender Force-Placed Ins. Litig.*, 895 F. Supp. 2d at 1353; *see also In re Power Morcellator Prod. Liab. Litig.*, 140 F. Supp. 3d 1351, 1353 (J.P.M.L. 2015) (centralizing some actions but declining to create "industry-wide MDL").

Here, there is no industry standard common among different cases; instead, they challenge different rules, in different markets, allegedly arising from different conspiracies. And, because no other actions challenge the REBNY rules, or assert claims arising from transactions on the REBNY Listing Service, no cases but the REBNY cases will be concerned with proving the effect of the REBNY rules on the commissions paid on transactions from the REBNY Listing Service. Similarly, the REBNY cases do not allege any antitrust injury arising from any rules or listing service other than REBNY's, so it will be wholly irrelevant what effect other rules may have had in other markets.

\* \* \*

Notwithstanding the numerous factual differences apparent on the face of the complaints, the Motion erroneously mischaracterizes *March* as "discuss[ing] the essential role NAR has played in the conspiracy." *See* Motion at 5 (citing *March* Dkt. 1 ¶¶ 73–74, 81–88). But nothing could be further from the truth. Paragraphs 73 and 74 of the *March* complaint discuss how "historically" certain Brooklyn neighborhoods used a NAR listing service but stopped in 2012 (well outside the statute of limitations). And, in any event, *March* alleges a conspiracy in Manhattan not Brooklyn, so these allegations do not describe even a historical role for NAR in the alleged conspiracy, let alone a purportedly "essential" role. *See March* Dkt. 1 ¶¶ 73–74.

Meanwhile, Paragraphs 81–88 of the *March* complaint simply include a historical description of the NAR rule being litigated in *Burnett*, *Moerhl*, and *Nosalek v. MLS*

10

*Property Information Network Inc.*, Case No. 20-12244 (D. Mass.). The *March* complaint, however, is entirely devoid of any allegation connecting that history to REBNY's purported conspiracy in Manhattan, other than to say REBNY has a rule "[l]ike" the NAR rule. *Id.* ¶ 81; *see also id.* ¶ 73. But that is merely a concession that the NAR rule is not the operative rule involved in the alleged REBNY conspiracy, a point that *Friedman* makes even more explicitly: "[N]either REBNY itself nor REBNY members transacting through the [REBNY Listing Service] are subject to NAR rules like the NAR Code of Ethics and Standards of Practice or the Handbook on Multiple Listing Policy." *Friedman* Dkt. 1 ¶ 51. In short, the "conspiracy (or conspiracies) not to compete over Buyer Broker commissions perpetuated through NAR have no effect on the . . . conspiracy perpetuated through REBNY here." *Freidman* Dkt. 1 ¶ 83 n. 24 (emphasis added).

### B. Centralization and Transfer Away from New York City Would Not Promote Judicial Economy or the Convenience of the Parties

Even where common questions of fact predominate, centralization may occur only where it is "necessary for the convenience of the parties and witnesses or to further the just and efficient conduct of this litigation." *In re H&R Block Emp. Antitrust Litig.*, 355 F. Supp. 3d at 1380–81; *accord* 28 U.S.C. § 1407(a). Again, the burden is on Movants to show that centralization is necessary under this standard. *See In re Dry Bean Revenue Prot. Crop Ins. Litig.*, 350 F. Supp. 3d 1381, 1382 (J.P.M.L. 2018). But Movants cannot make any such showing here.

First, the REBNY cases are fundamentally about New York City and New York City market participants, and transferring the cases out of the Southern District of New York would impose serious inconvenience on the parties. The lead defendant, REBNY, is a non-profit organization headquartered in New York City and dedicated to serving the New York City property markets. The other defendants are overwhelmingly New York City real estate brokerages with their headquarters in New York City. The classes of plaintiffs bringing claims are all specifically defined to be residential real estate sellers in two boroughs of New York City. All the transactions at issue occurred in New York City.

11

Accordingly, the evidence at issue in the REBNY cases will overwhelmingly be in New York City. Requiring witnesses to leave New York City would be inconvenient and expensive, and transferring proceedings to another venue would increase the burden and costs of litigation for the parties all resident in New York City.

Second, there would be no meaningful efficiency gains from transferring the REBNY cases because there is essentially no overlap in the discovery relevant to REBNY cases compared to other cases targeting different trade associations, different listing services, and different geographic markets. As explained above, the REBNY cases are fundamentally distinct from those elsewhere, in that they concern markets, plaintiff classes, and key defendants—including E&V New York—that are present only in New York.

An MDL outside of New York would therefore be inconvenient and inefficient for all parties and witnesses involved in the REBNY cases, and it would offer no meaningful efficiencies at all in return. Centralization of the REBNY cases will not "eliminate duplicative discovery; prevent inconsistent pretrial rulings, including with respect to class certification; [or] conserve the resources of the parties, their counsel, and the judiciary." *In re Uber Techs., Inc., Data Sec. Breach Litig.*, 304 F. Supp. 3d 1351, 1353 (J.P.M.L. 2018).

Further, to the extent there is benefit to be gained from coordinating the two REBNY cases, that has already been achieved, because they are already pending in the same district and assigned to the same judge and magistrate judge. Nothing further would be gained by including such already coordinated cases in an MDL.

Where the parties are willing to coordinate, and indeed have already done so, centralization is unnecessary. *In re Varsity Spirit Athlete Abuse Litig.*, No. MDL 3077, 2023 WL 3828645, at *2 (J.P.M.L. June 5, 2023). In similar circumstances where the actions are already in fora amendable to coordination, the Panel routinely denies even unopposed motions to centralize. *See, e.g., In re: Equinox Fitness Wage & Hour Emp. Pracs. Litig.*, 764 F. Supp. 2d 1347, 1348 (J.P.M.L. 2011).

Additionally, we understand that many (or all) of the parties to the REBNY cases are against centralization, and this Panel has made clear that it takes such a consensus into

12

account when deciding whether to centralize. *See, e.g.*, *In re CVS Caremark Corp.*, 684 F. Supp. 2d 1377, 1379 (J.P.M.L. 2010). Moreover, the views of parties most likely to benefit from centralization, such as those who would "face duplicative discovery requests in the absence of an MDL," are entitled to particular weight. *In re H & R Block Emp. Antitrust Litig.*, 355 F. Supp. 3d at 1381. Here, those parties are the defendants named in multiple cases. Although E&V New York is not named outside the REBNY actions, E&V Americas is named in a case against NAR. That E&V New York joins so many other parties in opposing centralization of the REBNY cases, even while E&V Americas is not opposed to centralization of cases against NAR, demonstrates clearly how overbroad centralization would not advance the efficient administration of justice at all.

C. <u>The Western District of Missouri Is an Especially Poor Candidate for Transferee Court</u>

Finally, and strictly in the alternative, if the Panel nonetheless determines that the REBNY cases should be centralized, E&V New York respectfully urges against the selection of the Western District of Missouri as the transferee court.

### *1. The Western District of Missouri Is Not a Convenient Venue.*

Western Missouri is a long way from New York; and, apart from the two actions involving Movants themselves, <u>none</u> of the scheduled cases are even within 400 miles of Kansas City. *See* Dkt. 1-2; Dkt. 197. Rather, a substantial number of actions are on the East Coast; and, even if a more central location is necessary, much larger travel hubs like Chicago or Dallas are available and would be more convenient for parties and witnesses. *See, e.g.*, *In re Watson Fentanyl Patch Prods. Liab. Litig.*, 883 F. Supp. 2d 1350, 1352 (J.P.M.L. 2012) (transferring to Chicago due to its centrality and accessibility); *In re "Factor VIII or IX Concentrate Blood Products" Prod. Liab. Litig.*, 853 F. Supp. 454, 455 (J.P.M.L. 1993) (same).

In contrast, there is no argument in favor of the location of the Western District of Missouri except that it is equally bad for everyone but the Movants. *See* Motion at 12. Movants do not claim that the Western District of Missouri is home to the headquarters of

any defendant, nor do they represent that it is home to a disproportionate share of evidence or witnesses. To the contrary, NAR's headquarters are in the Northern District of Illinois, and a substantial portion of the discovery in NAR cases is thus likely to occur in that district. *See* Dkt. 196 at 15-16. Similarly, the actions in the Northern District of Georgia and the Eastern District of Texas name predominantly local parties presumably headquartered in their respective venue. There are thus several potential venues for centralization that are more convenient to more parties, including by virtue of greater air travel accommodations.

### 2. *Transferring to the Western District of Missouri Would Reward Forum Shopping.*

The lack of any connection between these actions and the Western District of Missouri points to the real reason that Movants favor transfer there: they have already once rung the bell in that jurisdiction, and now they hope to capitalize on favorable rulings from that venue in all the other cases nationwide. As Movants acknowledge, their proposed jurist, Judge Bough, is the same judge who presided over *Burnett* in the Western District of Missouri, which resulted in a major trial verdict and settlements favorable to the plaintiffs. Motion at 2. Indeed, Movants even go so far as to praise Judge Bough's record in *Burnett* of "guiding a multibillion-dollar, multi-defendant class action from complaint to verdict . . . in only 54 months," as a basis for transfer. *Id.* at 10. Movants, both of whom are plaintiffs, clearly hope to receive similar solicitude to their claims (and the claims of all other plaintiffs) in the Western District of Missouri.

It is well established, however, that "the possibility that another district judge may be more favorably disposed to a particular litigant's position is not a factor in the Section 1407 analysis." *In re Thomas E. Noble Litig.*, 223 F. Supp. 3d 1332, 1333 (J.P.M.L. 2016). Moreover, the Panel has recognized that it is more appropriate to select a neutral forum when, as here, there has already been a trial verdict in a related case prior to the establishment of the MDL. *See In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 793 F. Supp. 1098, 1100 (J.P.M.L. 1992). The appearance of fairness and respect for due

14

process are, of course, best served by avoiding the centralization of numerous cases throughout the country in a single venue that has already reached a trial verdict for one side. Such a trial outcome necessarily carries with it a history of procedural and substantive decisions made on putatively related matters before all interested parties could be represented. Ultimately, the selection of a neutral forum best serves the requirement in Section 1407 that transfer occur only where it "will promote the just and efficient conduct" of litigation. 28 U.S.C. § 1407.

Consequently, the Panel should reject Movants' transparent effort to secure a favorable forum by means of MDL centralization in the one district to reach a trial verdict in a related case on the very day they filed their own actions there. To promote the appearance of fairness and due process, the Panel should not transfer cases alleging similar antitrust theories as *Burnett* to the venue of the *Burnett* trial—a forum that is otherwise far removed from most actions and inconvenient for virtually everyone else.

## IV.   CONCLUSION

For the foregoing reasons, E&V New York respectfully requests that the Panel deny Movants' motion with respect to the REBNY cases or, if the Panel still determines to transfer the REBNY cases, that they be transferred to a district other than the Western District of Missouri.

Dated:  February 22, 2024         Respectfully submitted,

_____
Michael L. Sibarium
Drew A. Navikas
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, N.W
Washington, D.C. 20036
t + 202.663.8000
michael.sibarium@pillsburylaw.com
drew.navikas@pillsburylaw.com

Kenneth W. Taber
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019-6131
t +1.212.858.1000
kenneth.taber@pillsburylaw.com

*Counsel for Engel & Völkers New York Real Estate LLC*