CALEB MARKER (SBN 269721)
 Email: caleb.marker@zimmreed.com
Flinn T. Milligan (SBN 323042)
 Email: flinn.milligan@zimmreed.com
ZIMMERMAN REED LLP
6420 Wilshire Blvd, Suite 1080
Los Angeles, CA 90048
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA FREEDLUND, an individual, on behalf of others similarly situated and the general public,<br><br>        Plaintiff,<br><br>v.<br><br>REDFIN CORPORATION, a Delaware Corporation, THE NATIONAL ASSOCIATION OF REALTORS, THE CALIFORNIA ASSOCIATION OF REALTORS,<br><br>        Defendants. | CASE NO.:<br><br>*Assigned for All Purpose to the Honorable*<br><br>**COMPLAINT**<br><br><u>**CLASS ACTION**</u><br><br>1. Violation of the Sherman Act, 15 U.S.C. § 1;<br>2. Violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16720;<br>3. Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*<br><br>**[JURY TRIAL DEMANDED]** |

Plaintiff Andrea Freedlund ("Plaintiff"), on behalf of herself and others similarly situated and the California general public ("general public"), hereby commences this suit against Defendant Redfin Corporation, ("Redfin"), Defendant National Association of Realtors ("NAR"), and the California Association of Realtors ("CAR"). CAR and NAR are collectively referred to as the Association Defendants. Plaintiff makes the following allegations based upon personal knowledge, information and belief, and Plaintiff's attorneys' reasonable investigative efforts as to the Defendants' actions and misconduct, and states and alleges as follows:

## PRELIMINARY STATEMENT

1.     This is an action brought under Section 1 of the federal Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14, and California's Cartwright Act, Bus. & Prof. Code § 16720, and Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.*, to restrain anticompetitive conduct by Defendants Redfin Corporation ("Redfin"), the California Association of Realtors ("CAR") and the National Association of Realtors ("NAR"). This case challenges Defendants' scheme of conspiring to fix and inflate the price of buyer-side real estate agent commissions to supracompetitive levels.

2.     Middle class wealth in the United States is typically tied up in a person's home, and buying a home is frequently described as the most significant transaction people undergo in their lifetime.[1] At the time of selling a home, the seller profits only on the difference (if positive) between the purchase price and the sale price. However, due to anticompetitive collusion between the vast majority of realtors (and all of whom that are members of the NAR, with membership being required if a given realtor wishes to use the REALTOR trademark) sellers of property are typically required to pay the buyer's agent's commission, with that commission calculated as a percentage of the value of the home as a whole, not only the profit (if any). Thus, any collusion or other wrongdoing that has the effect of raising or stabilizing buyer's broker commissions operates to take a large chunk out of the life savings

---

[1] Beth Nagalski, *Ending the Uniformity of Residential Real Estate Brokerage Services Analyzing the National Association of Realtors' Multiple Listing Service Under the Sherman Act*, 73 Brook. L. Rev. 771, 771 (2008).

of middle class Californians. Unfortunately, collusion and wrongdoing are a matter of explicit business practices for Defendants.

3.    Specifically, the Association Defendants promulgated a set of rules that, *inter alia*, require home sellers to make a blanket, non-negotiable offer of buyer's broker's commission as a condition of listing the property on the Multiple Listing Service ("MLS"). The MLS is a dynamic list of properties for sale in a given region and is administered by the local chapter of the NAR, in this case the CAR. Access to the MLS is an essential facility for realtors. The effect of these rules is to fix and stabilize buyer-side commissions at an anticompetitively high level. Defendant Redfin was until October 2023 a member of both associations, as were many of its realtor members, and Redfin required its realtors to abide by the anticompetitive rules described. Thus, all Defendants agreed to the anticompetitive scheme.

4.    One major consequence of the antitrust violations described herein is the facilitation of "steering" by buyer's brokers—the well-recognized practice of such brokers giving preferential treatment to properties that list a favorable (for the broker) buyer's broker's commission—which also helps to enforce the cartel as discounters are punished by not having their homes shown. Other aspects of the challenged rules also anticompetitively facilitate steering, such as the requirement that all offers be expressed as a percentage of total sale or a dollar value and the prohibition on invitations to negotiate, which allows for easy comparison of buyer's broker's commission. And to cap it off, the Defendants' unlawful agreement even prohibits buyers' brokers from conditioning a purchase offer upon a reduction of buyer side broker commission.

5.    The Antitrust Division of the United States Department of Justice is currently actively investigating practices in residential real estate brokerage marketplaces, including buyers' agent commission practices, among others. Notably, in July 2021 the Justice Department withdrew from its settlement with NAR on the basis that "the settlement will not adequately protect the department's rights to investigate other conduct by NAR that could impact competition in the real estate market and may

harm home sellers and home buyers. The department is taking this action to permit a broader investigation of NAR's rules and conduct to proceed without restriction."[2]

6.     As a typical commission rate is 5-6%, split approximately 50-50 between the buyer's and the seller's agent due to the anticompetitive and collusive agreement between agents, this unlawful scheme represents probably the greatest theft of middle-class wealth in the country. This 5-6% rate, with 2-3% going to the buyer's agent, is significantly out-of-step with prevailing rates in other developed nations, strongly suggesting that this supracompetitive rate is not the product of healthy competitive forces but rather a product of unlawful and unfair collusion in violation of the federal antitrust laws and, in turn, the Unfair Competition Law (Bus. & Prof. Code §§ 17200 *et seq*., "UCL").

7.     The Defendants collectively possess market power in relevant markets for real estate agent services, including through their control of regional MLSs. Brokers are required to list all properties they are responsible for to the MLS if they are members of that MLS. Access to the MLS is a competition essential for realtors (and home sellers), and all MLSs in this case are controlled by local NAR organizations. Crucially, access to this essential facility[3] is strictly conditional on a given broker's agreement to follow the NAR's rules in its 2023 Handbook on Multiple Listing Policy ("2023 NAR Handbook"), including the anticompetitive rules challenged herein. Notably, 84% of MLSs nationwide require membership in a realtor's association in order to access the system.[4]

8.     Defendant's illegal collusion has the inevitable effect of forcing home sellers like Plaintiff to bear a cost—buyer's side commissions—that in a competitive marketplace lacking Defendants' collusion would be borne by the buyer, if at all. Buyers are obviously better placed and incentivized to exert downward pressure on commissions as they are the ones actually receiving and benefitting from the service and so are incentivized to spend according to their needs. In such a sane system, buyer's brokers would be in competition with one another, including price competition. Thus,

---

[2] Department of Justice, *Justice Department Withdraws from Settlement with the National Association of Realtors*, available at https://www.justice.gov/opa/pr/justice-department-withdraws-settlement-national-association-realtors.
[3] Beth Nagalski *supra* at 773 ("the Department of Justice describes real estate agent access to the MLS as "critical to compete in the local market.")
[4] *Id*. at 774. Nagalski also opines that the MLSs have market power for antitrust purposes at 804.

another anticompetitive effect of the rules challenged in this action is the sheer fact that sellers are required to compensate buyers' agents at all.

9.  Through this action Plaintiff seeks, as well as antitrust damages for herself and the Class, prospective public injunctive relief for the benefit of the general public. Plaintiff would only benefit from the requested public injunctive relief in the same manner as the general public and thus only incidentally and as a member of the general public.

10.  Plaintiff is a home seller who sold her home to a person using a Redfin buyer's agent, and brings this action against Redfin and the Association Defendants for unlawfully agreeing and conspiring to enact and enforce anticompetitive restrictions on realtor contracting behavior, causing sellers to pay inflated buyers' agent commissions on the sale of their homes, in violation of federal antitrust laws and the UCL's prohibition on unlawful and unfair conduct and the antitrust laws.

## THE PARTIES

11.  Plaintiff Andrea Freedlund ("Plaintiff") is an individual residing in Aliso Viejo, California. Aliso Viejo is in Orange County. Plaintiff is a citizen of the state of California. Plaintiff sold her home in Laguna Niguel, California, on or around September 27, 2021 to a buyer who was represented by a Redfin agent. Plaintiff was also represented by a Redfin agent. The buyer's agent was paid 2% of the sale price as a commission. At the time of Plaintiff's sale, and those of the putative Class, Redfin and its agents were members of NAR and CAR and had agreed to abide by the Challenged Rules, and did so as to Plaintiff's home sale. As a direct result of the conduct challenged in this Complaint, Plaintiff paid a supra-competitively high buyer's broker's commission.

12.  Defendant National Association of Realtors ("NAR") is a professional association which currently has over 1.5 million members.[5] Members of NAR are allowed to use the trademarked designation REALTOR. NAR is a powerful lobbying group that lobbies on behalf of real estate agents. NAR is headquartered in Chicago, Illinois, but has subsidiary offices of the California Association of

---

[5] National Association of Realtors, https://www.nar.realtor/ (last visited Jan. 30, 2024).

Realtors in multiple locations in California.[6] NAR requires its agents to abide by and enforce the anticompetitive rules challenged in this action.

13.     The California Association of Realtors ("CAR") is a professional association that operates under the ambit of the NAR (its realtors are REALTORS). CAR has offices at 525 S. Virgil Avenue, Los Angeles, CA 90020, as well as numerous local associations operating under its ambit throughout California. CAR requires its agents to abide by and enforce the anticompetitive rules challenged in this action.

14.     Defendant Redfin Corporation ("Redfin") is a resident of Washington state, with its principal place of business at 1099 Stewart Street, Suite 600, Seattle, WA 98101. Defendant maintains multiple offices in California from which it conducts substantial business for the California market, with locations in Carlsbad, Long Beach, Los Angeles, Orange County, Palm Springs, Sacramento, San Diego, San Francisco, San Jose, and Temecula. Defendant Redfin is organized under the state of Delaware. At relevant times, Redfin required its agents to abide by and enforce the anticompetitive rules challenged in this action. Defendant Redfin has been licensed as a brokerage since January 20, 2006 and has numerous individual realtors licensed under its brokerage umbrella.

## JURISDICTION & VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 4 and 16 of the Clayton Antitrust Act. 15 U.S.C.§§ 15, 26. This Court further has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the defendants.

16.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and California's long-arm statute. Cal. Code Civ. Proc. § 410.10.

---

[6]     Local Associations by City, California Association of Realtors, https://www.car.org/en/contactus/rosters/localassocbycity (last visited Jan. 30, 2024).

17.     This Court also has personal jurisdiction over Defendant Redfin because Defendant is a registered Company doing business in the State of California, and it conducts, and is authorized to conduct, substantial business in this State, generally, and this County, specifically. Defendant provides its services to persons in this county and throughout the state of California, including Plaintiff. Defendant has sufficient contacts with the State of California and this County such that rendering the exercise of jurisdiction over it is consistent with the traditional notions of fair play and substantial justice.

18.     This Court has personal jurisdiction over Defendant NAR as NAR is an organization that conducts significant business directed at California, including through its subsidiary offices via the CAR. NAR conducts substantial business in this state and county and provides its services to members of the general public throughout California. The challenged rules of NAR and CAR constitute an aspect of those parties' intentional contacts with California..

19.     This Court has personal jurisdiction over Defendant CAR as CAR is a California based association with offices across the state devoted to providing real estate services to members of the California general public. CAR conducts substantial business in this state and county and provides its services to members of the general public throughout California.

20.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and the federal venue statutes, 28 U.S.C. § 1391, because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects in this District.

## **COCONSPIRATORS**

21.     Several local real estate associations are not named as Defendants but participated as co-conspirators in the conspiracy alleged, performing acts and making statements in furtherance thereof. This includes each of the local REALTOR associations that own and operate the MLSs for their area. This includes actions by local MLSs to enforce the Challenged Rules. Each MLS promoted, complied with, and implemented and enforced the local version of the Challenged Rules. In addition, other local REALTORS have participated in, and followed the dictates of, the Challenged Rules in their local area,

including through engaging in steering behaviors, reporting violations of the Challenged Rules to local associations and/or CAR and NAR, and failing to advertise pricing.

22.     Defendants are jointly and severally liable for the acts of their co-conspirators whether named or unnamed as defendants in this Complaint.

**RELEVANT MARKET**

23.     The relevant product market is the market for buyer-side real estate brokerage services. The relevant geographic market is California.

24.     There are no readily-available substitutes for real estate brokerage services. While buyers are able to use sites like Zillow to list homes for sale, realtors provide a comprehensive package of services and advice that has no currently extant substitute, particularly including access to the MLS, essential to any serious home seller. Thus, brokers provide a package of services in a convenient bundle, including MLS access and broker experience, that no competing or alternative service is able to offer. To truly challenge Defendants, a market entrant would be required to come up with a service comparable to the MLS; an impossibility in an entrenched service market in which access to data on homes actually for sale is paramount.

25.     The relevant geographic market is reasonably coextensive with the coverage of the CAR and its MLSs. The great majority of homes sold in this geographic area were listed on an MLS by a CAR and/or NAR broker who is subject to the Challenged Rules. Residential real estate is an inherently local business, with many sellers preferring to retain brokers who have experience and familiarity in a given submarket. Similarly, the majority of buyers would prefer an agent who is experienced and knowledgeable about the given market.

26.     Defendants and their coconspirators collectively have market power in California through their monopoly on the MLS and dominant position in the local market for real estate brokerage services.

**FACTUAL ALLEGATIONS**

**A. The Challenged Rules**

27.    Chief among these anticompetitive rules is a rule that requires every seller's agent, at the time of listing on the MLS (required to compete as a realtor), to make a "blanket unilateral offer[] of compensation" to the buyer agent who finds a buyer for the home. Indeed, the 2023 NAR Handbook contains the following *definition* of an MLS: "a means by which authorized participants make blanket unilateral offers of compensation to other participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law.") 2023 NAR Handbook at 3.

28.    This requirement of a "blanket unilateral offer of compensation" to buyers' agents is inherently anticompetitive and has led directly to the present state of affairs in which the United States stands alone among developed nations for its ultra-high buyer's agent compensation.

29.    The 2023 NAR Handbook contains the following provisions:

> A multiple listing service is: . . . a means by which authorized participants make blanket unilateral offers of compensation to other participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law). (2023 NAR Handbook at 3.)

> Since the MLS is an association service by which the participants make a blanket unilateral offer of compensation to the other participants with respect to listings for which they are an agent, no association or association MLS may make or maintain a rule which would preclude an individual or firm, otherwise qualified, from participating in an association MSL solely on the basis that the individual or firm functions, to any degree, as the agent of potential purchasers under a contract between the individual (or firm) and the prospective purchaser (client). (2023 NAR Handbook at 30.)

> G. Commission/Cooperative Compensation Offers: In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants. This is necessary because cooperating participants have the right to know what their compensation will be prior to commencing their efforts to sell. (2023 NAR Handbook at 39.)

> While offers of compensation made by listing brokers to cooperating brokers through MLS are unconditional (except where MLS rules create specific exceptions as specified elsewhere in this policy statement), a listing broker's obligation to compensate a cooperating broker who was the procuring cause of sale (or lease) may be excused if it is determined through arbitration that, through no fault of the listing broker and in the exercise of good faith and reasonable care, it was impossible or financially unfeasible for the listing broker to collect a commission pursuant to the listing agreement. In such instances, entitlement to cooperative compensation offered through MLS would be a question to be determined by an arbitration hearing panel . . . . (2023 NAR Handbook at 39.)

Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitation by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships. (Amended 11/96.) (2023 NAR Handbook at 40.)

A multiple listing service is a means by which authorized participants make blanket unilateral offers of compensation to other participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law) . . . (2023 NAR Handbook at 53, under "Model Association Bylaw Provisions Authorizing MLS as a Committee of an All-REALTOR Association.")

Any REALTOR of this or any other association who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these bylaws, shall be eligible to participate in multiple listing upon agreeing in writing to conform to the rules and regulations thereof and to pay the costs incidental thereto. (2023 NAR Handbook at 53, under "Model Association Bylaw Provisions Authorizing MLS as a Committee of an All-REALTOR Association.")

A multiple listing service is a means by which authorized participants make blanket unilateral offers of compensation to other participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law); by which cooperation among participants is enhanced; by which information is accumulated and disseminated to enable authorized participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; by which participants engaging in real estate appraisal contribute to common databases; and is a facility for the orderly correlation and dissemination of listing information so participants may better serve their clients and the public. Entitlement to compensation is determined by the cooperating broker's performance as a procuring cause of the sale (or lease) (Amended 11/04) (2023 NAR Handbook at 57, under "Model Association Bylaw Provisions Authorizing MLS as a Committee of an Association with REALTOR and REALTOR-ASSOCIATE Members.")

The exclusive agency listing also authorizes the listing broker, as exclusive agent, to offer cooperation and compensation on blanket unilateral bases, but also reserves to the seller the general right to sell the property on an unlimited or restrictive basis. Exclusive agency listings and exclusive right-to-sell listings with named prospects exempt should be clearly distinguished by a simple designation such as a code or symbol from exclusive right-to-sell listings with no named prospects exempt, since they can present special risks of procuring cause controversies and administrative problems not posed by exclusive right-to-sell listings with no named prospects exempt. (2023 NAR Handbook at 62-62, under "Model Rules and Regulations for an MLS Operated as a Committee of an Association of REALTORS.")

In filing a property with the multiple listing service of an association of REALTORS, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants. Specifying the compensation on each listing is necessary, because the cooperating broker has the right to know what his compensation shall be

prior to his endeavor to sell. (Amended 11/96). (2023 NAR Handbook at 69-70, under "Division of Commissions.")

A multiple listing service is a means by which authorized participants make blanket unilateral offers of compensation to other participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law); by which cooperation among participants is enhanced; by which information is accumulated and disseminated to enable authorized participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; by which participants engaging in real estate appraisal contribute to common databases; and is a facility for the orderly correlation and dissemination of listing information so participants may better serve their clients and the public. Entitlement to compensation is determined by the cooperating broker's performance as procuring cause of sale (or lease). (Amended 11/04). (2023 NAR Handbook at 97, under "Model Association Bylaw Provisions Authorizing a Multiple Listing Service as a Wholly-owned Subsidiary Corporation of the Association.")

A multiple listing service is a means by which authorized participants make blanket unilateral offers of compensation to other participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law); by which cooperation among participants is enhanced, by which information is accumulated and disseminated to enable authorized participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; by which participants engaging in real estate appraisal contribute to common databases; and is a facility for the orderly correlation and dissemination of listing information so participants may better serve their clients and the public. Entitlement to compensation is determined by the cooperating broker's performance as procuring cause of the sale (or lease). (Amended 11/04). (2023 NAR Handbook at 101, under "Model Bylaws for a Multiple Listing Service Separately Incorporated but Wholly-owned by an Association of REALTORS.")

The exclusive agency listing also authorizes the listing broker, as exclusive agent, to offer cooperation and compensation on blanket unilateral bases, but also reserves to the seller the general right to sell the property on an unlimited or restrictive basis. (2023 NAR Handbook at 110.)

In filing a property with the multiple listing service of an association of REALTORS, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants. Specifying the compensation on each listing is necessary, because the cooperating broker has the right to know what his compensation shall be prior to his endeavor to sell. (Amended 11/96). (2023 NAR Handbook at 118.)

The concept of cooperation in real estate transactions can be enhanced by a mechanism such as the multiple listing service which enables a REALTOR to cooperate with other REALTORS by extending to them a blanket offer of compensation. If any significant group of REALTORS desires to establish a means of extending blanket unilateral offers of compensation, the association should establish an MLS to enable them to achieve such objective. (Amended 11/96). (2023 NAR Handbook at 147.)

Standard of Practice 3-2: Any change in compensation offered for cooperative services must be communicated to the other REALTOR prior to the time that REALTOR submits an offer to purchase/lease the property. After a REALTOR has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction. (Amended 1/14). (2023 NAR Standards of Practice.)

30. What these provisions describe is the "behind the scenes" that accompanies a sale of a home made through an NAR realtor.

31. Upon listing a property on the MLS, and as a condition of such listing, sellers' agents are required to make "blanket" "unilateral" offers of compensation and cooperation to any buyer's agent that is involved in the sale. This is despite the fact that, in the modern age of the internet, buyers' agents simply do not do much work to earn a commission—far less the typical 2-3% of total sale price that they earn under these unlawful agreements—such that the requirement of unilateral offers of cooperation is essentially a boondoggle for realtors who receive handsome compensation (that grows with the inexorable rise in housing prices) for minimal effort (that shrinks as more and more realtor functions, such as showing a list of homes, are completed by buyers using technology such as Zillow).

32. The California Association of Realtors ("CAR") has its own rules that contain a version of the commission rule as follows:

A Multiple Listing Service is a means by which authorized MLS Broker Participants establish legal relationships with other Participants by making a blanket unilateral contractual offer of compensation and cooperation to other Broker Participants . . . (California Model Multiple Listing Services Rules ("California Model Rules") at 9)

7.12 Unilateral Contractual Offer; Subagency Optional. In filing a property with the MLS, the Broker Participant makes a blanket unilateral contractual offer of compensation to the other MLS Broker Participants for their services in selling the property. Except as set forth in Rule 7.15 below or pursuant to California Civil Code Section 1087, a Broker Participant must specify some compensation to be paid to either a buyer's agent or a subagent and the offer of compensation must be stated in one, or a combination of, the following forms (1) a percentage of the gross selling price; or (2) a definite dollar amount. The amount of compensation offered through the MLS may not contain any provision that varies the amount of compensation offered based on conditions precedent or subsequent or on any performance, activity or event. Furthermore, the MLS reserves the right to remove a listing from the MLS database that does not conform to the requirements of this section. At the Broker Participant's option, a Broker Participant may limit his or her offer of compensation to buyer's agents only, to subagents only, or make the offer of compensation to both. Any such limitations must be specified on the property data form and in the MLS. The amount of compensation offered to buyers' agents or subagents may be the same or different but must be clearly specified on the property data profile

sheet. Broker Participants wishing to offer subagency to the other MLS Broker Participants must so specify on the property data profile sheet and on the MLS, otherwise, the offer of compensation does not constitute an offer of subagency. (California Model Rules at 19-20).

33.  Hereinafter these provisions of the CAR and NAR are referred to as the "Challenged Rules."

34.  Further, listed under "Tier One Offenses" in the California Model Rules is "9. Failure to Offer Unconditional Compensation [Rule 7.12 (Unilateral Contractual Offer)]". Thus, CAR considers a failure to participate in the cartel to be an "offense" in violation of its rules.

35.  Tier One offenses are initially treated with a warning, the second violation requires taking a class or paying a fine (the California Model Rules recommend $100-$250). A third and subsequent violation leads to a fine, which the California Model Rules recommend at between $300 and $1,000. Thus, refusal to participate in the cartel can grow expensive quickly for dissenting agents.

36.  Thus, due to Defendants' conspiracy, the Association Defendants condition a broker's access to and use of NAR and CAR MLSs on a broker's agreement to terms that nakedly restrain competition and fix prices.

**B. The Challenged Rules are Anticompetitive**

37.  Defendant NAR is a national trade association of realtors. NAR promulgates rules and requirements for realtors that must be followed if a given realtor is to be granted access to the MLS, an essential facility for a realtor, and be allowed to use the REALTOR trademark.

38.  Defendant CAR likewise condition access to the MLS that they control on adherence to NAR rules including the Challenged Rules.

39.  Defendant Redfin is a leading brokerage that until recently required all of its realtors to agree to the Challenged Rules.

40.  These Challenged Rules requiring unilateral blanket offers of compensation are anticompetitive for several reasons.

41.  First, the Challenged Rules require payment of the buyer's agent by the seller despite the fact that the buyer's agent represents the counterparty and adversary to the transaction. This naturally disincentivizes the buyer from shopping for a cheaper agent, and requires home sellers to pay a cost that,

in a competitive market—and but for the anticompetitive agreement to the Challenged Rules—would be paid by the buyer. This disincentive thus raises the upwards pressure on commission rates by artificially removing a natural downward pressure in the form of cost-conscious buyers.

42.     Second, the Challenged Rule requires offers to be "blanket," meaning that sellers forced to compensate buyers' agents are not even able to adjust the compensation based on the experience or reputation of the buyer's agent as they would in a freely competitive environment. Thus sellers are left paying more for a less desirable service.

43.     Third, the Challenged Rules encourage steering of prospective home buyers towards properties that have posted high buyer's agent fees on the MLS listing, meaning that prospective buyers have their searches guided by buyers' agents who have a fundamental conflict between their own financial remuneration and the potentially adverse actual preferences of the prospective buyers.

44.     "Steering occurs when traditional listing brokers make it difficult or impossible for non-traditional or "discount" brokers to bring potential buyers to the property."[7] In other words, buyers' agents are incentivized to show homes with a high commission, regardless of whether such homes are particularly suited to the prospective buyer. By the same token, the Challenged Rule incentivizes sellers' agents to encourage sellers to set buyers' agents' commission on the listing artificially high so that they benefit from any steering behavior, driving up the price of realtor services in the marketplace. Most buyer brokers will simply not show homes at all to their clients where the seller is offering a low buyer commission, or they will prioritize showing homes with a higher buyer commission. As a result, to ensure the cooperation of buyers' agents, selling brokers are incentivized to offer a higher buyer commission as part of complying with the Challenged Rules. As described by one commentator "Steering in real estate takes place when an agent or broker guides a buyer to or away from a particular property for their own selfish reasons rather than the best interests of the buyer."[8] Nadel goes on to say that "[l]ike most self-interested salesmen, buyers' agents will favor listings that offer them the highest commissions."[9] This is an anticompetitive harm. Indeed, "analysts speculate that a truly competitive

---

[7] Nagalski *supra* at 786–87.
[8] Mark S. Nadel, *Obstacles to Price Competition in the Residential Real Estate Brokerage Market*, 18 Berkeley Bus. L.J. 90, 96 (2021).
[9] *Id*. at 103.

residential real estate industry would feature lower commission rates and "a greater range and variety of services [offered] at varying prices.""[10]

45. If the Challenged Rules were not in place, then the cost of buyer commissions would be paid by buyers. Buyer brokers would thus have to compete with one another, including through offering a lower commission rate—in other words, the kind of competition would exist that is the goal of the competition laws. The Challenged Rules therefore restrain price competition among buyer brokers because the person who actually retains the broker—the home buyer—does not negotiate or pay the commission for their broker.

46. Fourth, another rule requires that buyers' agent commissions be expressed as either a percentage of sale price or a dollar amount, and prohibits the reservation of the right to negotiate such fees. This operates to fix the price of buyers' agents services in the marketplace and further facilitates steering as commissions are easily compared by avaricious buyers' brokers. This fact in itself has anticompetitive effects as "basing broker commissions on the sale price of the home is problematic, in part because the typical co-op fee incents buyers' agents to encourage buyers to bid higher. Absent some good reason to support this approach, this ethical flaw is yet another reason to ban percentage co-op fees set by sellers."[11]

47. Fifth, similarly one of NAR's "Standards of Practice" outright prohibits any subsequent negotiation of buyers' agent compensation. In other words, upon listing a property the sellers' agent must list buyer's agent compensation as a flat dollar amount or a percentage of the total sale, and cannot later negotiate down the buyer's agent's compensation without violating the Challenged Rules. Thus, a seller is unable to respond to a purchase offer with a counter that is conditional on reducing the buyer's agents' commission. Likewise, a seller cannot, after receiving multiple purchase offers, decide to unilaterally reduce or remove the buyer's agent's commission as listed on the MLS. As noted by Nadel, "[t]he problem is that once a seller has signed the standard listing agreement, which allocates a specific commission on a sale, the co-op fee designated for the buyer's agent is not available for the seller to refund to the buyer who wants to go it alone. MLS rules actually prohibit listing brokers from adjusting

---

[10] Nagalski *supra* at 783.
[11] Nadel *supra* at 107.

co-op fees after the buyer has made a bid, even if the seller asks that the arrangement reflect the buyer's situation and preferences concerning a broker."[12]

48.     Sixth, the anticompetitive effects of the scheme are effectively hidden from actual clients who do not have the same access to the MLS, such that potential purchasers are unable to determine whether their broker is engaging in the above-described steering practices towards properties with high buyers' agent commissions listed. This is despite the fact that in November 2020 the DOJ announced a lawsuit against the NAR and a consent decree that, *inter alia*, required NAR to enable buyers to view the formerly hidden commission fees that listing agents offered to buyers' brokers.[13]

49.     Seventh, the Challenged Rules support the fixing of prices for buyers' agent services. As described by Nadel, "[c]ombining (1) the inertia from this long history of fixed prices, (2) the reluctance of listing agents to set co-op fees below the prevailing rate displayed to them in the MLS, given the practices of buyer agents, discussed above, (3) the general aversion of traditional agents to price competition, and (4) the ability of agents to punish deviators, discussed below, the result is a strong incentive to maintain fixed co-op fees."[14] The marketplace for buyers' agents is deeply unhealthy, and the Challenged Rules are the cause.

50.     Nadel concludes by stating that "[g]iven the many anti-competitive effects of allowing listing brokers to set a default co-op fee for buyers' brokers and the lack of any reasonable benefit to consumers, it is hard to understand why such an anachronistic practice is not prohibited as an anti-consumer, protectionist policy for preserving real estate agent fees. The 2020 Consent Decree's requirement that the previously hidden co-op fee be available to buyers should help deter steering, but the NAR was probably unwilling to accept a complete decoupling of buyer and seller commissions absent an unfavorable decision at trial."[15]

51.     Two such unfavorable decisions have been laid down by courts in recent months. In the case of *Burnett v. NAR* a Missouri jury in October, 2023 found NAR and others liable for $1.78 billion after just three hours of deliberation for their agreement to substantially identical rules to the Challenged

---

[12] Nadel *supra* at 108.
[13] Nadel *supra* at 99.
[14] Nadel *supra* at 110-11.
[15] *Id.* at 113.

Rules. Another case, *Moehrl v. NAR*, was certified as a class action in March 2023 *(Moehrl v. Nat'l Ass'n of Realtors*, No. 19-cv-01610, 2023 U.S. Dist. LEXIS 53299, at *6 (N.D. Ill. Mar. 29, 2023) after defeating a motion to dismiss in October 2020 (*Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 773 (N.D. Ill. 2020)) and Plaintiffs settled with several of the realtor defendants named in the complaint, seeking preliminary approval of $138.5 million. These proceedings demonstrate the palpable illegality of Defendants' scheme, and the early settlements by major realtor groups reflect the viability of the claims in those cases.

### C. The Challenged Rules Sustain a Highly Pathological Marketplace for Realtor Services

52.     The general purpose and effect of these agreements to the Challenged Rules is to restrain competition, and there is no procompetitive justification. Rather, for decades the dominant realtor firms, including Redfin, and the NAR have succeeded in maintaining high uniform prices across varying geographic areas.[16] Stephen Brobeck, then-Director of the Consumer Federation of America, testified that market participants had used two techniques to maintain artificially high commission rates; "tacit agreement not to advertise or even make easily available price information" and "'discrimination' against most service providers that offer and advertise low prices."[17] Brobeck continued that "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive. In this system, there would be no hidden commission splits that propped up rates."[18]

53.     This problem is ongoing, with clear effects on competition. A January 2022 report by the Consumer Federation of America found that in each of 10 cities, at least 87% of the home sales had identical commission rates, in each of 18 cities, at least 70% of the sales had identical commission rates, and in each of 24 cities at least 88% of the sales had commission rates between 2.5 and 3.0 percent.[19] Brobeck, an author of the report, states "[t]his rate uniformity is striking evidence of the lack of price

---

[16] Stephen Brobeck, *Residential Real Estate Brokerage Services: A Cockamamie System That Restricts Competition and Consumer Choice*, available at https://consumerfed.org/wp-content/uploads/2006/07/7-25-06-Residential-Real-Estate-Brokerage_Testimony.pdf (last visited Jan. 30, 2024).
[17] *Id.* at 3.
[18] *Id.* at 4.
[19] Analysis of Real Estate Commission Rates in 35 Cities Reveals Lack of Price Competition, Consumer Federation of America, available at https://consumerfed.org/press_release/analysis-of-real-estate-commission-rates-in-35-cities-reveals-lack-of-price-competition/ (last visited Jan. 30, 2024).

competition in the residential real estate industry" and "[a]n industry rule requiring listing agents to set buyer agent rates prevents home buyers from negotiating these rates."[20] In other words, there is a direct relationship between the Challenged Rules and the highly unhealthy state of competition in the marketplace.

54. Brobeck, in his testimony before the House Financial Services Committee, described the situation as a cartel and notes that, given the extremely low barriers to becoming a realtor, it is "remarkable that commission rates are so high, and that new licensees are able to charge the same rates as experienced ones."[21] Brobeck adds that "[m]any have noted that the NAR has absolutely no interest in changing this system that produces about $100 million in income from the membership fees they charge, which service providers must pay in order to get full access to MLSs and Realtor.com."

55. Redfin was, until October 2023, a member of NAR and CAR and required its realtors to join and participate in this anticompetitive agreement to operate. Redfin required its realtors to follow the Challenged Rules in listing properties, directly contributing to the anticompetitive effects described. By participating in the associations, the NAR and CAR, that prevent members from allowing realtors to compete with one another to offer lower commissions, and requiring compliance with the anticompetitive Challenged Rules, Redfin has directly contributed to the conspiracy.

56. The effect of the cartelization of real estate services is that home sellers are required to pay costs that would fall to buyers in a competitive market (or even disappear entirely). A truly competitive rate for buyers' agents would in fact be 0% or $0 as, in the vast majority of cases, buyers' agents do minimal if any work to secure a sale, with buyers doing much of their own searching via popular websites like zillow.com, and redfin.com itself.

57. NAR itself acknowledges that "[f]or 47 percent of recent buyers, the first step that they took in the home buying process was to look online at properties for sale, while 18 percent of buyers

---

[20] *Id.*

[21] Stephen Brobeck, *Residential Real Estate Brokerage Services: A Cockamamie System That Restricts Competition and Consumer Choice*, available at https://consumerfed.org/wp-content/uploads/2006/07/7-25-06-Residential-Real-Estate-Brokerage_Testimony.pdf (last visited Jan. 30, 2024).

first contacted a real estate agent."[22] Similarly, "[n]early all buyers used online tools in the search process at 96 percent."[23]

58.   Further, as buyers' agents will steer buyers away from homes with a lower buyer's agent commission and towards homes with higher commission, sellers are incentivized when making the required blanket offers to win buyer's agent attention by posting high commissions. Thus, buyer broker compensation, as a direct result of the unlawful agreement to the Challenged Rules, is raised to supracompetitive levels.

59.   Notably, one effect of the Challenged Rule seems to be that consumers are ill-informed of the negotiability of real estate agent commissions, with a 2007 survey showing that 58% of recent home buyers and sellers thought that commissions were set by the industry or agents, or by state law.[24]

60.   Naturally, absent the Challenged Rule, buyer's agent commissions would be paid by the buyer, who would therefore be incentivized to shop around for lower rates. As stated by the Consumer Federation of America, "the MLS rule requiring sellers to set buyer agent rates allows realtors to informally establish rate norms, which keeps rates high and preserves the possibility of big paydays."[25]

61.   It is telling that in comparable foreign markets that are not dominated by an NAR-type organization with a rule similar to the Challenged Rules, home buyers pay their own brokers if they choose to use one at all, and they pay half or less the 2-3% that is typical in the United States. The Wall Street Journal has published a list of real estate agent commission rates from around the world, showing that among developed economies the United States' 5-6% is anomalously high, a fact directly attributable to the Challenged Rules. Rates for comparable countries include Australia at 2.5% paid by seller with buyers' agents not typical, China at 2.5%, the Netherlands at 2% paid by seller with buyers'

---

[22]National Association of Realtors, 2022 Profile of Home Buyers and Sellers, available at https://cdn.nar.realtor//sites/default/files/documents/2022-highlights-from-the-profile-of-home-buyers-and-sellers-report-11-03-2022_0.pdf (last visited Jan. 30, 2024).
[23] *Id.*
[24] Stephen Brobeck, *Comments of Stephen Brobeck, Executive Director Consumer Federation of America, Before the Department of Justice-Federal Trade Commission Public Workshop on Competition Issues, June 5, 2018*, available at https://consumerfed.org/wp-content/uploads/2018/06/CFA-comments-DOJ-FTC-public-workshop-on-competition-issues.pdf (last visited Jan. 30, 2024).
[25] *Analysis of Real Estate Commission Rates in 35 Cities Reveals Lack of Price Competition*, Consumer Federation of America, available at https://consumerfed.org/press_release/analysis-of-real-estate-commission-rates-in-35-cities-reveals-lack-of-price-competition/ (last visited Jan. 30, 2024).

agents not typical, Norway at 1.8%, and the United Kingdom at 1.3%.[26] As one can see from the Wall Street Journal's findings, places lacking a rule akin to the Challenged Rules often do without buyers' agents entirely, demonstrating the anticompetitive nature and effects of the Challenged Rules.

62. Remarkably, despite the declining real-world role of buyers' agents, the Defendants, through the Challenged Rules, have stabilized rates at supracompetitive levels. This has occurred at the same time as a great increase over the past few decades in house prices nationwide.[27] In other words, just as they are doing less than ever to earn their money, buyers' agents are earning more than ever (and have stabilized their compensation at a supracompetitive level).[28]

63. Brobeck discusses the relationship between the Challenged Rules and the high and uniform commission rates:

> This agent and broker incentive to maintain commission levels is reinforced by a selling process that can discriminate, often in very subtle ways, against non-traditional agents that seek to compete on price. Sales involving traditional brokers, a large majority of all sales, typically require the seller to agree on a commission that is then shared with buyer agents. If listing agents post a relatively low commission split for buyer agents on their local Multiple Listing Service (MLS), the latter may steer clients away from these properties. The commission splits are disclosed on the MLS to all agents and brokers but not to home buyers, so it is practically impossible for buyers to learn if agents are steering them to properties with higher splits.[29]

64. Redfin, until recently a full member of NAR and CAR and participant in the conspiracy, started out as a lower-cost competitor to "traditional" agents. However, as noted by Brobeck, "[o]ver time, Redfin felt compelled to offer more personalized service and rebate less of commissions."[30] Also

---

[26] Veronica Dagher, *Almost No One Pays a 6% Real-Estate Commission—Except Americans*, Wall Street Journal (Nov. 16, 2023) available at https://www.wsj.com/personal-finance/real-estate-buying-home-charts-6dc40caa (last visited Jan. 30, 2024).
[27] Stephen Brobeck, *Comments of Stephen Brobeck, Executive Director Consumer Federation of America, Before the Department of Justice-Federal Trade Commission Public Workshop on Competition Issues, June 5, 2018*, available at https://consumerfed.org/wp-content/uploads/2018/06/CFA-comments-DOJ-FTC-public-workshop-on-competition-issues.pdf (last visited Jan. 30, 2024) ("For example, between 2001 and 2007, the average price of new homes in current dollars sold rose from $213,200 to $384,900, according to U.S. Census Bureau statistics.")
[28] *Id.* ("According to Real Trends, the most relied on source for commission rates, the average rate nationally, at 5.12 percent, was the same in 2017 as it was in 2001. Yet dollar commissions increased substantially because housing prices were much higher.")
[29] *Id.*
[30] *Id.*

as noted by Brobeck, "[a]ll other discount brokerages featured by the Trends Report were projected to participate in far fewer 2017 sales [than Redfin], several less than 100."[31]

65.     The value of the conspiracy is tremendous, with Brobeck describing over $60 billion spent on brokerage services in 2005 alone.[32] And yet, despite the scale of the industry "[t]here is no other important consumer service in America where it is so difficult to learn about costs."[33] This is in part due to the fact that most agents do not advertise fees, making comparison shopping in the market— a market that is already highly pathological due to the effects of the Challenged Rule—effectively impossible.[34]

66.     The interaction between "soft" patterns of self-serving behavior, such as the failure to advertise prices or the "steering" of clients away from low-fee homes, and "hard" rules, such as the Challenged Rules, lead to a highly unhealthy marketplace where consumer information is at a minimum and naked profiteering can thrive. As described by Brobeck, the effect includes, but is not limited to, steering:

> This discrimination [against discounters] is facilitated by a pricing system where home sellers ostensibly pay the entire commission, but listing brokers "split" commissions with any separate brokers working with home buyers. This commission split, which is poorly disclosed to sellers and not disclosed to buyers, is made accessible to brokers on various listing services. In a 6% rate area it is typically 3%, and in a 7% area, it is typically 3.5%. A listing broker lists a split below this level at their, and their clients', peril, because of the risk that traditional brokers working with buyers will avoid this property: These brokers not only want the highest possible commission split but also do not want to support brokers offering lower rates. That is why many low-price listing brokers complain that their properties are not shown, and it is why many rebating buyer brokers complain that listing brokers make it difficult for them to show or sell properties.

67.     Brobeck continues:

> This informal discrimination against price competitors is the most important factor that allows dominant brokers to maintain high and uniform prices. But in eleven states the problem is made much worse by anti-rebate statutes supported

[31] Id.
[32] Stephen Brobeck, *Residential Real Estate Brokerage Services: A Cockamamie System That Restricts Competition and Consumer Choice*, available at https://consumerfed.org/wp-content/uploads/2006/07/7-25-06-Residential-Real-Estate-Brokerage_Testimony.pdf (last visited Jan. 30, 2024).
[33] Id.
[34] Id.

by traditional brokers.[35] These blatantly anti-competitive laws, which have been opposed by the Department of Justice, make it impossible for buyer brokers to introduce price competition through rebating a portion of near-uniform splits.

In a rational pricing system, home seller and buyers would each pay for real estate brokerage services they receive. In this system, there would be no hidden commission splits that propped up rates. In the interim, brokers should be required to clearly disclose these splits to sellers and buyers. That disclosure, as it became understood by consumers, would encourage listing brokers to list lower commission splits and buyer brokers to show properties with these lower splits. The result would be more transparent, varied, and lower average commission rates.[36]

68.     The pathological effect of the conspiracy is demonstrated by the utter disconnect between the value of the services provided, the cost of those services to the agent, and the amount of compensation received by that same agent. Clearly, selling a million dollar home is not substantially more difficult or costly to the agent than selling a $100,000 home, it may even be easier, yet in the former case the buyer's broker, pursuant to the Challenged Rules, would earn ten times more commission, regardless of their skills or experience.

69.     The conspiracy between the cartel members, including Defendants, inflated buyers' agent commissions to supracompetitive rates, thereby increasing the total cost paid by home sellers. Given that one's home is, for a typical member of the general public, one's greatest investment of capital, reversing this trend of artificially-stabilized and sky-high prices would greatly benefit the general public on a prospective basis. Thus, an order for public injunctive relief that invalidates the Challenged Rules as an unfair or unlawful practice under the UCL would greatly benefit the general public of California by protecting intergenerational and intra-family wealth generation from the greed of the conspiracy members.

70.     Remarkably, NAR has all but acknowledged the anticompetitive nature of the Challenged Rules through its 2015 D.A.N.G.E.R Report. That report showed that total commissions in the United States are inflated compared to international markets such as the United Kingdom, Singapore, the Netherlands, Australia, and Belgium. According to NAR's own report, in those nations the average

---

[35] California is not one of these states.

[36] Stephen Brobeck, *Residential Real Estate Brokerage Services: A Cockamamie System That Restricts Competition and Consumer Choice*, available at https://consumerfed.org/wp-content/uploads/2006/07/7-25-06-Residential-Real-Estate-Brokerage_Testimony.pdf (last visited Jan. 30, 2024).

total commission (for both parties' agents, if a buyer's agent is used at all) between 1% and 3%.[37] The statistics are presented with a warning: "The continued rise in home prices has facilitated the elevation of real estate earnings based on commissions. Those earnings have not gone unnoticed by consumers, who are responding by placing increased pressure on real estate agents to reduce their commission rates. As a result, many fear a gradual downward slide or a realignment of fees as charged in other countries in the world." The solution? The Challenged Rules which make it next to impossible for a given home seller to exert the kind of "pressure" the Report fears.

71.     As a representative of an international brokerage noted at an FTC/DOJ Joint Public Workshop focused on the real estate industry, "[i]t's hard to believe its 2018 and we're in the US and the average commission fee is still between 5% and 6% when we have one of the largest, most developed markets in the country.[38] But we still maintain that elevated level of commission expense."[39] As noted by Nadel, "[a]llowing listing agents to set the default fee the buyer pays only frustrates competition."[40]

72.     Through this action Plaintiff seeks antitrust damages for herself and the class and public injunctive relief under the UCL for the benefit of the general public of California. Plaintiff would benefit from this public injunctive relief in an identical manner to any other member of the general public, benefitting only incidentally and as a member of the general public.

---

[37] Swanepoel Group, *D.A.N.G.E.R. Report*, National Association of Realtors, at 22, available at https://www.gcar.net/images/uploads/subpage/NAR_Danger_Report_Part_1_of_2.pdf (last visited Jan. 30, 2024).
[38] This appears to be an error that should instead read "world," or it makes no sense.
[39] FTC/DOJ Joint Public Workshop, Segment 2 Trs., June 5, 2018 available at https://www.ftc.gov/system/files/documents/public_events/1361534/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_2.pdf (last visited Jan. 30, 2024).
[40] Mark S. Nadel, *Obstacles to Price Competition in the Residential Real Estate Brokerage Market*, 18 Berkeley Bus. L.J. 90, 101 (2021).

**D. NAR Wields Access to the MLS as a Weapon to Punish Dissent**

73.     "Most people seeking to buy or sell a home hire a real estate agent to assist them with the process."[41] Agents assist sellers by marketing their homes, and assist buyers by finding homes that match their preferences.

74.     The MLSs in turn are run by the local branch of the NAR. In California, this is subdivided into individual MLSs operated by member associations of the CAR, in turn itself a regional subsidiary of NAR. Most MLSs are owned, administered, and controlled by members of the NAR, a trade association to which the vast majority of residential real estate agents belong (and to which they must belong if they are to use the REALTOR trademark).[42]

75.     Access to the relevant MLS is an essential facility for a realtor, and most agents pay monthly fees to their local MLS to maintain access. The MLS is a live-updated listing of all homes for sale in a given area, and contains standardized information such as price, as well as the requirements of the Challenged Rules for buyer broker commissions. While it is theoretically possible to operate as a real estate agent without access to the MLS, to do so would be such a tremendous disadvantage to an agent that it is extremely uncommon for agents to operate totally independent of the MLS and its Challenged Rules. The Ninth Circuit has observed that "[r]esidential real estate agents 'regard participation in their local MLS as critical to their ability to compete.'"[43]

76.     The Ninth Circuit also discussed the inception of the NAR's "Clear Cooperation Policy," a component of the Challenged Rules herein, as follows:

> Even before PLS was formed, NAR and several MLSs, including CRMLS, Bright MLS, and MRED, became concerned with the growth of pocket listings. A 2015 NAR study warned, "Off-MLS listings may contribute to the unraveling of the MLS as we know it, and its replacement by a private network that serves to benefit a certain group of participants." Another NAR study cautioned, "A number of industry initiatives suggest that the current MLS-centric era might be coming to an end. After half a century of operating as the only gateway, there is a strong likelihood that the MLS may lose its exclusive positioning as the principal source of real estate listings."
>
> Two years after PLS launched, NAR's "MLS Technology and Emerging Issues Advisory Board" voted to recommend that NAR adopt a policy that would

---

[41] *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 829 (9th Cir. 2022), *cert. denied sub nom. The Nat'l Ass'n of Realtors v. The PLS.com, LLC.*, 214 L. Ed. 2d 336 (Jan. 9, 2023).
[42] Nagalski *supra* at 773.
[43] *PLS.Com*, 32 F.4th 824, 830.

require agents posting listings on competing services to also post those listings on the appropriate MLS. A month later, CRMLS, Bright MLS, MRED, and other MLSs issued a white paper "that called for collective action to address the threat to the MLS system presented by the rise of pocket listings and the prospect of a competing listing network that would aggregate such listings." A month after that, Bright MLS adopted a policy consistent with the NAR board's recommendation, and CRMLS, Bright MLS, and MRED met with other NAR-affiliated MLSs "at a [Council of Multiple Listing Services] conference in Salt Lake City, Utah to discuss the competitive threat presented by pocket listings and the need for NAR to take action at the upcoming NAR Convention to eliminate that threat through adoption of" the policy nationwide. MRED's CEO "explained that the [policy] was motivated by concerns that pocket listings were 'making the MLS less valuable.'"

The next month, NAR adopted the Clear Cooperation Policy,[44] which provides: "Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants." This new policy meant that members of a NAR-affiliated MLS who chose to list properties on PLS were required to also list those properties on an MLS. Agents who did not comply faced severe penalties, including in some cases several-thousand dollar fines, or suspension from, or termination of, their access to the MLS.

*831 "NAR-affiliated MLSs and [the Council of Multiple Listing Services] have admitted that the purpose of the Clear Cooperation Policy was to maintain the market dominance of the NAR-affiliated MLS system, and specifically to exclude PLS." PLS alleges that the Clear Cooperation Policy has had its intended effect: After the Clear Cooperation Policy was adopted, "[l]istings were removed from PLS and submitted instead to NAR-affiliated MLSs," "[a]gent participation in PLS declined," and "PLS was foreclosed from the commercial opportunities necessary to innovate and grow" "a critical mass of members and listings to create a powerful network effect."

*PLS.Com*, 32 F.4th 824, 830–31.

**E. A Typical Home Sale**

77.     Individuals wishing to represent the parties to a real estate sale must be licensed under state law as a broker or agent. California law makes it "unlawful for any person to engage in the business, act in the capacity of, advertise, or assume to act as a real estate broker or a real estate sales[person] within this state without first obtaining a real estate license from the California Department of Real Estate." Cal. Bus. & Prof. Code § 10130.

78.     According to the NAR website, 67% of REALTORS are licensed as sales agents, 21% hold broker licenses, and 14% hold broker associate licenses.[45] The median gross income of

---

[44] This is what NAR calls the Challenged Rules.
[45] Quick Real Estate Statistics, National Association of Realtors, available at https://www.nar.realtor/research-and-statistics/quick-real-estate-statistics (last visited Jan. 30, 2024).

REALTORS was $54,330 in 2021, an increase from $43,330 in 2020.[46]

79.     The typical practice in the residential real estate industry is for brokers and agents to be compensated through commissions on the sales in which they act as agent, typically calculated as a percentage of the total sale price.

80.     Many brokers and individual realtors act as both buyers' agents and sellers' agents, depending on the transaction.

81.     Seller-side agents typically have their compensation set in a listing agreement, the contract between the seller and the agent that describes the terms of the listing, typically granting exclusivity to the seller's agent. The listing agreement sets the total commission that a seller will pay to the broker, often with a portion designated for the buyer's agent (that may be retained by the seller's agent if the buyer does not use an agent).

82.     Defendants' conspiracy has stabilized buyer broker commissions at 2-3% for many years despite the greatly diminishing role of buyer brokers in the internet age. Many home buyers do without a buyer's broker entirely and find a home using technology such as Zillow. As discussed, this is not unknown to Defendants. Would-be home buyers frequently retain a buyer's broker after having already found a home to purchase. Despite their roles diminishing, often to almost nothing, the percentage of commission charged by buyer's brokers has remained stable as a result of the conspiracy. This is occurring concurrently with the increase of home prices substantially boosting the real dollar value of the commission. Despite transaction costs going down considerably in many industries that have been transformed by the internet, such as travel agencies, real estate commission rates have remained high and uniform at 5-6%. This further suggests that the effect of the Challenged Rules is anticompetitive.

83.     In the event that the buyer does use a broker, the seller pays the buyer's broker out of the total commission paid by the home seller. Thus, buyers' agents receive their compensation not from the party they ostensibly represent, who would be incentivized to shop around for a better deal (and may decide to do without), but by the seller who, by operation of the Challenged Rules, was required to make

---

[46] *Id.*

a "unilateral, blanket" offer of compensation to the buyer's agent as a condition to listing the property on the MLS—practically an essential if they want the home to actually sell.

84. Likewise, in a healthy market that lacked the Challenged Rule, buyers would pay brokers directly (and be incentivized to shop around) while sellers would expect to pay about half as much commission as they would only be required to compensate their own agent. Indeed, this is the practice in most of the developed world.

85. When buyers retain a broker, the buyer contracts with the broker, with the contract typically stating that the buyer's broker would be paid by the seller. But for the Challenged Rules, buyers would pay their own brokers (if they choose to use one at all) and the total broker commission would be approximately half the cost to the seller compared to under the Challenged Rules.

86. The NAR Board of Directors supervises the Multiple Listings Issues and Policies Committee and occasionally decides whether to modify a policy in the Handbook. The policies that are created and/or retained as part of that process are published in new editions of the Handbook, which is issued approximately annually. 2023 NAR Handbook.

**A. The Challenged Rules Constitute an Unlawful Agreement in Restraint of Trade**

87. In deciding on MLS terms, including the Challenged Rule, the NAR successfully invited the other Defendants to participate in an agreement in unreasonable restraint of trade. The nature of that agreement is as follows: Defendant realtors/brokers may use and participate in the MLS, and gain the benefits provided by NAR/CAR and the MLS, only on condition that they agree to adhere to and enforce the anticompetitive Challenged Rules. This is an agreement for the purposes of the antitrust laws.

88. The preface to the 2023 NAR Handbook includes the following warning: "Association and association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program. Associations are encouraged to review any variance from these policies with their legal counsel so the legal

1  implications and liabilities incident to such variance can be clearly ascertained." In other words: agree

2  to the Challenged Rules, or get cut off from the essential access to the MLS.

3      89.    In this case, Defendant Redfin did agree to the Challenged Rules and engaged in a course

4  of conduct prescribed by that agreement in requiring its sellers to make blanket, unilateral offers of

5  buyer compensation as a condition of listing. This agreement and subsequent conduct satisfies any

6  agreement requirement under the antitrust laws.

7      90.    The core of the Challenged Rules to which all Defendants agreed with NAR is as follows:

8  > In filing a property with the multiple listing service of an association of
   > REALTORS, the participant of the service is making blanket unilateral offers of

9  > compensation to the other MLS participants, and shall therefore specify on each
   > listing filed with the service, the compensation being offered to the other MLS

10 > participants. Specifying the compensation on each listing is necessary, because
   > the cooperating broker has the right to know what his compensation shall be

11 > prior to his endeavor to sell. (Amended 11/96). (2023 NAR Handbook at 118.)

12     91.    The Challenged Rules shift the cost of buyer's agents, which would, absent the rule, be

13 paid by the buyer (if at all), to the seller. As Brobeck has explained, "[i]n a rational pricing system, home

14 sellers and buyer would each pay for real estate brokerage services they receive."[47] The Challenged

15 Rules instead lead to overcharging the seller by requiring seller brokers to make "blanket, unilateral,

16 unconditional offers of compensation" to their adversarial broker.

17     92.    There is no procompetitive justification for the Challenged Rules. The "blanket" nature

18 of the rule even means that the same fee must be offered to new brokers with no experience as is offered

19 to experienced brokers, despite the fact that broker experience is clearly relevant to the usefulness of a

20 given broker in effecting a sale. As such, unlike a competitive marketplace, there is no proportionality

21 between skill and compensation.

22     93.    NAR requires its members, including local realtor organizations, as well as nonmembers

23 who are nonetheless members of the MLS, to comply with the Challenged Rules as a condition to

24 membership. Specifically, the Code of Ethics and the 2023 NAR Handbook containing the Challenged

25

26

---

27  [47] Stephen Brobeck, *Residential Real Estate Brokerage Services: A Cockamamie System that Restricts
28  Competition and Consumer Choice*, available at https://consumerfed.org/wp-content/uploads/2006/07/7-25-06-Residential-Real-Estate-Brokerage_Testimony.pdf.

Rules are mandatory for NAR members. Members of NAR that own/operate an MLS must comply with the mandatory provisions of the 2023 NAR Handbook and the Code of Ethics.

94.     Because access to the MLS is an essential facility for brokers and realtors, all such brokers and realtors must comply with the mandatory provisions of the 2023 NAR Handbook and the Code of Ethics.

95.     Additionally, NAR has established and distributed "model rules" for local realtor associations and the MLSs they operate, with such model rules requiring that the local organization adhere to the 2023 NAR Handbook and the Code of Ethics.

96.     NAR offers its realtor associations and MLSs professional liability insurance, with eligibility contingent on adherence to the mandatory provisions of the 2023 NAR Handbook. The 2023 NAR Handbook states "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."[48] NAR affirmatively reviews the governing documents of member organizations to ensure compliance, requiring the local organizations to send governing documents to NAR periodically for review and approval.

97.     Defendant Redfin agreed to the conspiracy, including by agreeing to the Challenged Rules and through enforcement of those rules as to its own agents. Additionally, Defendant Redfin sent delegations to NAR meetings, assisted NAR in enforcement of the rules, and had its agents participate in local organizations and their MLSs. By developing and issuing the Challenged Rules and other complimentary rules and Ethics Standards, and by enforcing the Challenged Rules through its own brokers and agents, Defendant Redfin directly agreed to and participated in the unlawful agreement in restraint of trade. Defendant Redfin and its agents were, until October 2023, also actively involved in

---

[48] 2023 NAR Handbook, at 8.

CAR and, where applicable, must agree to the CAR version of the Challenged Rules as well as the NAR version in the 2023 NAR Handbook.

98.     For years buyer broker commission rates have remained stable despite a) the increase in home values, making those commissions much more valuable, and b) the diminishment to near nothing of what buyer brokers actually do to earn their commission. Absent the Challenged Rules, this would naturally lead to a reduction in buyer broker commissions, which has not occurred due to the Challenged Rules. This is an antitrust harm that should be remedied through antitrust damages and prospective public injunctive relief.

**B. The Challenged Rules Restrain Trade**

99.     The effect of the Challenged Rules is to create a great deal of pressure on sellers to offer the supracompetitive standardized commission rate, or risk not having their home shown due to "steering" by buyers' brokers motivated by a higher commission. The phenomenon of "steering" behaviors is known to the industry, government regulators, and academics. As stated by one commentator, "With between 1.4 and 2 million active real estate agents competing to sell about 5.3 million homes in a year, there is intense competition for listings in almost all markets in the nation."[49] Nadel also points out that costs for buyers' agents have been on the decline, in large part due to technological advances, yet rates have remained high and uniform.[50]

100.     The foreseeable effect of the Challenged Rule is that blanket offers are overwhelmingly made at or near the supracompetitive 2-3% rate that has become standard in the industry. As Brobeck has noted, listing brokers discount only at the peril of their clients, who will risk brokers avoiding the

---

[49] Mark S. Nadel, *Obstacles to Price Competition in the Residential Real Estate Brokerage Market*, 18 Berkeley Bus. L.J. 90, 91 (2021).
[50] *Id.* at 92.

property through "steering."[51] Given the stress, uncertainty, and high stakes nature of a home sale, it is unsurprising that few homeowners are willing to roll the dice.

101.    The Challenged Rule directly promotes steering behavior by enabling buyers' brokers to compare listings to see which are only offering a cut-rate commission to the buyer's broker. Notably, the fact of cut-rate commission is often visible only to those directly accessing the MLS—typically the brokers, not their clients—making it difficult and unlikely for a buyer to override the preferences of the buyer's broker and select a lower-commission listing to view (and ultimately purchase).

102.    Revealing some of the extent of the pressure on brokers (and their clients) to toe the line and offer standard 2-3% commissions, one discount realtor stated in a combined FTC/DOC workshop that "[w]e've had bricks thrown through car windows. We've had our cars egged. We've had hate mail sent to our sellers. And so the anticompetitive nature we've dealt with is—I've got here a list of over 719 brokerages in Denver alone that have flat out said, we will not show [my company's] listings. We tell every seller, 40% of agents will go out of their way, above and beyond, and push hard not to show or sell your home if you don't offer a 2.8% to 3% commission."[52] This same hostility to discounters/disruptors is noted by Nadel, who writes that:

> Traditional agents also try to dissuade buyers and sellers from using lower-priced new entrants by disparaging them, heralding the old adage: "you get what you pay for." Traditional agents imply that brokers with lower prices must be skimping on quality and/or services compared to the "full service" offered by traditional brokers, although they conveniently fail to define full service. This is easy to refute by noting that if brokers who charge a 6 percent commission ($18,000 on a $300,000 home) can afford to provide full service, then brokers charging only a 4 percent commission on a $1 million home ($40,000) can, too. There is also empirical data finding that discount brokers do not secure significantly lower prices. Yet when media firms criticize protectionist tactics of

---

[51]   Brobeck, *Residential Real Estate Brokerage Services: A Cockamamie System that Restricts Competition and Consumer Choice*, available at https://consumerfed.org/wp-content/uploads/2006/07/7-25-06-Residential-Real-Estate-Brokerage_Testimony.pdf (last visited Jan. 30, 2024).

[52] Statement of Joshua Hunt*, What's New in Residential Real Estate Brokerage Competition—An FTC-DOJ Workshop (Segment 2)*, FTC, available at https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-2/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_2.pdf (last visited Jan. 30, 2024).

traditional brokers or praise new firms, vocal brokers accuse the media of being misinformed and biased.[53]

103.　The effect of the Challenged Rules on steering is worsened by the Challenged Rules' requirement that the compensation listed for the buyer's broker must be expressed either as a percentage of total sale price or a definite dollar amount, as well as by the prohibition on "general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationship."[54] These requirements have the primary effect of making it even easier (for the broker) to compare listings based on the offered buyer's broker commission, and to engage in steering based on commission amounts.

104.　Nor does technology provide an out to cost-conscious sellers. On information and belief, the MLSs make use of hidden fields that only realtors who are members of the MLS can see, with two hidden fields relating to buyer broker compensation. The first field is the unilateral blanket offer made pursuant to the Challenged Rule, the second is "private remarks" which can include other incentives. Members of the general public, including buyers and sellers, do not often have access to these hidden fields so cannot reasonably constrain buyers' brokers from steering behavior. This in turn is further cemented by the designation of the content of the MLS as confidential.[55]

105.　Thus, even if a given buyer wanted to seek out a property with a lower buyer's agent commission, not only would they have no incentive (as they are not paying them), but they would have no means, as it is unlikely that they have personal access to these hidden parts of the MLS setting buyer broker compensation.

106.　This limitation on consumer information, which unlawfully increases consumer search costs and encourages anticompetitive steering, occurs simultaneously with actively requiring

---

[53] Mark S. Nadel, *Obstacles to Price Competition in the Residential Real Estate Brokerage Market*, 18 Berkeley Bus. L.J. 90, 117 (2021).

[54] 2023 NAR Handbook at 40.

[55] 2023 NAR Handbook at 77 ("Any information provided by the multiple listing service to the participants shall be considered official information of the service. Such information shall be considered confidential and exclusively for the use of participants and real estate licensees affiliated with such participants and those participants who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property and licensed or certified appraisers affiliated with such participants.")

information exchange among brokers through the Challenged Rules. This unilateral information sharing prevents price competition and allows brokers to artificially prop up their commission rates.

107. The effect of the Challenged Rules has been entirely foreseeable, degrading price competition and stabilizing and fixing the buyer broker charges at a standard supracompetitive level. The conspiracy has led to the benchmark of 2-3% becoming effectively a uniform requirement for sellers; at least, for those sellers who actually want a chance to sell their home. Thus, even though real estate commissions are theoretically negotiable under the rules, even if negotiation is possible the effect of the Challenged Rules is to erect a kind of benchmark from which negotiations may proceed, which exerts upward pressure on the price negotiation.

108. Similarly, by requiring sellers to make blanket, unilateral offers as a condition of listing on the MLS, the Challenged Rules force sellers to offer high buyer-broker commissions to attract buyers (or, rather, their agents). This works hand in hand with "soft" pressures to list at the uniform rate, such as representations from listing agents that a low buyer commission would result in fewer potential buyers seeing the listing, and other "steering" behaviors described herein.

109. The anticompetitive effects of the Challenged Rules are further heightened by the fact that Standard of Practice 16-16 of the Code of Ethics provides "REALTORS, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation." Thus, buyer brokers are prohibited from presenting an offer to a seller that is conditional on reducing the buyer broker commission. This further stabilizes and fixes the price of buyer broker services in the marketplace above the competitive level without procompetitive justification.

110. A similar effect arises from the rule that "Any change in compensation offered for cooperative services must be communicated to the other REALTOR prior to the time that REALTOR submits an offer to purchase/lease the property. After a REALTOR has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation

with respect to that cooperative transaction."[56] Thus, a seller is unable to respond to a purchase offer with a counter that is conditioned on reducing the buyer-broker commission. Likewise, the seller cannot, after receiving purchase offers, decide to reduce the buyer broker commission offered on the MLS listing.

## ANTITRUST INJURY

111.    The goals of the cartel have been well-served by the Challenged Rules, successfully stabilizing and fixing commissions rates well above any competitive level.[57]

112.    The effects of the conspiracy are significant, having at least the following anticompetitive effects: a) sellers are forced to set artificially high buyer broker commissions to incentivize buyer's brokers to show their homes; b) sellers are forced to pay commissions to their adversaries, greatly increasing the cost of selling; c) the amount of buyer broker compensation is artificially inflated beyond a competitive level, d) the unnatural split between who selects versus who compensates buyers' brokers, with the broker chosen by the buyer but paid by the seller, e) price competition among buyer brokers has been effectively eliminated, f) competition among home buyers has been curtailed by inability to compete for the purchase of a home by lowering the buyer broker commission rate or amount, and g) steering behavior has been facilitated and incentivized. Plaintiff and the Class paid more for buyers' brokers' commission than they would have absent the unlawful conspiracy.

113.    There are no procompetitive effects to the Challenged Rules and the agreement thereto by Defendants, notwithstanding any findings by other courts that the association defendants and/or their rules may have other positive effects on competition. There is also nothing inherent in the nature of an MLS that makes something like the Challenged Rules necessary for its proper functioning. Even if there were procompetitive justifications, such justifications are dwarfed by the obvious and serious anticompetitive effects of the agreement. As shown by the comparison to other countries lacking the Challenged Rule, in the absence of that rule buyer broker commissions would be shrunk to or near the point of nonexistence.

## CLASS ALLEGATIONS

---

[56] NAR Standard of Practice 3-2, 2023.
[57] *See generally* Nagalski *supra*.

114.    Plaintiff brings this action individually and on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class which is defined as follows:

>   All persons in California who paid a buyer's broker commission, directly or indirectly, to Redfin or a Redfin buyer's agent in connection with the sale of residential real property between October 2, 2019 and October 2, 2023 (the "Class Period").

115.    The Class is so numerous that joinder of all members in this action is impracticable. There likely are tens of thousands of Class members or more.

116.    Plaintiff's claims are typical of those of the Class.

117.    Plaintiff is a member of the Class who was injured by the same unlawful conduct, which resulted in paying inflated amounts for buyer's broker's commission as a result of Defendants' agreement and adherence to the Challenged Rules.

118.    Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff is not aware of any interest that is antagonistic to the Class.

119.    Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be individual to individual class members since the Defendants have acted and refused to act on grounds generally applicable to the Class.

120.    Excluded from the Class are all Defendants, their officers and directors, and the judicial officer(s)

121.    Question of law and fact common to the Class include:

a.  Whether the California buyer's brokers services market constitutes a relevant market;

b.  Whether Defendants possess market power in the relevant market;

c.  Whether Defendants' agreement and adherence to the Challenged Rules constituted a violation of Section 1 of the Sherman Act;

d.  Whether Defendants' conduct constitutes a conspiracy, combination, or collusion to fix, raise, maintain, or stabilize the cost of their services;

e.  Whether Defendants' conduct caused Plaintiff and the Class to pay supra-competitive buyers' brokers' fees during the class period;

f.  The appropriate declaratory and injunctive relief for the Class;

g.  Whether Plaintiff seeks public injunctive relief;

h.  The nature of public injunctive relief to which Plaintiff and the general public are entitled;

i.  The applicability of public injunctive relief to the Association Defendants; and

j.  The measure of damages sustained by Plaintiff and the Class.

122.  Plaintiff is represented by counsel who are experienced in the prosecution of complex antitrust and unfair competition class actions.

123.  Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding as a class action, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in managing this class action.

## ALLEGATIONS REGARDING THE GENERAL PUBLIC

124.  Plaintiff brings this action on Plaintiff's own behalf and on behalf of the general public pursuant to Business and Professions Code § 17200 *et seq.*

125.  It is not necessary to seek class certification in order to obtain injunctive relief on behalf of the general public.[58]

126.  "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203.

---

[58] *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 960, 393 P.3d 85, 93 (2017).

127.   The general public of California are directly affected by the effects of the unlawful agreement to the Challenged Rules which form the gravamen of this complaint. No home seller in California can protect themselves from the Challenged Rules, which mandates that in selling their homes they will be required to make a blanket, unilateral offer of buyer compensation, typically pegged to 2-3% of the total value of their home. The Challenged Rules affect homeowners in the general public in the same way, and in the same way as the Challenged Rules affect Plaintiff personally. Plaintiff has already been harmed and would only benefit from the sought injunction in the same manner as any other California homeowner (or person likely to become a homeowner) in the general public. Plaintiff would benefit from any public injunctive relief only incidentally or as a member of the general public. Thus, what is sought is truly public injunctive relief.

128.   While Redfin has separated from NAR and CAR and thus no longer requires agreement to the Challenged Rules, public injunctive relief is appropriate as to NAR and CAR who continue to condition MLS access on adherence to the Challenged Rules.

## FIRST CAUSE OF ACTION

### Agreements to Restrain Trade

### Violation of Section 1 of the Sherman Act, 15, U.S.C. § 1

129.   Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

130.   Defendants Redfin, NAR, and CAR formed a cartel to artificially inflate the cost of real estate brokerage services for home sellers, and that cartel ran for at least the complete duration of the Class Period and, as to the Association Defendants, is ongoing.

131.   By operation of the Challenged Rules, the Association Defendants require their brokers, which included Defendant Redfin's brokers, to force home sellers to make a blanket non-negotiable offer of buyer's broker's commission.

132.   In service of their scheme, Defendants engaged in an ongoing contract, combination, or conspiracy to unreasonably restrain trade and commerce. This violates Section 1 of the Sherman Act, 15 U.S.C. § 1. In this case, the contract, combination, or conspiracy in question comprises a compact

between Defendants and coconspirators to require home sellers to make a blanket, non-negotiable offer of buyer's broker's commission as a condition of listing the home on the MLS.

133. Each Defendant participated in the creation and enforcement of the anticompetitive Challenged Rules, including by requiring compliance therewith from their own agents and employees, including brokers.

134. Defendants' conduct has led directly to inflated buyer's broker's commission rates at a supracompetitive level, affecting all home sellers in California. But for Defendants' conspiracy, sellers would not be required to pay buyers' brokers, the amount of buyers' brokers' fees would be substantially reduced, likely to nothing, and buyers' brokers would compete on price. There are no procompetitive justifications for Defendants' cartel or the Challenged Rules, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

135. As a matter of fact, Defendants' conspiracy has led to an increase and stabilization of buyers' brokers' commission rates in California. Plaintiff and the Class paid these illegally-inflated commissions as a condition of listing their homes on the MLS. But for the illegal conspiracy, Plaintiff and the class would have paid far less for buyer's brokers commission fees.

136. In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

    a. Participated in the establishment, implementation, and enforcement of the Buyer Broker Commission Rule and other anticompetitive NAR and CAR rules in California;

    b. Participated in the establishment, implementation, and enforcement of rules by local NAR and CAR associations and MLSs that implemented the Buyer Broker Commission Rule and other anticompetitive NAR rules in California; and

    c. Included provisions in franchise agreements, policy manuals, and other corporate agreements with franchisees, affiliates, and realtors of the Brokerage Defendants that required the implementation of and adherence to the Buyer Broker Commission Rule and other anticompetitive NAR rules in California.

137.    Defendants' conspiracy has required sellers in California like Plaintiff to pay buyer-brokers, and to pay an inflated buyer-broker commission and an inflated total commission, and has restrained price competition among buyers' brokers. This harm to competition substantially outweighs any competitive benefits from the conspiracy.

138.    Defendants' conspiracy has caused buyers' brokers' commissions and total commissions in California to be inflated. Plaintiff and other members of the Class paid the inflated commissions during (and before) the last four years in connection with the sale of residential real estate listed on an MLS in California. Absent Defendants' conspiracy, Plaintiff and other class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer (and buyer-broker commissions would not be at supra-competitive levels).

139.    As a direct and proximate consequence of Defendants' ongoing (as to CAR and NAR) violations of Section 1 of the Sherman Act, Plaintiff and the Class have been injured in their business and property and suffered damages in an amount to be proven at trial.

140.    Defendants' cartel is unlawful *per se*. In the alternative, Defendants' cartel is unlawful under either a quick look or rule of reason.

## SECOND CAUSE OF ACTION

### Contract, Combination, or Conspiracy to Restrain Trade

### Violation of the Cartwright Act, California Business & Professions Code § 16720

141.    Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

142.    Defendants and co-conspirators contract, combination, trust, or conspiracy was substantially carried out and effectuated within the State of California, and Defendants' conduct within California injured natural persons such as Plaintiff and the Class.

143.    For at least four or more years, and (as to Association Defendants) continuing to the present day, Defendants and co-conspirators entered into and engaged in a continuing unlawful trust for the purpose of unreasonably restraining trade in violation of Section 16720 of the California Business and Professions Code.

144. These violations of Section 16720 of the California Business and Professions Code consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the substantial terms of which were to create and carry out restrictions on the cost of buyer's-side real estate brokerage services.

145. For the purpose of forming and effectuating the unlawful trust, Defendants agreed to follow the Challenged Rules and require their agents to do so.

146. The combination and conspiracy has had, among other things, the following effects: a) sellers are forced to set artificially high buyer broker commissions to incentivize buyer's brokers to show their homes; b) sellers are forced to pay commissions to their adversaries, greatly increasing the cost of selling; c) the amount of buyer broker compensation is artificially inflated beyond a competitive level, d) the unnatural split between who selects versus who compensates buyers' brokers, with the broker chosen by the buyer but paid by the seller, e) price competition among buyer brokers has been effectively eliminated, f) competition among home buyers has been curtailed by inability to compete for the purchase of a home by lowering the buyer broker commission rate or amount, and g) steering behavior has been facilitated and incentivized.

147. As a direct and proximate result of Defendants' violations of Section 16720 of the California Business and Professions Code, natural persons, including Plaintiff and the Class, residing in the State of California have suffered these ill effects of violation and were injured in their business or property.

148. As a direct and proximate result of Defendants' violations of Section 16720 of the California Business and Professions Code, natural persons, including Plaintiff and the class, were injured in their business or property as they paid artificially and unlawfully inflated buyer's broker commissions.

### THIRD CAUSE OF ACTION

**Unlawful Conduct**

**Violation of the Unfair Competition Law, California Business & Professions Code §§ 17200 *et seq.***

149. Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

150. Plaintiff brings this claim individually, on behalf of the Class, and on behalf of the general public against Defendant.

151. Beginning more than four years before the filing of this action, Defendants engaged in an ongoing contract, combination, or conspiracy to unreasonably restrain trade and commerce in the market for buyer-side realtors in violation of the Sherman Act (15 U.S.C. § 1) and the Cartwright Act (California Business & Professions Code § 16720).

152. This contract, combination, or conspiracy constituted an ongoing agreement among Defendants and their co-conspirators to require home sellers to pay the commission of the buyer's agent, and to pay an artificially inflated amount therefor.

153. Defendants' conspiracy required sellers to pay buyer brokers an artificially inflated commission and restrained price competition among buyer brokers, with this harm to competition greatly outweighing any procompetitive justifications.

154. Plaintiff and other members of the general public have been required to pay these inflated commissions during and before the Class Period in connection with sales of residential real estate listed with Defendant Redfin. But for the conspiracy, combination, or contract in restraint of trade alleged, Plaintiff would have paid significantly lower commissions because the buyer's broker would have been paid by the buyer (or would not have been used at all).

155. Defendants' conspiracy, as it is a price fix, constitutes a per se violation of the Sherman Act and thus also a violation of the Unfair Competition Law's prohibition on "unlawful" business practices. Defendants' violation of the Sherman and Cartwright Acts constitutes the necessary predicate for Plaintiff's UCL claim, falling under its "unlawful prong."

156. As a direct result of the challenged scheme, Plaintiff lost money or property in the form of inflated realtor commissions resulting from the sale of their home according to the Challenged Rules.

157. As a result of the foregoing, Plaintiff on behalf of the general public seeks public injunctive relief to cause the Association Defendants to abandon their anticompetitive agreement and

the Challenged Rules, reasonable attorneys' fees and costs pursuant to Cal. Civ. Code § 1021.5 and/or other applicable law, and all other relief available to the general public at law or equity.

## FOURTH CAUSE OF ACTION

### Unfair Conduct

### Violation of the Unfair Competition Law, California Business & Professions Code §§ 17200 *et seq.*

158. Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

159. Plaintiff brings this claim individually and on behalf of the general public against Defendant.

160. By way of the foregoing, Defendants acted in violation of the UCL and its prohibition on "unfair" business practices. Defendants' conduct violates established public policy and is immoral, unethical, oppressive, and unscrupulous.

161. Defendants' conduct harms Plaintiff in a manner identical to other home sellers or potential home sellers in the general public, all of whom will be required to pay inflated broker commissions in the event they sell a home using one of Defendants' realtors. If continued by the Association Defendants, such conduct threatens future injury and harm to members of the general public in California who have not yet but may enter into transactions to sell a home with one of the Association Defendants' REALTORS.

162. Defendants' conspiracy represents at minimum an incipient violation of the antitrust laws.

163. In addition, as the statements by a discount realtor supra indicate, competition itself is directly harmed by Defendants' scheme, which facilitates steering behaviors that improperly exclude discounters from the marketplace. The effect of the Challenged Rules is to give an unfair competitive advantage to Association Defendants' REALTORS as they are able to exclude discounters from the marketplace, and to fix prices at a supracompetitive level.

164. Defendants' practice in creating, implementing, and enforcing an unlawful agreement to

restrain competition through the Challenged Rules and other anticompetitive NAR rules is an unfair practice.

165. The Association Defendants' conduct is ongoing, and members of the general public remain at risk of harm from these abusive practices.

166. The public injunctive relief sought by Plaintiff, if granted, will create and secure a public benefit.

167. As a direct result of the challenged scheme, Plaintiff lost money or property in the form of inflated realtor commissions resulting from the sale of their home according to the Challenged Rules.

168. As a result of the foregoing, Plaintiff on behalf of the general public seeks public injunctive relief to cause the Association Defendants to abandon their anticompetitive agreement and the Challenged Rules, reasonable attorneys' fees and costs pursuant to Cal. Civ. Code § 1021.5 and/or other applicable law, and all other relief available to the general public at law or equity.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the California general public, request relief as follows on all counts:

A. A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiff be appointed as class representative, and that Plaintiffs' counsel be appointed as class counsel;

B. A declaration that Defendants' agreement to the Challenged Rules constituted (and, as to the Association Defendants, continues to constitute) an unreasonable and unenforceable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 4;

C. A declaration that Defendants' agreement to the Challenged Rules constituted (and, as to the Association Defendants, continues to constitute) an unlawful trust in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*;

D. Compensatory and treble damages resulting from Defendants' Sherman Act, Clayton Act, and Cartwright Act violations;

1      E.      Permanent injunctive relief invalidating the Challenged Rules and any agreement thereto

2 as to the Association Defendants;

3      F.      Public injunctive relief under the UCL and all other applicable law to cause the

4 Association Defendants to abide by the requirements of the Sherman Act, Cartwright Act, and other

5 antitrust law by withdrawing from any agreement to the Challenged Rules; and

6      G.      Such other and further relief as the Court deems just and proper and to which Plaintiff

7 and members of the general public may be entitled, even if this complaint has not demanded that relief,

8 and even if the complaint does not identify the law on which these claims rest, as long as the same set

9 of facts would entitle Plaintiff and members of the general public to such relief.

10                                   ZIMMERMAN REED LLP

11

12 Dated:___02/26/2024___      By: _____

13                                     Caleb Marker
                                    Flinn T. Milligan

14                                     6420 Wilshire Blvd, Suite 1080
                                    Los Angeles, CA 90048

15                                     (877) 500-8780 Telephone
                                    (877) 500-8781 Facsimile

16                                     caleb.marker@zimmreed.com
                                    flinn.milligan@zimmreed.com

17                                     *Attorneys for Plaintiff*

18

19

20

21

22

23

24

25

26

27

28