# U.S. District Court
## Eastern District of Louisiana (New Orleans)
### CIVIL DOCKET FOR CASE #: 2:24–cv–00557–GGG–JVM

| | |
|---|---|
| Peiffer v. Latter & Blum Holding, LLC et al | Date Filed: 03/05/2024 |
| Assigned to: Judge Greg Gerard Guidry | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Janis van Meerveld | Nature of Suit: 410 Anti–Trust |
| Cause: 15:1 Antitrust Litigation | Jurisdiction: Federal Question |

**Plaintiff**

**Joseph C Peiffer**  represented by  **Benjamin D. Reichard**
Fishman Haygood, LLP (New Orleans)
201 St. Charles Ave.
Suite 4600, 46th Floor
New Orleans, LA 70170–4600
504–586–5252
Email: breichard@fishmanhaygood.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Latter & Blum Holding, LLC**

**Defendant**

**Latter & Blum Ltd.**

**Defendant**

**Latter & Blum Inc**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/05/2024 | 1 | COMPLAINT with jury demand against All Defendants (Filing fee $ 405 receipt number ALAEDC–10427638) filed by Joseph C Peiffer. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons)Attorney Benjamin D. Reichard added to party Joseph C Peiffer(pty:pla).(Reichard, Benjamin) (Entered: 03/05/2024) |
| 03/05/2024 | 2 | Initial Case Assignment to Judge Greg Gerard Guidry and Magistrate Judge Janis van Meerveld. (meb) (Entered: 03/05/2024) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH C. PEIFFER, on behalf of himself and all others similarly situated, | Case Number: 24-557 |
| Plaintiff, | |
| v. | |
| LATTER & BLUM HOLDING, LLC, LATTER & BLUM, LTD., and LATTER & BLUM, INC. | Jury Trial Demanded |
| Defendants. | |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  JURISDICTION AND VENUE.............................................................................8

III. THE PARTIES .......................................................................................................9
     A.   Plaintiff ......................................................................................................9
     B.   Defendants..................................................................................................9
     C.   Co-Conspirators .......................................................................................10

IV.  FACTUAL BASIS ...............................................................................................11
     A.   Real Estate Market Basics .......................................................................11
     B.   The Multiple Listing Services (MLSs) ....................................................13
     C.   The NAR Rules that Latter & Blum Implement Create an Anticompetitive
          Environment..............................................................................................14
     D.   Latter & Blum and Other Brokers Participate in the Conspiracy ............17
     F.   Effects of the Conspiracy .........................................................................20
     G.   Market Power............................................................................................22
     H.   Continuous Accrual ..................................................................................23

CLASS ACTION ALLEGATIONS ..............................................................................24

CAUSE OF ACTION .....................................................................................................26
     Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ...............................26

PRAYER FOR RELIEF .................................................................................................28

JURY DEMAND ............................................................................................................29

### I. INTRODUCTION

1.      Plaintiff, a home seller who listed his property on a Multiple Listing Services ("MLS") in Louisiana brings this class action against Defendants Latter & Blum Holding, LLC, Latter & Blum, Ltd., and Latter & Blum, Inc. (collectively, "Latter & Blum"), which operate under various trade names the dominant real estate brokerage in Louisiana, for agreeing, combining, and conspiring to impose, implement, and enforce, along with its co-conspirators, anticompetitive restraints that cause home sellers to pay inflated commissions on the sale of their homes, in violation of federal antitrust law.

2.      Latter & Blum and its co-conspirators collectively possess market power in local markets in Louisiana for real estate brokerage services through their operation of those services and control of the local MLSs. An MLS is a database of properties listed for sale in a particular geographic region of the state. It is a marketplace hub that drives the vast majority of home sales in Louisiana. Brokers list homes for sale on the MLS to effectively market those homes to prospective buyers. The MLSs in Louisiana are controlled by brokers and local affiliates of the National Association of Realtors ("NAR"), who condition access to such MLSs on the MLS participants' agreement to follow all mandatory rules set forth in NAR's Handbook on Multiple Listing Policy, including the rules at issue here. Moreover, all REALTORS® — a designation conferred by NAR — in the United States are subject to NAR rules. NAR issues a Code of Ethics, which applies nationwide and is binding on all REALTORS®.

3.      Louisiana has several regional REALTOR® associations, including the New Orleans Metropolitan Association of REALTORS® ("NOMAR"), the Greater Baton Rouge Association of REALTORS®, the Greater Central Louisiana Association of REALTORS®, the Bayou Board of REALTORS®, the Northshore Area Board of REALTORS®, the Southwest

Louisiana Association of REALTORS®, the Greater Fort Polk Board of REALTORS®, the Northeast REALTORS® of Louisiana, the Northwest Louisiana Association of REALTORS®, and Louisiana REALTORS®. These regional associations have operated and/or operate MLSs both individually and in combination with each other. For instance, NOMAR has operated the Gulf South Real Estate Information Network MLS ("GSREIN") since at least 1995 and since 2021 has operated the ROAM MLS together with the Greater Baton Rouge Association of REALTORS®, the Greater Central Louisiana Association of REALTORS®, and the Bayou Board of REALTORS®. These MLSs generally limit their membership to REALTORS®, and they have adopted the NAR rules at issue here.

4. Pursuant to the conspiracy, brokers representing or otherwise working with home sellers and homebuyers may use the MLSs only if those brokers agree to adhere to and help implement terms that significantly restrain competition. Specifically, when seller brokers list a property on an MLS, the NAR rules, which Latter & Blum and its co-conspirators followed and enforced, require the listing brokers (*i.e.*, the brokers who represent the sellers) to make, according to NAR's Handbook on Multiple Listing Policy, "blanket unilateral offers of compensation" to any broker who may work with a buyer in purchasing that property (the "buyer-broker"). This requirement, and related terms implementing the requirement, is set forth in Policy Statement 7.23 in NAR's Handbook on Multiple Listing Policy and is hereafter referred to as the "Mandatory Buyer Broker Compensation Rule."

5. Latter & Blum's and its co-conspirators' implementation of and adherence to the rules at issue in this case is manifestly anticompetitive:

a) The Mandatory Buyer Broker Compensation Rule compels the seller, upon listing its property on the MLS, to make an up-front offer of payment to compensate

the buyer's broker even though the buyer's broker is working on behalf of the buyer, not the seller.

b)      The Mandatory Buyer Broker Compensation Rule further requires that this up-front offer be made on the exact same compensation terms to every buyer-broker without regard to their experience, the services they are or will be providing to the buyer, or the financial arrangement they have made with the buyer.

c)      Sellers must make this blanket offer to every buyer-broker using the MLS. Because a majority of buyer-brokers use the MLS, they can compare the blanket offers that the NAR rules require every seller to post on the MLS. Thus, the Mandatory Buyer Broker Compensation Rule effectively compels sellers to offer a standardized, albeit inflated, commission rate. This permits and encourages buyer-brokers to "steer" buyers away from lower-commission properties to properties offering higher buyer-broker commissions. Economists and industry observers have commented on the prevalence of such steering, including its anticompetitive impact on consumers and exclusionary impact on brokers trying to compete with alternative, lower-cost models.

d)      The anticompetitive effects are further reinforced by NAR's rules providing that after the seller has received purchase offers, the listing broker is prohibited from attempting to unilaterally modify the buyer-broker commission that was offered on the MLS. NAR Standard of Practice 3-2 states: "Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to

purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction." As a result, a seller cannot respond to a purchase offer with a counteroffer that is conditional on reducing the buyer-broker commission. Nor can the seller, after receiving purchase offers, decide to unilaterally reduce or eliminate the buyer-broker commission offered on the MLS.

e)      Until recently, the anticompetitive effects were compounded by the fact that NAR rules restricted consumers' visibility into the buyer-broker commissions that were being offered to their own brokers. This limited buyers' ability to know whether their brokers were only showing them properties where they would be paid the highest commission amounts. This problem was compounded by NAR's ethical rule, which was in place until 2022, that permitted buyer-brokers to tell clients that their services were free.

6.      There is no pro-competitive justification for Latter & Blum and its co-conspirators' agreement to such rules and related conduct; to the contrary, the agreement's purpose and effect is to restrain competition. Stephen Brobeck, the Executive Director of the Consumer Federation of America has testified that "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive."[1] Envisioning a more rational system, the United States Department of Justice recently wrote, in objecting to a settlement of similar claims:

> Preventing sellers and listing agents from setting buyer-broker commissions would promote greater price competition and innovation in the market for brokers' services. If buyers set the compensation for their own brokers directly, some buyer brokers might choose to offer flat fees or hourly rates in lieu of percentage commissions, since the amount of time and effort required by a buyer broker has a

---

[1] Stephen Brobeck, *Residential Real Estate Brokerage Services: A Cockamamie System That Restricts Competition and Consumer Choice*, CONSUMER FEDERATION OF AMERICA, 4 (2006), available at https://consumerfed.org/wp-content/uploads/2006/07/7-25-06-Residential-Real-Estate-Brokerage_Testimony.pdf

weak correlation, if any, to the ultimate sales price of the house. And most, if not all, buyers would likely prefer a fee structure that does not reward their broker for helping them to pay more for a home.[2]

7.      Latter & Blum, along with its co-conspirators, has mandated and/or encouraged affiliates, franchisees, brokerages, and individual realtors to join and implement this anticompetitive agreement. Indeed, because Latter & Blum is among the leading brokers in Louisiana, its participation in the conspiracy and implementation and enforcement of its terms is essential to the success of the conspiracy in Louisiana. The unlawful restraints implemented and enforced by the conspirators have benefitted Latter & Blum and its co-conspirators and furthered their common goals by allowing brokers to impose supra-competitive charges on home sellers in Louisiana and restrain competition by forestalling competition from lower-priced alternatives.

8.      Latter & Blum and its co-conspirators have used their affiliate and franchise agreements, employee policies and procedures, and leadership roles in local realtor associations, to require brokers in local residential real estate markets to adhere to NAR's rules, including the Mandatory Buyer Broker Compensation Rule, and thereby have helped implement and enforce the conspiracy.

9.      The conspiracy has saddled home sellers with costs that they would not pay in a competitive market. Moreover, because buyer-brokers are disincentivized to show homes to their clients where the seller is offering a lower buyer-broker commission and/or incentivized to show homes with higher commission offers first, sellers are compelled to offer high commissions when making required blanket offers. Thus, the conspiracy: (a) requires sellers to pay for services that the buyer's broker provides to the buyer, the seller's counterparty; (b) fixes buyer-broker compensation at levels that are greater than the levels that a competitive marketplace would

---

[2] *Nosalek, et al. v. MLS PIN, et al.*, Case No. 1:20-cv-12244 (D.Mass.) Dkt. #290 at 21.

produce; and (c) encourages and facilitates steering and other actions that impede entry and market success by lower-cost real estate brokerage services.

10. This method of setting buyer-broker commissions is wholly different from the practices that would exist absent the Mandatory Buyer Broker Compensation Rule. Absent the Rule, buyers — to the extent they would elect to use brokers at all — would have the incentive to set and negotiate buyer-broker pricing. Compensation for clients among buyer-brokers would result in their offering lower commissions to their prospective clients for their services.

11. In more competitive but otherwise comparable foreign markets, homebuyers pay their brokers if they choose to use one, and they pay a rate that is lower than the rate paid to buyer-brokers in the United States. In comparable international markets without a rule like the Mandatory Buyer Broker Compensation Rule, such as the United Kingdom, Australia, and the Netherlands, buyer-brokers, when they are used, are paid directly by homebuyers, rather than by home sellers. As an article in the *Wall Street Journal* explained, real estate brokers have "shielded themselves with a skein of anticompetitive 'practices'" that "have kept the high fees they charge unchanged since 1991."[3] The total broker fees that have been imposed are "significantly higher than those paid elsewhere in the developed world," and, if they were instead paid at a competitive level, American consumers would save tens of billions of dollars annually.[4]

12. According to the Consumer Federation of America, in the United States, the average total commission rates continue to remain over 5%, which is "no lower than it was in 2001" despite significant technological advances.[5] Approximately half of this amount is the

---

[3] Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J. (Mar. 3, 2019), https://www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734?mod=Searchresults_pos1&page=1.
[4] *Id.*
[5] FTC-DOJ Joint Public Workshop, Segment 3 Tr. June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/public_events/1361534/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf;

commission for the buyer-broker. Moreover, because housing prices have increased substantially during the last quarter century (at a rate exceeding inflation), and commissions are charged on a percentage of a home's sale price, the actual dollar commissions imposed on home sellers increased significantly because housing prices were much higher. For example, between 2001 and 2022 the average price of new homes in current dollars sold rose from $213,200 to $540,000, according to U.S. Census Bureau Statistics.[6]

13.     The result of the conspiracy is that successful stabilization of buyer-broker commissions despite the diminishing role of buyer-brokers. Many homebuyers no longer locate prospective homes with the assistance of a broker, but rather independently through the internet. Despite their diminishing role, buyer-brokers continue to receive from home sellers the same artificially elevated percentage of the sales price due to the conspiracy. One author has observed:

> Although competitive pressures ordinarily force an industry's fee structure to reflect its costs, real estate broker commissions are strangely unrelated to either the quantity or quality of the service rendered or even to the value provided. Rather, this fee has been based solely on the price of the home. (It is as if tax preparers set their fee as a flat percentage of a client's gross income, irrespective of how difficult the return was to prepare or how much their efforts saved the taxpayer).[7]

14.     As a result, home sellers such as Plaintiff and the other class members have paid an inflated and fixed rate for services provided to their contractual counterparty. Plaintiff and the other class members have each incurred, on average, thousands of dollars in improper charges as a result of the conspiracy. In a competitive market, buyers would have the incentive to set and negotiate buyer-broker prices, and the total commissions paid in any transaction, including the commissions paid by sellers would be lower.

---

https://www.realtrends.com/articles/average-real-estate-commission-rate-at-highest-level-since- 2013/ ("Average real estate commission rate at highest level since 2013").

[6]     *New Residential Sales: Historical Data*, U.S. CENSUS BUREAU, https://www.census.gov/construction/nrs/historical_data/index.html (last visited March 5, 2024).

[7]  Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure*, 5 CORNELL REAL ESTATE R., 4 (2007).

15.     Put simply, the anticompetitive conduct at issue takes money from the seller's pocket and gives it to the buyer's broker, perpetuating a system of inflated compensation. Plaintiff, on behalf of himself and the class, sues for Latter & Blum's violations of the federal antitrust laws as alleged herein, and seeks treble damages, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees, and demands a trial by jury.

## II.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the classes contain more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the class is a citizen of a State different from Defendants. The Court also has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4, 16 and 28 U.S.C. §§ 1331, 1337.

20.     This Court has personal jurisdiction over the Latter & Blum Defendants. Latter & Blum has (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District, and/or (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

21.     Latter & Blum has received revenue attributable to business transacted in Louisiana and in this District from the brokerage operations of its brokerage entities, subsidiaries, affiliates, and/or transaction counterparts that transact business in Louisiana and in this District.

22.     Latter & Blum, as well as other co-conspirators operating in this District, comply with NAR policies, including its Handbook on Multiple Listing Policy and Code of Ethics. Among

8

the policies that Latter & Blum and other co-conspirators follow in this District is the Mandatory Buyer Broker Compensation Rule.

23.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. §1391 because Latter & Blum has transacted business in this District, has intentionally availed itself of the laws and markets within this District, a substantial part of the events giving rise to Plaintiff's claims arose in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

24.     The Mandatory Buyer Broker Compensation Rule and other anticompetitive NAR rules have been implemented and enforced by Latter & Blum and its co-conspirators in Louisiana. These rules govern the conduct of Louisiana's MLSs, regional NAR associations, local brokers, and local REALTORS®. Latter & Blum and its co-conspirators' conduct alleged herein has inflated buyer-broker commissions in Louisiana and has injured home sellers in Louisiana who have paid those commissions.

### III.    THE PARTIES

#### A.    <u>Plaintiff</u>

19.     Joseph C. Peiffer is a resident and domiciliary of New Orleans, Louisiana. On August 26, 2021, he sold a home located in New Orleans, Louisiana, which was listed on an MLS. Mr. Peiffer was represented by Latter & Blum as the selling broker. As part of that sales transaction, Mr. Peiffer paid the buyer's broker a substantial compensation of 3% of the sale price.

#### B.    <u>Defendants</u>

20.     Latter & Blum Holding, LLC, Latter & Blum, Ltd., and Latter & Blum, Inc. are each companies incorporated in Louisiana with a principal place of business in New Orleans, Louisiana. As used herein, the term "Latter & Blum" will refer collectively to Latter & Blum

Holding, LLC, Latter & Blum, Ltd., and Latter & Blum, Inc. Latter & Blum operates brokerage offices, affiliates, and franchises throughout the State of Louisiana under various Latter & Blum trade names. It provided brokerage services for over 16,000 real estate transactions in 2022 representing a sales volume of over $5.2 billion; it is the leading broker in Louisiana both by sales volume and transaction sides.[8] Latter & Blum has multiple affiliates and agents operating in this District.

### C. Co-Conspirators

21. Co-conspirator National Association of REALTORS® ("NAR") is headquartered in Chicago, Illinois. NAR has over 1.5 million individual members and is one of the largest lobbying groups in the country, advocating for the interests of real estate brokers. NAR oversees fifty-four state and territorial realtor associations and over 1,200 member local realtor associations. NAR's participation is described throughout, chiefly through its adoption and promulgation of the Mandatory Buyer Broker Compensation Rule.

22. Co-conspirator Keller Williams Realty, Inc. ("Keller Williams") is a company incorporated in Texas with its principal place of business in Austin, Texas. Keller Williams is one of the nation's largest real estate brokerages. It franchises local Keller Williams brokers, which have more than 1,100 offices and 191,000 sales associates around the country. Keller Williams maintains a substantial presence in Louisiana through its affiliated brokers, including at least 40 franchise offices. Keller Williams franchisees in Louisiana occupy a substantial portion of market share in Louisiana. Keller Williams required its franchisees and brokers to become NAR members and in turn to abide by the Mandatory Buyer Broker Compensation Rule.

23. Multiple local realtor associations and MLSs not named as Defendants also

---

[8] *See* https://www.realtrends.com/500-by-sides/ (last visited March 5, 2024).

participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. These include the REALTOR® associations within Louisiana and their associated MLSs, including: Bayou Board of REALTORS®, Greater Baton Rouge Association of REALTORS®, Greater Central Louisiana REALTOR® Association, Inc., Louisiana REALTORS®, New Orleans Metropolitan Association of REALTORS®, Northeast REALTORS® of Louisiana, Northshore Area Board of REALTORS®, Northwest Louisiana Association of REALTORS®, Inc., REALTOR® Association of Acadiana, Southwest Louisiana Association of REALTORS®, Inc., Greater Fort Polk Board of REALTORS®, Greater Southern MLS, and ROAM MLS. By adopting the Mandatory Buyer Broker Compensation Rule, the Louisiana REALTOR® associations and their MLSs, among others, have participated as co-conspirators in the antitrust violations alleged herein and performed acts and made statements in furtherance thereof.

24.     Latter & Blum is jointly and severally liable for the acts of its co-conspirators whether named or not named as Defendants in this Complaint.

## IV.     FACTUAL BASIS

### A.     <u>Real Estate Market Basics</u>

25.     According to NAR, about 86% of homebuyers purchase their homes through a real estate agent or broker.[9]  Louisiana, like most states, has licensing laws that regulate who may represent sellers and buyers in real estate transactions. Real estate professionals generally fall into two categories: (1) real estate brokers (either individuals or entities licensed as real estate brokers); and (2) the individual real estate licensees or agents.

26.     In Louisiana, licensed brokers represent homebuyers or sellers in real estate

---

[9] *See* https://www.nar.realtor/research-and-statistics/quick-real-estate-statistics (last visited March 5, 2024).

transactions. Thus, brokerage contracts are with brokers, and payments to agents occur through brokers. Most brokers and their individual agents occupy dual roles: they operate on behalf of sellers as listing brokers for some home sales and on behalf of buyers as buyer-brokers for other home sales.

27.     Brokers and agents are compensated for their work with commissions that are generally calculated as a percentage of a home's sale price; brokers and agents receive the commission out of the proceeds of the seller's home sale.

28.     The listing agreement between the seller and its broker dictates the broker's compensation. The listing agreement is a form contract that the listing broker presents to the seller, prescribing the terms of the listing, granting the listing broker exclusive marketing rights, and setting the total commission that a home seller will pay.

29.     If the buyer retains a broker, the buyer's broker negotiates for the buyer against the seller. Yet, the seller compensates the buyer's broker from the total commission that the seller pays to the listing broker upon the sale of the home. Until recently, NAR's Code of Ethics affirmatively permitted buyer-brokers to tell their clients that their services came at no cost.

30.     In the absence of the Mandatory Buyer Broker Compensation Rule, whereby the seller pays for the buyer's broker, buyers would be incentivized to negotiate and set the compensation of their own brokers. Sellers would typically pay a commission solely to compensate the listing broker and the listing broker's commission would be about half of the amount that sellers have paid under the Mandatory Buyer Broker Compensation Rule as a total commission to compensate both their own broker and the buyer-broker who is hired to work against their interests.

### B. The Multiple Listing Services (MLSs)

31.     MLSs are proprietary databases of properties listed for sale in a defined region that is accessible to real estate brokers and their individual REALTORS® that agree to comply with the rules of the MLS. MLSs are generally owned and operated by local realtor associations that are affiliated with NAR.

32.     There are several MLSs in Louisiana, including the ROAM MLS, the Greater Southern MLS, and others affiliated with regional REALTOR® associations in Louisiana. These MLSs have all adopted NAR's Mandatory Buyer Broker Compensation Rule and require observance of that rule for brokers to list properties on the MLS. For example, ROAM MLS Rules §5 requires:

> In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants.[10]

33.     The NAR rules, which Latter & Blum has implemented across its business, mandate that a listing broker list its client's property on an MLS. This rule effectively ensures that home listings exist within the ecosystem that Latter & Blum and its co-conspirators have conspired created. If a listing broker does not list a client's property on an MLS, this results in reduced visibility of the property to buyer-brokers and prospective buyers.

34.     Latter & Blum's agreement to implement the Mandatory Buyer Broker Compensation Rule means that when it acts as the listing broker for the seller, it makes blanket, unilateral offers of compensation to buyer-brokers when listing a home on an MLS. If a buyer represented by a broker purchases the home, the buyer-broker receives the offered compensation.

---

[10] *See* https://roammls.org/wp-content/uploads/2021/12/ROAM-Rules10.2021.pdf (last visited March 5, 2024).

### C.    The NAR Rules that Latter & Blum Implement Create an Anticompetitive Environment

35.    NAR officially adopted the Mandatory Buyer Broker Compensation Rule in the mid-1990s, incorporating it into the Handbook on Multiple Listing Policy. This rule has remained in effect since its inception.

36.    Before adopting the Mandatory Buyer Broker Compensation Rule, a similar market structure existed whereby the buyer's broker was a "sub-agent" of the seller's broker. Under this system of sub-agency, brokers representing buyers were legally obligated to act in the interest of sellers, even when primarily working with buyers. As a result, the practice of sellers compensating both their broker and the buyer's broker emerged. This system created considerable confusion for buyers as to whose interests the buyer-brokers represented. "When this sub agency system, in which brokers working with buyers were legally obligated to pass on information disadvantageous to their clients to sellers, was exposed through press coverage, it collapsed almost overnight."[11]

37.    In the wake of the collapse of sub-agency, the Mandatory Buyer Broker Compensation Rule took on added significance and became the vehicle for the anticompetitive scheme described herein, which maintained supra-competitive commissions and impeded lower-priced competition. The Mandatory Buyer Broker Compensation Rule has been retained despite criticism from economists and industry experts, who argue that the rule contributes to anticompetitive market conditions and inflated commission rates.

38.    Latter & Blum and its co-conspirators have actively participated in this

---

[11] Stephen Brobeck & Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, CONSUMER FED'N OF AM., 3 (2006), available at https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

anticompetitive scheme by agreeing to follow, promote, implement, and enforce the Mandatory Buyer Broker Compensation Rule. These actions have established an environment that perpetuates high commissions and restricts market competition.

39.     Latter & Blum and the other co-conspirators have joined to condition the ability to participate in the MLS system and enjoy the benefits that NAR and MLSs provide upon compliance with the anticompetitive restraints set forth in the Handbook on Multiple Listing Policy and other rules and policies. Regardless of their initial involvement in drafting or adopting the Mandatory Buyer Broker Compensation Rule, Latter & Blum has since joined the conspiracy and committed to upholding and enforcing the rule.

40.     The Handbook explicitly states the Mandatory Buyer Broker Compensation Rule:

> In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service, the compensation being offered by the listing broker to the other MLS participants. [12]

41.     The Handbook further states that:

> Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships. [13]

42.      In a freely competitive market, the buyer would ordinarily pay its own broker; here, however, the Mandatory Buyer Broker Compensation Rule transfers that cost to the seller. The effect of the rule is that home sellers become obligated to pay for the buyer's broker if they want to list their property on an MLS. Nor does the rule promote competition. Rather, it compels sellers to offer compensation to buyer-brokers, irrespective of the buyer-broker's level of experience or service offering. As the Executive Director of the Consumer Federation of America

---

[12] NAR Multiple Listing Service Policy Statement 7.23.
[13] Id.

has remarked:

> One implication of fairly uniform rates is that there is little or no relationship between commission level and service quality. Skilled, experienced agents and brokers charge about the same price as agents with little experience and limited knowledge of how to best serve the consumer clients. In a price-competitive market, less experienced and less skilled agents would be offering consumers lower commission rates, but we know of no compelling evidence that they are doing so.[14]

43.     Every broker using the MLS can see the blanket offer of commission that the seller must make and can compare one seller's blanket offer to the blanket offers that every other seller must make if they wish to have their broker list their property on the MLS. As a result, the Mandatory Buyer Broker Compensation Rule creates an environment in which sellers are compelled to offer a high commission that aligns with brokers' expectations for the level of compensation that the industry has long maintained and enjoyed. If the seller's property is listed on the MLS with a lower commission, buyer-brokers will be disincentivized to select and show that property to buyers and instead will be incentivized to "steer" homebuyers to the residential properties that provide a higher standard commission. As one commentator has explained:

> The effects of steering, and its efficiency in curtailing price competition because of the importance of cooperating in the residential real estate industry, have been widely discussed. Brokers are able to engage in steering because an MLS listing gives brokers information on the commission that will be paid to the broker who brings the buyer to that property.[15]

44.     The purpose and anticompetitive effects of the Mandatory Buyer Broker Compensation Rule were reinforced by the fact that until recently neither the buyer nor the seller

---

[14] Comments of Stephen Brobeck, Executive Director Consumer Federation of America Before the Department of Justice-Federal Trade Commission Public Workshop on Competition Issues, CONSUMER FEDERATION OF AMERICA, 3 (2018), available at
https://consumerfed.org/wp-content/uploads/2018/06/CFA-comments-DOJ-FTC-public-workshop-on-competition-issues.pdf .

[15] Bradford W. Muller, *Encouraging Price Competition Among New Jersey's Residential Real Estate Brokers*, 39 SETON HALL L. REV. 665, 682-683, 683 n.100 (2009); P. Barwick, P. Parag, A. Pathak & M. Wong, *Conflicts of Interest and the Realtor Commission Puzzle*, NAT'L BUREAU OF ECON. RESEARCH, 1 (2015), available at https://www.nber.org/papers/w21489.pdf ("In the conventional compensation arrangement where sellers pay for the commissions of their listing agents and potential buyers' agents, the latter have an incentive to prioritize properties that offer higher commissions. This kind of steering is thought to lead to uniformly high commissions.").

was even permitted to view the universe of buyer-broker commission or other compensation terms and thus had limited means to detect whether the buyer-broker was engaged in steering to higher commission properties.

45.     At the same time that sellers and buyers were precluded from viewing compensation terms, NAR rules mandated that brokers share that information with one another on the MLSs. Without the relevant data, consumers were ill-equipped to pressure brokers to compete on price or detect steering by buyer-brokers. As one commentator explained, "Buyers are never aware they are being steered. The buyer agent makes a selection of homes to show, and since the public sources of homes never shows the commission offered, buyers are never aware when their agents select out the homes with lower priced commission offerings."[16]

46.     The system violates antitrust laws by diminishing price competition and keeping buyer-brokers compensated at roughly the same level, despite rising home prices and without regard to the quality of the buyer-broker's quality of service, the work they perform, or the market conditions. As technology has advanced, a buyer's ability independent of an agent to search for and locate their next house on third party services such as Zillow, using their computer or smartphone, should have — in a competitive market — resulted in lower buyer-broker commissions.

### D.     Latter & Blum and Other Brokers Participate in the Conspiracy

47.     Together with NAR, Latter and Blum and its other co-conspirators have actively supported, implemented, and enforced the Mandatory Buyer Broker Compensation Rule. They have required their brokers, affiliates, franchisees, and agents to comply with NAR rules, including

---

[16] Peng Liu & Richard Weidel III, *Compensation Structure of Buyer Brokers and Residential Real Estate Transactions*, 7 CORNELL REAL ESTATE REV. 74, 79 (2009) ("The ability to 'steer' clients is aided by the practice of never publicly showing the commission rate offered. Only licensed real estate agents have access to the commission rate information, such that a consumer would never know that a broker screened listings based on commission rates.").

the Mandatory Buyer Broker Compensation Rule. Latter & Blum and its co-conspirators mandated or encouraged their brokers, affiliates, franchisees, and agents to join NAR and follow NAR's Code of Ethics and join a local realtor association and/or MLS, which requires compliance with the Mandatory Buyer Broker Compensation Rule and the other anticompetitive NAR rules.

48.     Thus, Latter & Blum and its co-conspirators, and their brokers, affiliates, franchisees, and agents, through their participation in MLSs and their officers' and employees' membership in NAR, agree to adhere to anticompetitive restraints, including those reflected in the MLS rules and NAR's Code of Ethics.

49.     Therefore, Latter & Blum and its broker co-conspirators, along with their agents and affiliates, have furthered the conspiracy by agreeing to implement, follow, and enforce NAR's rules.

## E.     Local Associations and MLSs Implement and Enforce NAR's Rules

50.     State and local realtor associations, as well as non-member brokers and individual realtors operating in areas with MLSs owned and/or operated by local realtor associations, must fully comply with the anticompetitive rules described herein, and with other rules contained in the NAR Handbook on Multiple Listing Policy and the NAR Code of Ethics.

51.     NAR affiliates that own and/or operate an MLS must comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. Section 3 of NAR's Policies in the MLS Handbook states that an agreement for the establishment of an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics" and the "intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."

52.     Individual and associational NAR members face expulsion for failing to comply

with the Code of Ethics. Article IV, Section 2 of NAR's Bylaws mandate that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

53.     Thus, local realtor associations monitor their MLSs to ensure compliance with the mandatory provisions in NAR's Handbook on Multiple Listing Policy. By following along, each local REALTOR® association and regional MLS promotes the anticompetitive restraints challenged herein and assists NAR in implementing and enforcing those restraints.

54.     NAR provides various benefits to its REALTOR® associations and the MLSs, including professional liability insurance. Eligibility for this insurance is conditioned on complying with NAR's rules:

> Coverage is extended to those associations and MLSs whose governing documents and operations adhere to the Constitution and Bylaws of NAR and the policies adopted, and amended from time to time, by the Board of Directors of NAR. Associations must certify annually that [their] association bylaws and MLS rules and policies include verbatim adoption of mandatory provisions.[17]

55.     Indeed, NAR's Handbook on Multiple Listing Policy, Policy Statement 7.17 imposes draconian consequences on associations and MLSs that deviate from NAR's rules:

> Those associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation.

Thus, it has been observed that the "forced membership for local and state Realtor associations" creates a relationship "dictated by coercion rather than choice."[18]

56.     Even among MLSs that are run by brokerages rather than real estate associations,

---

[17] NAR Insurance Program Coverage: What Officers and Directors Need to Know, available at https://cdn.nar.realtor/sites/default/files/documents/insurance-primer-for-bod-2023-02-13.pdf.
[18] Swanepoel Trends Report, 19th Ed., at 197 (2024).

the brokerages are nonetheless NAR-aligned and their MLSs operate with the same anticompetitive restraints under NAR's control because all REALTOR® members are subject to NAR's Code of Ethics and the MLSs abide by NAR's anticompetitive rules.

### F. Effects of the Conspiracy

57. The conspiracy has had anticompetitive effects in Louisiana, including:

a) Sellers are compelled to pay commissions to their adversary's representative, the buyer-brokers who represents buyers, which inflates the cost to sellers of selling their homes.

b) Sellers are also compelled to offer high buyer-broker commissions, lest buyer-brokers steer clients to homes offering more attractive buyer-broker commissions.

c) Sellers pay inflated commissions, which reduces the financial benefit that sellers reap from sales.

d) Because the seller sets the buyer-broker's compensation, the buyer's retention of a buyer-broker is severed from the setting of the broker's commission. Divorcing the retention from the compensation creates a distorted market.

58. Moreover, price competition has been restrained among brokers, resulting in windfall profits because of the increased commission levels.

59. The conspiracy does not generate any countervailing pro-competitive effects. There is no pro-competitive reason for listing brokers to set the prices that buyer-brokers charge to their customers. Moreover, the MLSs function as centralized databases for housing stock that give buyers and sellers a forum to meet. The mandatory offer of compensation does not augment the MLSs' primary function. Thus, the NAR rules and conduct at issue here are anticompetitive

and detrimental to the competitive landscape.

60.     Even assuming pro-competitive benefits of Latter & Blum's and its co-conspirators' conduct, such benefits would not justify the Mandatory Buyer Broker Compensation Rule because they are substantially outweighed by its anticompetitive effects including restraint on price competition and encouragement of steering.

61.     There is substantial economic evidence that the conspiracy has resulted in sellers paying inflated total commissions and buyer-broker commissions, in excess of what a competitive market would dictate.

62.     In comparison to other countries with competitive real estate markets, commission rates in the United States are significantly higher, including in Louisiana where the average commission is around 5.5%.[19]

63.     This commission rate prevails despite the fact that many buyers independently use the internet to search for and locate the homes that they ultimately purchase. According to NAR, "[n]early all buyers used online tools in the search process at 96 percent."[20]  In a competitive market, this would tend to drive down buyer's agent's commissions. Yet, the consistency of the fees remains. "One would have expected that an information and communication-based industry like real estate brokerage, would enjoy tremendous cost efficiencies from the development of the Internet, Databases, and other communication technologies. Yet it appears that traditional brokers generally have not passed on their cost savings to consumers in the form of lower fees."[21] As industry observers have found, "[NAR] has not adapted in critical ways, and remains hide-bound,

---

[19] *See* https://listwithclever.com/average-real-estate-commission-rates-in-every-state/#rates-by-state (collecting agent data showing an average Louisiana commission of 5.56%)
[20] NAR Profile of Home Buyers and Sellers (2022), available at
https://www.nar.realtor/sites/default/files/documents/2022-highlights-from-the-profile-of-home-buyers-and-sellers-report-11-03-2022_0.pdf
[21] Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure*, 5 CORNELL REAL ESTATE R., 4 (2007).

stuck in another, less-transparent era."[22]

64.     The Consumer Federation of America, in a nationwide survey of agents and brokers, reached the following findings:[23]

> a)     A large majority of agents interviewed (70%) say they charge a six percent commission.
>
> b)     In most areas, commission rates appear uniform or near-uniform, and commission splits (the portion received by the buyer agent) are even more uniform. As a number of agents explained, if these splits are below the typical rate for the area, buyer agents will have less incentive to show properties.
>
> c)     A large majority of all interviewed agents (73%) say they will not negotiate their commission, though some will offer a reduced rate if they themselves can find a buyer for the property.

65.     These findings reinforce the point that Latter & Blum and its co-conspirators have created an anticompetitive market.

### G.     **Market Power**

66.     The relevant market for the claims herein is the bundle of services provided to homebuyers and sellers by residential real estate brokers with access to MLSs.

67.     The relevant geographic market for the claims is the state of Louisiana. A considerable proportion of homes sold in Louisiana were listed on MLSs by brokers that have agreed to uphold the NAR regulations, including the Mandatory Buyer Broker Compensation Rule or its functional equivalent. Another set of relevant geographic markets are local and regional

---

[22] Swanepoel Trends Report, 19th Ed., at 186 (2024).

[23] Stephen Brobeck, *Hidden Real Estate Commissions: Consumer Costs and Improved Transparency*, CONSUMER FEDERATION OF AMERICA, (2019), available at https://consumerfed.org/wp-content/uploads/2019/10/Real-Estate-Commissioner-Report.pdf

markets that are no larger than the area served by an MLS. All brokers in each MLS have the ability to view all other listings made on that MLS and to offer and accept blanket cooperative compensation offers within that MLS, and they are subject to the rules imposed by that MLS, including those challenged here.

68.     Latter & Blum possesses significant market power within the relevant market, which allows it to wield considerable influence.

69.     Non-conspiring brokers seeking to compete outside of the conspiracy face insurmountable barriers. To compete with the conspiring brokers, non-conspiring brokers would need to establish an alternative listing service since the co-conspirators control the MLSs. Alternatively, non-conspiring brokers would need to attempt to compete without access to a listing service. A listing broker who represented a seller without using a listing service would lose access to the majority of potential buyers, and a buyer-broker who represented a buyer without using a listing service would lose access to the majority of sellers. Brokers cannot compete effectively without access to a listing service. Alternative listing services aiming to compete with an MLS would require listings that are as comprehensive as an MLS, but brokers within the conspiracy lack the incentive to participate in such a service. Homebuyers and sellers also would be reluctant to utilize a new alternative listing service without a proven track record. Moreover, NAR advises the MLSs to restrict third-party websites from becoming competitors.

## H.     <u>Continuous Accrual</u>

70.     For four years preceding the filing of this Complaint, Latter & Blum, reflexively and systematically charged sellers with buyer-broker commissions and total commissions at inflated rates, as part of the conspiracy. During these four years, Plaintiff and other class members paid these inflated commissions when selling residential real estate listed on MLSs in Louisiana.

Each time Plaintiff and other class members paid such commissions over the past four years constitutes an injury to them, giving rise to new cause of action stemming from that injury.

71.     Throughout the preceding four years, Latter& Blum, alongside its co-conspirators, has consistently upheld, executed, and enforced the Mandatory Buyer Broker Compensation Rule and various other anticompetitive NAR directives.

## CLASS ACTION ALLEGATIONS

72.     Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following class:

> All persons who, from March 5, 2020, through the present, used Latter & Blum as their listing broker in the sale of a home listed on an MLS in Louisiana, and who paid a commission to the buyer's broker in connection with the sale of the home.

73.     Excluded from the Class are Defendants and their officers and directors, the judicial officers presiding over this action and the members of their immediate families and judicial staff, and Plaintiff's counsel and employees of their law firms.

74.     The Class is readily ascertainable because records of the relevant home sale transactions should exist.

75.     Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiff believes that the Class has many thousands of members, the exact number and their identities being known to Latter & Blum.

76.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class.

77.     Common questions of law and fact exist as to all members of the Class and predominate over any question affecting only individual Class members. These common legal and

factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

    a)    Whether Latter & Blum engaged in the alleged conspiracy;

    b)    Whether the conduct of Latter & Blum and its co-conspirators caused injury to the Plaintiff and the other members of the Classes;

    c)    Whether the effect of the conspiracy inflated both total commissions and buyer-broker commissions;

    d)    Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

    e)    Whether Latter & Blum's conduct is unlawful; and

    f)    The appropriate class-wide measures of damages.

78.    Plaintiff's claims are typical of the claims of the members of the Class because their claims arise from the same course of conduct by Latter & Blum and the relief sought within the Class is common to each member.

79.    Plaintiff has retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent themselves and the Class. Together Plaintiff and his counsel intend to prosecute this action vigorously for the benefit of the Class. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

80.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Latter & Blum, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and

would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Class to seek redress for the violations of law alleged herein.

81.     Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a)     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Latter & Blum;

b)     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

c)     Latter & Blum has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## **CAUSE OF ACTION**

## **Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

82.     Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

83.     Beginning more than four years before the filing of this Complaint, and continuing into the present, Latter & Blum and its co-conspirators engaged in a contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of the Sherman Act,

15 U.S.C § 1.

84.     The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Latter & Blum and its co-conspirators to require home sellers to pay the commissions of buyer-brokers and at an inflated rate.

85.     In furtherance of the contract, combination, or conspiracy, Latter & Blum and its co-conspirators have committed one or more of the following overt acts:

> a)     Participated in the creation, maintenance, implementation, and enforcement of the Mandatory Buyer Broker Compensation Rule and other anticompetitive NAR rules;

> b)     Participated in the establishment, maintenance, implementation, and enforcement of rules by local NAR associations and MLSs that implemented the Mandatory Buyer Broker Compensation Rule and other anticompetitive NAR rules; and

> c)     Required affiliates, franchisees, REALTORS®, and others to implement the Mandatory Buyer Broker Compensation Rule and other anticompetitive NAR rules, which was achieved through agreements, policy manuals, and other contracts.

86.     The conspiracy has required home sellers to pay buyer-brokers, to pay an inflated commission to buyer-brokers and an inflated total commission, and it has restrained price competition among buyer-brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

87.     Plaintiff and the other members of the Class paid these inflated commissions during the last four years in connection with the sale of residential real estate. Absent the conspiracy, Plaintiff and the other class members would have paid substantially lower

commissions because buyers would have paid their own brokers and/or buyers would be incentivized to set and negotiate buyer-broker prices (and buyer-broker commissions would not be fixed at supra-competitive levels).

88. The conspiracy is a *per se* violation of 15 U.S.C. § 1.

89. In the alternative, the conspiracy violates 15 U.S.C. § 1 under a rule-of-reason analysis.

90. As a direct and proximate result of Latter & Blum's past and continuing violation of 15 U.S.C. § 1, Plaintiff and the other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

91. WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, requests relief and prays for judgment against Latter & Blum as follows:

92. An Order certifying the Class under the appropriate provisions of Rule 23 of the Federal Rule of Civil Procedure, and appointing Plaintiff Peiffer to represent the Class and his counsel to represent the Class;

93. Declarations that the actions of Latter & Blum, as set forth above, are unlawful;

94. An award to Plaintiff and the other members of the Class for damages and/or restitution in an amount to be determined at trial;

95. An award of pre- and post-judgment interest to Plaintiff and the other members of the Class;

96. An award to Plaintiff and the other members of the Class for their costs of suit, including reasonable attorneys' fees and expenses;

97.     A permanent injunction under Section 16 of the Clayton Act enjoining Latter & Blum from any conduct determined to be unlawful; and

98.     An award of such other relief as the Court may deem just and proper.

## **JURY DEMAND**

99.     Plaintiff, on behalf of himself and all others similarly situated, hereby demands a jury trial of all issues so triable.

Dated: March 5, 2024

Respectfully submitted,

BY:     B    _/s/ Benjamin D. Reichard_
        Benjamin D. Reichard (LA Bar No. 31933)
        James R. Swanson (LA Bar. No. 18455)
        Molly L. Wells (LA Bar No. 36721)
        **FISHMAN HAYGOOD L.L.P**
        201 St. Charles Avenue, 46th Floor
        New Orleans, Louisiana 70170
        Telephone: (504) 586-5252
        Facsimile: (504) 586-5250
        breichard@fishmanhaygood.com
        jswanson@fishmanhaygood.com
        mwells@fishmanhaygood.com
        _Attorneys for Plaintiff & Putative Class_

        Joseph R. Saveri (_pro hac vice forthcoming_)
        Cadio Zirpoli (_pro hac vice forthcoming_)
        JOSEPH SAVERI LAW FIRM
        601 California Street, Suite 1000
        San Francisco, CA 94108
        Telephone: (415) 500-6800
        jsaveri@saverilawfirm.com
        czirpoli@saverilawfirm.com

        Robert Leiff (_pro hac vice forthcoming_)
        P.O. Drawer A
        Rutherford, CA 94573
        rlieff@lieff.com